# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

ANNA LANGE,

     Plaintiff,

v.

HOUSTON COUNTY, GEORGIA;
HOUSTON COUNTY BOARD OF
COMMISSIONERS; Houston County
Commissioners TOMMY STALNAKER,
H. JAY WALKER III, GAIL ROBINSON,
LARRY THOMSON, and TOM
McMICHAEL, in their official and
individual capacities; Houston County
Director of Administration BARRY
HOLLAND, in his official and individual
capacity; Houston County Director of
Personnel KENNETH CARTER, in his
official and individual capacity; and
Houston County Sheriff CULLEN
TALTON, in his official and individual
capacity,

     Defendants.

Civil Action

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiff Anna Lange, by and through her attorneys, files this Complaint against

Defendants Houston County, Georgia; the Houston County Board of Commissioners; Houston

County Commissioners Tommy Stalnaker, H. Jay Walker III, Gail Robinson, Larry Thomson,

and Tom McMichael, in their official and individual capacities; Houston County Director of

Administration Barry Holland, in his official and individual capacity; Houston County Director

of Personnel Kenneth Carter, in his official and individual capacity; and Houston County Sheriff

Cullen Talton, in his official and individual capacity (collectively, the "Defendants"); and respectfully states as follows:

## INTRODUCTION

1. This case is about the denial of equal benefits for equal work.

2. Sergeant Anna Lange ("Plaintiff" or "Sgt. Lange"), a twenty-three-year veteran of law enforcement, is a Deputy Sheriff in the Houston County Sheriff's Office ("Sheriff's Office"), where she has worked since 2006.

3. Sgt. Lange is also a transgender woman who requires doctor-recommended gender-transition treatment for a medical condition: gender dysphoria.

4. Under the Houston County employee health plan (the "Health Plan"), employees generally receive coverage for their medically necessary care. In contrast, Sgt. Lange is being denied medically necessary care under the Health Plan because Houston County ("Houston County" or the "County") has expressly and deliberately excluded the care she needs. The Health Plan specifically provides that the medical treatments that Sgt. Lange's physicians have prescribed for her—which it calls "[d]rugs for sex change surgery," and "[s]ervices and supplies for a sex change"—are not covered (the "Exclusion").[1]

5. The County hasn't adopted the Exclusion because the excluded care isn't medically necessary or widely recognized as effective, but simply because the County seeks to discriminate against employees like Sgt. Lange. Houston County's creation of the Exclusion deliberately discriminates for three reasons, each of which is unlawful: first, to injure Sgt. Lange

---

[1] The term "sex change surgery" is not used in the medical community, which instead refers to these procedures as gender reassignment surgery or gender confirmation surgery. These terms reflect the contemporary medical and psychological understanding that gender-transition medical treatments make visible, but do not "change," an individual's sex, by bringing primary and secondary sex characteristics into alignment with the person's sense of gender.

and others like her, for engaging in conduct—seeking a gender transition—that changes physical sex characteristics from male to female and transgresses gender stereotypes; second, to deprive Sgt. Lange and all other Houston County employees of coverage for the only treatment known to be effective for a stigmatized medical condition, gender dysphoria, because Defendants disfavor "sex change[s];" and third, to target Sgt. Lange and other transgender employees for inferior treatment compared to their co-workers.

6. As a result of the Exclusion, Sgt. Lange has been forced to forgo some medically necessary gender-transition care because she cannot afford to pay for it out of pocket; and has incurred out-of-pocket costs to obtain other medically necessary care without the financial protections afforded by the Health Plan.

7. She also suffers distress, humiliation, and a loss of dignity because of this targeted discrimination and Defendants' categorical denigration of her and her medical needs.

8. Sgt. Lange has repeatedly asked Defendants to remove the Exclusion from the Health Plan, including in correspondence, through testimony at a public meeting of the Houston County Board of Commissioners in February 2019, and at an in-person meeting with Sheriff Talton the same month.

9. In response to her requests, Defendants have doubled down on their discrimination. After Sgt. Lange sent her initial letter requesting a removal of the Exclusion in January 2019, Houston County's Director of Personnel, Kenneth Carter, wrote to the Health Plan's claims administrator, Anthem Blue Cross and Blue Shield ("Anthem"), reaffirming that the County would retain the Exclusion, and agreeing to be responsible for any penalties incurred as a result of the County's unlawful discrimination. Subsequently, the County Attorney, Tom

Hall, directed the Board and its staff not to speak to anyone about the Exclusion. The Houston County Board of Commissioners subsequently voted to readopt the Exclusion for 2020.

10. Sgt. Lange thus brings this action seeking declaratory and injunctive relief and an award of damages caused by Defendants' discriminatory denial of health care coverage and their failure to reasonably accommodate her disability.

## JURISDICTION AND VENUE

11. This action arises under the equal protection guarantees of the Fourteenth Amendment of the United States Constitution (pursuant to 42 U.S.C. § 1983) and of Article I, § 1, ¶¶ II and XXV of the Georgia Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); Titles I and II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*

12. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a); and 42 U.S.C. § 2000e-5(f)(3).

13. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

14. Under 28 U.S.C. § 1391, venue is proper in the Middle District of Georgia because Defendants reside and are subject to personal jurisdiction in the District and a substantial part of the events or omissions giving rise to the claim occurred in Houston County, Georgia.

15. This action arises in the Macon Division because the events or omissions that give rise to the claim occurred in Houston County, Georgia.

## PARTIES

16. Plaintiff Anna Lange resides in Houston County, Georgia. She is employed as a sheriff's deputy in Houston County.

17. Defendant Houston County, Georgia is a political subdivision of the State of Georgia. Its office is located at 200 Carl Vinson Parkway, Warner Robins, Georgia. Houston County has 15 or more employees and is engaged in the business of government, which affects commerce.

18. The County is a member of the Georgia Interlocal Risk Management Agency (GIRMA) risk pool for liability insurance, which operates as a common risk management and insurance program for local government members.

19. Defendant Houston County Board of Commissioners (the "Board") is the governing authority for Houston County. Its office is located at 200 Carl Vinson Parkway, Warner Robins, Georgia. The Board has authority to set the terms of, and administer, the Health Plan.

20. Sgt. Lange is annually issued an IRS Form W-2 identifying the "Houston County Commissioners" as Sgt. Lange's employer, and an IRS Form 1095-C likewise identifying the "Houston County Commissioners" as the provider of her employer-provided health insurance, pursuant to the Affordable Care Act.

21. The Board's members are Defendants Tommy Stalnaker, H. Jay Walker III, Gail Robinson, Larry Thomson, and Tom McMichael. Commissioner Stalnaker is Chairman of the Board; in that capacity, he serves as the County's chief executive officer. The Board has delegated to Commissioner Walker the role of developing and maintaining appropriate personnel policies and fringe benefits for Houston County employees. Commissioner Thomson's work assignments include the Sheriff's Office.

22. Defendant Barry Holland is Houston County's Director of Administration. He is responsible for the day-to-day operations of the County's staff departments and advises the Board on finance and personnel, among other matters.

23. Defendant Kenneth Carter is Houston County's Director of Personnel. He administers the County's selection of the Health Plan's terms, including the Exclusion.

24. Defendant Cullen Talton is Houston County's Sheriff. He is Plaintiff's supervisor and oversees the entire Sheriff's Office, which is located at 202 Carl Vinson Parkway, Warner Robins, Georgia and 201 Perry Parkway, Perry, Georgia.

25. Defendant Talton, in his capacity as Sheriff of Houston County, is the highest policy making official within the Sheriff's Office.

26. The Sheriff's Office receives federal financial assistance, including through the Edward Byrne Memorial Justice Assistance Grant Program.

27. Defendant Talton has delegated to Houston County the authority to provide Sheriff's Office employees with fringe benefits and other essential employer functions.

28. Defendants Tommy Stalnaker, H. Jay Walker III, Gail Robinson, Larry Thomson, Tom McMichael, Kenneth Carter, and Cullen Talton are referred to herein as the "Individual Defendants." The Individual Defendants are sued in both their official and personal capacities.

**EXHAUSTION OF ADMINISTRATIVE REQUIREMENTS**

29. On May 20, 2019, Plaintiff timely filed a charge with the Equal Employment Opportunity Commission ("EEOC") against Houston County for sex and disability discrimination in violation of Title VII and the ADA, respectively.

30. The EEOC did not undertake any conciliation efforts and issued a right-to-sue letter, dated July 8, 2019, which was received on July 11, 2019.

31. A true and accurate copy of the right-to-sue letter is attached hereto as Exhibit A.

32. On February 11, 2020, Plaintiff timely filed a charge with the EEOC against the Sheriff's Office and Sheriff Talton for sex and disability discrimination in violation of Title VII and the ADA, respectively.

33. The EEOC did not undertake any conciliation efforts and issued a right-to-sue letter, dated February 26, 2020, which was received on February 28, 2020.

34. A true and accurate copy of the right-to-sue letter is attached hereto as Exhibit B.

## FACTUAL BACKGROUND

### *Houston County Deputy Sheriff Sgt. Anna Lange's Career in Law Enforcement*

35. Sgt. Lange, a Georgia native, has worked in Georgia law enforcement for twenty-three years.

36. In September 2006, the Sheriff's Office hired Sgt. Lange to serve as Patrol Deputy. As a result of her exemplary performance, she has been promoted twice, first in 2012 to the rank of Corporal and, subsequently in 2014, to her current rank of Sergeant in the Criminal Investigation Division of the Sheriff's Office.

37. Sgt. Lange also brings specialized training to the job. She has been a Field Training Officer since 2001 and helps to train new officers. In 2009, she graduated from the Georgia Bureau of Investigations' Georgia Terrorism and Intelligence Project program. She has an At-Risk Adult Crime Tactics (ACT) Specialist certification and is the County's primary investigator for elder-abuse cases. She is also currently a member of the Middle District of Georgia's Human Trafficking Network and works to aid prosecutions of those crimes.

38. In her current position, Sgt. Lange is tasked with investigating Houston County's most serious crimes, and she routinely risks her life to serve and protect the County's citizens. She has been trained to work on cases involving homicide, sexual assault, financial crimes, and theft. Sgt. Lange serves throughout the county, carries a firearm, and makes arrests. In 2014, she

led a homicide investigation that resulted in the conviction of two men—Devasko Lewis, who had hired a hitman to kill his former business partner; and the hitman, Jamarcus Clark, who mistakenly murdered the intended victim's nephew. Her six-hour interrogation of Mr. Clark yielded his confession.

39. From the time she joined the Sheriff's Office until early 2017, Sgt. Lange wore typical men's clothing at work, went by her male birth name, and responded to male pronouns. As detailed further below, by early 2017, Sgt. Lange had begun the process commonly known as "gender transition," through which she took steps to align her outward—previously male— appearance with her internal experience of being female. This required her to inform her employer that she would begin wearing typical women's clothing, using her female name, Anna, going by female pronouns, and otherwise being openly female at work. Thus, in April 2017, she informed Defendant Carter and Defendant Talton of her transition plans during an in-person meeting. With Defendant Talton's unspoken support, she told her other work colleagues at a meeting the following day.

40. While, as discussed further below, Sgt. Lange has experienced significant distress as a consequence of gender dysphoria, her transition has positively impacted her job performance and experience. She has found being able to live and work as female—openly and with the acceptance of her colleagues—to be a blessing, and she has continued to perform her work successfully.

41. The "essential functions" of the position of Deputy Sheriff were listed on the County's website as of the time this case was filed.[2] Sgt. Lange has been consistently able to

---

[2] Houston County, Personnel, Deputy Sheriff, https://www.houstoncountyga.org/jobs.cms/110/Sheriff%20Department/Deputy%20Sheriff (last accessed Oct. 1, 2019).

perform these functions, despite never receiving an accommodation from the County, as discussed further below. However, she remains the only openly transgender employee out of over three hundred in the Sheriff's Office, and, indeed, one of only a very small number of openly transgender law enforcement officers in the nation.

42.     As part of her overall employment compensation as a Deputy Sheriff, Sgt. Lange receives health care benefits offered and administered by Houston County under the Health Plan. As with other Health Plan participants, she currently contributes $10 of her compensation per pay period for health care benefits.

### *Transgender Status, Gender Dysphoria, and Transition-Related Health Care*

43.     A transgender person is someone whose sex assigned at birth, as determined by the appearance of external sex characteristics, does not match that person's innate, internal sense of being male, female, or some other category (often referred to as "gender identity"). Most of the time, people born with male external characteristics experience themselves as male, and those with female external characteristics experience themselves as female. However, for a transgender person, their external characteristics and their internal perception of sex do not match.

44.     Being transgender bears no relation to their ability to perform or contribute to society. People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.

45.      "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes …. There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).

46. Transgender people face stigma and discrimination across all areas of life, from employment, to housing, to health care and public accommodations. The 2015 U.S. Transgender Survey Georgia State Report illuminates the issues facing transgender Georgians.[3] One out of five report losing a job due to their gender identity or expression. Of those who are employed, a third reported being fired, not hired, or denied a promotion for being transgender; and large percentages reported other forms of mistreatment, including being denied appropriate restrooms, told they had to hide their transgender status at work, or being verbally or physically harassed or sexually assaulted. This widespread discrimination leads transgender Georgians to have unemployment and poverty rates of over twice the national average.

47. Nearly one in three transgender Georgians have experienced homelessness at some point in their lives and more than one in four have been denied housing because of being transgender. Over half have avoided using public restrooms out of fear. One in three report negative experiences with health care providers, including being refused treatment; and one in four did not see a doctor when they needed to due to fear of being mistreated. Onerous bureaucratic requirements prevent most transgender Georgians from obtaining ID documents that correctly reflect their name and gender. This creates a public health and safety hazard:  one in three transgender Georgians who have shown such an ID to another have experienced verbal harassment, denial of service, or assault as a result.

48. Nationwide and in Georgia, transgender people lack political power and have been unable to translate public support into laws to protect themselves from discrimination. On average, public support for explicit protections in statewide employment nondiscrimination laws

---

[3] National Center for Transgender Equality, 2015 *U.S. Transgender Survey: Georgia State Report* (2017), http://www.transequality.org/sites/default/files/docs/usts/GA-State-Report-FINAL.pdf.

must reach 81% before such laws can be passed, reflecting a "democratic deficit" when it comes to transgender people.[4]

49. Transgender people commonly experience gender dysphoria. Gender dysphoria is a rare but serious medical condition that is defined in the American Psychiatric Association's authoritative treatise, the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), as a condition characterized by a marked incongruence between one's gender assigned at birth and one's internal sense or experience of gender, which results in clinically significant distress.[5] Gender dysphoria derives from an atypical interaction of the endocrine and neurological systems, which results in a person being born with external sex characteristics and hormones that are inconsistent with the person's gender perception.

50. Individuals suffering from untreated gender dysphoria often experience severe psychological harm and suffering, including anxiety, depression, thoughts of suicide, and other mental health issues.

51. Individuals suffering from gender dysphoria are inherently transgender. Nevertheless, unlike the outdated diagnosis of "gender identity disorder," the hallmark or presenting feature of gender dysphoria is not a person's gender identity per se, but rather the clinically diagnosable distress they experience as a consequence of the incongruence of their assigned and experienced genders.

---

[4] Andrew R. Flores et al., *Transgender inclusion in state non-discrimination policies: The democratic deficit and political powerlessness*, RESEARCH AND POLITICS 1, 1 (2015), https://journals.sagepub.com/doi/pdf/10.1177/2053168015612246.

[5] AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013).

52.     In addition to the negative health conditions directly attributable to gender dysphoria, people with gender dysphoria (as with transgender people generally) are frequently subjected to discrimination in multiple areas of their lives, including health care, housing, employment, school, and interactions with police and other government officials, which exacerbates these negative health outcomes.

53.     Like many other medical conditions, gender dysphoria is highly treatable. It is a well-established medical consensus that transition-related medical care, which includes hormonal and surgical treatment to align external sex characteristics with a person's internal sense of sex, is successful in alleviating gender dysphoria.[6]

54.     The World Professional Association for Transgender Health ("WPATH"), an interdisciplinary professional and educational organization devoted to transgender health, has established internationally accepted Standards of Care ("SOC") for the treatment of people with gender dysphoria. Major medical and mental health organizations, including the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association, have endorsed the SOC as the authoritative standards of care.

---

[6] *See*, *e.g.*, WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE 8 (7th ed. 2012) https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards of Care V7 - 2011 WPATH (2)(1).pdf ("[H]ormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people."); DSM-5 at 51 ("[M]any are distressed if the desired physical interventions by means of hormones and/or surgery are not available.") (emphasis added); see also *O'Donnabhain v. C.I.R.*, 134 T.C. 34, 69 (U.S. Tax Ct. 2010) (holding that the costs of transition-related care are tax deductible, and stating that "[t]he evidence is clear that a substantial segment of the psychiatric profession has been persuaded of the advisability and efficacy of hormone therapy and sex reassignment surgery as treatment for [gender dysphoria], as have many courts").

55. The treatment for gender dysphoria, as recommended by WPATH, is to assist the person in undergoing a gender transition that will alleviate the distress caused by gender dysphoria and allow the person to live in alignment with their affirmed sex. The transition process has three main components—social, pharmacological, and surgical:

a. Social transition involves bringing a person's gender expression and social sex role into alignment with their affirmed sex. It may include wearing clothes, using a new name and pronouns, and interacting with peers and one's social environment in a manner that matches the person's affirmed sex.

b. A physician may also prescribe medications that change the hormone balance in the body to be consistent with the person's affirmed sex. For example, a transgender woman would be prescribed medications that reduce testosterone and replace those hormones with estrogen, which will feminize that person's sex characteristics.

c. Lastly, a transgender person may pursue surgical treatment to alleviate dysphoria caused by having incongruent primary and secondary sex characteristics.

56. The precise medical treatments required to alleviate a particular individual's gender dysphoria may vary based on the person's individualized medical needs.

### *Sgt. Lange's Gender Dysphoria and Gender Transition*

57. Sgt. Lange is a transgender woman. Although she was assigned the sex of male at birth based on external physical sex characteristics, Sgt. Lange is female.

58. As a child, Sgt. Lange experienced significant distress, but she did not understand its source. As a teenager, she would sometimes buy traditionally female articles of clothing to try on in private—only to throw them away later in shame.

59. As a younger adult, Sgt. Lange considered the possibility of "coming out" as a woman. She sought talk therapy, and briefly attempted seeking hormone replacement therapy in

2004. She ultimately decided not to transition at that time because of concern that her marriage and family relationships could suffer, her young child could face discrimination, or she would be forced out of a career that she loved.

60. Sgt. Lange's gender dysphoria, left untreated, caused her to experience stress, anxiety, depression, and distress, making it difficult to think, concentrate, and interact with others, including her spouse, child, and coworkers.

61. In 2017, she was diagnosed by her health care provider with gender dysphoria and began sustained treatment. As a part of her treatment for gender dysphoria, Sgt. Lange underwent gender transition. Specifically, Sgt. Lange now lives fully and consistently with her female identity: she "came out" as transgender to her family, friends, and her employers; she exclusively uses a female name and female pronouns; and she wears typical women's clothing.

62. Sgt. Lange has been consistently taking hormone replacement therapy, which includes estrogen and a testosterone blocker, under the care of an endocrinologist since March 2017. The therapy has feminized her appearance over time and has reduced the gender dysphoria caused by her male secondary sex characteristics.

63. Hormone therapy helps to alleviate gender dysphoria in transgender women by changing the predominant sex hormone in the body from testosterone to estrogen. This results in mental health benefits as well as physical changes, including the development and maintenance of female sex characteristics. Common effects include body fat redistribution, decreased muscle mass and strength, softening and decreased oiliness of skin, decreased libido and sperm production, male sexual dysfunction, variable breast growth, and thinning and slowed growth of body and facial hair.

64. In December 2017, Sgt. Lange legally changed her name, and the name and sex designation on her Georgia driver's license. She also took steps to legally change the sex on her birth certificate but was ultimately prevented from doing so because Georgia law requires that she first certify that she has had gender reassignment surgery.

65. Sgt. Lange's legal name change also allowed her to begin using the name Anna at work. Previously, she had used her former name, as Defendant Talton, acting on the advice of County Attorney Tom Hall, had denied her earlier request to be called Anna at work.

66. In April 2018, Sgt. Lange had feminizing chest surgery (also known as "top surgery"). Due to the Exclusion, Sgt. Lange paid $6,866 out of pocket for it.

67. Since her top surgery, Sgt. Lange continues to experience distress regarding her remaining male external sex characteristics. Although the medical treatment she has received thus far has been therapeutic, Sgt. Lange requires additional treatment to fully resolve her gender dysphoria. She continues to experience stress, anxiety, depression, and distress, which she handles as best as she can, but has continued to limit her ability to function socially and professionally. Her reproductive,[7] neurological and endocrine functions remain impaired.[8] She remains a qualified individual with a disability, she has a record of a disability, and she is regarded as having a disability.

68. Sgt. Lange also fears for her safety, given the incongruence between her increasingly feminized appearance and those characteristics.

---

[7] *See* SOC at 36-38 (discussing decreased sperm production in people taking feminizing hormones).

[8] *See also generally* 29 C.F.R. § 1630.2(j)(4)(ii) ("[T]he *non-*ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.") (emphasis added).

69. To alleviate her gender dysphoria, Sgt. Lange has decided, upon the recommendation of her endocrinologist, two psychologists, and a surgeon, that genital surgery (also known as "bottom surgery") is the next step in her treatment.

*Defendants' Discriminatory Health Plan*

70. Defendants operate the Health Plan for the benefit of participating employees.

71. As an employee, Sgt. Lange is qualified to and does participate in the Health Plan.

72. Defendants have entered into an arrangement under which Sherriff Talton has delegated to Houston County the obligation to provide the Sheriff's Office employees with fringe benefits and other essential employer functions.

73. Consistent with this delegation of employer functions, Defendant Carter oversees the compensation and health benefits of the Sheriff's Office employees, just as he does for other employees of Houston County. The County includes the Sheriff's Office employees within its payroll system and within the Health Plan. The County adds and removes from the Health Plan each employee that the Sheriff's Office directs it to.

74. Defendants Houston County and the Board have exclusive control over setting the terms of, administering, and financing the Health Plan. Defendant Carter administers the Health Plan and recommends changes to the Health Plan to the Board.

75. Defendants Houston County and the Board have contracted with Anthem as the third-party administrator of the Health Plan. The Health Plan is funded by the county and administered by Anthem, which provides administrative services for the Health Plan, including the preparation of template benefits plans, customized plan design consultation, and claims processing. Defendants Houston County and the Board have final say over the terms of the plan, including which services are covered and which are excluded. The Health Plan recites that the

Board, as the sponsor of the plan, is "[t]he legal entity that has adopted the [Health] Plan and has authority regarding its operation, amendment and termination."

76. Notwithstanding the fact that both the County and the Board control the terms and conditions of the Health Plan provided to employees of the Sheriff's Office, including Sgt. Lange, both the County and the Board have, in this litigation, denied being Sgt. Lange's employer and argued that they are not liable for the discriminatory Exclusion on that basis. However, both are an "employer" under the applicable statutes because they are joint employers with, and agents of, the Sheriff's Office.

77. Defendant Talton has no control over setting the terms of, administering, or financing the Health Plan. The Sheriff's Office offers no health plans to its employees directly and relies exclusively on Defendants Houston County and the Board to provide health care coverage.

78. Defendant Talton has the authority to rescind his delegation of control over the terms of Sheriff's Office employees' health benefits and instead offer a health plan that does not contain the Exclusion, but he has not done this. Defendant Talton also has the authority to offer a supplemental health plan that covers treatments for general dysphoria, but he has not done this.

79. The Health Plan covers medically necessary services including "office visits and doctor services," "diagnostic laboratory" services, "prescription drugs," "surgical supplies," "inpatient hospital care," and "inpatient professional services" including "surgery" and "general anesthesia."

80. However, the Health Plan excludes coverage of these same services for treating gender dysphoria.

81. Specifically, the Health Plan excludes the following services: "Sex Change – Services and supplies for a sex change and/or the reversal of a sex change," and "Sex Change Drugs – Drugs for sex change surgery." But for these exclusions, gender transition-related care would be covered under the Health Plan on the same terms as other medically necessary care.

82. The Health Plan covers medically necessary hormone replacement therapy, medically necessary genital surgery, and medically necessary breast surgery as treatment for various other health conditions, but it expressly excludes coverage of such treatments when prescribed "for a sex change."

83. Excluding "sex change" treatments is, by definition, an exclusion of gender-transition treatments. Only services undertaken for the exclusive purpose of changing external sex characteristics from male to female and vice versa are excluded. Thus, the Exclusion targets employees like Sgt. Lange because they are transgender.

84. The Exclusion deliberately excludes treatments for gender dysphoria. The only recognized effective treatment for gender dysphoria is gender transition. No other diagnosis other than gender dysphoria uses gender-transition as a treatment. That is, no one without gender dysphoria undergoes gender transition. Thus, the Exclusion targets employees like Sgt. Lange because they need gender dysphoria treatments.

85. The Health Plan contains a generic exclusion for "Non-Medically Necessary Services," that is, services that are not undertaken to treat a diagnosed condition. Thus "sex change" services that were undertaken for non-therapeutic reasons by persons not diagnosed with gender dysphoria would never be covered under the Health Plan.

86. Similarly, absent the Exclusion, only medically necessary treatments for gender dysphoria could be covered.

87. Most people with gender dysphoria undergo gender transition treatment. Excluding treatments because they change sex characteristics therefore also disproportionately affects people who need access to treatments for gender transition for the purpose of treating gender dysphoria.

88. As administrator of the Health Plan, Anthem uses corporate medical policies to make medical necessity determinations when evaluating claims. Since at least 2006, Anthem has generally recognized the medical necessity of sex reassignment surgeries in its medical policy on Gender Reassignment Surgery,[9] which outlines the clinical criteria for when it considers such care to be medically necessary. Accordingly, gender transition care meets the Health Plan's definition of medical necessity.

89. Sgt. Lange has met all of the clinical criteria outlined in Anthem's policy to qualify for surgical treatment for gender dysphoria, including, inter alia, the capacity to make fully informed decisions and consent to treatment; a diagnosis of gender dysphoria; undergoing hormone therapy for over a year; documentation of having lived openly as female for over a year; not having any other significant medical or mental health issues present; and two referrals from qualified mental health professionals.

90. The specific procedures that have been prescribed for Sgt. Lange and for which she seeks coverage would be covered as medically necessary under the Health Plan but for Defendants' specific decision to deny coverage pursuant to the Exclusion.

---

[9] Anthem, *Clinical UM Guideline, Gender Reassignment Surgery* (Dec. 18, 2019), https://www.anthem.com/dam/medpolicies/abcbs/active/guidelines/gl_pw_a051166.html (last accessed Mar. 23, 2020).

91. Defendants knowingly and intentionally chose to adopt and maintain the Exclusion. Sgt. Lange has repeatedly and unsuccessfully requested that Defendants remove or waive it.

92. In preparation for bottom surgery, Sgt. Lange called Anthem to inquire as to whether this surgery was covered under the Health Plan. Anthem's agent informed Sgt. Lange that she did not see an exclusion and that the surgery would be covered. Skeptical, Sgt. Lange asked her surgeon's office to inquire as well, and they, too, were told that the surgery would be covered under the Health Plan.

93. Based upon these assurances, Sgt. Lange flew out of state for a surgical consultation in November 2018. After the consultation, the surgery was scheduled, and Sgt. Lange's surgeon applied to Anthem for preauthorization.

94. Notwithstanding its prior assurances, in a letter dated November 26, 2018, Anthem denied preauthorization, citing the Exclusion. Sgt. Lange submitted an appeal to Anthem on December 11, 2018, which Anthem denied on January 29, 2019, again citing the Exclusion. Sgt. Lange submitted a voluntary second-level appeal on March 28, 2019. Anthem did not issue a response.

95. The Health Plan provides that the Board "may change the benefits described in this Benefit Booklet and the Member will be informed of such changes as required by law. This Benefit Booklet shall be subject to amendment, modification, and termination in accordance with any of its provisions by the Employer, or by mutual agreement between the Claims Administrator and the Employer without the consent or concurrence of any Member."

96.     The Exclusion must be renewed annually as part of Houston County's renewal of its Administrative Services Agreement with Anthem and its update of the Health Plan's terms. Anthem's plan selection documents include a box to check that indicates whether the Exclusion should be renewed. The most recent version of Anthem's checkbox form recites that the Exclusion is unlawful but will be preserved if the box is checked.

97.     Signing the Administrative Services Agreement and checking the box renewing the Exclusion are among the responsibilities of Defendant Carter.

98.     On December 12, 2018, Defendant Carter checked the Exclusion box and signed the checkbox form, thus renewing the Exclusion for the 2019 plan year.

99.     Upon information and belief, Defendant Carter again communicated to Anthem the County's intention to renew the Exclusion for the 2020 plan year, sometime subsequent to November 18, 2019.

100.    As Defendants are responsible for the Exclusion, Sgt. Lange has sought to have them rescind it.

101.    In a January 16, 2019, letter from her attorney to the Board, Sgt. Lange explained that she is transgender, requires care excluded by the Exclusion, and asked to engage in a dialogue about modifying or eliminating the Exclusion.

102.    In response, Defendants reaffirmed their commitment to discriminate against Sgt. Lange because she is a transgender woman seeking transition-related health care as treatment for her gender dysphoria. On February 13, 2019, Defendant Carter sent a letter to Anthem,

reaffirming Houston County's decision to adopt the Exclusion and agreeing to be responsible for any legal consequences of that decision.[10]

103.    At a February 19, 2019 public meeting of the Board, Sgt. Lange spoke on the record about her transition, her gender dysphoria, and her need for care excluded by the Exclusion, and asked for a modification. The Board responded that it would not change the Exclusion. County Attorney Tom Hall directed the Board and its staff not to explain their reason for the denial and not to speak about it with anyone.[11]

104.    Shortly before that, approximately the week of February 11, 2019, Sgt. Lange met with Sheriff Talton to discuss the Exclusion, her request for coverage for her surgery, and her plan to speak at the Board meeting. Although Sheriff Talton asked about the Exclusion, the

---

[10] Upon information and belief, this letter was solicited by Anthem as a condition of agreeing to retain the Exclusion.

[11] The following colloquy occurred at the meeting between the Board and Sgt. Lange's counsel Noah Lewis:

> Chairman Stalnaker:  "I'm gonna call on County Attorney Tom Hall to tell the County's position on this particular issue. Mr. Hall."

> Mr. Hall:  "Thank you Mr. Chairman. The information that you sent on the 19th of January, we did receive, and had an answer to that prepared, and then your client asked for an audience here at the meeting. So, we determined that we weren't going to send you an answer—that we would, at this meeting, as you present yours, we would also tell you our answer.

> What you requested, as you know, is not covered by the County health insurance. The Board is not considering any changes to the plan at this time. I'll let everyone know that I have advised the Commission and the staff not to discuss this matter due to the potential for litigation. So, if you do ask them about it, they're not going to answer you about it. So, that is, in a nutshell, that's our answer. And we appreciate your time."

> Mr. Lewis:  "Can you offer a reason for the…"

> Chairman Stalnaker:  "No, thanks. Your time's up. Thank you very much."

process of denial, and the cost of the surgery, he did not engage in an interactive process or offer to provide her with a reasonable accommodation.

105. Counsel for Sgt. Lange also sent Defendant Talton an ante litem notice detailing her claims by overnight mail on February 12, 2020, but received no reply.

106. On April 19, 2019, Defendant Carter signed the annual renewal and amendment of the Administrative Services Agreement for the 2019 plan year on the Board's behalf.

107. In a September 20, 2019, email from her attorneys to Mr. Hall, Sgt. Lange renewed her request for a rescission of the Exclusion, clarifying that she was also seeking it not be applied to her, as a disability accommodation. The Board did not make any response other than a request by Mr. Hall for further time to respond.

108. Upon information and belief, Chairman Stalnaker and Commissioner Walker have the authority to direct Defendant Carter to rescind the Exclusion and have not done so.

109. Prior to the commencement of this litigation, the Board had never publicly voted or debated on the Exclusion, nor offered any reason for it.

110. There is no medical or cost basis for it. It also has no relation to any employee's job function.

111. Defendants have elected to maintain the Exclusion, notwithstanding that a valued employee requested it be eliminated and in the teeth of an express warning of illegality from Anthem, which requires Defendants to assume responsibility for any penalties incurred.

112. Following the commencement of this litigation, on November 19, 2019, the Board met and considered Defendant Carter's recommendations concerning plan changes for the 2020 plan year. At that meeting, Defendant Carter recommended that the Board maintain the Exclusion.

113. The Board approved Defendant Carter's recommendation. The Board did not discuss or approve any accommodation for Sgt. Lange.

114. The only proffered reason for maintaining the Exclusion at that meeting was cost. That has also been the only reason Defendants have provided for maintaining the Exclusion in this litigation.

115. Saving money is not a legitimate basis for discrimination on the grounds of sex, disability, or transgender status.

116. Even if it were, there is no actuarially sound reason to single out and price gender transition coverage separately from all other procedures. The Health Plan covers other medical conditions that are more widespread and costlier to treat. Gender transition care is not uniquely costly as compared to other forms of health care.

117. The cost of removing an exclusion of medically necessary treatments for gender dysphoria from a health care plan is insignificant. *See*, *e.g.*, *Flack v. Wisconsin Dep't of Health Servs.*, No. 18-CV-309-WMC, 2019 WL 3858297, at \*5 (W.D. Wis. Aug. 16, 2019) ("[D]efendants estimate that removing the Challenged Exclusion and covering gender-confirming surgeries would cost between $300,000 and $1.2 million annually. There is no dispute that these amounts are actuarially immaterial as they are equal to approximately 0.008% to 0.03% of the State's $3.9 billion share of Wisconsin Medicaid's $9.7 billion annual budget."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1000 (W.D. Wis. 2018) ("From an actuarial perspective, there appears to be no dispute that the cost of coverage is immaterial at 0.1% to 0.2% of the total cost of providing health insurance to state employees, even adopting defendants' cost estimation.").

118. The cost of the care covered by the Exclusion is in line with other medical treatments. This care also has a low utilization rate, given that transgender people comprise a very small percentage of the population.

119. The cost of care covered by the Exclusion is also offset by the treatment expenses and morbidities associated with inadequately treated gender dysphoria, including anxiety, depression, substance abuse, HIV incidence, depression, and suicide attempts.

120. Upon information and belief, the County engaged in no actuarial or other analysis of its likely costs absent the Exclusion.

121. Rescinding the Exclusion would not impair or threaten the Health Plan's solvency.

122. Actuarial data supports a conclusion that rescinding the Exclusion would not even require the Health Plan to raise employee or employer contribution rates in order to pay for the care.

123. Defendants maintain stop-loss insurance that allows them to pay for any claims that are unusually high.

124. Given the Exclusion, Sgt. Lange is unable to equally access the fringe benefits offered under the Health Plan without a reasonable accommodation for her disability. Sgt. Lange's proposed, reasonable accommodation is coverage of her medically necessary care.

125. A one-time exception from the Exclusion for Sgt. Lange would be an expense on par with comparable forms of health care, and would not unduly burden the Health Plan, nor affect its solvency.

126. Lacking any justified or justifiable reason, the only conceivable purpose of the Exclusion is its effect: to single out transgender people undergoing a gender transition for

inferior compensation as compared to their colleagues, and to unlawfully seek to avoid paying for a stigmatized form of health care.

127. Most transgender people do seek at least some transition-related health care, commonly including a lifelong course of hormone replacement therapy. And only transgender people seek transition-related medical care. Thus, the Exclusion affects only transgender people and, by definition, it affects only those people who seek a gender transition. It also, by definition, excludes the only medically accepted medical and pharmaceutical treatments for gender dysphoria.

128. The Exclusion's singling out of people who seek gender dysphoria treatment not only harms their health and their finances, it deepens the stigma attached to being transgender, suffering from gender dysphoria, and seeking a gender transition. It communicates to them and to the public that their local government deems them unworthy of being treated equally and of obtaining the same coverage for medically necessary health care that all other employees receive in exchange for their work.

129. The discrimination against Sgt. Lange remains ongoing as long as the Exclusion remains in the Health Plan.

130. Because the Exclusion prohibits all treatments for gender transition, Sgt. Lange has been forced to incur out-of-pocket costs for medically necessary health care.

131. She has also been forced to forgo medically necessary care because she cannot afford it, leaving her gender dysphoria inadequately treated.

132. The discrimination she has suffered as a result of the Exclusion has caused her financial hardship, distress, anguish, stress, and humiliation.

## FIRST CAUSE OF ACTION

***Violation of 42 U.S.C. § 1983 Caused by Violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution on the Basis of Sex and Transgender Status, Against Houston County, the Board, and the Individual Defendants in Their Individual and Official Capacities***

133. The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

134. 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, … subjects, or causes to be subjected, any … person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."

135. Defendants' adoption of the Exclusion has denied and continues to deny Sgt. Lange equal protection of the laws, by discriminating against her on the basis of sex and transgender status.

## SECOND CAUSE OF ACTION

***Violation of the Georgia Equal Protection Guarantee on the Basis of Sex and Transgender Status, Against the Individual Defendants in Their Individual Capacities***

136. Georgia's Equal Protection Clause states as follows:  "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." Ga. Const. Art. I, § 1, ¶ II.

137. Ga. Const. Art. I, § 1, ¶ XXV provides further that, "The social status of a citizen shall never be the subject of legislation."

138. Defendants' adoption of the Exclusion has denied and continues to deny Sgt. Lange equal protection of the laws by discriminating against her on the basis of sex and transgender status.

## THIRD CAUSE OF ACTION

*Unlawful Discrimination on the Basis of Sex in Violation of Title VII of the Civil Rights Act of 1964, Against Houston County, the Board, and the Individual Defendants in Their Official Capacities*

139. Title VII of the Civil Rights Act of 1964 provides that an employer or agent thereof may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

140. The County, the Board, and the Individual Defendants in their official capacities are Sgt. Lange's employers under Title VII of the Civil Rights Act.

141. Defendants' adoption of the Exclusion violates Title VII by intentionally providing lesser terms of compensation to employees, including Sgt. Lange, who are seeking a gender transition.

## FOURTH CAUSE OF ACTION

*Unlawful Discrimination on the Basis of Disability in Violation of Title I of the Americans with Disabilities Act Against Houston County, the Board, and the Individual Defendants in Their Official Capacities*

142. Title I of the Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to … employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

143. Title I of the ADA prohibits disparate treatment of a qualified individual with a disability, including:  (i) "limiting, segregating, or classifying a job applicant or employee in a

- 28 -

way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee"; (ii) "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs)"; and (iii) "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(1)-(2), (4); *see also* 29 C.F.R. §§ 1630.4 – 1630.8.

144. Title I of the ADA prohibits conduct that has a disparate impact on a qualified individual with a disability, including:  (i) "utilizing standards, criteria, or methods of administration … that have the effect of discrimination on the basis of disability"; and (ii) "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(3), (6); *see also* 29 C.F.R. §§ 1630.7, 1630.10.

145. Title I of the ADA also prohibits "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or … denying employment opportunities to a job applicant or employee who is an otherwise qualified

individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5); *see also* 29 C.F.R. § 1630.9.

146. 29 C.F.R. § 1630.2(o)(1)(iii) also requires "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."

147. The County, the Board, and the Individual Defendants in their official capacities are Sgt. Lange's employers under Title I of the ADA.

148. Employees enrolled in the Health Plan who do not have gender dysphoria are able to access medically necessary services under the plan without limitation due to disability.

149. Employees enrolled in the Health Plan who do not have gender dysphoria can get coverage under the Health Plan for hormone therapy, mastectomies, breast implants, and other surgical modifications of their bodies for the purpose of treating an illness or disease.

150. Sgt. Lange is not able to access medically necessary services under the Health Plan because of her gender dysphoria, meaning Sgt. Lange has been unable to enjoy equal benefits and privileges of employment.

151. Defendants' adoption of the Exclusion violates Title I of the ADA by discriminating against Sgt. Lange on the basis of her gender dysphoria.

152. Defendants' adoption of the Exclusion also violates Title I of the ADA because it has the effect of discriminating against employees, including Sgt. Lange, on the basis of gender dysphoria.

153. Sgt. Lange informed Defendants of her need for a reasonable accommodation necessary for her to enjoy equal benefits and privileges of employment, namely a waiver or revocation of the exclusion for "sex change" services.

154. Defendants did not engage in a dialogue about what would constitute a reasonable accommodation or grant her proposed accommodation in the form of making a one-time exception to the general rule that the plan excludes "sex change" services.

155. Making a one-time exception would not financially or otherwise unduly burden the operation of the Health Plan. Additionally, the Sheriff could also reasonably accommodate Sgt. Lange by replacing the Health Plan with a different health plan that did not include the Exclusion.

156. Defendants' refusal to grant Sgt. Lange the requested reasonable accommodation of rescinding or waiving the Exclusion or refusing to replace the Health Plan with one that does not include the Exclusion violates Title I of the ADA by discriminating against Sgt. Lange on the basis of her gender dysphoria.

## FIFTH CAUSE OF ACTION

*Unlawful Discrimination on the Basis of Disability in Violation of Title II of the Americans with Disabilities Act Against Houston County, the Board, and the Individual Defendants in Their Official Capacities*

157. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132, including "[a]fford[ing] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii) or "utiliz[ing] criteria or methods of administration

- 31 -

. . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability," *id.* § 35.130(b)(3)(i).

158. Title II of the ADA also requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

159. Employees enrolled in the Health Plan who do not have gender dysphoria are able to access medically necessary services under the plan without limitation due to disability.

160. Employees enrolled in the Health Plan who do not have gender dysphoria can get coverage under the Health Plan for hormone therapy, mastectomies, breast implants, and other surgical modifications of their bodies for the purpose of treating an illness or disease.

161. Sgt. Lange is not able to access medically necessary services under the Health Plan because of her gender dysphoria, meaning Sgt. Lange has been unable to enjoy equal benefits and privileges of employment.

162. Defendants' adoption of the Exclusion violates Title II of the ADA by discriminating against Sgt. Lange on the basis of her gender dysphoria.

163. Defendants' adoption of the Exclusion also violates Title II of the ADA because it has the effect of discriminating against employees, including Sgt. Lange, on the basis of gender dysphoria.

164. Defendants' failure to modify the Health Plan to waive or rescind the Exclusion or to replace the Health Plan with one that does not include the Exclusion also violates Title II of

the ADA because the Exclusion relegates Sgt. Lange to using a benefit or service that is not equal to that afforded to Health Plan enrollees without gender dysphoria.

165. Eliminating the Exclusion would not fundamentally alter the nature of the Health Plan as the Health Plan is designed to provide coverage for medically necessary services and treatments for gender dysphoria are medically necessary.

## SIXTH CAUSE OF ACTION

### *Unlawful Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act Against Defendant Talton in His Official Capacity*

166. Section 504 of the Rehabilitation Act ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a); *see also* 28 C.F.R. § 42.503(a), including "discrimination in employment under any program or activity receiving Federal financial assistance." 28 C.F.R. 42.510(a).

167. Section 504 prohibits discrimination accomplished either directly or indirectly through contractual or other arrangements. 28 C.F.R. § 42.510(a); *see also* 29 U.S.C. § 794(d) (stating that standards under Title I of the ADA shall apply to employment discrimination by federally funded programs or activities). Section 504 further forbids conduct that has a disparate impact on a qualified individual with a disability, including "utiliz[ing] criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap" or "perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State." 28 C.F.R. § 42.503(b)(3).

168. Section 504 requires the provision of "reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee

unless the recipient can demonstrate . . . that the accommodation would impose an undue hardship on the operation of its program or activity." 28 C.F.R. § 42.511(a).

169. At all relevant times, Defendant Talton, in his capacity as the Sheriff of Houston County, received federal financial assistance for the operation of the Sheriff's Office and is thus subject to the Rehabilitation Act. 29 U.S.C. § 794(b)(1); *see also* 28 C.F.R. § 42.540(h). In particular, the Sheriff's Office receives federal funding through the Edward Byrne Memorial Justice Assistance Grant Program.

170. Employees enrolled in the Health Plan who do not have gender dysphoria are able to access medically necessary services under the plan without limitation due to disability.

171. Employees enrolled in the Health Plan who do not have gender dysphoria can get coverage under the Health Plan for hormone therapy, mastectomies, breast implants, and other surgical modifications of their bodies for the purpose of treating an illness or disease.

172. Sgt. Lange is not able to access medically necessary services under the Health Plan because of her gender dysphoria, meaning Sgt. Lange has been unable to enjoy equal benefits and privileges of employment.

173. Defendant Talton's decision, in his capacity as Sheriff of Houston County, to provide employees health care coverage containing the discriminatory Exclusion violates Section 504 of the Rehabilitation Act because it constitutes discrimination against employees, including Sgt. Lange, solely on the basis of a disability, preventing them from fully and equally enjoying all of the benefits of the Health Plan.

174. Defendant Talton's decision to provide employee health care coverage containing the discriminatory Exclusion also violates Section 504 of the Rehabilitation Act because it has

the effect of discriminating against employees, including Sgt. Lange, on the basis of gender dysphoria.

175. Defendant Talton further violated Section 504 of the Rehabilitation Act by failing to reasonably accommodate Sgt. Lange by providing her health care coverage that does not contain the Exclusion—a reasonable accommodation that would not impose an undue hardship on Defendant Talton, the Sheriff's Office, or its operations.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Sgt. Anna Lange respectfully requests that this Court:

A. Declare that the Defendants' adoption of the Exclusion violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Georgia Constitution's equal protection guarantee, Title VII of the Civil Rights Act, Title I of the ADA, Title II of the ADA, and Section 504 of the Rehabilitation Act;

B. Enjoin Defendants from any further enforcement or application of the Exclusion, and from enforcing or applying the Health Plan or any future health plan in any discriminatory or unlawful manner against transgender individuals, individuals with gender dysphoria, or individuals seeking transition-related health care;

C. Award Plaintiff compensatory, consequential, and punitive damages in an amount to be determined at trial;

D. Award pre-judgment and post-judgment interest at the highest lawful rate;

E. Award Plaintiff her reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

F. Award Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully submitted this 10th day of April, 2020.

*/s/ Kenneth E. Barton*
Kenneth E. Barton III
Ga. State Bar No. 142447
M. Devlin Cooper
Ga. State Bar No. 301171
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com

David Brown*
Noah E. Lewis*
Alejandra Caraballo*
TRANSGENDER LEGAL DEFENSE EDUCATION FUND, INC.
520 8th Ave.
Suite 2204
New York, NY 10018
(646) 862-9396 tel.
(646) 993-1686 fax
dbrown@transgenderlegal.org
nlewis@transgenderlegal.org
acaraballo@transgenderlegal.org

Wesley Powell*
Mary Eaton*
Sarah M. Wastler*
Jill K. Grant*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com
meaton@willkie.com
swastler@willkie.com
jgrant@willkie.com

Kevin M. Barry*
QUINNIPIAC UNIVERSITY SCHOOL OF LAW LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, CT 06518
(203) 582-3238 tel.
(203) 582-3237 fax
legalclinic@quinnipiac.edu

*Attorneys for Plaintiff*

* Admitted *pro hac vice*.