**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ANNA LANGE,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:19-cv-392 (MTT)** |
| | ) | |
| **HOUSTON COUNTY, Georgia,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Plaintiff Anna Lange brought this action challenging a provision in an employee healthcare plan that excludes coverage for "sex change surgery."  The Defendants moved to dismiss all claims, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  For the following reasons, Defendant Sheriff Talton's motion to dismiss on sovereign immunity grounds (Doc. 61) is **DENIED**, and the Defendants' motion to dismiss for failure to state a claim (Doc. 62) is **GRANTED in part** and **DENIED in part**.

### I. BACKGROUND

Plaintiff Anna Lange is a Deputy Sheriff at the Houston County Sheriff's Office, where she has worked since 2006.  Doc. 56 ¶ 2.  In 2017, Lange was diagnosed by her healthcare provider with gender dysphoria, which, she alleges, is "defined in the American Psychiatric Association's authoritative treatise, the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), as a condition characterized by a marked incongruence between one's gender assigned at birth and one's internal sense

or experience of gender, which results in clinically significant distress." *Id.* ¶¶ 61, 49. As treatment for her gender dysphoria, Lange has begun using a female name and female pronouns, started wearing typical women's clothing, started receiving hormone therapy, and started identifying as female to her family, friends, employers, and coworkers. *Id.* at 61-65. In April 2018, Lange received feminizing chest surgery, and she now seeks feminizing genital surgery. *Id.* at 66-69. She alleges she seeks feminizing genital surgery on the advice of her endocrinologist, two psychologists, and a surgeon. *Id.* ¶ 69.

Lange receives healthcare benefits[1] as an employment benefit of her job at the Houston County Sheriff's Office. She alleges that the Sheriff's Office and Houston County "have entered into an arrangement under which Sheriff Talton has delegated to Houston County the obligation to provide the Sheriff's Office employees with fringe benefits and other essential employer functions." *Id.* ¶ 72. In other words, Sheriff's Office employees are allowed to participate in the County's health plan. The County's health plan is funded by the County and employee contributions. The Plan is administered by Anthem Blue Cross and Blue Shield. One does not stray from the record to infer that Anthem has expertise and experience in the drafting and administration of health plans and that the County sought Anthem's assistance, to some degree, because of that expertise and experience.

The Plan generally covers medically necessary treatment and services. *Id.* ¶ 79. Lange alleges that Anthem, since at least 2006, "has generally recognized the medical

---

[1] The health plan is self-insured with stop loss coverage. Doc. 56 ¶¶ 74-75, 123. Lange also alleges the County provides other employment-related services to Sheriff's Office employees. *Id.* ¶ 72. It is not yet known whether the Sheriff's Office has placed its employees in the County's civil service system. Doc. 88 at 16:8-11.

necessity of sex reassignment surgeries in its medical policy on Gender Reassignment Surgery." *Id.* ¶ 88.  However, Houston County's Plan excludes coverage for "Sex Change—Services and supplies for a sex change and/or the reversal of a sex change" and "Sex Change Drugs—Drugs for sex change surgery."  *Id.* ¶ 81.  Lange alleges that Exclusion was adopted by the County, against Anthem's advice, for the purpose of discriminating against transgender employees.  *Id.* ¶¶ 4-5.

It is not yet known when the County first adopted the Exclusion.  Lange alleges that Anthem initially informed her and her surgeon that her surgery would be covered by the Plan.  *Id.* ¶ 92.  But shortly after that, on November 26, 2018, Anthem, now citing the Exclusion, denied preauthorization for the surgery.  *Id.* ¶ 94.  Apparently, the Exclusion was in fact in effect in 2018 because Lange alleges the County "renew[ed]" the Exclusion for the 2019 plan year on December 12, 2018.  *Id.* ¶ 98.  On January 16, 2019, Lange's attorney wrote the Board in an effort "to engage in a dialogue about modifying or eliminating the exclusion."  *Id.* ¶ 101.  Lange alleges the Defendants, rather than engaging in dialogue, "reaffirmed their commitment to discriminate against Sgt. Lange because she is a transgender woman seeking transition-related health care as treatment for her gender dysphoria."  *Id.* ¶ 102.  That conclusory allegation apparently is based in part on a letter the County sent to Anthem on February 13, 2019 "reaffirming Houston County's decision to adopt the Exclusion and agreeing to be responsible for any legal consequences of that decision."  *Id.*  Lange alleges that Anthem required that indemnification for the consequences of the "unlawful" exclusion as a condition of retaining the Exclusion.  *Id.* at n.10.

On February 19, 2019, Sgt. Lange appeared at a public meeting of the Board to request relief from the Exclusion. *Id.* ¶ 103. According to Lange, the County's attorney "directed the Board and its staff not to explain their reason for the denial and not to speak about it with anyone." *Id.* On April 19, 2019, the County renewed the Plan and retained the Exclusion. After Lange filed this action, she alleges the Board again decided to retain the Exclusion for the 2020 plan year. Lange alleges that the "most recent version" of Anthem's plan renewal documentation "recites that the Exclusion is unlawful but will be preserved if the [renewal] box is checked [by the County]." *Id.* ¶ 96.

In her initial Complaint, Lange, for some reason, did not sue her actual employer, Sheriff Talton in his official capacity. (Distinguishing between the Sheriff in his individual capacity and the Sheriff in his official capacity is particularly important here. Accordingly, this Order, when addressing the Sheriff in his official capacity, refers to the Sheriff's Office.) Rather, she sued the County; the County Board of Commissioners; the individual members of the Board of Commissioners; Barry Holland, Houston County's Director of Administration; and Kenneth Carter, the County's Director of Personnel. Doc. 56 ¶¶ 1-2.[2] The Defendants moved to dismiss, arguing the County is not Lange's employer. Taking the hint, Lange amended her complaint to add claims against the Sheriff's Office and the Sheriff in his individual capacity. Docs. 29; 56. In her amended complaint, she generally alleges the adoption and maintenance of the Exclusion violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Title I and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act of

---

[2] The original complaint included a claim against Robbie Dunbar, which was withdrawn by the amended complaint. Doc. 1 at 1. The original complaint also identified Holland as a member of the Board of Commissioners, rather than a Director of Administration. *Id.* ¶ 19.

1973, 29 U.S.C. § 701 *et seq.*; the Equal Protection Clause of the U.S. Constitution; and the Equal Protection guarantee of the Georgia Constitution.

## II. MOTION TO DISMISS STANDARD

### A. Standard under Rule 12(b)(1)

"[T]he Eleventh Amendment's ultimate guarantee is that nonconsenting states may not be sued by private individuals in federal court. Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power established in Article III, federal courts lack jurisdiction to entertain claims that are barred by the Eleventh Amendment." *McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001) (quotation marks and citations omitted). In unpublished guidance, the Eleventh Circuit has stated that "a dismissal on sovereign immunity grounds should be pursuant to Rule 12(b)(1) because no subject-matter jurisdiction exists." *Thomas v. U.S. Postal Serv.*, 364 F. App'x 600, 601 n.3 (11th Cir. 2010). When "the existence of subject matter jurisdiction is inextricably intertwined with material facts affecting the merits of the claim, a district court must be guided by the standard for summary judgment motions[.]" *Bennett v. United States*, 102 F.3d 486, 488 n.1 (11th Cir. 1996). Here, the jurisdictional issue is not inextricably intertwined with facts affecting the merits of the claim, so the Court analyses the motion under Rule 12(b)(1). The Court addresses the sovereign-immunity defenses first.

"A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Stalley v. Orlando Reg'l Heathcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (citation omitted). "A facial attack on the complaint requires the court merely to look and see if the plaintiff has

sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his

complaint are taken as true for the purposes of the motion." *Id.* at 1232-33 (quotation

marks and citation omitted).  A factual attack, however, "challenges the existence of

subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits

or testimony." *Id.* at 1233 (citation omitted).  The parties have not introduced any

material extrinsic to the pleadings, and the Court will look only to the complaint to

determine whether there is jurisdiction.

**B. Standard under Rule 12(b)(6)**

The Federal Rules of Civil Procedure require that a pleading contain a "short and

plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

P. 8(a)(2).  To avoid dismissal pursuant to Rule12(b)(6), a complaint must contain

sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544,

570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*  "Factual

allegations that are merely consistent with a defendant's liability fall short of being

facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)

(quotation marks and citations omitted).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and

the reasonable inferences therefrom are construed in the light most favorable to the

plaintiff." *FindWhat Inv'r Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011)

(quotation marks and citations omitted).  But "conclusory allegations, unwarranted

deductions of facts or legal conclusions masquerading as facts will not prevent

dismissal." *Wiersum v. U.S. Bank, N.A.,* 785 F.3d 483, 485 (11th Cir. 2015) (quotation marks and citation omitted).  The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (quotation marks and citation omitted).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018) (citations omitted).

### III. DISCUSSION

**A. Sovereign immunity**

The Sheriff's Office argues that it is entitled to sovereign immunity from Lange's claims for damages under the Federal Equal Protection Clause, the ADA, and the Rehabilitation Act.  Doc. 61-1.  In response, Lange argues (1) that the Sheriff's Office is not an "arm of the state" for purposes of sovereign immunity, (2) that Congress abrogated sovereign immunity from Lange's ADA Title II claim, and (3) that the Sheriff's Office waived sovereign immunity with respect to Lange's Rehabilitation Act claim.  Doc. 74 at 48-53.  Because the Sheriff's Office has failed to show it was acting as an arm of the state, the Court does not consider Lange's abrogation and waiver arguments.

The Eleventh Amendment protects a state or an arm of the state from being sued in federal court without the state's consent.  *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).  "To receive Eleventh Amendment immunity, a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State,' which includes agents and instrumentalities of the State.  Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is

asserted to arise. . . . In Eleventh Amendment cases, [the Eleventh Circuit] uses four factors to determine whether an entity is an 'arm of the State' in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Id.* at 1308–09.  The entity invoking Eleventh Amendment immunity "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to share in its immunity." *Haven v. Bd. of Trustees of Three Rivers Reg'l Libr. Sys.*, 625 F. App'x 929, 933 (11th Cir. 2015) (citations omitted); *see Miller v. Advantage Behav. Health Sys.*, 677 F. App'x 556, 559 (11th Cir. 2017) (citations omitted).[3]

That much is easily said.  But as some district judges have noted and as the five dissenting judges in *Manders* argued, the application of the *Manders* factors can be challenging.[4]  Before turning to those factors, two preliminary points merit mention. First, as the majority in *Manders* repeatedly stressed, the *Manders* factors must be considered "in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Manders*, 338 F.3d at 1308.

---

[3] The Eleventh Circuit never quite says in its published "arm of the state" cases that the party raising the affirmative defense of sovereign immunity bears the burden of proving its defense. Although the decisions cited here are unpublished, the Court agrees with their reasoning.  Further, other circuits addressing the issue have unanimously concluded the burden is on the party invoking immunity. *Grajales v. Puerto Rico Ports Auth.*, 831 F.3d 11, 15 (1st Cir. 2016); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006); *Christy v. Pa. Tpk. Comm'n,* 54 F.3d 1140, 1144 (3d Cir.1995); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 542 (4th Cir. 2014); *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000); *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002); *Baxter by Baxter v. Vigo Cty. Sch. Corp.*, 26 F.3d 728, 735 n.5 (7th Cir. 1994); *United States ex rel. Fields v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 872 F.3d 872, 876 (8th Cir. 2017); *ITSI T.V. Prods., Inc. v. Agric. Associations*, 3 F.3d 1289, 1292 (9th Cir. 1993).

[4] *See Johnson v. Ogeechee Behav. Health Servs.*, 479 F. Supp. 2d 1357, 1365 (S.D. Ga. 2007); *Mia Luna, Inc. v. Hill*, 2008 WL 4002964, at *3-6 (N.D. Ga. Aug. 22, 2008); *Massengale v. Hill*, 2005 WL 8155185, at *4-5 (N.D. Ga. July 25, 2005).

Thus, the question here is not whether the Sheriff's Office acted as an arm of the state "in some categorical all or nothing manner," but whether it acted for the state "in the particular function[] at issue today." *Id.* at 1309, n. 9 (quotation marks and citations omitted). That would seem to require a very narrow inquiry. But critics of *Manders* argue that the practical application of the *Manders* factors has resulted, as the dissenting judges warned, in "a blatant end-run around our function-by-function approach." *Id.* at 1334 (Barkett, J., dissenting).

Second, and of fundamental importance here, the Sheriff's Office bears the burden of proving that its affirmative defense of sovereign immunity requires dismissal of Lange's claims for damages against him in his official capacity. As Judge Anderson put it in his *Manders* dissenting opinion (albeit not in the context of the standard of review), "the proper question is whether the sheriff has carried his burden of proving that he is an arm of the state." *Id.* at 1331 (Anderson, J., dissenting). In the discharge of that burden, the Sheriff's Office has chosen to make a facial attack; it introduces no extrinsic evidence shedding light on the application of the *Manders* factors.

That said, the Court turns to the narrow question posed by the Sheriff's Office—whether, based on the allegations of the amended complaint, it has established that it acts as an arm of the state when it provides healthcare benefits to its employees. Although the Eleventh Circuit's significant "arm of the state" cases have involved Sheriff's Offices, none of those decisions has addressed anything remotely related to that narrow function. Nonetheless, the Sheriff's Office argues that those decisions provide the answer here. It argues that Eleventh Circuit precedent necessarily

establishes that *any* personnel decision by the Sheriff's Office is taken as an arm of the state.  Docs. 61-1 at 4-8; 80 at 1-2.

The first *Manders* factor, how state law defines the entity, supports a finding of sovereign immunity.  As the Eleventh Circuit has noted, "sheriffs in Georgia derive their power and duties from the State, are controlled [as to certain functions] by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs."  *Pellitteri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015) (quoting *Manders*, 338 F.3d at 1313).  As the Court in *Manders* stressed, under Georgia law, the Sheriff's Office and the County are independent, separate entities.  *Id.* at 1319.  The first factor supports a finding that the Sheriff's Office was acting as an arm of the state. [5]

As for control, the second factor, the Sheriff's Office has failed to demonstrate that the State exercises any control over the provision of healthcare benefits.  Instead, it argues that the State exercises control over peace officer training and certification.  Doc. 61-1 at 5-7.  Though it is true that the State's authority to train and discipline supports a finding that the Sheriff's Office is an arm of the state *for purposes of hiring and firing deputies*, provision of healthcare benefits to employees is a different function.  So although "[a sheriff's] power to hire and fire his deputies is subject to a significant amount of oversight by the State," nothing in the briefs or record indicates that the Sheriff's Office's provision of benefits to employees is subject to similar oversight.  *Pellitteri*, 776 F.3d at 781.  Rather, looking to the allegations in the complaint, it appears the Sheriff's Office, not the State, maintains full control over the healthcare benefits it

---

[5] Of course, the same could be said, and has been said, for many other entities created by Georgia law, such as counties and municipalities.  *See Manders*, 338 F.3d at 1335 (Barkett, J., dissenting) ("all local government is by definition a creature of the state's authority to attach powers and duties to particular offices.").

provides its employees.  Exercising that control, it delegated the provision of health benefits to the County.  But nowhere in the complaint, or even in the Sheriff's Office's brief, is there any indication that the State had any control over the Plan or over employee benefits more generally.  Accordingly, looking only to the facts alleged, that factor supports a finding that the Sheriff's Office was not acting as an arm of the state when it performed the function of providing healthcare benefits to its employees.

As to the third factor, source of funding, "each county in Georgia bears the major burden of providing funds to the sheriff's office, including the salaries of the sheriff and his deputies."  *Pellitteri*, 776 F.3d at 782.  However, the Eleventh Circuit has held that this factor does not weigh against immunity because (1) state law requires counties to fund sheriff's offices and (2) counties cannot dictate how the funds are spent.  *Id.*[6] Similarly, the County here cannot dictate how the Sheriff's Office spends its funds.  Accordingly, this factor does not weigh for or against immunity.

Fourth, the Court considers monetary liability for a potential judgment against the Sheriff's Office.  In Georgia, as a general matter, "neither the State nor the County will be required to directly pay for any adverse judgment against the Sheriff's office."  *Id.* at 783 (citation omitted).  Typically, therefore, this factor weighs against immunity.  *Id.* Here, however, it arguably weighs against immunity even more strongly: not only will the State treasury be unaffected, but also the County may be responsible for an adverse judgment.  After all, it is the County's Plan, and Lange alleges the County made

---

[6] With respect to funding, the Court in *Pellitteri* stated that "we cannot conclude that this factor weighs in favor of Eleventh Amendment immunity."  However, that quotation was seemingly a typographic mistake, and the Court intended to write, "we cannot conclude that this factor weighs against Eleventh Amendment immunity."  *See Nelson v. Jackson*, 2015 WL 13545487, at *10 n.10 (N.D. Ga. Mar. 31, 2015), *report and recommendation adopted,* 2015 WL 13546505 (N.D. Ga. Apr. 21, 2015) ("Although the court in *Pellitteri* wrote, '[W]e cannot conclude that this factor weighs in favor of Eleventh Amendment immunity,' it seems clear that this was a misstatement.").

the decision to exclude coverage for her needed surgery.  *See Hess v. Port Auth.*

*Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994) ("rendering control dispositive does not

home in on the impetus for the Eleventh Amendment: the prevention of federal-court

judgments that must be paid out of a State's treasury. . . . Accordingly, Courts of

Appeals have recognized the vulnerability of the State's purse as the most salient factor

in Eleventh Amendment determinations."); *see also Ga. Ports Auth. v. Lawyer*, 304 Ga.

667, 676, 821 S.E.2d 22, 29 (2018) (describing "the protection of state treasuries *and*

the preservation of the respect and dignity due the states as sovereigns" as the twin

reasons for being of the Eleventh Amendment) (citing *Hess*).

In sum, under Eleventh Circuit law, the first factor supports a conclusion that the

Sheriff's Office was acting as an arm of the state, the second and fourth support a

conclusion that it was not acting as an arm of the state, and the third does not support

either conclusion.  Looking only to the facts alleged in the complaint, the Sheriff's Office

has failed to carry its burden of showing it was acting as an arm of the state.

Accordingly, its motion to dismiss (Doc. 61) is **DENIED**.

**B. ADA Title II claims**

The Defendants also argue that Lange fails to state a claim under Title II of the

ADA.  To establish a prima facie case under Title II of the ADA, a plaintiff must show

> (1) that he is a qualified individual with a disability; (2) that he was either
> excluded from participation in or denied the benefits of a public entity's
> services, programs, or activities, or was otherwise discriminated against by
> the public entity; and (3) that the exclusion, denial of benefit, or
> discrimination was by reason of the plaintiff's disability.

*Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007) (citation omitted).

The Defendants argue that Lange's ADA Title II claims fail because (1) Lange is

not disabled within the meaning of the ADA and (2) failure to tailor a plan to a specific

disabled individual's needs is not a denial of access to a public benefit or discrimination within the meaning of the ADA. Doc. 62-1 at 11-17.

*1. Disability*

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). However, the ADA excludes "gender identity disorders not resulting from physical impairments" from its definition of disability. 42 U.S.C. § 12211(b)(1). Lange alleges she has "gender dysphoria," which is "defined in the [DSM-5] as a condition characterized by a marked incongruence between one's gender assigned at birth and one's internal sense or experience of gender, which results in clinically significant distress." Doc. 56 ¶ 49. The Defendants argue that "gender dysphoria" is a "replacement diagnosis" for "gender identity disorder." Doc. 62-1 at 12-13. They argue that a change in how the condition is labeled should not alter the legal effect of the statutory exclusion.

In response, Lange argues that "gender dysphoria" is not a mere relabeling or replacement diagnosis, but rather a "new and distinct diagnosis." Doc. 74 at 38. Lange also argues that, as alleged, her gender dysphoria "'result[s] from physical impairments.'" *Id.* at 38-39. Specifically, she alleges that "[g]ender dysphoria derives from an atypical interaction of the endocrine and neurological systems, which results in a person being born with external sex characteristics and hormones that are inconsistent with the person's gender perception." Doc. 56 ¶ 49. The Defendants' only argument in reply is that that general allegation about the causes of gender dysphoria

does not allege that *Lange's own* dysphoria was caused by an atypical interaction of the endocrine and neurological systems.  Doc. 79 at 15-16.

However, if Lange is alleging (i) that gender dysphoria results from a physical impairment and (ii) that she has gender dysphoria, then it follows that (iii) her dysphoria results from a physical impairment.  Certainly, if this issue were addressed at the summary judgment stage, those allegations might receive more scrutiny.  For example, the Defendants may argue that not all gender dysphoria results from physical impairment, that gender dysphoria has multiple causes, and so on.  But they do not make those arguments here, and it is unlikely the Court could consider them at the motion to dismiss stage.  As a matter of pleading, Lange clearly alleges that she has a condition that results from physical impairment.

Because she has alleged that, the Court cannot conclude as a matter of law that the statutory exclusion of "gender identity disorders" applies, and there is no cause to address whether "gender dysphoria" is a replacement diagnosis.

2. *Whether the Exclusion violates Title II of the ADA*

The Defendants also argue the Exclusion does not violate Title II of the ADA because Lange and other employees had equal access to the same health plan.  Lange does not dispute that she had access to the same health plan as her coworkers.  Instead, she argues that the Plan singles out transgender employees for less coverage, thereby impeding their "access" to healthcare.  But courts have consistently rejected her interpretation of Title II's requirements.  In a case under the Rehabilitation Act, the Supreme Court upheld a state's limitation in Medicaid coverage which disproportionately affected handicapped persons.  *Alexander v. Choate*, 469 U.S. 287

(1985).  The Court noted that the Act did not require that "each [Medicaid] recipient . . . receive that level of health care precisely tailored to his or her particular needs." *Id.* at 303.  Further, the Court noted that the state could choose which benefits it provided, and the Rehabilitation Act did not require the state to alter its definition of benefits "simply to meet the reality that the handicapped have greater medical needs." *Id.* Applying *Alexander*, courts of appeals have uniformly rejected plaintiffs' arguments that exclusion of disability benefits under a health plan constitutes discrimination under Title II of the ADA.[7]  *See, e.g.*, *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 608, 610 (3d Cir. 1998) ("While the defendants' insurance plan differentiated between types of disabilities, this is a far cry from a specific disabled employee facing differential treatment due to her disability. . . . The cases finding no violation of the ADA by a disparity in benefits between mental and physical disabilities are supported by the ADA's legislative history."); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1019 (6th Cir. 1997) ("As the Court concluded regarding the Rehabilitation Act, the ADA similarly does not prohibit an insurance company from differentiating between different disabilities."); *E.E.O.C. v. CNA Ins. Companies*, 96 F.3d 1039, 1044 (7th Cir. 1996) ("All employees— the perfectly healthy, the physically disabled, and the mentally disabled—had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous. This may or may not be an enlightened way to do things, but it was not discriminatory in the usual sense of the term.").

---

[7] The same reasoning may apply to Lange's claims under Title I of the ADA.  However, the Defendants have not made that argument, so the Court does not consider it.

Lange cites no authority to the contrary.  Instead, she argues that her employer should have offered her an "accommodation."  Doc. 74 at 40-41.  By "accommodation," she means rescinding the Exclusion and paying for her treatment.  *Id.*  But she cites no authority in support of the proposition that the ADA requires public employers to cover treatments for any disability.

She cites only two cases, both by district courts.  Neither is apposite.  The first found that state-funded mental health care that was inaccessible to deaf people violated the ADA.  *Belton v. Georgia*, 2012 WL 1080304, at *3 (N.D. Ga. Mar. 30, 2012).  The scope of provided treatment—specifically, mental health counselling—was the same, but the unavailability of American Sign Language interpreters or funding for such interpreters rendered that care inaccessible to deaf people.  Accordingly, that case was not about differential treatment, but denial of access.  In the only other case Lange found to support her interpretation of the ADA, a district court in California wrote that "a person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation."  *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998).  The Court, and likely the Defendants, would agree, but the case does not support Lange's argument.[8]

---

[8] In that case, the plaintiff brought a claim under a California statute analogous to the ADA, based on trains not stopping at the platform long enough for physically disabled people to embark and disembark. *Presta*, 16 F. Supp. 2d at 1136.  In the order Lange cites, the Court held that a jury instruction requiring the plaintiff to prove discriminatory intent was inappropriate.  *Id.* at 1135 ("The parties have submitted proposed jury instructions. . . . Having considered arguments submitted in letter briefs by both parties, and good cause appearing, the Court now holds that in a claim for discrimination on the basis of disability brought under [California's] Unruh Act, a plaintiff need not prove that the defendant harbored discriminatory intent.").  It is difficult to discern how this case even arguably supports Lange's position.

Because the Plan is equally available to all employees and Lange has pleaded no facts suggesting otherwise, she fails to state a claim under Title II of the ADA.  The Defendants' motion to dismiss (Doc. 62) is **GRANTED** as to the Title II claims.

## C. Rehabilitation Act claims

For similar reasons, Lange fails to state a claim under the Rehabilitation Act. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a). The parties agree that the same analysis applies to the Rehabilitation Act and Title II of the ADA.  Docs. 62-1 at 17-18, 18 n.16; 74 at 43; *see Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases.").  Again, Lange has access to the same health plan as everyone else, and the fact the health plan provides more adequate treatment for some conditions than for others does not show discrimination.  Because the Sheriff's Office does not, through the Exclusion, deny Lange access to health care or discriminate against her within the meaning of the Rehabilitation Act, she fails to state a claim.  Accordingly, the Sheriff's Office's motion to dismiss (Doc. 62) is **GRANTED** as to the Rehabilitation Act claim.[9]

---

[9] The Sheriff's Office also argues that the Rehabilitation Act, which prohibits discrimination "*solely* by reason of [the plaintiff's] disability," imposes a higher causation and pleading requirement and that Lange cannot meet that requirement.  29 U.S.C. § 794(a) (emphasis added); Doc. 62-1 at 17-18.  It argues that Lange cannot plausibly allege that the Sheriff's Office chose to offer its employees the County's Plan *solely* to discriminate.  Because the Rehabilitation Act claim fails for the reasons already noted, the Court need not reach this argument.

**D. Employer Liability**

The Sheriff's Office argues that the Title VII claims should be dismissed because it has no control over setting the terms of the Plan; the County argues that the ADA Title I and Title VII claims should be dismissed because Lange is not a County employee. Doc. 62-1 at 6-9.  The Court rejects both arguments.

*1. The Sheriff's Office's Liability*

The Sheriff's Office's lack of control argument fails for two reasons.

First, the Sheriff's Office does have control over its employees' healthcare: it chose to provide its employees with the County's allegedly discriminatory Plan, and it could remove them from the Plan or provide an alternative plan if it chose to.  At the hearing, the Defendants' counsel did not admit the Sheriff's Office retained ultimate control, but neither could he refute it:

> "THE COURT: But the sheriff, the employer, still has control ultimately over the plan; correct?
>
> [Defendants' counsel]: I hesitate because I do some ERISA law, and there are some limitations on what the employer does versus what is a function that the insurance company does."

Doc. 88 at 14:19-23.  Counsel then argued that the County "are handling things that are not, I guess, employer functions; they are just doing the paperwork essentially for the sheriff's office."  *Id.* at 15:15-17.  Under that view, of course, the Sheriff's Office does retain control over its employees' health benefits.  Counsel also admit that if an employer delegates an employment function to an agent and the agent violates Title VII, the employer remains liable.  *Id.* at 15:18-16:7.  Clearly, as alleged, the Sheriff's Office delegated the function of providing benefits to the County.  Doc. 56 ¶¶ 27, 72.  And the Defendants have not argued—let alone, established—that the Sheriff's Office does not

-18-

retain ultimate control over Lange's health benefits.[10]   Accordingly, the Court rejects the argument that the Sheriff's Office's delegation of healthcare benefits to the County insulates it from responsibility for the terms of the Plan.

    *2. The County's Liability*

    The County, by contrast, argues it is not Lange's employer for purposes of Title I of the ADA and Title VII.  Doc. 62-1 at 6-9.  It is undisputed that Lange is employed by the Sheriff's Office and that under Georgia law, the Sheriff's Office and the County are separate entities.

    However, as Lange argues, two separate entities can both be an employer under Title VII.  *See* Doc. 74 at 21.  The ADA and Title VII both define "employer" to include an employer's agents.  42 U.S.C. §§ 12111(5), 2000e(b).  That definition must be construed liberally.  *Williams v. City of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984), *cert. denied,* 470 U.S. 1053 (1985).  Lange first argues that the County is an agent of the Sheriff's Office.  "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship."  *Williams*, 742 F.2d at 589.  Here, Lange alleged that the Sheriff's Office has chosen to delegate the provision of healthcare benefits to the County.  The County provided healthcare benefits to Sheriff's Office employees on behalf of the Sheriff's Office and tailored those benefits to exclude genital surgery.  With regard to the claims at issue in this lawsuit, therefore,

---

[10] Again, it is not yet known whether the Sheriff's Office has placed its employees in the County's civil service system or has otherwise ceded control of its employees to the County.

Lange has plausibly alleged that the County was acting as an agent of the Sheriff's Office.[11]

### E. ADA Title I claims

As noted above, the Sheriff's Office has not demonstrated it is immune from the ADA Title I claim, and the County has not shown that it is not Lange's employer under the ADA.  The Defendants' motions to dismiss do not address the merits of Lange's ADA Title I claims.  Accordingly, the claims against the Sheriff's Office and against the County will proceed.  The County's motion to dismiss the ADA Title I claims (Doc. 62) is **DENIED**.

### F. Title VII claims

The Sheriff's Office and County originally argued that the Exclusion does not discriminate on the basis of sex because gender dysphoria is a sex-neutral condition.  Doc. 62-1 at 9-11.  After the Defendants filed their motions, the Supreme Court ruled in *Bostock v. Clayton Cty., Ga.*, that discrimination against a transgender person necessarily discriminates on the basis of that person's sex.  140 S.Ct. 1731, 1737 (2020).  The Defendants acknowledge that that holding forecloses their original argument.  Doc. 88 at 10:16-11:2.

In their reply brief, the Defendants argue that Lange must allege sufficient facts "to show that the Sheriff adopted the Plan containing the Exclusion with the intent to discriminate against Plaintiff *specifically*."  Doc. 79 at 23 (emphasis added).  They argue that, at most, Lange's allegations demonstrate the Exclusion's impact on "transgender

---

[11] Because the County may be liable under an agency theory, there is no reason to address Lange's alternative argument that the County is liable as a joint employer with the Sheriff's Office.

persons as a whole." Doc. 79 at 24. Unless the Exclusion was adopted to discriminate against Lange, they argue, it cannot violate Title VII.

But that argument patently lacks merit. Under the Defendants' standard, an employer could, hypothetically, adopt a policy of paying all female employees 20% less than their male counterparts. In many situations, a female plaintiff could not prove the policy was adopted with intent to discriminate specifically against her—for instance, if the company had hundreds of female employees or if the policy was adopted before the plaintiff was hired. Under the Defendants' test, that policy might well be immune from challenge under Title VII.

Thus it is no surprise the Defendants can find no authority to support that test. Their only citation is to the Supreme Court's statement in *Bostock* that Title VII analysis should focus on "'individuals, not groups.'" Doc. 79 at 23 (quoting *Bostock*, 140 S. Ct. at 1740). However, the Defendants take that quote out of context. The *Bostock* Court made that observation by way of rejecting the defendant's argument that transgender discrimination does not violate Title VII because it does not favor one sex over another sex. But that principle does not support the Defendants' argument that a showing of discriminatory animus against a protected class is insufficient to state a claim under Title VII.

Second, the Defendants' argument is factually mistaken, too. Lange has alleged sufficient facts to support a plausible inference of individual discrimination. Her amended complaint alleges the following:

- Lange is the only openly transgender employee in the Sheriff's Office. Doc. 56 ¶ 41.  (And, as far as the record reveals, the only openly transgender employee on the Plan.)

- In February 2019, Lange spoke about her transition and requested coverage of her surgery at a public board meeting.  *Id.* ¶ 103.

- The County Attorney acknowledged Lange's request but informed her the Board would not consider modifying the Exclusion.  *Id.*

- Subsequently, the Board "voted to readopt the Exclusion for 2020."  *Id.* ¶ 9.  In April 2019, the County renewed its insurance policy, including the Exclusion.  *Id.* ¶ 106.

- The Board refused to give a rationale for the Exclusion.  *Id.* ¶¶ 103, 109.

- The Board did all this despite Anthem's warning that their exclusion of coverage was "unlawful."[12]

From those allegations, "the court [can] draw the reasonable inference that the defendant is liable" for sex discrimination under Title VII, even under the Defendants' unduly restrictive test.  *Iqbal,* 556 U.S. at 678 (citation omitted).

Because the Defendants' original argument is foreclosed by *Bostock* and their new argument misstates the law and overlooks key factual allegations, their motion to dismiss (Doc. 62) is **DENIED** as to the Title VII claims.[13]

---

[12] Of course, Anthem does not determine legality.  But the point is that the Defendants, without explanation, repeatedly rebuffed Lange even though the Plan administrator advised them their Exclusion was not proper.

[13] The parties do not address whether the adoption or renewal of the Exclusion is an adverse employment action within the meaning of Title VII.  As a result, the Court does not address that issue here.  For a discussion of the analogous issue of whether exclusions of disability coverage for pregnancy violate Title VII, *see Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 676 (1983); *see also General Elec. Co. v. Gilbert*, 429 U.S. 125 (1976), *overruled by Newport News.*

**G. The Federal Equal Protection Clause**

*1. The Sheriff's Office and the County*

As noted above, the Sheriff's Office has not shown it is immune from damages for the equal protection claim.  The Sheriff's Office and the County argue that exclusion of coverage of treatment for a medical condition unique to transgender persons is not discrimination within the meaning of the Equal Protection Clause.  Docs. 62-1 at 31-32; 79 at 18-21.  That argument fails.

There are three types of equal protection claims: (i) that a statute or policy discriminates on its face against the plaintiff's group, (ii) that neutral application of a facially neutral statute or policy has a disparate impact, and (iii) that the defendants are unequally administering a facially neutral statute.  *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citation omitted).  For the latter two claims, the plaintiff must show the defendant acted with a discriminatory purpose.  *Id.* at 112 n.5, 113. Lange argues the policy is facially discriminatory, and the Defendants argue it is not discriminatory at all.  Both arguments are flawed.  The Court concludes that Lange sufficiently alleges that the Exclusion is a facially neutral classification that has a disproportionate impact on transgender persons and is motivated by discriminatory purpose.

First, though, Lange's argument that the Exclusion is facially discriminatory is suspect.  In the analogous situation of a state disability insurance program which excluded coverage for lost work due to pregnancy, the Supreme Court found the exclusion was not facially sex-based.  *Geduldig v. Aiello*, 417 U.S. 484 (1974).  As the Court noted, the exclusion did not prevent particular groups of people from accessing

the disability program.  The classification, a pregnancy exclusion, did not classify between men and women, or any other *groups* of people.  Instead, it classified by conditions, excluding coverage for pregnancy-related disabilities.  The Court noted that there was "no risk from which men are protected and women are not.  Likewise, there is no risk from which women are protected and men are not."  *Id.* at 496.  A male individual had the same coverage as a female individual.  Similarly, Lange has the same health coverage as other employees.

Lange contends that *Geduldig* has been undermined by intervening precedent. Docs. 74 at 12-13; 83 at 2-3 (citing *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1763 (2020); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989);  *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011)).  But those cases have no bearing on whether a health exclusion is facially discriminatory.  As Lange notes, *Bostock* recognized that discrimination against transgender persons, which penalizes them for not conforming to sex stereotypes, is a form of discrimination on the basis of sex for purposes of Title VII. And under Eleventh Circuit precedent, that rationale applies to equal protection claims, too.  *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011).  But the issue addressed by *Geduldig* is different: whether an insurance exclusion based on a health condition is facially discriminatory.  Neither *Bostock* nor *Glenn* had any bearing on that issue. Similarly, the Court questions Lange's argument that the Eleventh Circuit's recent decision in *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty*, 968 F.3d 1286 (11th Cir. 2020), undermines *Geduldig*.  In *Adams*, the Court held that a facially discriminatory bathroom policy triggered heightened scrutiny under the Equal Protection

Clause.[14]  But *Adams* has no bearing on whether the Plan's exclusion is facially discriminatory.  Again, *Geduldig's* analysis suggests the Exclusion, which does not facially classify among groups at all, is facially neutral.  To some, that analysis may seem a bit strained today, but it nonetheless remains intact.

But assuming Lange's argument that the Plan is facially discriminatory fails, that is not dispositive of her claim.  *Geduldig* noted that a plaintiff can still prevail by "showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other."  417 U.S. at 496 n.20; *see also Washington v. Davis*, 426 U.S. 229, 241 (1976) ("A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of [a protected class].").  Thus the Defendants' argument that *Geduldig* compels dismissal of the equal protection claim fails.

In sum, the Court rejects the Defendants' argument that *Geduldig* forecloses Lange's equal protection claim altogether.  The Defendants do not argue that Lange fails to allege plausible facts supporting an inference of discriminatory purpose, so there is no need to address that argument here.  However, the Court notes that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive

---

[14] The majority, dissent, and district court all disagreed on their analysis of how the policy classified groups.  The majority believed the policy was facially discriminatory because it singled out transgender students as a group for different treatment.  *Adams*, 968 F.3d at 1296.  The dissent argued that because the policy was sex-based, it was facially neutral as to transgender students.  *Id.* at 1315 (11th Cir. 2020) (Pryor, C.J., dissenting).  The trial judge, by contrast, had found that the policy was facially sex-based, so it triggered heightened scrutiny as to transgender students.  *Adams by & through Kasper v. Sch. Bd. of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293, 1312 (M.D. Fla. 2018), *aff'd sub nom. Adams by & through Kasper v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286 (11th Cir. 2020) ("The School Board's bathroom policy cannot be stated without referencing sex-based classifications . . . The School Board does not dispute that its bathroom policy makes distinctions based on sex.").  None of those three different characterizations describe the policy here, which does not facially classify on the basis of sex or of transgender status.

inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  Relevant evidence of intent may include any disproportionate impact of the challenged law or policy, the historical background of the decision, any departures from normal procedures, or legislative or administrative history.  *Id.* at 266-68.  Again, the parties do not reach the question of whether Lange has alleged sufficient facts to create a plausible claim for intentional discrimination.  However, if the Defendants had made that argument, the Court would find that Lange has plausibly alleged that the adoption of the Exclusion was motivated by discriminatory purpose.

The County makes one further argument: that Lange "lacks standing to assert her Section 1983 claim against the County."  Doc. 62-1 at 30.  Although they use the word "standing," the County does not argue that the 12(b)(1) standard applies or that its argument goes to jurisdiction.  Rather, the County's argument seems based on a misinterpretation of decisions addressing 42 U.S.C. § 1983 claims seeking to vindicate statutory rights.[15]  The County cites two cases.  The first decision, *Gonzaga Univ. v. Doe*, addressed "[t]he question . . . whether a student may sue a private university for damages under Rev. Stat. § 1979, 42 U.S.C. § 1983 (1994 ed., Supp. V), to enforce provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA or Act), 88 Stat. 571, 20 U.S.C. § 1232g, which prohibit the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized

---

[15] The background principle is that § 1983 creates a right of action against officials who deprive persons of "any rights, privileges, or immunities secured by the Constitution *and laws*."  42 U.S.C. § 1983 (emphasis added).  The vast majority of § 1983 suits brought in this Court allege deprivations of constitutional rights, but § 1983 also allows, in rare circumstances, for plaintiffs to sue to vindicate statutory rights.  *See generally Maine v. Thiboutot*, 448 U.S. 1 (1980). The County appears to have conflated the two.

persons." 536 U.S. 273, 276 (2002). The second, *Blessing v. Freestone*, addressed whether a plaintiff could sue under § 1983 for a state agency's violation of a provision of the Social Security Act. 520 U.S. 329. Lange's § 1983 claims are not premised on the County's alleged violation of a statutory right, but rather on its alleged violation of her right to equal protection under the Fourteenth Amendment of the Constitution.[16] The County cites no authority concerning standing to assert constitutional rights.

For those reasons, the motion to dismiss is **DENIED** as to the equal protection claims against the Sheriff's Office and the County.

### 2. The individual Defendants

The Defendants also argue that Lange fails to plausibly allege an equal protection claim and that the individual Defendants are entitled to both qualified immunity and legislative immunity.

> a. The allegations against Holland, Carter, and the Sheriff in his individual capacity

Before addressing those arguments, the Court notes that although the parties fail to address the particular allegations against Defendant Holland, it is clear that Lange fails to state a claim against him. Lange's only allegations against Holland are that he is

---

[16] *Gonzaga* limited § 1983 claims based on statutes that did not themselves provide a cause of action. To determine whether a plaintiff can sue under § 1983 to enforce a statutory right, the Court held, a court must "determine whether Congress *intended to create a federal right*" for private citizens when it enacted the statute. *Gonzaga*, 536 U.S. at 283 (citation omitted).

The County's statement that "a third party beneficiary only has standing to sue if the source of the claimed benefit is a Congressional enactment 'intended to create a federal right'" badly misreads *Gonzaga*. Doc. 62-1 at 31 (citing *Gonzaga*, 536 U.S. at 283-84). Nor does it make any sense in this context: obviously, no one is arguing that Lange's health plan was a benefit created by the United States Congress. Similarly, the distinction between (i) a contractual "third-party beneficiary" of a healthcare plan and a (ii) a beneficiary of a federal statute for which Congress provided no means of private enforcement, should be clear. Further, although the County describes the *Gonzaga* question about whether a statute creates a right enforceable through § 1983 in terms of "standing," the cases it cites do not. Doc. 62-1 at 30; *see generally Gonzaga*; *Blessing*.

the County's Director of Administration and is "responsible for the day-to-day operations of the County's staff departments and advises the Board on finance and personnel." Doc. 56 ¶ 22. These allegations are in the introductory paragraphs of Lange's amended complaint; thereafter, Lange makes no mention of Holland. Clearly, that is insufficient to state an equal protection claim.

Similarly, Lange fails to state a claim against the Sheriff in his individual capacity. The original complaint sued only the County and County Defendants. Doc. 1 at 1. When the Defendants filed a previous motion to dismiss, arguing the Sheriff's Office, not the County, was Lange's employer, Lange amended her complaint to add claims against the Sheriff's Office. Although she also joined the Sheriff in his individual capacity as a Defendant, she did not add sufficient allegations to support that claim. Doc. 56 at 1-2. Lange alleges that she "asked Defendants to remove the Exclusion . . . at an in-person meeting with Sheriff Talton[;]" that he delegated employee health insurance to the County; that he "has no control over setting the terms of, administering, or financing the Health Plan;" that he has the authority to rescind the agreement providing his employees insurance on the County Plan, but has not done so; and that he could enroll Lange in a different plan, but has not done so. Doc. 56 ¶¶ 8, 73, 77-78, 104, 155. Those allegations do not raise a plausible inference that Talton delegated health benefits for the purpose of discriminating against Lange. The Defendants' motion (Doc. 62) is therefore **GRANTED** as to the claims against Holland and the Sheriff in his individual capacity.

The parties' briefs also do not address the allegations against Defendant Carter, but those allegations are somewhat more substantial. Lange alleges he is the County's

Director of Personnel, "administers the County's selection of the Health Plan's terms, including the Exclusion," "oversees the compensation and health benefits of the Sheriff's Office employees," recommended the Board maintain the Exclusion for 2020, and has various administrative responsibilities for implementing the healthcare plan, including the Exclusion. *Id.* ¶¶ 23, 73-74, 97, 102, 106, 112.  Given the Defendants' failure to address Carter, the Court cannot say those allegations are plainly insufficient to state a claim.

        b. Legislative immunity

        The Defendants also argue that Lange's claims against the individual Defendants in their individual capacities are barred by legislative immunity.  "Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity," including actions by local legislators.  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (quotation marks omitted).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  *Id.*  "Generally, absolute immunity applies to prospective, legislative-type rules that have general application. Employment decisions generally are administrative except when they are accomplished through traditional legislative functions such as policymaking and budgetary restructuring that strike at the heart of the legislative process."  *Bryant v. Jones*, 575 F.3d 1281, 1306 (11th Cir. 2009) (quotation marks and citations omitted).  "[V]oting, debate and reacting to public opinion are manifestly in furtherance of legislative duties . . . Additionally, a legislative act is characterized by having a policymaking function and general application."  *Brown v. Crawford Cty., Ga.*, 960 F.2d 1002, 1011 (11th Cir. 1992).  The burden to establish legislative immunity is on the party asserting it.

The complaint alleges that "The Houston County Board of Commissioners . . . voted to readopt the Exclusion for 2020."  Doc. 56 ¶ 9.  As part of a healthcare plan that applies to all County employees and Sheriff's Office employees, the Exclusion is a "'prospective, legislative-type rule[]' that ha[s] general application."  *Bryant*, 575 F.3d at 1306.  Further, as the Defendants note, the home rule provisions of the Georgia Constitution provide that county governing authorities are authorized to determine compensation and "to establish and maintain . . . insurance" for their employees.  Ga. Const. Art. IX, § 2, ¶ I.  Clearly, a vote by the Commissioners on a provision of an insurance plan is a legislative act.

Lange argues that legislative immunity should be confined to acts "necessary to preserve the integrity of the legislative process," such as "voting, speechmaking . . . . [or] preparing committee reports."  Doc. 74 at 30.  However, it seems clear that, to the extent any individual Commissioners could be liable for adopting and maintaining the Exclusion, Lange seeks to hold them liable precisely because of their vote.  At trial, Lange could prevail on her claims against an individual Commissioner Defendant only by proving his vote was motivated by a purpose to discriminate.  Lange's claims would require "proof of a legislative act or the motives or purposes underlying such an act" and implicate the core concerns of legislative immunity.  *Gravel v. United States*, 408 U.S. 606, 621 (1972).

The claims against Defendants Stalnaker, Walker, Robinson, Thomson, and McMichael in their individual capacities are therefore subject to dismissal.  However, the same reasoning does not apply to Defendant Carter.  The complaint does not seek to hold Carter responsible for how he voted, so it is not clear that legislative immunity

applies to him.  Nor do the Defendants' briefs address legislative immunity in Carter's

particular circumstances.  For that reason, the motion to dismiss (Doc. 62) is **GRANTED**

as to the claims against Stalnaker, Walker, Robinson, Thomson, and McMichael in their

individual capacities.

      c. Qualified immunity

The individual Defendants also argue they are entitled to qualified immunity

because they were acting within their discretionary authority and their actions did not

violate any clearly established rights.  As noted above, the complaint fails to state a

claim against Holland and the Sheriff in his individual capacity, so the Court does not

reach qualified immunity for those Defendants.  Similarly, the Commissioners are

entitled to legislative immunity.  Accordingly, the Court addresses only whether Carter is

entitled to qualified immunity.

"Qualified immunity offers complete protection for individual public officials

performing discretionary functions 'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known.'"  *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982)).  "'Once discretionary authority is established, the

burden then shifts to the plaintiff to show that qualified immunity should not apply.'"

*Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W.

Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).  To meet this burden, a plaintiff

must establish that "the officer's conduct amounted to a constitutional violation" and "the

right violated was 'clearly established' at the time of the violation."  *City of W. Palm

Beach*, 561 F.3d at 1291.  This two-step analysis may be done in whatever order is

deemed most appropriate for the case.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Lange does not dispute that Carter was acting within his discretionary authority, so the burden shifts to her to show he violated clearly established rights.  Doc. 74 at 26. For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  A plaintiff can show a right is clearly established in three ways: first, by pointing to "relevant case law at the time of the alleged violation that would have made it obvious to the officer that his actions violated federal law." *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018).  Second, a plaintiff "can identify a broader, clearly established principle that should govern the novel facts of the situation." *Id.* Third, the plaintiff "can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary." *Id.* at 1259-1260.

Lange makes two arguments: first, she argues that Eleventh Circuit law established the general principle that "the Equal Protection Clause prohibits government discrimination on the basis of someone's gender nonconformity[.]"  Doc. 74 at 27 (citing *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011)).  That is true as a general statement, but that broad principle would not have put Carter on notice that his actions in recommending the Exclusion and administering the Plan violated the law.  "[I]n most qualified immunity cases preexisting case law that is factually similar is necessary to give officials 'fair notice' that the behavior violated a constitutional right." *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1272 (11th Cir. 2003) (quoting *Willingham*

*v. Loughnan,* 321 F.3d 1299, 1301 (11th Cir.2003)).  The Plaintiffs do not cite any cases clearly establishing that adopting an exclusion in a health plan is discriminatory, let alone that Carter's alleged conduct—making recommendations about a health plan and "administering"[17] a health plan—violates the Equal Protection Clause.  "Although intentional . . . gender-based discrimination is unlawful, none of the cases set forth by [Lange] fairly and clearly put [Carter] on notice that the decision at issue in this case was unlawful."  *Williams*, 341 F.3d at 1273 (holding that officer was entitled to qualified immunity from claim that he chose not to create new positions because the candidates for those positions were of a different race).

Second, Lange argues that she, her attorney, and Anthem told the Defendants that they believed the Exclusion was unlawful.  Doc. 74 at 28.  But the opinion of Lange and her lawyers does not "clearly establish" the law.  *See J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d at 1259-1260 (discussing ways to show the law was clearly established).  Nor does the opinion of Anthem's lawyers.

For those reasons, Lange has failed to carry her burden of showing that Carter's conduct, as alleged, violated clearly established rights.[18]  The Defendants' motion to dismiss (Doc. 62) is **GRANTED** as to Carter.

**H. Georgia Equal Protection Clause**

The Defendants argue that the Georgia Constitution does not provide a cause of action for violations of constitutional rights.  In response, Lange argues that Article I,

---

[17] The allegations that Carter "administers the County's selection of the Health Plan's terms" and "oversees the compensation and health benefits of the Sheriff's Office employees" are too vague to really pinpoint what conduct by Carter allegedly violated the Equal Protection Clause.

[18] The Court does not rule out the possibility that if, during discovery, more evidence about Carter's specific conduct comes to light, Lange may be able to argue that that conduct violated clearly established rights.  In light of that possibility, the Court's dismissal of Carter is without prejudice.

Section II, Paragraph IX(d) creates an express right of action for equal protection

violations.  Doc. 74 at 32-33.  The relevant provision reads:

> Except as specifically provided by the General Assembly in a State Tort
> Claims Act, all officers and employees of the state or its departments and
> agencies may be subject to suit and may be liable for injuries and damages
> caused by the negligent performance of, or negligent failure to perform, their
> ministerial functions and may be liable for injuries and damages if they act
> with actual malice or with actual intent to cause injury in the performance of
> their official functions. Except as provided in this subparagraph, officers and
> employees of the state or its departments and agencies shall not be subject
> to suit or liability, and no judgment shall be entered against them, for the
> performance or nonperformance of their official functions. The provisions of
> this subparagraph shall not be waived.

Ga. Const. Art. I, § 2, Par. IX(d).  However, as the Defendants note, that provision

codifies Georgia's common-law doctrine of official immunity.[19]  Doc. 79 at 3.  It does not

create a cause of action, nor does it supplant the longstanding principle that Georgia

"ha[s] no equivalent to 42 U.S.C. § 1983, which gives a claim against a state officer

individually for certain unconstitutional acts."  *Howard v. Miller*, 222 Ga. App. 868, 871,

476 S.E.2d 636, 639 (1996).  That constitutional provision provides no cause of action

for the Defendants' alleged violations of the Georgia Constitution.

Lange cited no other cause of action for her state constitutional claims.[20]

However, she argues that two cases recognized a general cause of action for equal

protection violations.  Doc. 85 at 1 (citing *Lathrop v. Deal*, 801 S.E.2d 867 (Ga. 2017);

---

[19] That is not to suggest that official immunity at common law and under Paragraph IX(d) are identical. "[A]lthough the text of Article I, Section II, Paragraph IX (d) does not unambiguously incorporate all of the preexisting decisional law on official immunity, it also does not unambiguously sweep that law into the dustbin of historical curiosities."  *Lathrop v. Deal*, 301 Ga. 408, 440, 801 S.E.2d 867, 889 (2017).

[20] Because Lange has not pleaded or argued a cause of action for her Georgia claims, the Court need not address the separate issue of sovereign immunity.  However, it is worth noting that "the doctrine of sovereign immunity usually poses no bar to suits in which state officers are sued in their individual capacities for official acts that are alleged to be unconstitutional."  *Lathrop*, 301 Ga. at 434, 801 S.E.2d at 885.  However, the court did not clearly articulate what cause of action such a suit would be based on.

*Liberty County Sch. Dist. v. Halliburton*, 762 S.E.2d 138 (Ga. App. 2014)).  Neither support her argument.

Lange argues that *Lathrop* "state[s] that [Georgia constitution] claims seeking prospective relief from the threatened enforcement of unconstitutional laws could be maintained against state officials in their individual capacity[.]"  *Id.* at 1.  But that is too broad a statement of *Lathrop*'s holding.  More precisely, the Georgia Supreme Court stated that "*the doctrine of sovereign immunity* usually poses no bar to suits in which state officers are sued in their individual capacities for official acts that are alleged to be unconstitutional."  *Lathrop*, 301 Ga. at 434, 801 S.E.2d at 885 (emphasis added). Nowhere in *Lathrop* did the court suggest there is a general cause of action for violations of the Georgia constitution.[21]

Lange also argues that in one case, the Georgia Court of Appeals "declin[ed] to dismiss suit under the Georgia Equal Protection Clause against individual capacity defendants."  Doc. 85 at 1 (citing *Halliburton*, 762 S.E.2d 138).  But the Court finds little support for Lange's assertion that *Halliburton* involved a "suit under the Georgia Equal Protection Clause."[22]  And the issue in *Halliburton* for the individual-capacity claims was

---

[21] To the contrary, *Lathrop* affirms the longstanding principle that there is no general right of action for constitutional violations.  The plaintiff in *Lathrop* argued that every violation by a government official of a constitutional right created an implied right of action—a more developed version of Lange's argument here.  The Georgia Supreme Court rejected that argument, limiting implied rights of action to Georgia's Takings Clause.  And it noted that "Unlike the Takings Clause, many constitutional guarantees of right do not identify in specific and explicit terms a justiciable remedy for violations of the guarantee, nor are they without meaning in the absence of a right of action against the government itself."  *Lathrop*, 301 Ga. at 427.

[22] It is not clear that the cause of action was in *Halliburton*.  The plaintiff sued the school board for alleged racial discrimination in nonrenewing her contract as school principal.  *Halliburton*, 328 Ga. App. at 422, 762 S.E.2d at 140.  The only mention of equal protection in the entire decision is an explanatory parenthetical after a case citation.  Lange does not explain how that supports her contention.  Still, the Court attempted to flesh out Lange's argument, such as it is, by consulting the trial court documents from *Halliburton*.  The complaint alleged breach of contract, wrongful termination, violation of equal protection, tortious interference with contract, violation of freedom of speech, freedom of association, malice, and

not whether the plaintiff had a cause of action, but whether the plaintiff had alleged malice sufficient to overcome Georgia's official immunity defense.  *See* Ga. Const. Art. I, § 2, Par. IX(d).

In sum, Lange's only argument for a cause of action is based on the limited sovereign-immunity waiver in the Georgia Constitution, and that argument fails.  Her attempt to bolster that argument by citing *Lathrop* and *Halliburton*, without explaining their relevance, also fails.  After the Court examined those cases in an attempt to guess Lange's argument, it is clear that *Halliburton* provides no support for her argument and that *Lathrop* undermines her argument.  Because she has not identified a cause of action for her claims under the Georgia Constitution, those claims will be dismissed.

## IV. CONCLUSION

For the reasons noted, the Sheriff's Office's motion to dismiss for lack of jurisdiction (Doc. 61) is **DENIED**.  The Defendants' motion to dismiss for failure to state a claim (Doc. 62) is **GRANTED** as to the ADA Title II claims, the Georgia equal protection claims, and the federal equal protection claims against Defendants Stalnaker, Walker, Robinson, Thomson, McMichael, Holland, Carter, and the Sheriff in his individual capacity; but **DENIED** as to the Title VII and ADA Title I claims against the County, the federal equal protection claims against the County, and the Title VII claims against the Sheriff in his official capacity.

---

negligence.  *Halliburton v. Liberty County School District*, 4:14-cv-179 (S.D.Ga. 2014), Doc. 1-2 at 13-14. In their motion to dismiss, the defendants argued Halliburton's complaint failed to allege actual malice, so it was barred by official immunity.  Doc. 1-4 at 5-7.  That is the issue the Court of Appeals ruled on. Whether or not the plaintiff had a freestanding cause of action for equal protection was never at issue in that case.  On remand, the plaintiff amended her complaint to add federal claims, and the defendants removed to the Southern District of Georgia.  The individual claims were later dismissed for failure to allege sufficient facts to state a claim.  *Id.*, Doc. 40.

The remaining claims, therefore, are (1) ADA Title I claims against the County and the Sheriff in his official capacity, (2) Title VII claims against the County and the Sheriff in his official capacity, and (3) federal equal protection claims against the County and the Sheriff in his official capacity.

**SO ORDERED**, this 30th day of October, 2020.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT