IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ANNA LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:19-CV-00392-MTT |
| HOUSTON COUNTY, GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT HOUSTON COUNTY, GEORGIA'S STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

COMES NOW, Defendant Houston County, Georgia ("the County"), and hereby files its Statement of Undisputed Material Facts as to Which There is No Genuine Issue to be Tried, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56 of the Local Rules of the Middle District of Georgia.

1.

Plaintiff, a transgender female, is employed as a Deputy Sheriff by the Houston County Sheriff's Office. (Pl. Dep. I, p. 9:24-10:4; Am. Complaint, ¶¶ 2, 3, 16.)

2.

Plaintiff was hired by the Sheriff's Office in 2006 (Pl. Dep. I, p. 10:2-4.) and in exchange for her employment, the Sheriff's Office offered her a salary and a package of benefits, including health and pension benefits. (Pl. Dep. II, p. 98:3-21.)

3.

The Sheriff's Office promoted Plaintiff to corporal in the Criminal Investigations Division ("CID") in July 2012 and then to sergeant in CID, her current position, in July 2014. (Pl. Dep. I, p. 10:5-10.)

4.

The County and the Sheriff's Office have entered into an intergovernmental agreement in which the County makes its health insurance plans available to employees of the Sheriff's Office (Pl. Dep. I, p. 53; Carter Dec., ¶ 6.)

5.

The Sheriff is an elected official who has chosen to permit his employees to receive medical benefits covered under the County's health insurance plans (Pl. Dep. I, p. 53:7-12; Carter Dec., ¶ 7.)

6.

Plaintiff is a participant in the Houston County Employee Benefit Plan (the "Plan" or "Health Plan") (Pl. Dep. I, p. 40.)

7.

The County's Plan is self-funded, with third-party administrative services provided by Anthem Blue Cross/Blue Shield ("Anthem"). (Am. Complaint, ¶ 75; County 30(b)(6) Carter Dep., p. 55:7-56:10; Clark Dec., ¶ 3.)

8.

The Houston County Board of Commissioners is the "Plan Sponsor," which the Plan defines as "the legal entity that has adopted the Plan and has authority regarding its operation, amendment and termination. (Pl. Dep. I, Ex. 7, p. 112.)

9.

The Plan defines "Employee" as "a person who is engaged in active employment with the Employer and is eligible for Plan coverage under the employment regulations of the Employer" and "Employer" means "an Employer who has allowed its Employees to participate in the Plan by acting as the Plan Sponsor *or adopting the Plan as a participating Employer*." (emphasis added) (Pl. Dep. I, Ex. 7, p. 107.)

10.

Plaintiff understands that the Plan is sponsored by the County, even though her health benefits are part of the employment package the Sheriff's Office offers to its employees, including her. (Pl. Dep. II, p. 99:3-20.)

11.

The County does not have any control over the terms of Plaintiff's employment, including the Sheriff's decisions to hire or promote Plaintiff, establish her job responsibilities, regulate her work environment or supervisor her, or determine her compensation package, including her ability to receive health and pension benefits. (Carter Dec., ¶ 8.)

12.

The County's only role in hiring is to post the Sheriff's Office's vacancies on the County website; to add newly-hired Sheriff's Office employees into applicable benefit plans sponsored by the County, when directed to do so by a letter from the Sheriff's Office (S.O. 30(b)(6) Dep. Rape, pp. 45:20-46:3; County 30(b)(6) Dep. I Carter, p. 18:4-19:2); and to provide a benefits orientation about those benefit plans to new Sheriff's Office employees. (S.O. 30(b)(6) Dep. Rape, p. 123:2-18.)

13.

The Sheriff's Office leaders make their own decisions on employee termination and major discipline without consultation with the County. (S.O. 30(b)(6) Dep. Rape, pp. 33:20-34:4; County 30(b)(6) Dep. I Carter, p. 19:3-13; Pl. Dep. II, p. 100:8-24.)

14.

When the Sheriff's Office decides to terminate an employee, the County's only task is to terminate benefits upon receiving a letter from the Sheriff's Office conveying the termination of employment decision. (S.O. 30(b)(6) Dep. Rape, p. 46:4-14; County 30(b)(6) Dep. I Carter, p. 19:3-13.)

15.

The Sheriff Office's decisions are based on their own standards and Sheriff's Office employees are not subject to the County's merit system and enjoy none of the protections of that system. (Carter Dec., ¶ 3.)

16.

In April 2017, Plaintiff notified the Sheriff's Office of her transgender status and that she would be undergoing gender transition. (Pl. Dep. I, 53:13-56:8; 57:23-58:7.)

17.

In December 2018, Plaintiff sought coverage under the Plan for sex reassignment surgery. (Pl. Dep. I, p. 44:22-45:4.)

18.

Plaintiff was informed by Anthem that her request for coverage for sex reassignment surgery was denied because among the Plan's numerous medical exclusions was an exclusion for sex reassignment surgery. (Pl. Dep. I, p. 44:22-45:19.)

19.

The 2019 Plan includes 68 medical exclusions and 29 pharmacy exclusions. (Carter Dec., ¶ 13)

20.

The Health Plan covers medically necessary hormone medication, endocrinologist visits, and psychological monitoring for participants suffering from gender dysphoria, and the Plan covers those nonsurgical medical treatments for participants of both sexes (regardless of gender) equally. (Pl. Dep. I, p. 49:1-14; Ex. 7, pp. 46 (HC1657), 47 (HC1658), 57 (HC1668).)

21.

Plaintiff acknowledges that the Plan covered her transition-related hormone medication, endocrinologist visits, and psychological monitoring. (Pl. Dep. I, pp. 48:19-49:15; Pl. Dep. II, pp. 120:14-123:24, Ex. 36.)

22.

The Plan does not cover sex-reassignment surgery – or the reversal of the same – and related services and supplies, including drugs, for participants of either sex (regardless of gender). (Pl. Dep. I, Ex. 7 at HC 1677.)

23.

The exclusion for sex reassignment surgery is believed to have been initially adopted into the County's plans in the 1990s as a standard exclusion and has remained in the Plan since. (County 30(b)(6) Dep. I Holland, pp. 29-30; Clark Dep., p. 40.)

24.

Plaintiff has been treated the same as all other plan members by being offered the same health insurance options, and she is aware of no one who receives a different plan than the PPO or POS, which were offered to her, or who has special coverage outside the scope of the PPO or POS plans. (Pl. Dep. I, p 40:3-9, 21-25.)

25.

During the February 19, 2019 meeting of the Board of Commissioners ("Commission"), Plaintiff spoke about her gender transition and requested that the sex

change surgery exclusion be removed or for her to be granted an exception to cover her surgery. (County 30(b)(6) Dep. I Holland, p. 66:20-25.)

26.

Plaintiff's request to the Commission was made at a point in time when the plan terms were set for the plan year, so the Commission responded that it would not consider a change "at this time." (County 30(b)(6) Dep. I Holland, p. 53:12-14.)

27.

The County's insurance broker – who has been working on the County's plan since 1993 – confirmed that, in her experience, the County had never made a mid-year change to the health plan. (Clark Dep., p. 12:23-13:10, 24:10-12.)

28.

In November 2019, the Commission considered plan renewal issues for the 2020 plan year. (County 30(b)(6) Dep. I Holland, p. 103:10-104:14.)

29.

The Commission approved new cost-sharing features, including higher co-pays for all members and increased premiums for retirees for the 2020 plan year. (County 30(b)(6) Dep. II Carter, p. 103.)

30.

In deference to Plaintiff's request that the sex change surgery exclusion be removed from the Plan and in light of this recently filed lawsuit, the Commission also received

information on the pricing for procedures and other treatments for a gender transition. (County 30(b)(6) Dep. I Holland, p. 94.)

31.

After reviewing and considering that information, in addition to the Commissioners' knowledge of the escalating costs of the health plan as a whole, the Commission voted to approve the plan as a whole, with all 68 medical exclusions and all 29 pharmacy exclusions. (County 30(b)(6) Dep. I Holland, p. 104, Ex. 15, Stalnaker Dec., ¶ 4, Walker Dec., ¶ 4, Robinson Dec., ¶ 4.)

32.

In addition to the cost trends of the Plan, the County knew that plan members had asked about exclusions other than the sex change surgery exclusion and there was concern that eliminating one exclusion would lead to requests (or even lawsuits) to remove other exclusions. (County 30(b)(6) Dep. II Carter, p. 84, Ex. 31.)

33.

Since Plaintiff's lawsuit, some members have even stated that, if Plaintiff gets the relief she is seeking, those members would take action (legal or otherwise) to have the exclusion that affects them removed from the plan. (County 30(b)(6) Dep. II Carter, p. 161:15-164:4, Ex. 31.)

34.

While removing the sex change surgery exclusion would have a negative financial impact on the plan, removing *several* exclusions could make the plan unworkable. (Carter, Dec. ¶ 16.)

35.

The County tracks its annual spending on the Health Plan and the costs have steadily increased since at least 1994. (County 30(b)(6) Dep. II Carter, p. 37:9-14, Ex. 32.)

36.

The County funds the Plan, along with contributions by plan participants, and a per capita charge to the Sheriff and other participating employers for their employees' participation. (Carter Dec., ¶ 11)

37.

The Annual Cost Per Employee rose from $2,057 in 1994 to $15,881 in 2018. (County 30(b)(6) Dep. II Carter, p. 113:8-19, Ex. 32.) Annual plan costs rose by over 17% from $10.6 Million in 2018 to $12.5Million in 2019 and by 2.3% in 2020 to $12.8 Million. (Carter Dec., ¶ 9.)

38.

The Plan is self-funded, meaning the County is financially responsible for the claims of plan members; it does not pay premiums to a traditional insurer. (Carter Dep., p. 55; Clark Dec., ¶ 3.)

39.

As of 2019, the County's Plan has approximately 1,500 participants and paid claims of approximately $12 Million. (Galasso Dep., Ex. 3, p. 7 (HC0425).)

40.

The County's cost concerns are not that its premium would increase; rather, they are based on the impact of claims it pays during each plan year.  (County 30(b)(6) I Holland, p. 43; County 30(b)(6) II Carter, p. 84.)

41.

There are two kinds of "stop-loss" insurance in place – one for individual claims that exceed $175,000 and another for aggregate loss if the plan's annual actual claims exceed anticipated claims by 25%.  (Galasso Dep., p. 109:13-22.)

42.

Anthem (formerly Blue Cross Blue Shield) acts as third-party administrator (TPA) for the Plan (Clark Dec., ¶ 3), which means Anthem approves or denies specific claims for benefits under the Plan.  (Clark Dec., ¶ 3.)

43.

Using Anthem as a TPA keeps the County removed from plan members' medical details and allows an entity with experience administering claims to handle that aspect of the plan. (Clark Dec., ¶ 3.)

44.

Anthem provides the County with annual plan updates to the language of the Plan, including its recommendations on additional plan exclusions. (Clark Dec., ¶ 3.)

45.

The County generally follows Anthem's recommendations, and the County's Director of Personnel cannot recall an occasion when the County did not follow Anthem's recommendations on exclusions. (County 30(b)(6) Dep. I Carter, p. 25; County 30(b)(6) Dep. I Holland, p. 29; Carter Dec., ¶ 10.)

46.

Anthem did not make any recommendation to the County regarding the exclusion for sex reassignment surgery, but rather it requested a letter from the County accepting responsibility for any penalties for not applying Section 1557 of the Affordable Care Act (ACA). (Carter Dep., pp. 78-79, Exs. 4, 5.)

47.

The County's Director of Personnel, Ken Carter, reviewed the federal Health and Human Services website for guidance on the type of plans to which Section 1557 of the Affordable Care Act ("ACA") applied and determined that the County's self-funded plan was not among those affected. (Carter Dep., p. 60:18-21.)

48.

Based on his determination, the Director of Personnel returned a letter to Anthem (as it requested) accepting responsibility for any ACA penalties that might be imposed in connection with the Plan's interpretation of Section 1557. (Carter Dep., pp. 78-79, Ex. 5)

49.

Anthem acknowledged that Section 1557 is subject to varying interpretations. (Carter Dep., Ex. 5, p. 6 (HC447); County 30(b)(6) Dep. I Holland, pp. 49-50, Ex. 4; Clark Dep., p. 44; County 30(b)(6) Dep. I Carter, p. 35.)

50.

The County cannot recall an occasion when the plan removed an exclusion except on one occasion where a previous pre-existing condition exclusion was removed as required under an applicable provision of the ACA and when certain treatments were removed as required by the Mental Health Parity Act and subsequent legislation bolstering the MHPA. (County 30(b)(6) Dep. I Carter, p. 25:10-23; County 30(b)(6) Dep. I Holland, p. 30:16-21; Carter Dec., ¶ 10.)

51.

As the cost of health insurance claims has continued to rise each year, the County has sought to balance the competing interests of offering a plan that covers the most common health insurance needs of participants and controlling costs, so the plan remains financially viable. (Carter Dec., ¶ 15; County 30(b)(6) Dep. II Carter, p. 74:19-23.)

52.

The County has knowledge that multiple employees and family members have complained to Carter over the years regarding various exclusions that affected them. (County Dep. II Carter, p. 129:24-130:15.)

53.

The County is subject to a statutory cap on how much it can raise its millage rate for property taxes, and thus cannot simply pass on an increase in spending to the taxpayers. (Holland Dec., ¶ 6.)

54.

The Plan covers various medically necessary treatments for participants suffering from obesity, but excludes lap-band surgery. (Pl Dep. I, Ex. 7, pp. 47 (HC1658), 48 (HC1659), 57 (HC1668), 67 (HC001678.)

55.

While the County has granted cost of living increases, budget constraints have limited it from paying merit increases to any employees since 2009. (Holland Dec., ¶ 5.)

56.

Sgt. Lange's gender, transgender status, or her intent to have sex reassignment surgery were not factors in the Commission's decision to retain all plan exclusions for 2020, nor were those issues a factor in plan renewals in other years. (Stalnaker Dec., ¶ 4; Walker Dec., Dec., ¶ 4; Walker Dec., Dec., ¶ 4.)

-14-

Respectfully submitted this 3rd day of November, 2021.

                                    *s/ Sharon P. Morgan*
R. Read Gignilliat
Georgia Bar No. 293390
Sharon P. Morgan
Georgia Bar No. 522955
Patrick L. Lail
Georgia Bar No. 431101

ELARBEE, THOMPSON, SAPP &
    WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700
(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com
morgan@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| ANNA LANGE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 5:19-CV-00392-MTT |
| HOUSTON COUNTY, GEORGIA, et al., ) | |
| ) | |
| Defendants. ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2021, I electronically filed the foregoing **DEFENDANT HOUSTON COUNTY, GEORGIA'S STATEMENT OF UNDISPUTED MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED** with the Clerk of Court using the CM/ECF System, which will automatically send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| Kenneth E. Barton, III | Wesley R. Powell |
| M. Devlin Cooper | Jill K. Grant |
| | |
| David Brown | Kevin M. Barry |
| Gabriel Arkles | |

Respectfully submitted, this the 3rd day of November, 2021.

*s/ Sharon P. Morgan*
Sharon P. Morgan
Georgia Bar No. 522955

ELARBEE, THOMPSON, SAPP &
    WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia  30303
(404) 659-6700
(404) 222-9718 (Facsimile)
morgan@elarbeethompson.com

*Attorneys for Defendants*