**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

---------------------------------------------------------x
               :

ANNA LANGE,              :

        Plaintiff,       :

               :

v.                :       Civil Action: 5:19-CV-00392

               :

HOUSTON COUNTY, GEORGIA; and :    **ORAL ARGUMENT REQUESTED**
Houston County Sheriff CULLEN TALTON, :
in his official and individual capacity,  :

               :

       Defendants.      :

               :

               :

---------------------------------------------------------x


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO**
**EXCLUDE EXPERT TESTIMONY**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT .................................................................................................................3

I.      THE STANDARD FOR *DAUBERT* MOTIONS. ..................................................3

II.     THE TESTIMONY OF DR. BLUEBOND-LANGNER SHOULD BE
        ADMITTED IN ITS ENTIRETY. ...................................................................5

        A.      Dr. Bluebond-Langner's Opinions Are Reliable. ........................................6

        B.      Dr. Bluebond-Langner's Testimony is Highly Relevant to Plaintiff's
                Case. .......................................................................................................8

III.    THE TESTIMONY OF DR. SCHECHTER SHOULD BE ADMITTED. ...........10

IV.     THE TESTIMONY OF CHANEL HALEY AND PAISLEY CURRAH SHOULD
        BE ADMITTED. .......................................................................................12

        A.      Ms. Haley is Qualified to Testify and She Uses Reliable Methods. ..........13

        B.      The Witnesses' Testimony is Helpful and Reliable. ..................................15

V.      THE TESTIMONY OF DR. BARRETT SHOULD BE ADMITTED. .................18

        A.      Ms. Barrett Appropriately Relied on the "Best Available" Evidence. .......19

        B.      Ms. Barrett Does Not Offer a "Personal" Opinion But Her Expert Opinion
                Based On Her Experience Advising Healthcare Plans. ...........................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. City of New York,*
143 F. Supp. 3d 134 (S.D.N.Y. 2015)......................................................................16

*Allison v. McGhan Medical Corp.,*
184 F.3d 1300 (1999)............................................................................................15

*AMCO Ins. Co. v. TAF, Inc.,*
No. CV 617-022, 2018 WL 4624097 (S.D. Ga. Sept. 26, 2018).............................15

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.,*
208 F. Supp. 3d 850 (S.D. Ohio 2016)..................................................................16

*Bellitto v. Snipes,*
302 F. Supp. 3d 1335 (S.D. Fla. 2017)..................................................................20

*Bogart, LLC v. Ashley Furniture Indus., Inc.,*
No. 3:10-CV-39 CDL, 2012 WL 3745833 (M.D. Ga. Aug. 28, 2012)............................2, 6, 7

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020)............................................................................................9

*City of South Miami v. Desantis,*
No. 19-cv-22927, 2020 WL 7074644 (S.D. Fl. Dec. 3, 2020) *app. filed*, No.
21-13657 (11th Cir. Oct 20, 2021)..............................................................5, 17, 18

*City of Tuscaloosa v. Harcros Chemls., Inc.,*
158 F.3d 548 (11th Cir. 1998) .....................................................................1, 2, 3, 4

*Elardi v. Royal Caribbean Cruises, Ltd.,*
No. 19-CV-25035, 2021 WL 1053281 (S.D. Fl. March 12, 2021)............................5

*Evancho v. Pine-Richland Sch. Dist.,*
237 F. Supp. 3d 267 (W.D. Pa. 2017).....................................................................16

*Fisher v. Ciba Specialty Chems. Corp.,*
No. 03-0566-WS-B, 2007 WL 2302470 (S.D. Ala. Aug. 7, 2007) .........................15

*Flack v. Wis. Dept. of Health Servs.,*
328 F. Supp. 3d 931 (W.D. Wisc. 2018).................................................................16

*Giusto v. Int'l Paper Co.,*
No. 1:19-CV-00646-SDG, 2021 WL 3603374 (N.D. Ga. Aug. 13, 2021).........................2, 13

*Glenn v. Brumby,*
    663 F.3d 1312 (11th Cir. 2011) ...................................................................9, 16

*Gomez v. Gen. Nutrition Corp.,*
    323 F. Supp. 3d 1368 (S.D. Fla. 2018) ...................................................................15

*Guinn v. AstraZeneca Pharms. LP,*
    602 F.3d 1245 (11th Cir. 2010) ...................................................................3, 9

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.,*
    499 U.S. 187 (1991)...................................................................9

*Liquid Transfer Georgia, Inc. v. RECO Constructors, Inc.,*
    No. 1:15-CV-180-LJA, 2018 WL 2056554 (M.D. Ga. Mar. 27, 2018) ...................................2

*Little v. Washington Metro. Area Transit Auth.,*
    249 F. Supp. 3d 394 (D.D.C. April 18, 2017)...................................................................5

*In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.,*
    No. 3:07-CV-00088, 2010 WL 1782272 (M.D. Ga. Apr. 29, 2010) ...............................7, 8, 12

*Milton v. C.R. Bard, Inc.,*
    No. 5:14-cv-00341-TES, 2021 WL 67356 (M.D. Ga. Jan. 7, 2021) ...................................4, 8

*Morrow v. Allstate Indem. Co.,*
    No. 5:16-CV-137 (HL), 2020 WL 11629213 (M.D. Ga. June 1, 2020) ...................................5

*Floyd ex rel. Ray v. United States,*
    No. 3:08-CV-122 CDL, 2010 WL 4905010 (M.D. Ga. Nov. 26, 2010) ...........................4, 5, 8

*United States v. Frazier,*
    387 F.3d 1244 (11th Cir. 2004) ................................................................... *passim*

*United States v. Williams,*
    865 F.3d 1328 (11th Cir. Aug. 1, 2017) ...................................................................4

*Williams v. Ethicon Inc.,*
    No. 5:20-CV-234, 2021 WL 1087808 (M.D. Ga. March 22, 2021)...................................20

**Other Authorities**

Fed. R. Evid. 702(a)...................................................................15

## PRELIMINARY STATEMENT

Defendants have presented no expert witnesses to support their defenses or, with one exception, to rebut the conclusions of Plaintiffs' experts.  Nor, in their multiple *Daubert* motions, do Defendants contest Plaintiff's experts' opinions on the core issues in this case, that:  1) gender dysphoria—the combination of incongruence between expressed and assigned gender and its resultant significant distress and impairment in social, occupational, and other areas of functioning—is a serious and even life-threatening condition, 2) the treatments sought by Sgt. Lange in this action are safe, effective, and medically necessary, 3) transgender people have historically been subject to discrimination, 4) transgender people have a defining characteristic that frequently bears no relation to ability to perform or contribute to society, 5) transgender people have immutable, or distinguishing characteristics that define them as a discrete group, and 6) transgender people are a minority or politically powerless.  Instead, Defendants seek to chip away at Plaintiff's largely uncontested expert opinions by attacking ancillary portions of those opinions, mischaracterizing their content, and advancing positions on the admissibility of expert evidence that are plainly contrary to established law.

A review of the traditional *Daubert* factors demonstrates that Defendants' arguments are misplaced, and each of Plaintiff's experts' opinions should be admitted in their entirety.  First, each of Plaintiffs' witnesses is *qualified* to offer his or her opinions.  For expert opinions to be admissible, the witness must be "qualified to testify competently regarding the matters [the witness] intends to address."  *City of Tuscaloosa v. Harcros Chemls., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).  Defendants do not challenge the qualifications of four of Plaintiff's five witnesses. They do attack Chanel Haley for her lack of traditional academic qualifications, remarking that she "does not have an advanced degree, or any degree."  (Motion to Exclude Haley (ECF 130-1) at 1.)  However, under the Rules of Evidence and well-established law in the Eleventh Circuit, an

"advanced degree" is *not* a prerequisite for providing expert testimony, as "Rule 702 permits a witness to be qualified as an expert based on his or her experience in the relevant field." *Giusto v. Int'l Paper Co.*, No. 1:19-CV-00646-SDG, 2021 WL 3603374, at *2 (N.D. Ga. Aug. 13, 2021). Ms. Haley's unquestioned professional experience in advocacy on behalf of the transgender community more than qualifies her to offer the opinions she provides in this litigation.

Moreover, each of Plaintiff's witnesses will offer *reliable* opinions before this court. Expert testimony is admissible if "the methodology by which the expert[s] reach[] [their] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*." *City of Tuscaloosa*, 158 F.3d at 562. Courts in the Eleventh Circuit have held that experience, which each of Plaintiff's witnesses unquestionably possesses, bears not only on the witness's qualifications, but also her reliability. *Bogart, LLC v. Ashley Furniture Indus., Inc.*, No. 3:10-CV-39 CDL, 2012 WL 3745833, at *17 (M.D. Ga. Aug. 28, 2012). In addition to their experience, Plaintiff's witnesses rely on accepted and reliable sources of information to reach their conclusions. In challenging many of Plaintiff's experts' opinions, the Defendants take issue not with the "principles and methodology" espoused by the experts—the proper focus of a *Daubert* inquiry, *Liquid Transfer Georgia, Inc. v. RECO Constructors, Inc.*, No. 1:15-CV-180-LJA, 2018 WL 2056554, at *3 (M.D. Ga. Mar. 27, 2018)—but with their conclusions. *See, e.g.,* Motion to Exclude Bluebond-Langner Testimony (ECF 142-1) at 9 ("Paragraph 27 of Dr. Bluebond-Langner's Report misleadingly suggests a uniformity among insurance providers that the cited Article determined did not exist.") But in asking this Court to disallow expert testimony because they disagree with the experts' opinions, Defendants address the ultimate merits of the experts' opinions, not the threshold issue of qualifications and reliability. *Liquid Transfer Georgia, Inc.*, 2018 WL 2056554, at *3 ("The Court does not make ultimate conclusions as to the persuasiveness

of the proffered evidence.")  As the Eleventh Circuit has held, Courts must be careful to avoid conflating the merits inquiry with the *Daubert* admissibility analysis.  *See generally Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010).

Third, Plaintiffs' experts offer opinions that will be *helpful* to the trier of fact.  In challenging the relevance of Plaintiff's experts' opinions, Defendants do not engage with Plaintiff's claims in this litigation, nor how the proffered expert testimony supports them, but rather they evaluate the experts' testimony in connection with the case that Defendants *believe* Plaintiff *should* be making.  Each of Plaintiff's experts opines on matters within their expertise that support her case that Defendants have discriminated against her in violation of the Equal Protection Clause, Title VII of the Civil Rights Act, and Title I of the Americans with Disabilities Act.

For these reasons and those below, each of the Defendants' *Daubert* motions should be denied.

## ARGUMENT

## I.     THE STANDARD FOR *DAUBERT* MOTIONS.

The Eleventh Circuit has held that, "in determining the admissibility of expert testimony under Rule 702, [courts] engage in a rigorous three-part inquiry."  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  As part of that inquiry, courts "must consider whether:  (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  *Id.* (internal quotations omitted); *City of Tuscaloosa*, 158 F.3d at 562.  In *Frazier*, the court summarized these factors as "qualification, reliability, and helpfulness,"

3

and the burden is on "the proponent of the expert opinion" to establish these factors by a preponderance of the evidence.  *Id.*

As an initial matter, the expert must be *qualified*.  A court in this District has held that "in determining whether a proffered expert is "qualified" to offer an opinion, courts generally look to evidence of the witness's education and experience and ask whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise."  *Floyd ex rel. Ray v. United States*, No. 3:08-CV-122 CDL, 2010 WL 4905010, at *9 (M.D. Ga. Nov. 26, 2010).  As the court held, "[i]t is beyond dispute that experience in a field may provide a sufficient foundation for expert testimony."  *Id.*; *see also Frazier*, 387 F.3d at 1260-61 (stating that "experience in a field may offer another path to expert status.  In fact, the plain language of Rule 702 makes this clear . . . 'nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony.'"); *United States v. Williams*, 865 F.3d 1328, 1338 (11th Cir. Aug. 1, 2017) (noting that "experts may be qualified by…experience in the relevant field; they need not be formally educated to qualify as experts.").

In addition to the witness being qualified, their testimony must be *reliable.*  Courts consider several factors in determining whether proposed testimony is reliable, including "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community."  *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir.2004) (en banc ); *Floyd*, 2010 WL 4905010, at *9 (internal quotations omitted); *Milton v. C.R. Bard, Inc.*, No. 5:14-cv-00341-TES, 2021 WL 67356 at *3 (M.D. Ga. Jan. 7, 2021).  "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony."

4

*Frazier*, 387 F.3d at 1262 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  This list is "not exhaustive, and district courts have substantial discretion in deciding how to test an expert's reliability." *Floyd*, 2010 WL 4905010, at \*9.  The court must "conduct a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," focusing "solely on principles and methodology, not on the conclusions that they generate." *Id.* (internal quotations omitted).

Finally, the expert's proffered testimony must be *helpful* to the trier of fact.  Under this inquiry, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262; *Morrow v. Allstate Indem. Co.*, No. 5:16-CV-137 (HL), 2020 WL 11629213, at \*6 (M.D. Ga. June 1, 2020) (denying motion to exclude expert testimony where expert provided opinions on issues that were "relevant to Plaintiffs' claims and beyond the understanding of the average lay person.").

As multiple courts have held, "[t]he presumption is that expert testimony is admissible, so that once a proponent has made the requisite threshold showing, further disputes go to weight not admissibility." *Elardi v. Royal Caribbean Cruises, Ltd.*, No. 19-CV-25035, 2021 WL 1053281, at \*2 (S.D. Fl. March 12, 2021); *City of South Miami v. Desantis*, No. 19-cv-22927, 2020 WL 7074644, at \*3 (S.D. Fl. Dec. 3, 2020) *app. filed*, No. 21-13657 (11th Cir. Oct 20, 2021); *Little v. Washington Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 408 (D.D.C. April 18, 2017).

## II.    THE TESTIMONY OF DR. BLUEBOND-LANGNER SHOULD BE ADMITTED IN ITS ENTIRETY.

As an initial matter, Defendants "do not contest Dr. Bluebond-Langner's medical qualifications and experience in general or as a gender-confirming surgeon in particular." (Motion to Exclude Bluebond-Langner Testimony at 4.)  Indeed, Defendants "do not contest Dr. Bluebond-

Langner's opinion that gender-confirming surgery is medically necessary for Plaintiff," and "do not contest the safety and efficacy of such surgery." (*Id.*)

However, Defendants object to Dr. Bluebond-Langner's statements regarding "insurance costs and the cost efficiency of covering procedures, as well as her opinion that the plan exclusions at issue here [are] 'medically unjustified and inconsistent with the standard of care.'" (*Id.* at 1.) Specifically, Defendants argue that "Dr. Bluebond-Langner's qualifications do not include either insurance underwriting or actuarial science," and therefore her "opinions about the cost effectiveness of covering transition surgery" are not reliable. (*Id.* at 1-2.)

Defendants also argue that aspects of Dr. Bluebond-Langner's opinion are either irrelevant or likely to confuse the jury, complaining that Dr. Bluebond-Langner "mischaracterizes aspects of the County's plan and overstates the findings of reports on plans that cover sex change surgery. She also opines that the exclusions at issue are 'medically unjustified and inconsistent with standard of care.'" (*Id.*)  These objections miss the mark.

### A.     Dr. Bluebond-Langner's Opinions Are Reliable.

Defendant argues that Dr. Bluebond-Langner's "opinion in Paragraph 27 of her Report that 'it is extremely unusual for an insurer to have a blanket exclusion for all transition-related healthcare' does not rest on a reliable basis and should therefore be excluded under Rule 702." (Motion to Exclude Bluebond-Langner Testimony at 8.)  Defendants are wrong.

Dr. Bluebond-Langner offers "concrete evidence" to support her position. *Bogart, LLC v. Ashley Furniture Indus., Inc.*, No. 3:10-CV-39 CDL, 2012 WL 3745833, at *17.  In 2019 she published, in a leading peer-reviewed journal in her field, a "survey . . . of coverage for gender-confirming top surgery among 57 of the nation's largest insurance plans," (¶ 37), and the following year did the same for genital surgery, (*id*. at 21 of ECF 57-5.).  Those two surveys alone would be enough to support her opinions.  But as a court in this District has held, "[e]xperience in a field

6

may serve as sufficient foundation for expert testimony." *Id.* (finding proffered testimony reliable where expert "s[ought] to testify based on his more than thirty years of experience in celebrity licensing valuation to establish the fair market value Ashley would have had to pay Plaintiff for a license to use the "Bogart mark" and where expert "point[ed] to concrete evidence supporting his opinions, including evidence of how others in the market place have placed a value on these intellectual property rights."); *see also In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, No. 3:07-CV-00088, 2010 WL 1782272, at *5 (M.D. Ga. Apr. 29, 2010) (expert's "experience provide[d] a sufficient foundation for her to offer opinions regarding the Mentor's conduct in bringing ObTape to market and responding to complications."). Dr. Bluebond-Langner's experience here provides a similarly "sufficient foundation." As she affirmed in her April 10, 2020 declaration, refiled this year in support with Sgt. Lange's summary judgment motion, she maintains "a clinical practice in plastic surgery at NYU Langone Health in New York City." (Declaration of Dr. Rachel Bluebond-Langner (ECF 144-1) ¶ 6.) In that capacity, Dr. Bluebond-Langner currently performs over 300 gender-confirming surgeries per year and has performed about 1000 gender-confirming surgeries in her career. (*Id.* ¶ 8.) Approximately 95% of the patients seen in her clinical practice are transgender people seeking gender confirmation surgeries. (*Id.*) She accepts most major health plans, and the vast majority of her patients, including those on Medicare and Medicaid, have insurance coverage for their care. (*Id.* ¶ 37.) As a medical doctor with a clinical practice that relies on payment from insurance companies, Dr. Bluebond-Langner has expertise in both gender confirmation procedures and the normal scope of insurance coverage for them. It is therefore reasonable for her to testify based on her experience as to whether blanket exclusions for gender confirming care are common.

Defendants also disagree with how Dr. Bluebond-Langner characterizes the Exclusion, and with the significance of one data point in one of the surveys she conducted.[1]   However, that attack on Dr. Bluebond-Langner's conclusions, as opposed to the "principles and methodology" behind them, is not the purpose of reliability analysis.  *Floyd*, 2010 WL 4905010, at *9; *Milton*, 2021 WL 67356, at *3-4.  If this case is tried, Defendants will be able to challenge Dr. Bluebond-Langner's opinions on cross-examination.  *In re Mentor Corp. ObTape Tranobturator Sling Prod. Liab. Litig.*, 2010 WL 1782272, at *5; *Milton*, 2021 WL 67356, at *3 (noting that the *Daubert* gatekeeping role is "not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Defendants offer no sound basis to exclude her opinions at this stage.

### B.      Dr. Bluebond-Langner's Testimony is Highly Relevant to Plaintiff's Case.

Defendants also argue that Dr. Bluebond-Langner's testimony is not relevant, or that its relevance is outweighed by the danger of unfair prejudice because it does not bear on Defendants' intentions in adopting the Exclusion and rejecting the Nondiscrimination Mandate, which they say was solely to control costs.  (Motion to Exclude Bluebond-Langner Testimony at 9-12 (citing, *inter alia*, County's summary judgment briefing).)

As an initial matter, as evinced by their explicit reference to their summary judgment brief, Defendants are effectively arguing that Dr. Bluebond-Langner's testimony should not be admitted because Defendants are correct on the merits.  That is the exact conflation of merits and *Daubert*

---

[1] The County urges that its own interpretations of how its Exclusion works and of the data point in question show that the Exclusion is less of an outlier from most insurance plans than Dr. Bluebond-Langner claims.  (Motion to Exclude Bluebond-Langner Testimony at 8-9).  Defendants additionally point out the Plan is smaller than others considered by Dr. Bluebond-Langner, (*id.* at 9), but do not argue how this makes comparisons to them inadmissible.  At most this, too, is an argument about weight not admissibility.

inquiry prohibited under Eleventh Circuit law.  *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256, n. 9 (11th Cir. 2010) (appellant's "argument that the district court erred by applying the wrong state law causation standard when excluding Dr. Marks' testimony improperly conflates *Daubert*'s reliability requirement with the showing necessary to survive summary judgment.")

Moreover, Dr. Bluebond-Langner's testimony about whether the Plan is inconsistent with typical insurance coverage, and with the standard of care for the community she serves, is directly relevant to Plaintiff's case.  It is central to Sgt. Lange's discrimination claim that she is similarly situated to other employees in that she seeks coverage for medically necessary care.  (*See* Pls' Sum. J. Br. (ECF 140) at 1-3.)  This is especially true given that Defendants seek to argue that the Exclusion does not discriminate against transgender individuals because, Defendants claim, it excludes surgery but not some other forms of care.  (County Br. (ECF 137-2) at 14-15.)  Should the case go to trial, Sgt. Lange would need to establish she is similarly situated to her colleagues, and that there is no reasonable basis to treat the care that she needs differently from other care, *see Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) ("[t]he Equal Protection Clause requires the State to treat all persons similarly situated alike or, conversely, to avoid all classifications that are 'arbitrary or irrational'")—including rebutting any argument Defendants make that the Plan covers non-surgical care, or that such coverage would be adequate.

Further, the intent inquiry under Title VII is not limited to whether Defendants acted with animus in adopting and maintaining the Exclusion.  *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1744 (2020) ("it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else [other than sex] might motivate it"); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("the absence of a malevolent motive does not convert a facially discriminatory policy into

a neutral policy with a discriminatory effect."). Thus, Defendants also err when they argue that expert evidence is only relevant to evaluating whether their "snowball" defense shows animus. By establishing the Exclusion as atypical and inconsistent with the standard of care, Dr. Bluebond-Langner's testimony is relevant to showing that Defendants' cost argument is baseless, objectively flawed, and lacking in credibility. Plaintiff would be seriously prejudiced if she were unable to present this evidence at any trial.

Dr. Bluebond-Langner's testimony should be admitted it its entirety.

## III.     THE TESTIMONY OF DR. SCHECHTER SHOULD BE ADMITTED.

Defendants' quarrels with Dr. Schechter, as with Dr. Bluebond-Langner, do not extend to his core opinions; to wit, they "do not contest Dr. Schechter's medical qualifications in general or as a gender-confirming surgeon in particular" and "do not contest Dr. Schechter's opinion that gender-conforming surgery is a medically-accepted treatment for gender dysphoria and is 'medically necessary' for Plaintiff (as well as at least some other transgender individuals)." (Motion to Exclude Dr. Schechter Testimony (ECF 132-1) at 4.)

However, Defendants "object to any testimony by Dr. Schechter that gender-confirming surgeries 'are likely to be reimbursed at the same or similar rates' as 'similar procedures' in connection with 'unrelated interventions,'" as well as Sgt. Lange's "proffer of Dr. Schechter's opinion testimony that gender-confirming surgeries are likely to be "cost-efficient" in the long-term." (*Id.* at 4-5.) They later state that "any opinion testimony that Plaintiff might proffer from Dr. Schechter as to the practices of insurance companies regarding reimbursement for surgery related to gender-dysphoria or other procedures is irrelevant and likely to lead to confusion on any jury." (*Id.* at 11.) Defendants' objections are not well-taken.

As an initial matter, Defendants misapprehend Dr. Schechter when they state that his opinion about reimbursement is irrelevant to a self-insured employer, which "is not reimbursed by

insurers."  Dr. Schechter is opining about the rates at which health plans reimburse *doctors*— simply put, the actual price paid for the surgery—and not offering any opinion regarding reimbursement of *employers*.

This misunderstanding aside, Defendants' arguments fail to raise any issues with Dr. Schechter's testimony under traditional *Daubert* analysis.  With regard to relevance, Defendants' claims that Dr. Schechter's testimony is not helpful to the trier of fact is at odds with their position on summary judgment that "cost concerns" motivated previous decisions to impose the Exclusion. (Def. Mot. For Summary Judgment (ECF 137-2) at 4, 19-20.)  Dr. Schechter's testimony puts the lie to these supposed concerns by establishing that "access to gender confirmation surgeries through insurance [is] likely a cost-effective treatment long term" because it results in "at a minimum a significant reduction of gender dysphoria" which can lead to "higher rates of negative health outcomes such as depression, HIV, drug abuse, and suicidality."  (Decl. of Dr. Schechter (ECF 57-4) at 14.)  In part, Dr. Schechter says this is because "post-surgery there is a reduction in suicide attempts and reduced utilization of mental health care for depression and anxiety."  (*Id.*)

Dr. Schechter bases this testimony on extensive research by researchers affiliated with the Johns Hopkins Bloomberg School of Public Health, the Commonwealth of Massachusetts Group Insurance Commission, and the University of Colorado.  (*Id.*)  That research found that the one-time costs of gender confirmation surgeries coupled with standard post-operative care, primary and maintenance care, were overall less expensive at 5- and 10-year marks, as compared to the long-term treatment of the negative health outcomes associated with lack of insurance and resulting healthcare access.  (*Id.*)

Having long provided care to the transgender community, Dr. Schechter has sufficient experience to identify how insurance plans reimburse treatments, and the cost savings achieved

through gender-affirming treatment. *In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, 2010 WL 1782272, at *5 ("Though she is not a statistician or a medical ethicist, Dr. Villarraga has experience designing, researching, developing, and validating new medical device designs. Such experience provides a sufficient foundation for her to offer opinions regarding the Mentor's conduct in bringing ObTape to market and responding to complications.") Dr. Schechter's extensive experience includes not only accepting insurance for gender confirming surgeries in his own practice – and making a living doing so for over 20 years – but he has also been featured as Invited Commentary on peer review articles addressing the issue of insurance for transgender care – including "Gender Surgery Beyond Chest and Genitals: Current Insurance Landscape" accepted for publication in the Aesthetic Surgery Journal. (Decl. of Dr. Schechter, Exh. A, p. 13).

Defendants miss the mark in arguing that Dr. Schechter is somehow not qualified to testify to insurance matters because he is not an actuary. Dr. Schechter's opinion on the likelihood of reimbursement is based on his experience treating thousands of patients from across the country and seeing their insurance coverage granted and denied. The testimony that he offers, therefore, is not the type that requires an actuary; someone with his extensive experience treating this community is more than qualified to provide the opinions he offers. *See In re Mentor Corp. ObTape Transobturator Sling Prod. Liab. Litig.*, 2010 WL 1782272, at *5.

## IV.  THE TESTIMONY OF CHANEL HALEY AND PAISLEY CURRAH SHOULD BE ADMITTED.

Plaintiff offers the opinions of Chanel Hayley and Paisley Currah as evidence of how transgender people satisfy the four factors required for establishing suspect or quasi-suspect class status, (*see* Pls. Br. (ECF 140-1) at 27-28), and also to provide relevant information regarding who transgender people are, and how they are impacted by discrimination. This kind of testimony,

12

from people who devote their lives to the service of the transgender community, provides the type of information that is both reliable and "beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.

**A.     Ms. Haley is Qualified to Testify and She Uses Reliable Methods.**

Defendants challenge Ms. Haley as an expert witness on the basis that she "does not have an advanced degree, or any degree," and that she does not use reliable methods.  (Motion to Exclude Haley Testimony at 1, 10-12.)

As to the first point, Defendants argue that someone must have initials after their name to serve as an expert witness.  This myopic focus on academic credentials, however, is not the law.  "Rule 702 permits a witness to be qualified as an expert based on his or her experience in the relevant field."  *Giusto v. Int'l Paper Co.*, No. 1:19-CV-00646-SDG, 2021 WL 3603374, at *2 (N.D. Ga. Aug. 13, 2021).  Indeed, the Committee notes to Rule 702 clarify that "[n]othing in this amendment is intended to suggest that *experience alone* . . . may not provide a sufficient foundation for expert testimony."  Fed. R. Evid. 702 Advisory Committee's Note (2000 amends.) (emphasis added).  Ms. Haley has worked with the transgender community in Georgia for over a decade, specifically in the areas of advocacy and of combatting discrimination that form the basis of her testimony.  For the past twelve years, she has "worked . . . with and in state and local government and politics in Georgia, with a specific focus on the transgender community."  (Chanel Haley Expert Report (ECF 146-1) ¶ 6.).  For six years, "[she has] been the Gender Policy Manager for Georgia Equality – the state's leading LGBTQ advocacy and political education organization." (*Id.* ¶ 4.)  In that capacity, she "lead[s] efforts to ensure the inclusion of transgender and gender variant individuals and communities in nondiscrimination legislation and policies across a diverse portfolio, including employment, housing, public accommodations, law enforcement, safe schools, access to health care, education and voter registration."  (*Id.*)  From 2014 to 2018, she "was the

Chair of the City of Atlanta Human Rights Commission." (*Id.* ¶ 5.)  She is also "a regular presenter regarding the Georgia transgender community at universities and in the media throughout the state." (*Id.* ¶ 7.)  This extensive experience more than qualifies her to testify as to the four class factors and as to the existence and nature of the transgender community.

To support their position that Ms. Haley's testimony is unreliable, Defendants cite to *Frazier*, which held that an expert relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." (Motion to Exclude Haley Testimony at 10, quoting *Frazier*, 387 F.3d at 1261 (quotations within *Frazier* omitted).)  Ms. Haley's testimony is admissible under that standard.  Relying on her "significant experience working with the transgender community in Georgia" as well as her "independent research" on the subject, Ms. Haley is able to conclude that "transgender individuals living and working in Georgia are subject to widespread discrimination, in both rural and urban areas throughout the state." (Chanel Haley Expert Report ¶ 14.)  Ms. Haley is able to substantiate her experience at Georgia Equality and the Atlanta Human Rights Commission fielding "numerous complaints from transgender individuals who have reported being targeted, profiled, and harassed at work, school, and in public" with survey results from hundreds of transgender Georgians attesting to the same experiences. (*Id.* ¶¶ 15-17, 21-23.)  In other words, she details her years of serving the transgender community in Georgia and explains both how that experience, and the survey evidence, led to the conclusions she reached about the discrimination transgender individuals face in Georgia, and specifically about their difficulties in obtaining protection from discrimination and access to government services. (*See, e.g.*, *id.* ¶¶ 32-33.)

Defendants' additional citations to *Amco* and *Gomez* are also not to the contrary.  Those cases stand for the unremarkable proposition that expert evidence based on purported experience may be excluded if the witness's experience is unrelated to the topic of their opinions.  *See, Gomez v. Gen. Nutrition Corp.*, 323 F. Supp. 3d 1368, 1378 (S.D. Fla. 2018) (excluding expert who "lack[ed] specialized knowledge or experience on web accessibility," and whose "professional training and experience [was] in e-commerce, which is at best tangentially related to web accessibility.")  *AMCO Ins. Co. v. TAF, Inc.*, No. CV 617-022, 2018 WL 4624097, at *8 (S.D. Ga. Sept. 26, 2018) (engineering expert not qualified to render an opinion on depreciation, which is "an entirely different area of expertise than determining the damages suffered by the structural components of a building.")  That's plainly not the case here.  Ms. Haley will testify, based on her years of experience providing services and fighting for the rights of transgender people, and on her research, as to the four suspect or quasi-suspect class factors, and she will provide an overview of who transgender people are and how they are harmed by discrimination.

## B.   The Witnesses' Testimony is Helpful and Reliable

Defendants challenge both witnesses' testimony as both unhelpful (and therefore also unduly prejudicial) and unreliable because it does not reference specific actions or omissions by Defendants.  (Motion to Exclude Haley Testimony at 12-20), (Motion to Exclude Currah Testimony (ECF 129-1) at 6-7, 11-18.)  But, as the Federal Rules provide, an expert may provide testimony helpful to determine *any* "fact in issue." Fed. R. Evid. 702(a); *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (1999) (expert testimony is "helpful" if it "logically advances a material aspect of the proposing party's case."); *see also Fisher v. Ciba Specialty Chems. Corp.*, No. 03-0566-WS-B, 2007 WL 2302470, at *3 (S.D. Ala. Aug. 7, 2007) (court did not "find persuasive defendants' reasoning that Dr. Farber's testimony cannot be helpful to a jury for Rule 702 purposes unless Dr. Farber links his statements to ultimate issues of fact specific to the

individual plaintiffs' situations and Ciba's alleged wrongdoing" as "federal courts routinely allow expert witnesses to testify on background matters, divorced from the specifics of liability and damages in a particular case, as being helpful to the jury") (reviewing cases).

Whether transgender people satisfy the four factors necessary to protection as a suspect or quasi-suspect class, (*see* Pls. Br. at 27-28), requires a determination of the underlying facts. These facts are thus necessarily "in issue." *See, e.g., Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 952-53 (W.D. Wisc. 2018) (considering facts in the record in holding transgender people constitute a quasi-suspect class); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (same); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015) (considering allegations as facts at motion to dismiss stage).[2]

Likewise, the impact of adverse government and employment action on transgender people is "in issue" in this case, (MTD Op. (ECF 74) at 26 (establishing impact as a relevant factor under *Arlington Heights*)). Indeed, the Sheriff has testified he doesn't "believe in" being transgender, (SOF (ECF 171) at ¶ 112), and so puts the very validity of transgender people as a group in issue. Dr. Currah and Ms. Haley will testify that transgender people are an identifiable group and part of the community, (*see* Expert Report of Paisley Currah (ECF 145-1) ¶¶ 11-20, 45-49 (defining terms and establishing existence and history of transgender people); Expert Report of Chanel Haley *passim* (same)), and that adverse government and employment actions are harmful, including

---

[2] Defendants also argue Dr. Currah opines on the legal issue of whether transgender people are a suspect class. (Br. at 9-10.) He does not. He provides, in part, facts and opinion relevant to permit such a holding, but this does not invade the province of the court. And Defendants' argument that transgender people *cannot* be a suspect or quasi-suspect class in this Circuit is unavailing: while it is true that discrimination on the basis of a transgender person's gender-nonconformity is sex discrimination under Equal Protection, *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), the Eleventh Circuit has never addressed the issue of whether, independently, transgender people constitute a suspect or quasi-suspect class under the clause. *See Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 952-53 (W.D. Wisc. 2018) (ruling that transgender people are at least a quasi-suspect class and that they may bring sex discrimination claims based on gender nonconformity); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (same).

specifically in the context of transgender health exclusions.  (*See* Expert Report of Paisley Currah ¶¶ 41-44 (reviewing impact of exclusions and of lack of access to healthcare, which results from exclusions), Expert Report of Chanel Haley ¶¶ 23-27 (same)).  Where jurors might agree with Defendants' views (especially in light of the Sheriff's longstanding leadership role in the community), it would be prejudicial to Sgt. Lange to preclude her from providing testimony that transgender people do validly exist, explaining who they are, and establishing how they may be harmed by adverse government and employer action.

Defendants' citations to *Martin*, *Robinson*, and *McPherson* are not to the contrary.  While in those cases the proffered expert testimony was determined not to be helpful,[3] there is no special rule prohibiting expert testimony regarding the history, impact, and scope of discrimination.  Notably, expert evidence is helpful where, as here, it tends to establish discriminatory impact under *Arlington Heights*. *City of S. Miami v. Desantis*, No. 19-cv-22927, 2020 WL 7074644 at *9-13, (Dec. 3, 2020) (denying *Daubert* motion to the extent it sought to preclude expert testimony "appl[ying] the pertinent facts of this case" to "each *Arlington Heights* factor [relevant to] determining discriminatory intent," including "informed historical and statistical analyses based on an exhaustive review of a wide variety of sources").[4]  Indeed, the adverse impact of race-based discrimination, as a general matter, was central to the Supreme Court's holding in *Brown v. Board of Education* that the defendants' specific practices were unconstitutional.  347 U.S. 483, 494 -95 (1954) (reviewing district court findings and learned treatises regarding psychological effects of racial discrimination on children).

---

[3] In *Martin*, because the statistical evidence the expert sought to use to show defendants' hiring process was discriminatory was not applicable to the hiring process; in *MacPherson* and *Robinson* because the proffered expert sought to opine on the ultimate issue; and in *Robinson* for the additional reason that the expert had no factual basis on which to predicate his opinion.

[4] *Desantis* properly granted the motion to the extent the expert sought to opine on the ultimate issue—*i.e.* whether the application of those facts demonstrated discriminatory intent.  *Id.* at *11.

## V.   THE TESTIMONY OF DR. BARRETT SHOULD BE ADMITTED.

As with Plaintiff's other proffered experts, Defendants do not question Dr. Barrett's qualifications "to opine on actuarial matters generally." (Motion to Exclude Barrett Testimony (ECF 133-1) at 1.) Nor could they. Ms. Barrett has been performing actuarial work for over 40 years, which has included advising self-insured health plans on cost and risk associated with changes to their benefit plans. (Expert Report of Barrett (ECF 143-1) at 4.) She is qualified as an expert to advise both as an actuary and based on her experience advising health plans on the cost of adding and removing benefits, including transgender healthcare benefits. (*Id.* at 4, Barrett Dep. (ECF 137-11) 65:4-16.) Based on this experience, Ms. Barrett been qualified as an expert witness multiple times on the exact opinions she is offering here, having provided expert opinions on behalf of:

- the plaintiffs in *Flack v. Wisconsin Department of Health Services*, Case No. 3:18-CV-00309- WMC in the United States District Court for the Western District of Wisconsin

- the plaintiffs in *Boyden v. State of Wisconsin Department of Employee Trust funds et al.*, Case No. 17-CV-264 in the United States District Court for the Western District of Wisconsin; and

- the plaintiffs in *Toomey, v. State of Arizona, et al.*, No. CV-19-00035-TUC-RM (LAB) in the United States District Court for the District of Arizona.

Instead, Defendants object to (1) Ms. Barrett's use of publicly available data, as opposed to specific data from Houston County (though that data was requested in discovery and what was provided did not contain sufficient information), to conduct the actuarial analysis; (2) her opinion that a cost of less than 0.1% is immaterial from an actuarial perspective; and (3) her opinion that removing one exclusion from a health plan does not impact other exclusions. (*See generally* Motion to Exclude Barrett Testimony.) Defendants further state that Ms. Barrett's "opinion testimony based on other plans that are much larger than the County's is not relevant and presents

18

a danger of confusing the issues and misleading a jury." (*Id.* at 2.)  Several of these objections misstate her testimony and none are valid.

### A.      Ms. Barrett Appropriately Relied on the "Best Available" Evidence.

As a threshold matter, Defendants mischaracterize the evidence that Ms. Barrett relied upon in forming her opinion.  Defendants state that she used data "contained in an expert report … in a previous litigation involving a state health care plan that is 100 times larger than the County's." (*Id.* at 1.)  They further argue that her opinion testimony presents a danger of confusing or misleading a jury because it is based on plans that are much larger than the Health Plan.  Neither is true.  Ms. Barrett did not rely on data from the *Boyden* litigation, which involved a similar exclusion for transgender healthcare under Wisconsin's insurance for state employees.  (Expert Report of Barrett at 14.)  Ms. Barrett relied upon a comprehensive data set used in an expert actuarial report (the "Williams Report") prepared for the *Boyden* litigation.  (*Id.* at 14-15.)  The distinction is critical – Ms. Barrett relied on a large database of publicly-available healthcare information that was *also* used in that litigation, not data that was specific to the health plan at issue in *Boyden* or any health plan at all.  The dataset originated from the 2016 Truven MarketScan commercial database, which contains enrollment and claims data for a nationwide sample of twenty million people with employer-sponsored health insurance.  (*Id.* at 14).  Ms. Barrett has opined that the Williams Report is consistent with actuarial standards of practice and best principles and that it is broadly representative of claims experience for self-insured plans.  (Expert Report of Barrett at 42-44.)  She testified that it is the best available data.  (Barrett Dep. at 58:1-9.)

The law is clear that an expert may use publicly available information in forming her opinion and that any concern with whether the information is representative or reliable goes to weight, not admissibility.  In *Bellitto v. Snipes*, 302 F. Supp. 3d 1335 (S.D. Fla. 2017), the

defendant moved to exclude an expert's testimony in a voting rights case by attacking the methods the expert employed to calculate voter registration rates and the underlying data upon which he relied for those calculations. *Id.* at 1350.  There, the expert used publicly available census data to provide the court with his assessment of the ratio of registered voters as compared with the eligible citizen population. *Id.*  The defendants argued that the estimates would understate the citizen voting-age population and would therefore be misleading. *Id.* at 1357.  However, the court held that there was nothing problematic about the expert's use of publicly available sample population data to perform straightforward calculations. *Id* at 1350-51.  The court held that the use of the sample data as opposed to case-specific data did not render the expert's testimony unreliable and noted that "to the extent that the… population estimates used by [the expert] do not lend to the kind of precision an exact value might, such a concern speaks to the weight of [the expert's figures], not their admissibility." *Id.* at 1351, *see also Williams v. Ethicon Inc.*, No. 5:20-CV-234, 2021 WL 1087808, *5 (M.D. Ga. March 22, 2021) (denying defendant's motion to exclude portions of an expert's testimony as unreliable because the expert did not test his theory or cite to an exact peer review study, as the court found that the expert relied on a peer-reviewed study that was relevant, if not perfectly on point, and had extensive personal experience in the field).

Similarly here, Ms. Barrett used publicly available data, which Defendants acknowledge she was qualified to interpret.  Any quarrel they have with her conclusions goes to their weight, not their admissibility.  Moreover, she considered the limits of this data in her analysis, performing a reasonableness test to compare her results to other, similar analyses.[5]  (Expert Report of Barrett at 16.)  She also considered other sources in addition to the Williams Report's dataset including, most

---

[5] In fact, Ms. Barrett's conclusion that the cost to the health plan would be less than 0.1% of the total plan budget ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Exhibit GG to the Declaration of Jill K. Grant (ECF 151-7) (document filed under seal).

importantly, all of the data considered by the County in deciding to opt out of the Nondiscrimination Mandates (*i.e.* none) and all of the data considered by the County in its 2019 vote (*i.e.* Mr. Carter's memoranda of Nov. 9 (ECF 155-17) and Nov. 16, 2019 ( ECF 155-18), and his Nov. 19, 2019 comments (ECF 36-1 at 23); *see also* Carter Decl. (ECF 36-1) at 3 (listing these materials)).  If it was appropriate for the County to rely on only these data in deciding that it would be too costly to remove the Exclusion, it is certainly appropriate for Sgt. Lange to have an expert to opine, based on that same data plus more, that doing so was not appropriate.

**B.**   **Ms. Barrett Does Not Offer a "Personal" Opinion But Her Expert Opinion Based On Her Experience Advising Healthcare Plans.**

Ms. Barrett has been performing actuarial work for over 40 years, which has included advising self-insured health plans on cost and risk associated with changes to their benefit plans. (Expert Report of Barrett at 6.)  She has advised self-insured plans on the cost of adding and removing benefits and exclusions, including transgender healthcare.  (Barrett Dep. at 10:4-11.) Defendants do not dispute that she is a qualified actuary specializing in healthcare.  And yet, Defendants suggest that, despite Ms. Barrett's expert credentials, she is offering personal opinion testimony on the actuarial standard for materiality.  In fact, Ms. Barrett has testified that, in her experience as a practicing actuary advising health plans, 0.1% is the accepted actuarial threshold for materiality of any particular cost.  (Barrett Dep. at 49:4-25.)  She testified that this opinion is based on her years of experience pricing costs for self-insured health plans.  (Barrett Dep. at 49:7-14.)  There is simply no reasonable argument that she is offering a "personal" opinion on the issue.

Similarly, Defendants argue that Ms. Barrett is offering her personal opinion testimony that removing one exclusion from a health plan does not have an impact on any other exclusions. (Motion to Exclude Barrett Testimony at 2.)  This is not the case.  Ms. Barrett has testified to her significant professional experience in evaluating the removal of benefit exclusions.  (Barrett Dep.

at 65:4-13.)  In fact, in her report, she specified that she was basing her opinion on her decades of professional experience, stating that "*I have advised many health plans over the years* [and] no plan has ever expressed a concern that removing one exclusion would open a 'Pandora's box' … [i]nstead, each exclusion was carefully considered on its own merits."  (Expert Report of Barrett at 20.)  Again, there can be no real argument that she is offering anything but an opinion based on her professional experience.

Respectfully submitted this 22 day of December, 2021.

Kenneth E. Barton III
Ga. State Bar No. 301171
M. Devlin Cooper
Ga. State Bar No. 142447
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com

David Brown*
Gabriel Arkles*
TRANSGENDER LEGAL DEFENSE EDUCATION
FUND, INC.
520 8th Ave. Ste. 2204
New York, NY 10018
(646) 862-9396 tel.
(646) 993-1686 fax
dbrown@transgenderlegal.org
acaraballo@transgenderlegal.org
nlewis@transgenderlegal.org

Wesley Powell*
Jill K. Grant*
Catherine E. Fata*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com
jgrant@willkie.com
cfata@willkie.com

Kevin M. Barry*
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, CT 06518
(203) 582-3238 tel.
(203) 582-3237 fax
legalclinic@quinnipiac.edu

*Attorneys for Plaintiff*

* Admitted pro hac vice.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **Omnibus Memorandum of Law in Oppositions to Defendants' Motions for Summary Judgment** to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

Sharon P. Morgan, Esq.
Patrick L. Lail
Elarbee, Thompson, Sapp & Wilson, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
morgan@elarbeethompson.com
lail@elarbeethompson.com
*Attorneys for Defendants*

This 22 day of December, 2021.

Kenneth E. Barton III
Ga. State Bar No. 301171
M. Devlin Cooper
Ga. State Bar No. 142447
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com