## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

ANNA LANGE,

        Plaintiff,

  vs.

HOUSTON COUNTY, GEORGIA; and Houston County Sheriff CULLEN TALTON, in his official capacity,

Civil Action No.

5:19-CV-00392-MTT

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN
## <u>OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................4

I.      Defendants Have Failed To Carry Their Burden On Summary Judgment. .......................4

II.     The County Is Sgt. Lange's Employer Under Title VII And The ADA. ............................4

        A.      The County Is Liable As An Agent Of The Sheriff's Office. ..................................5

        B.      The County Is Liable As A Joint Employer. ...........................................................7

                1.      The "Agreement Between The County And Sheriff" Triggers
                        Joint Employer Liability. ..............................................................................7

                2.      The County Has Sufficient Control To Establish Joint Employer
                        Liability. ........................................................................................................8

III.    The Exclusion Violates The Equal Protection Guarantee. ................................................11

        A.      The Exclusion Is Entitled to Heightened Scrutiny As A Classification
                Based On Sex And Transgender Status. ................................................................11

        B.      Defendants Ignore Record Evidence Of Intent. ...................................................12

        C.      Defendants' Economic Interests Fail Equal Protection Review. ...........................14

IV.     The Exclusion Violates Title VII. ....................................................................................15

        A.      Sgt. Lange Has Offered Direct Evidence Of Sex Discrimination. ........................16

        B.      Defendants' Arguments That The Exclusion Isn't Discriminatory
                Are Unavailing. ....................................................................................................17

        C.      Sgt. Lange Can Establish Sex Discrimination Based On Circumstantial
                Evidence. ..............................................................................................................20

                1.      Sgt. Lange Has Met Her Light Burden To Establish A Prima
                        Facie Case Of Sex Discrimination. .............................................................20

                        a.      Sgt. Lange Experienced An Adverse Employment
                                Action—Denial Of Benefits. ............................................................21

                        b.      The Plan Treats Sgt. Lange Less Favorably Than It
                                Treats Similarly Situated Cisgender Employees. ..............................23

                2.      The Defendants' Purportedly Non-Discriminatory Business
                        Reason for Maintaining the Exclusion—Cost—Is Demonstrably
                        False. ...........................................................................................................24

                        a.      The Proffered Reason For The Exclusion Is Mere Pretext. ...........25

                        b.      Cost Is No Defense Under Title VII. ................................................26

V.      The Exclusion Violates Title I Of The ADA. ...................................................................28

A.    The Uncontroverted Evidence Shows That Sgt. Lange Has A Disability. ............29

    1.    The ADA Does Not Exclude Gender Dysphoria. ......................................29

    2.    Sgt. Lange's Gender Dysphoria Is Not Excluded Under The ADA Because It Results From Physical Impairments. .............................32

    3.    Sgt. Lange Meets the ADA's Definition of "Disability." .........................34

B.    Sgt. Lange Suffered An Adverse Employment Action. ..........................................35

C.    Defendants Denied Sgt. Lange's Request For A Reasonable Accommodation. ...............................................................................................37

D.    Sheriff Talton Received Notice Of Sgt. Lange's Request For Reasonable Accommodation. .................................................................................................39

VI.    The Sheriff's Office Is Not Entitled To Sovereign Immunity. ...........................................40

A.    The Most Significant Factor—That Neither The State of Georgia Nor Houston County Is Responsible For A Monetary Judgment Against The Sheriff's Office—Weighs Strongly Against a Finding of Sovereign Immunity. ...............................................................................................................41

B.    The Other Factors Weigh Against Sovereign Immunity. .......................................41

C.    Sovereign Immunity Does Not Bar Claims For Prospective Relief. .....................43

CONCLUSION ....................................................................................................................43

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Avery v. City of Covington, Georgia,*
No. 1:18-CV-05417-JPB, 2021 WL 2435872 (N.D. Ga. Mar. 12, 2021)..................................8

*Bassano v. Hellmann Worldwide Logistics, Inc.,*
310 F. Supp. 2d 1270 (N.D. Ga. 2003) .................................................................21

*Blatt v. Cabela's Retail, Inc.,*
No. 5:14-cv-04822, 2017 WL 2178123 (E.D. Pa. May 18, 2017)..........................................30

*Blatt v. Cabela's Retail, Inc.,*
No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015) ....................................30

*Book v. Daytona Beach, Fla.,*
Case No. 6:08-cv-1180-Orl-28DAB, 2009 WL 10706063 (M.D. Fla. July 14, 2009) ..................................................................................................14

*Boots v. Nw. Mut. Life Ins. Co.,*
77 F. Supp. 2d 211 (D.N.H. 1999) ........................................................................37

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ................................................................................. *passim*

*Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,*
37 F.3d 12 (1st Cir. 1994)......................................................................................6

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985)....................................................................................14, 15, 32

*Curling v. Raffensperger,*
403 F. Supp. 3d 1311 (N.D. Ga. 2019) .................................................................43

*de Louis v. Metro. Atlanta Rapid Transit Auth.,*
No. 1:04-CV-2816-CC, 2005 WL 8154830 (N.D. Ga. Aug. 4, 2005) ....................................37

*Doe v. Arrisi,*
No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49 .........................................30

*Doe v. Dzurenda,*
No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57 .....................................30

*Doe v. Hosp. of Univ. of Pa.,*
No. 19-2881-KSM, 2021 WL 2661501 (E.D. Pa. June 29, 2021)..........................................34

*Doe v. Mass. Dep't of Corr.,*
No. CV 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ........................ *passim*

*Doe v. Pennsylvania Dept. of Corrections,*
120CV00023SPBRAL, 2021 WL 1583556 (W.D. Pa. Feb. 19, 2021) ...........................31, 32

*Doe v. Triangle Doughnuts, LLC,*
472 F. Supp. 3d 115 (E.D. Pa. 2020) ...................................................................30

*Donnellon v. Fruehauf Corp.,*
794 F.2d 598 (11th Cir.1986) ...........................................................................25

*E.E.O.C. v. Staten Island Savs. Bank,*
207 F.3d 144 (2d Cir. 2000) ..............................................................................36

*Edmo v. Idaho Dep't of Corr.,*
No. 1:17-cv-00151-BLW, 2018 WL 2745898 (D. Idaho June 7, 2018) ....................31

*EEOC v. Alton Packaging Corp.,*
901 F.2d 920 (11th Cir. 1990) ..........................................................................19

*EEOC v. Beverage Canners, Inc.,*
897 F.2d 1067 (11th Cir. 1990) ........................................................................19

*EEOC v. CNA Ins. Cos.,*
96 F.3d 1039 (7th Cir. 1996) ............................................................................36

*EEOC v. Dolgencorp, LLC,*
No. CV 617-100, 2018 WL 6251379 (S.D. Ga. Nov. 29, 2018) .............................16

*Fletcher v. Alaska,*
443 F. Supp. 3d 1024 (D. Alaska 2020) ..............................................................18

*Fletcher v. Tufts Univ.,*
367 F. Supp. 2d 99 (D. Mass. 2005) ..................................................................37

*Freyre v. Chronister,*
910 F.3d 1371 (11th Cir. 2018) ........................................................................41

*General Electric Co. v. Gilbert,*
429 U.S. 125 (1976) ...........................................................................18, 19, 22, 23

*Halliburton v. Peach Cnty. Sheriff's Dept.,*
2012 WL 4468764, No. 5:11-CV-109(MTT) (M.D. Ga. Sep. 26, 2012) ...............42

*Haven v. Bd. of Trs. of Three Rivers Reg'l Libr. Sys.,*
625 F. App'x 929 (11th Cir. 2015) .....................................................................40, 42

*Henderson v. Bodine Aluminum, Inc.,*
    70 F.3d 958 (8th Cir. 1995) .........................................................................37

*Hennessy-Waller v. Snyder,*
    529 F. Supp. 3d 1031 (D. Ariz. Mar. 30, 2021)...........................................18, 22, 23

*Hess v. Port Auth. Trans-Hudson Corp.,*
    513 U.S. 30 (1994).......................................................................................41

*Hornsby-Culpepper v. Ware,*
    906 F. 3d 1302 (11th Cir. 2018) ...................................................................27

*Hunt v. Aimco Props., L.P.,*
    814 F.3d 1213 (11th Cir. 2016) ....................................................................39

*Hurlbert v. St. Mary's Health Care Sys., Inc*.,
    439 F.3d 1286 (11th Cir. 2006) ..............................................................25, 26

*Iglesias v. True,*
    403 F. Supp. 3d 680 (S.D. Ill. Jul. 25, 2019) ..............................................33

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v.*
    *Johnson Controls, Inc.,*
    499 U.S. 187 (1991).......................................................................................17

*Jefferson v. Sewon Am., Inc*.,
    891 F.3d 911 (11th Cir. 2018) ......................................................................16

*John Doe v. Northrop Grumman Sys. Corp*.,
    No. 5:19-CV-00991, 2019 WL 5390953 (N.D. Ala. Oct. 22, 2019) .....................................31

*Keene v. Prine,*
    477 F. App'x 575 (11th Cir. 2012) ..........................................................26, 41

*Kimber v. Thiokol Corp*.,
    196 F.3d 1092 (10th Cir. 1999) ....................................................................36

*Lange v. Houston Cnty.,*
    499 F. Supp. 3d 1258 (M.D. Ga. 2020) ............................................ *passim*

*Lewis v. City of Union City,*
    918 F.3d 1213 (11th Cir. 2019) .............................................................15, 21, 23

*Lewis v. Kmart Corp*.,
    180 F.3d 166 (4th Cir. 1999) ........................................................................36

*Manders v. Lee,*
    338 F.3d 1304 (11th Cir. 2003) ..........................................................40, 41, 42

*Mazzeo v. Color Resols. Int'l, LLC,*
   746 F.3d 1264 (11th Cir. 2014) ...................................................................28

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973)............................................................................16, 20, 23, 24

*Mem'l Hosp. v. Maricopa Cnty.,*
   415 U.S. 250 (1974)....................................................................................14

*Merritt v. Dillard Paper Co.,*
   120 F.3d 1181 (11th Cir. 1997) .................................................................17

*Mileski v. Gulf Health Hosps., Inc*.,
   No. 14-0514-C, 2016 WL 1295026, No. CA 14-0514-C (S.D. Ala. Mar. 31,
   2016) .............................................................................................................35

*Minyard v. Escambia Cnty.,*
   No. 3:20cv34-TKW-HTC, 2020 WL 12309043 (N.D. Fla. May 4, 2020)...........................8, 9

*Monaghan v. Worldpay US, Inc.,*
   955 F.3d 855 (11th Cir. 2020) ....................................................................21

*Newport News Shipbuilding & Dry Dock Co. v. EEOC,*
   462 U.S. 669 (1983)................................................................................19, 21

*Parker v. Metro. Life Ins. Co*.,
   121 F.3d 1006 (6th Cir. 1997) (en banc) .................................................36

*Parker v. Strawser Constr., Inc.,*
   307 F. Supp. 3d 744 (S.D. Ohio 2018) .....................................................31

*Peppers v. Cobb Cty.,*
   835 F.4d 1289 (11th Cir. 2016) .......................................................7, 8, 9, 10

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979).....................................................................................12

*Rollins v. TechSouth, Inc.,*
   833 F.2d 1525 (11th Cir. 1987) .................................................................28

*Romer v. Evans,*
   517 U.S. 620 (1996)....................................................................................32

*Shedrick v. Dist. Bd. of Trs. of Miami-Dade Coll*.,
   941 F. Supp. 2d 1348 (S.D. Fla. 2013) .....................................................28

*Shorter v. Barr,*
   4:19CV108-WS/CAS, 2020 WL 1942785 (N.D. Fla. Mar. 13, 2020) ............................31, 33

*Spirt v. Teachers Ins. & Ann. Assn.*,
  475 F. Supp. 1298 (S.D.N.Y. 1979)..............................................................6

*Tay v. Dennison*,
  No. 19-cv-00501-NJR, 2020 WL 2100761 (S.D. Ill. May 1, 2020) ......................31

*Taylor v. Phoenixville Sch. Dist.*,
  184 F.3d 296 (3d Cir. 1999)..............................................................39

*Tex. Dep't of Cmty. Affs. v. Burdine*,
  450 U.S. 248 (1981)...........................................................20, 24

*Toomey v. Arizona*,
  No. CV-19-00035-TUC-RM (LAB), 2021 WL 753721 (D. Ariz. Feb. 26,
  2021) ...................................................................................19

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973)........................................................................14

*In re Union Pac. R.R. Emp. Pracs. Litig.*,
  479 F.3d 936 (8th Cir. 2007) ..............................................................23, 24

*United States v. Stone*,
  139 F.3d 822 (11th Cir. 1998) ..............................................................31

*United States v. Virginia*,
  518 U.S. 515 (1996).........................................................................11

*Venson v. Gregson*,
  No. 3:18-CV-2185-MAB, 2021 WL 673371 (S.D. Ill. Feb. 22, 2021) ..................30

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)........................................................................11

*Weyer v. Twentieth Century Fox Film Corp.*,
  198 F.3d 1104 (9th Cir. 2000) ............................................................36

*Williams v. City of Montgomery*,
  742 F.2d 586 (11th Cir. 1984) ..............................................................5

*Williamson v. Clarke Cnty. Dep't of Hum. Res.*,
  834 F. Supp. 2d 1310 (S.D. Ala. 2011)..................................................40

*Winnie v. Infectious Disease Assocs., P.A.*,
  750 F. App'x 954 (11th Cir. 2018) ......................................................38

*Woolsey v. Town of Hillsboro Beach*,
  541 F. App'x 917 (11th Cir. 2013) ......................................................27

*Ex Parte Young,*
  209 U.S. 123 (1908)................................................................................43

**Statutes**

42 U.S.C. § 12102(1).................................................................................34

42 U.S.C. § 12102(3)(A)...........................................................................35

42 U.S.C. § 12102(4)(A)...........................................................................34

42 U.S.C. § 12211(b)(1)............................................................................29

**Other Authorities**

29 C.F.R. § 1630.2(h)(1)...........................................................................33

29 C.F.R. § 1630.2(k)................................................................................35

135 Cong. Rec. S10753.............................................................................31

Fed. R. Civ. P. 56(a)..................................................................................4

Plaintiff Sergeant Anna Lange respectfully submits this omnibus memorandum of law in opposition to the Motions for Summary Judgment filed by Houston County, Georgia (the "County") and Sheriff Cullen Talton (the "Sheriff") (together, "Defendants"). Defendants have failed to meet their burden to show that, on the undisputed facts, they are entitled to summary judgment on Plaintiff's claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Protection Clause ("EPC"), and Title I of the Americans with Disabilities Act (the "ADA"). In addition, the Sheriff has not met his burden to show that he is entitled to sovereign immunity. Rather, Sgt. Lange has demonstrated that, on the undisputed record, she is entitled to summary judgment on each of these claims.

## INTRODUCTION

This case is about equal access to healthcare. Sgt. Lange, a transgender woman, has challenged the blanket exclusion of health insurance coverage for gender confirming care in the County's employee health plan (the "Health Plan" or the "Plan"). Sgt. Lange participates in the Health Plan, which the Sheriff's Office has arranged for the County to provide to its employees and which contains a categorical exclusion for "[d]rugs for sex change surgery," and "[s]ervices and supplies for a sex change" (the "Exclusion"). As a result, Sgt. Lange has been unable to obtain medically necessary surgery as well as routine tests and medical care. The Exclusion thus denies medically necessary care to transgender people for treatment of their gender dysphoria even where it would cover the same care for cisgender members who need the same care for other reasons. Defendants have not established that this discriminatory sex- and disability-based exclusion is lawful under Title VII, the EPC, and the ADA. Nor can they.

In their summary judgment motions, Defendants once again try to evade liability, repeating arguments that this Court has previously rejected. The County again argues that it is not liable

under Title VII or the ADA because it is not Sgt. Lange's employer.  But under the legal framework articulated in this Court's earlier ruling in this case, the record now supports a finding that the Sheriff has delegated the responsibility of providing healthcare to the County as its agent, creating liability under Title VII and the ADA.  The Sheriff argues that he is not liable, in his official capacity, for discrimination in the Health Plan because the Health Plan is offered by the County. Under this logic, no one is liable for discrimination in the Health Plan.  Together, Defendants ask this Court to find that any governmental employer can freely discriminate under Title VII and the ADA so long as they outsource the discrimination to a third party.  If the Court accepts these arguments, then members of the Health Plan (or others similarly situated) would have no recourse for violations of their civil rights.

The undisputed record in this case contains ample evidence of discrimination, which Defendants cannot overcome.  In addition to their affirmative choice to retain the Exclusion, which has kept Sgt. Lange from obtaining medically necessary healthcare, they have made disparaging statements about transgender people.  Among other examples, Sheriff Talton has stated that he "does not believe" in transgender people and refused to treat Sgt. Lange in the same manner as other women in the office (including referring to Sgt. Lange exclusively as "he" when the Sheriff was deposed in this matter).  Sheriff Talton and others have also likened Sgt. Lange's medically necessary healthcare to cosmetic surgery, like a "tummy tuck" or a "nose job."

Despite evidence of discrimination against Sgt. Lange (and transgender people) and undisputed evidence that the cost of removing the Exclusion would be minimal, Defendants argue that they have chosen to retain the Exclusion strictly as a cost-saving measure.  Defendants have further invented a *post hoc* argument that removing the Exclusion would force them to remove other exclusions and "snowball" the costs of the Health Plan.  This argument relies merely on

supposition and is contradicted by the record.  But even if these arguments were supported by the record, they fail as a matter of law because cost is not a justification under Title VII or the EPC.

Defendants further argue that Sgt. Lange does not have a disability covered by ADA.  They are wrong.  Plaintiff has produced expert evidence showing that gender dysphoria is a medical condition with a physical and biological etiology.  Indeed, Defendants do not contest that gender dysphoria has a physical origin but rather argue that Sgt. Lange has not shown that *her specific* case of gender dysphoria has a physical basis.  They are grasping at straws.  It is of no import that Sgt. Lange's medical records do not state this conclusion, as that ignores the Court's prior opinion and also is not something doctors do in the normal course.  Defendants' statements that they did not discriminate on the basis of her disability is also belied by the record which, as discussed, contains ample evidence to show animus to transgender people among the decision makers who chose not to remove the Exclusion after learning of its impact on Sgt. Lange.

Finally, the Sheriff offers an argument on sovereign immunity without citing any additional evidence that should change the Court's prior rejection of that argument.

In sum, Defendants have failed to carry their burden to demonstrate that they are entitled to summary judgment on any of Sgt. Lange's claims.  All of their arguments fail as a matter of law.  Defendants' legal theories have been rejected by many courts, including just last year by the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020), and this Court should reject them as well.  Indeed, not only should Sgt. Lange's claim survive Defendants' motions, the Court should grant summary judgment in Sgt. Lange's favor because the Exclusion unequivocally discriminates against her based on her sex and disability.

## ARGUMENT

### I.   Defendants Have Failed To Carry Their Burden On Summary Judgment.

Summary judgment may be granted only when the moving party establishes that there is no genuine dispute of material fact to be tried and the moving party therefore is entitled to judgment as a matter of law based on the undisputed record.  *See* Fed. R. Civ. P. 56(a).  Defendants have failed to carry this burden with respect to any of Sgt. Lange's claims in this action.  To the contrary, the parties' briefing in support of their respective motions for summary judgment collectively establishes that *Sgt. Lange* is entitled to summary judgment with respect to each of her claims.  Accordingly, Sgt. Lange requests that the Court deny Defendants' motions for summary judgment and enter an order of summary judgment in her favor.

### II.   The County Is Sgt. Lange's Employer Under Title VII And The ADA.

The County fails to rebut that it is Sgt. Lange's employer under Title VII and the ADA. The County offers three arguments as to why it is entitled to summary judgment with respect to this threshold issue.  Each is unavailing.  *First*, the County repeats its argument that a County cannot be an "employer" of a sheriff's deputy for Title VII purposes as a matter of Georgia law. *See* Memorandum of Law in Support of Defendant Houston County's Motion for Summary Judgment, Lange v. Houston County, et al., No. 5:19-CV-00392-MTT (M.D. Ga. Nov. 3, 2021), ECF No. 137-2 ("County's Br.") at 5-6.  The Court already rejected this argument, twice, and Sgt. Lange does not further address it here.  *See Lange v. Houston Cnty.,* 499 F. Supp. 3d 1258, 1273 (M.D. Ga. 2020); Order, Lange v. Houston County, et al., No. 5:19-CV-00392-MTT (M.D. Ga. Dec. 22, 2020), ECF No. 102 ("Order on Mot. to Reconsider Op.") at 2-4.  *Second*, the County argues it is not an "employer" under a joint employer theory because the County hasn't contracted in writing with the Sheriff's Office for Sgt. Lange's services.  *See* County's Br. at 6-8.  But there is no such requirement for joint employer liability.  Third, it argues

it isn't an "employer" under an agency theory because the Sheriff "controls both whether to provide health insurance benefits and how to provide such benefits." *See* County's Br. at 8-11. But the County ignores that it voluntarily provided healthcare benefits to Sheriff's Office employees on behalf of the Sheriff's Office, and tailored those benefits to exclude transgender healthcare—which, as discussed below, establishes liability under *Williams v. City of Montgomery*, the case on which the County relies.

### A.    The County Is Liable As An Agent Of The Sheriff's Office.

"[T]wo separate entities can both be an employer under Title VII" as "[t]he ADA and Title VII both define 'employer' to include an employer's agents." *Lange v. Houston Cnty.*, 499 F. Supp. 3d 1258, 1273 (M.D. Ga. 2020) (citing 42 U.S.C. 2000e(b)). "Where an employer delegates control of *some* of its traditional rights over its employees to another entity, that third party is an employer by virtue of the agency relationship." *Williams v. City of Montgomery*, 742 F.2d 586, 589 (11th Cir. 1984) (emphasis added). This Court previously held that allegations that the Sheriff's Office "has chosen to delegate the provision of healthcare benefits to the County" and that the "County provided healthcare benefits to Sheriff's Office employees on behalf of the Sheriff's Office and tailored those benefits to exclude genital surgery" are adequate to state a claim for liability under an agency theory. *Lange*, 499 F. Supp. 3d at 1273. Those allegations are now proven on the undisputed record. The County admits that it provides healthcare benefits to Sheriff's Office employees on behalf of the Sheriff's Office and tailors those benefits to exclude transgender healthcare coverage. County Br. at 8 ("Sheriff's Office employees are afforded an opportunity to subscribe to the County's health insurance plans."), 10 ("[T]he County . . . controls the terms and conditions of the Plan, *including its exclusions*." (emphasis added)). The County further admits that "the Sheriff has no authority to amend the plan; only the County, as Plan sponsor, may amend the Plan." *Id*. at 8. Based on the County's own admissions, the Sheriff's

Office has delegated the provision of healthcare benefits to the County, which, in turn, has control over the terms and conditions of the Health Plan, including whether to remove the Exclusion.

The County argues it cannot be liable because the Sheriff's Office controls "both <u>whether</u> to provide health insurance benefits to his employees and <u>how</u> to provide such benefits to his employees." County Br. at 10. But as this Court has previously noted, the claim arises from the provision of benefits by the County. *See* Order on Mot. for Reconsideration at 3. Sgt. Lange does not seek to hold the County liable for the Sheriff's Office's actions, but rather its own. *See id.* The County seeks support in *Spirt v. Teachers Ins. & Ann. Assn.*, 475 F. Supp. 1298 (S.D.N.Y. 1979), but that case actually proves this point: an employer adopted a benefit plan administered by a third party administrator; the administrator wrote a plan term that discriminated on the basis of sex; and the court ruled that the administrator faced liability as the employer's agent under Title VII because it controlled the aspect of employment that gave rise to the discrimination. *Id.* at 1308 ("[Defendant employers] have delegated their responsibility for and control over employee annuity plans to [third-party administrators]. To hold that discrimination in that aspect of employee compensation cannot be fully remedied under Title VII because of such delegation would impair the effectiveness of the Act."). *See also Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17 (1st Cir. 1994) (holding that insurance company could be considered an employer under the ADA if, inter alia, it "act[s] on behalf of the entity in the matter of providing and administering employee health benefits"); EEOC Compliance Manual, No. 915.003, 2-III(B)(2)(b)(2000), https://www.eeoc.gov/policy/docs/threshold.html (citing *Carparts*, 37 F.3d at 17) (stating that "an insurance company that provides discriminatory benefits to the employees of a law firm may be liable under the EEO statutes as the law firm's agent").

## B.   The County Is Liable As A Joint Employer.

"[W]here two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees," they are joint employers under Title VII. *Peppers v. Cobb Cty.*, 835 F.4d 1289 (11th Cir. 2016).  This is precisely the situation here: the County and Sheriff have agreed that the County will share in the control of the terms and conditions of Sheriff's Office employees, including but not limited to the terms of the health care plan offered to them.  The County argues that it cannot be held accountable for challenges to the Health Plan because the agreement to provide these benefits is informal and because the County does not have the requisite "control" to trigger joint employer liability.  Both arguments fail.  The County admits that there is an agreement, though informal, between the parties whereby the County provides the Health Plan to Sheriff's Office employees.  The County further admits that it has control over the terms of the Health Plan.  The undisputed facts thus show that the County meets the standard for both agreement and control required by *Peppers*.

### 1.   The "Agreement Between The County And Sheriff" Triggers Joint Employer Liability.

The County argues that there can be no joint employer liability because there is no formal "contract . . . for services to be provided by Plaintiff"—but concedes that there is indeed "an agreement between the County and the Sheriff" to provide group medical benefits to Sheriff employees.  County Br. at 7.  The County provides no support for its argument that the agreement between joint employers must be reduced to writing; nor is there any basis for this formalism in the text of Title VII, nor any case interpreting it.  Indeed, the County's argument—that an employer may evade liability for civil rights violations so long as they outsource discrimination through a verbal, rather than written, agreement—is contrary to the law's purpose.  *Cf. Peppers*, 835 F.4d at

1298 (recognizing that courts should not approve of mechanisms "maintained for the purpose of evading the federal employment discrimination laws").

> 2.   *The County Has Sufficient Control To Establish Joint Employer Liability.*

The County further argues that it cannot be liable as a joint employer because it does not have sufficient control over Plaintiff and does not have the ability to hire, fire, or modify certain other terms of her employment.   County Br. at 7.   This argument primarily relies on *Peppers*, arguing that the "focal point" of the joint employer analysis is not on "which entity controlled the . . . Plan exclusion . . . but rather, which entity controlled the fundamental and essential aspects of the employment relationship when taken as a whole."   County Br. at 8.   But *Peppers* actually held that two entities are joint employers where "one company retains sufficient control over the terms and conditions of employment of the other company's employees."   *Peppers*, 835 F.3d at 1298 (citing *Lyes*, 166 F.3d at 1341), and an entity is an employer when it controls "the fundamental aspects of the employment relationship *that gave rise to the claim.*"   *Id.* at 1297 (emphasis added). While a court should consider the totality of the employment relationship, the analysis does not end there.   *Id.*

The County's contrary reading of *Peppers* has been rejected by District Courts.   *See e.g. Avery v. City of Covington, Georgia*, *,* No. 1:18-CV-05417-JPB, 2021 WL 2435872, at *2 (N.D. Ga. Mar. 12, 2021) (internal quotations omitted) ("The applicable test does not require predominance.").   *Peppers* does not prohibit a court from finding joint employer status simply because of "the fact that Defendants could not fire or discipline Plaintiff or directly regulate the performance of her duties[.]"   *Minyard v. Escambia Cnty.*, No. 3:20cv34-TKW-HTC, 2020 WL 12309043, at *3 (N.D. Fla. May 4, 2020).   When faced with a similar situation involving two separate government entities, *Minyard* held that under *Peppers* lacking the ability to hire and fire

"does not necessarily mean that they were unable to exercise any control over Plaintiff's work *or modify the terms and conditions of her employment.*" *Id.* (emphasis added). For instance, a county's "budgetary control" over another entity could be wielded to control terms and conditions of employment, including by "refusing to fund certain expenses" in the budget. *Id.* at *3–4.

Thus, the central question under *Peppers* is "whether the alleged employer had the power to . . . modify the terms and conditions of the employee's employment." *See id.* Here, the County does for two reasons. *First*, there is no dispute that the County wields the power to fund (or not fund) a non-discriminatory health plan upon request of the Sheriff's Office. Grant Decl. Ex. E (Sheriff's Office 30(b)(6) Dep. (Rape) 44:3–45:10 (conceding that the "county could deny that request for funding of a new health plan," and indeed "might deny the money").[1] *Second*, the County undertakes all personnel functions for the Sheriff's Office, which does not have its own HR department. *See* Defendant Cullen Talton's Statement of Undisputed Material Facts as to Which There is No Genuine Issue to Be Tried, Lange v. Houston County, et al., No. 5:19-CV-00392-MTT (M.D. Ga. Nov. 3, 2021), ECF No. 136-1 ("Sheriff's SOF") ¶ 36 (County Personnel Department currently handles all Health Plan issues and employee questions); *see also* SOF ¶ 53.[2]

Additionally, it is undisputed that: the Sheriff's Office uses the County Personnel Policy Manual, which contains policies that apply to all Sheriff's Office employees. SOF ¶ 52. As a part of onboarding new Sheriff's Office employees, the County handles the new hire's paperwork and holds an orientation for them. SOF ¶ 53. When the Sheriff's Office terminates an employee or an employee otherwise leaves, the County handles the discontinuation of the employee's payroll and benefits. SOF ¶ 54. The County advises the Sheriff's Office regarding individual employee

---

[1]    Citations to "Grant Decl." refer to the Declaration of Jill K. Grant, filed on November 5, 2021, in support of Plaintiff's Motion for Summary Judgment, at ECF No. 150.

[2]    Citations to "SOF" refer to Plaintiff's Amended Local Rule 56 Statement of Undisputed Facts, filed on December 3, 2021, which is at ECF No. 174.

personnel issues; for example, Mr. Carter, the *County*'s Director of Personnel, has had two meetings with the Sheriff about Sgt. Lange regarding issues other than the Health Plan—the first on Sgt. Lange's transitioning at work and the second when the Sheriff requested his "HR sort of advice" about a disciplinary issue. SOF ¶ 55. The County administers employee payroll for the Sheriff's Office. SOF ¶ 56. Accordingly, "Houston County Commissioners" is listed as Sgt. Lange's employer on both her IRS Form W-2 and IRS Form 1095-C. SOF ¶ 57. And of course, the County sets the terms of the Health Plan, itself a fundamental "term and condition" of employment at the Sheriff's Office; and the County adds new Sheriff's Offices employees the Health Plan, if they choose to participate in it; and handles annuals annual renewals and open enrollment. SOF ¶¶ 58–59.

Under these circumstances, the County is liable as a joint employer. The County's control over the HR function in the Sheriff's Office generally, including *any* change to the Exclusion giving rise to the claim, distinguishes Sgt. Lange's situation from that in *Peppers*, where "the County only possessed the power to approve the 'manner and amount of compensation' for employees that was set by the District Attorney." *Peppers*, 835 F.3d at 1297. Moreover in *Peppers,* the key issue was pay. There, the plaintiff sued both the District Attorney (his employer, who set his pay) and Cobb County (which was the "paymaster," setting a budget and cutting the checks) under the Equal Pay Act. *Id.* at 1300-01. The Court found that Cobb County was not a joint employer under those circumstances. *Id.* Here, of course, the County is not simply a "paymaster" but instead is intimately involved in all personnel policy and procedures applicable to Sheriff's Office employees, including controlling the terms of the Plan at issue here. SOF ¶ 62. *Peppers* does not permit the County to escape liability under these circumstances.

III.    **The Exclusion Violates The Equal Protection Guarantee.**

The County makes two arguments in seeking summary judgment on Sgt. Lange's Equal Protection claim: that the Exclusion doesn't violate the Equal Protection guarantee because it's not a sex-based classification, County Br. at 28–30, and that it survives heightened scrutiny because it's closely related to Defendants' "general economic concerns," which are an important government interest, County Br. at 24–28.  *See also* Defendant Cullen Talton's Memorandum in Support of His Motion for Summary Judgment, Lange v. Houston County, et al., No. 5:19-CV-00392-MTT (M.D. Ga. Nov. 3, 2021), ECF No. 136-9 ("Sheriff's Br.") at 24 (adopting County's arguments for himself).  Both arguments fail.

A.    **The Exclusion Is Entitled to Heightened Scrutiny As A Classification Based On Sex And Transgender Status.**

This Court ruled on Defendants' motions to dismiss that Sgt. Lange had "sufficiently allege[d] that the Exclusion is a facially neutral classification that has a disproportionate impact on transgender persons and is motivated by discriminatory purpose."  *Lange*, 499 F. Supp. 3d at 1275.  This classification, which is now proven on the undisputed record, receives heightened scrutiny for two reasons.  *First*, it is sex-based.  *See Glenn*, 663 F.3d 1312, 1320 (11th Cir. 2011) ("The first inquiry is whether [the government] acted on the basis of [a transgender plaintiff's] gender-nonconformity.); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (requiring proof of discriminatory intent).  In these circumstances, the Court must apply heightened scrutiny to decide whether that action was substantially related to a sufficiently important governmental interest.  *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating test for intermediate scrutiny).  *See also Bostock*, 140 S. Ct. at 1740 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.").  *Second*, transgender status receives heightened scrutiny as at least a

11

quasi-suspect class, for the reasons set forth in Plaintiff's summary judgment brief.  *See* Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, Lange v. Houston County, et al., No. 5:19-CV-00392-MTT (M.D. Ga. Nov. 4, 2021), ECF No. 140-1 ("Pl.'s Br.") at 27, 28.

Defendants' argument that the Exclusion "does not discriminate on its face," County Br. at 24–26, simply rehashes their earlier argument that the Exclusion, as a matter of law, "is not discriminatory at all," which this Court has already rejected.  *Lange*, 499 F. Supp. 3d at 1275. Further, because the Court has already ruled that the Exclusion is not facially discriminatory under an Equal Protection analysis, Sgt. Lange does not make that argument here.  Of course, the fact that a practice is not facially discriminatory under the Equal Protection doctrine does not render the practice non-discriminatory: facially neutral classifications are unconstitutional when they are intended to affect a protected class and fail the applicable level of scrutiny.  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272–73 (1979); *Lange*, 499 F. Supp. 3d at 1275.

## B.    Defendants Ignore Record Evidence Of Intent.

The Court previously observed that testing allegations of intentional discrimination would require a "sensitive inquiry" into factors such as "any disproportionate impact of the challenged law or policy, the historical background of the decision, any departures from normal procedures, or legislative or administrative history."  *Lange*, 499 F. Supp. 3d at 1276.  The discovery record establishes those factors beyond dispute.  As detailed in Sgt. Lange's summary judgment brief:

> o The Exclusion impacts *only* transgender members of the Health Plan and *all* transgender members of the Health Plan; indeed, the County is aware of only one—Sgt. Lange.  Pl.'s. Br. at 20.

o   Defendants have repeatedly disparaged Sgt. Lange and her transition and deprecated her need for healthcare, even though they concede that the care she seeks is medically necessary.  The Sheriff has personally refused to recognize Sgt. Lange as a woman in the workplace, because he does "not believe in" it.  *Id*. at 21.

o   The County has repeatedly departed from normal procedures in opting out of the Nondiscrimination Mandate and renewing and maintaining the Exclusion.  *Id*. at 21–22.

o   The County has treated Sgt. Lange differently from other employees who sought relief from exclusions that were not based on sex or transgender status.  Notably, it granted an exception to an employee who requested an exception for multiple lap-band adjustment procedures following their initial bariatric surgery care that was subject to an exclusion.  *Id*. at 23.

Defendants do not dispute these facts nor make any argument that they are immaterial in light of this Court's prior ruling.  They simply say, without citation, that Sgt. Lange "cannot make the required showing" and her allegations are "spurious."  County Br. at 28–29; Sheriff's Br. at 24.  Under these circumstances, Defendants plainly have no basis to assert that discovery has eliminated any dispute that Defendants acted without discriminatory intent.

The Sheriff also attempts to evade liability by claiming he was not involved in setting the Plan's terms.  Sheriff's Br. at 23–24.  This is immaterial.  The Sheriff concedes that he "had the authority" to offer his employees a health plan without an Exclusion, but chose instead to offer them the County's plan "because [he] was satisfied with the current policy the county has."  Grant Decl., Ex. B Sheriff Talton Dep., at 81:4-25.  *See also* SOF ¶ 62; Sheriff's SOF at ¶¶ 34–37 (Sheriff chooses to offer the Health Plan to employees because it provides him cost savings and

administrative convenience).  As the Sheriff has selected the County's Plan precisely because the County administers it and sets its terms to his satisfaction, he is liable for the discriminatory content of those terms.

### C.    Defendants' Economic Interests Fail Equal Protection Review.

Defendants' argument that their "general economic concerns" satisfy heightened scrutiny is wrong.  *See* County Br. at 26.  As detailed in Sgt. Lange's opening brief, it is black letter law that cost savings is not an "important state interest" under heightened scrutiny.  *See* Pl.'s Br. at 29. *See also, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (contrasting rational basis scrutiny applicable to "economic legislation" and heightened scrutiny applicable to sex-based classifications.).  Defendants' citation to *Book*, an unpublished district court case, is unavailing.  *Book* cited numerous government interests supporting a challenged law, including crime prevention, morality, preventing the degradation of women, family wellbeing, community welfare, tourism promotion, and others—not solely the law's effect on the defendant's finances that Defendants' brief selectively quotes.  *Book v. Daytona Beach, Fla.*, Case No. 6:08-cv-1180-Orl-28DAB, 2009 WL 10706063, at *3 (M.D. Fla. July 14, 2009).  *Book* ruled that these interests, collectively, were "important governmental objectives."  *Id*.  It did not hold, contrary to decades of precedent, that the city's finances alone were "important" under heightened scrutiny.

Moreover, Defendants' asserted interest in cost control is insufficient to award them summary judgment under any level of scrutiny, as a government may never "protect the public fisc by drawing an invidious distinction between classes of its citizens."  *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974).  *See also U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 535–36 (1973) ("But even if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning [fraud prevention], . . . we still could not agree with the Government's conclusion that the [denial of benefits to otherwise eligible individuals] . . . constitutes a rational

effort to deal with these concerns."). Defendants have offered no reason that transgender people in particular need to bear the burden of going without necessary medically care to save Defendants money. It is undisputed that Defendants can and do implement cost-savings measures that apply to Plan members equally. *See* SOF ¶ 195; Sheriff's SOF ¶ 50 (increasing cost-sharing and premiums for all members). And it is undisputed that transgender healthcare isn't uniquely costly, SOF ¶ 18, *id*. at ¶ 192 (Sgt. Lange's surgery not a "high-cost claim"); and that the Plan covers other care that is both costlier and more utilized, resulting in much greater expense to the Plan than the care subject to the Exclusion, *see* SOF ¶¶ 244-246. Indeed, the Plan covers *the very care excluded by the Exclusion*, when it is used for any other purpose but a "sex change." SOF ¶¶ 17, 76. Accordingly, there is not even a rational basis for Defendants to single out gender-confirming care for imposition of unique cost-control measures, and the Exclusion fails any level of review. *See Cleburne*, 473 U.S. at 447–50 (striking down classification between classes that are identically situated in all relevant respects, "[b]ecause in our view the record does not reveal any rational basis for believing that [disadvantaged class] would pose any special threat to the city's legitimate interests").

## IV.     The Exclusion Violates Title VII.

To survive summary judgment in a Title VII action, a plaintiff can present direct evidence of discriminatory intent or demonstrate circumstantial evidence that warrants an inference of intentional discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 n.6 (11th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Although Defendants argue that Sgt. Lange can show neither, the undisputed record supports both.

As detailed in Sgt. Lange's motion for summary judgment, there is direct evidence of sex discrimination in two ways. *First*, the Exclusion itself is expressly discriminatory: it withdraws coverage for care that otherwise would be covered because the employee needs it for a "sex

change," which violates Title VII for three reasons: (i) it explicitly withholds benefits based on "sex," (ii) it discriminates on the basis of an employee's transgender status, and (iii) it discriminates on the basis of gender stereotype.  *Second*, there is also direct evidence in four other areas: (i) the Exclusion's disproportionate impact on transgender people; (ii) defendants' negative remarks about healthcare for transgender people, "whose intent could mean nothing other than to discriminate on the basis of some impermissible factor," *Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 922 (11th Cir. 2018) (citation omitted); (iii) their departures from normal procedures in adopting and renewing the Exclusion; and (iv) their willingness to grant exceptions to employees seeking them for exclusions not based on sex, but not to Sgt. Lange.

But even if the court finds no direct evidence, there is ample circumstantial evidence to establish a Title VII violation under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Here, Sgt. Lange has established a *prima facie* case of discrimination because (1) she belongs to a protected class (transgender employees), (2) she experienced an adverse employment action (denial of compensation in the form of health benefits), and (3) her employer treated similarly situated employees outside her class more favorably (by providing them healthcare benefits she does not receive).  Furthermore, Sgt. Lange has produced record evidence that the Defendants' purportedly nondiscriminatory business reasons for the Exclusion are pretext.  Summary judgment for Defendants is therefore inappropriate because—at the very least—there are genuine issues for trial.

## A.    Sgt. Lange Has Offered Direct Evidence Of Sex Discrimination.

Direct evidence is "evidence from which a trier of fact could reasonably find that the defendant more probably than not discriminated against the plaintiff on the basis of a protected personal characteristic." *EEOC v. Dolgencorp, LLC*, No. CV 617-100, 2018 WL 6251379, at *6

(S.D. Ga. Nov. 29, 2018) (citation omitted).   Facially discriminatory policies can be direct evidence of discrimination.  *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.,* 499 U.S. 187, 197–200 (1991).   Also, as this Court ruled, "[r]elevant evidence of intent may include any disproportionate impact of the challenged law or policy, the historical background of the decision, any departures from normal procedures, or legislative or administrative history."  *Lange v. Houston Cnty.*, 499 F. Supp. 3d 1258, 1276 (M.D. Ga. 2020).   Direct evidence additionally includes "'actions or statements of an employer that reflect[] a discriminatory . . . attitude correlating to the discrimination . . . alleged by the employee."  *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citation omitted).   This evidence is fully discussed in Plaintiff's opening brief.  Pl.'s Br. at 14–19.

### B.   Defendants' Arguments That The Exclusion Isn't Discriminatory Are Unavailing.

Despite the evidence that the Exclusion denies coverage on the basis of sex, Defendants nevertheless assert that the Exclusion cannot be discriminatory because it applies equally to all Plan participants and "participants of both sexes (regardless of gender)."   County's Br. at 15; Sheriff's Br. at 15.  However, this is the same argument the Supreme Court rejected in *Bostock*.  It is not a defense to a Title VII claim of sex discrimination:

> for an employer to say it discriminates against both men and women because of sex.  This statute works to protect individuals of both sexes from discrimination, and does so equally.  So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.

*Bostock*, 140 S. Ct. at 1741.  Excluding coverage based on sex does not become nondiscriminatory because it appears in a plan that applies to all employees.

In addition, Defendants suggest that the Plan cannot be discriminatory because it covers *some* non-surgical gender-affirming treatment, specifically "hormone medication, endocrinologist visits, and psychological monitoring for participants suffering from gender dysphoria." Sheriff's Br. at 15; County's Br. at 14-15. But this is irrelevant. Defendants' undisputed intent, which is the issue here, is to have "nothing be[] covered." SOF ¶¶ 77, 96, 110, 255. *See also* Exhibit A (Plaintiff's Response to Defendant Houston County's Local Rule 56 Statement of Undisputed Facts) at ¶ 20, attached hereto. It simply isn't material to the Defendants' intent whether Anthem is applying Defendants' intent exactly.[3] Moreover, it is legally irrelevant if the Exclusion doesn't reach all health benefits: any intentional reduction of benefits awarded because of sex violates the statute. Defendants' citations to *Hennessy-Waller v. Snyder,* 529 F. Supp. 3d 1031 (D. Ariz. Mar. 30, 2021) and *Fletcher v. Alaska,* 443 F. Supp. 3d 1024 (D. Alaska 2020), are misplaced–neither case holds that a transgender health exclusion must be a blanket exclusion for it to violate Title VII. In fact*, Hennessy-Waller* did not consider Title VII at all; it also ruled that, at the preliminary injunction stage, there were questions as to the safety and efficacy of the surgery the plaintiffs sought. *See* 529 F. Supp. 3d at 1042. Here, however, the medical necessity of the surgery is uncontested on a complete record. And *Fletcher* says nothing about a partial versus a blanket exclusion.

The County also relies on *General Electric Co. v. Gilbert,* 429 U.S. 125, 134 (1976), but that case is overruled. The County noted that it was "superseded by statute," County's Br. at 17–

---

[3] Sgt. Lange also disputes Defendants' (albeit immaterial) assertion. Sgt. Lange was denied coverage for her annual visit to the endocrinologist on October 18, 2021. *See* SOF ¶ 266. She was also denied coverage for routine bloodwork on June 12, 2019. *See* SOF ¶ 265. Her physician has since enrolled her in a program for blood testing for the uninsured, allowing her to pay a small price for blood tests rather face repeated denials due to the Exclusion. *See* Grant Decl., Ex. L Lange Dep., Sept. 14, 2021 at 158:20-159:11. Her hormone medications have been covered, as has her counseling, but Defendants have not submitted billing or insurance records showing that these were coded by Sgt. Lange's providers as gender dysphoria treatments, nor that Anthem recognized them and approved them as such.

18, but do not say that, according to the Supreme Court, that statute, the Pregnancy Non-Discrimination Act, "overrule[d]" *Gilbert* and "unequivocally rejected th[e] reasoning" and the holding of that case. *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 670, 684 (1983). Accordingly, *Gilbert* is no longer good law as to Title VII. And even if it were, Plaintiffs do not challenge the Exclusion on the sole basis that everyone it harms is transgender. As *Bostock* holds, Title VII "focus[es] on individuals rather than groups," 140 S. Ct. at 1740; and, here, the Exclusion "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth," and thus fails the simple test of "whether an individual . . . employee would have been treated the same regardless of her sex," *id*. at 1741, 1743.[4]

Defendants also argue that statements of personal opinion do not amount to direct evidence of discrimination, but courts in this Circuit have held that general discriminatory remarks unrelated to the employment decision can serve as direct evidence of discriminatory intent. *See EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1071 n.9 (11th Cir. 1990) ("Discriminatory motive may be proved by direct evidence of the hiring authority's racially discriminatory attitudes, regardless of whether it relates to the employment decision at issue."). Here, Sheriff Talton's and Kenneth Carter's statements about transgender people "indicate a decidedly negative attitude" toward transgender people on the part of the people responsible for the employment decision in question, the provision of health care benefits. *See EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 n.6 (11th Cir. 1990) (holding that general racially discriminatory statements made by two

---

[4] Similarly, the magistrate judge's R&R in *Toomey v. Arizona*, No. CV-19-00035-TUC-RM (LAB), 2021 WL 753721, at *6 (D. Ariz. Feb. 26, 2021) does not help Defendants because, contrary to their statement that it was "adopted" by the District Court, the District Court actually "rejected" the R&R on every ground except its reasoning regarding the preliminary injunction standard. The R&R's reasoning is further unpersuasive as to Title VII because it relied both on *Gilbert*, despite it later being overruled as to Title VII; and on *Geduldig*, which was not a Title VII case.

decisionmakers constituted direct evidence of those decisionmakers' failure to promote black employees for discriminatory reasons because defendants' statements "indicate[d] a decidedly negative attitude toward black people on the part of the two people responsible for promotions."). Similarly, Sheriff Talton's statements that he doesn't "believe in" transgender people and does not think any sex reassignment surgery should be covered by insurance (SOF ¶ 112; Sheriff's Br. at 17); Kenneth Carter's assertion that he was "good with nothing being covered" and did not want to cover gender-confirming care because it would create "loop holes" (SOF ¶¶ 110, 255); and statements by numerous Defendants likening gender-affirming healthcare to cosmetic surgery despite their knowledge that it is medically necessary (SOF ¶¶ 14, 262) are direct evidence of Defendants' discriminatory attitudes towards transgender people.

### C.    Sgt. Lange Can Establish Sex Discrimination Based On Circumstantial Evidence.

Defendants do not come close to establishing an evidentiary basis for obtaining summary judgment with respect to Plaintiff's Title VII claim based on circumstantial evidence.  As an initial matter, Sgt. Lange has carried her initial burden under *McDonnell Douglas* of establishing a prima facie case of discrimination.  In the face of Sgt. Lange's *prima facie* case, Defendant proffers a purported legitimate, non-discriminatory reason for its denial of care to Sgt. Lange—cost—that is contradicted by undisputed evidence.  Because she has demonstrated pretext, as well as produced other direct and circumstantial evidence regarding discriminatory intent, a reasonable fact finder could find in her favor.

#### 1.    Sgt. Lange Has Met Her Light Burden To Establish A Prima Facie Case Of Sex Discrimination.

This "burden of establishing a prima facie case of disparate treatment is not onerous," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981), and merely requires a plaintiff to show that (1) she is a member of a protected class, (2) she experienced an adverse employment action,

(3) she was qualified to do the job in question, and (4) her employer treated similarly situated employees differently.  *Lewis*, 918 F.3d at 1220–21.  Here, Defendants do not dispute that Sgt. Lange is a member of a protected class and is qualified to do her job.  However, Defendants argue that "she cannot show either that she was denied a benefit for which she was eligible under the terms of the Plan, or that a non-protected group member (*i.e.*, a male) received that same benefit dispute."  Sheriff's Br. 18–19; County's Br. 16–17.  These arguments fail as a matter of law and fact.  The undisputed record demonstrates that Sgt. Lange experienced an adverse employment action, and she received lesser health benefits than her similarly situated colleagues.  SOF ¶¶ 14-17, 21-24, 77-78, 121, 129.  As such, she has carried her prima facie burden.

a.    Sgt. Lange Experienced An Adverse Employment
Action—Denial Of Benefits.

Providing lesser healthcare benefits to Sgt. Lange than her cisgender colleagues received is an adverse employment action.  Defendants admit (as they must) that adverse actions are not limited to hiring actions and include matters that "affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone."  *Monaghan v. Worldpay US, Inc.,* 955 F.3d 855, 860 (11th Cir. 2020).  This extends to health benefits, which the Supreme Court has held are compensation within the meaning of Title VII.  *See Newport News Shipbuilding & Dry Dock Co.,* 462 U.S. at 682 ("Health insurance and other fringe benefits are compensation, terms, conditions, or privileges of employment.").  Because Sgt. Lange receives lesser health coverage than her cisgender colleagues, she receives lesser compensation than her cisgender colleagues.  *See Bassano v. Hellmann Worldwide Logistics, Inc.*, 310 F. Supp. 2d 1270, 1276 (N.D. Ga. 2003) (holding that an offer of a lower paying position with lesser health insurance benefits constituted an adverse employment action).  Accordingly, because it is undisputed that the Exclusion prevents

21

Sgt. Lange from receiving certain medically necessary healthcare, she has suffered an adverse employment action as a matter of law.

Because Defendants cannot overcome this fatal flaw in their argument, they argue instead that they have treated Sgt. Lange well in other areas of her employment. But this does not advance their argument. As a practical matter, none of the Sheriff's responses to Plaintiff's claim of an adverse employment action have anything to do with the specific adverse action Sgt. Lange has experienced in this case—denial of healthcare benefits. For instance, the Sheriff argues that he permitted Sgt. Lange to choose the color of her Sheriff's office vehicle. This is entirely beside the point. Even if Sgt. Lange was able to choose a car color, it has no bearing on the fact that Defendants denied her health care benefits equal to her peers. Nor does it alter the legal conclusion that the denial of equal health benefits she experienced is an adverse employment decision. Unsurprisingly, Defendants cite no legal support for this argument.

Defendants other examples of purported favorable treatment are similarly irrelevant and unpersuasive. Specifically, the Defendants assert that Sgt. Lange did not experience an adverse employment action because she received pay increases and was told that she would not be fired because of her transgender identity. These are merely examples of ways in which the Defendants did *not* illegally discriminate against Sgt. Lange based on her sex. They in no way disprove that the denial of health benefits she experienced was in and of itself an adverse employment action.

Furthermore, the County's reliance on *Gilbert* and *Hennessy-Waller* to argue that there is no adverse action because the Exclusion applies to all employees is misplaced because, as discussed above, *Gilbert* was overruled and *Hennessy-Waller* did not address a Title VII issue, nor an undisputed medically necessary procedure.

b.     **The Plan Treats Sgt. Lange Less Favorably Than It Treats Similarly Situated Cisgender Employees.**

A plaintiff asserting an intentional discrimination claim under *McDonnell Douglas* must demonstrate "that she was treated less favorably than 'similarly situated' individuals outside her class." *Lewis,* 918 F.3d at 1224.  Sgt. Lange can easily do so.

Here, by its express terms, the Plan provides different care to similarly-situated individuals. It covers "medically necessary surgery," but then withdraws the coverage when an employee seeks to obtain surgery for a "sex change"—even when the exact same procedure would be covered for a cisgender employee who needs it for a different purpose.  SOF ¶¶ 17, 72, 75-77.  In other words, Sgt. Lange is similarly situated to cisgender employees who need a medically-necessary vaginoplasty, but is treated differently from those other employees because Defendants withdraw coverage for the procedure due to her sex assigned at birth.

Seeking to escape this conclusion, Defendants argue that because the Plan contains 68 other exclusions, the Exclusion at issue in this case is not discriminatory.  Sheriff's Br. 21; County's Br. 19.  This argument makes no sense.  Whether "Sheriff Talton, a male," paid out of pocket for hearing aids has nothing to do with the Exclusion at issue here.  Defendants fail to explain how it does.

Defendants appear to be arguing that health plan exclusions do not violate Title VII if they apply equally to men and women, citing *In re Union Pacific Railroad* and *Saks v. Franklin Covey.* Reliance on these cases is misplaced.  In *In re Union Pacific Railroad* and *Saks*, no one was differentially treated because of sex.  *See In re Union Pac. R.R. Emp. Pracs. Litig.,* 479 F.3d 936 (8th Cir. 2007); *Saks v. Franklin* Covey Co., 316 F.3d 337 (2d Cir. 2003).  The courts simply clarified that, in Title VII challenges alleging that an exclusion for contraceptive or infertility coverage discriminates against women, a court must compare how the exclusion impacts women

23

to how it impacts men, and a plaintiff's case will fail if the two are treated the same.  *See In re Union Pac. R.R. Emp. Pracs. Litig.,* 479 F.3d at 944, *Saks*, 316 F.3d at 348–49.  In contrast, Sgt. Lange is not arguing the Exclusion is discriminatory because it differentially impacts women (or men).  Rather, Defendants intentionally treat employees differently on the basis of sex as explained in *Bostock,* 140 S. Ct. at 1741: an employee assigned the female sex at birth is granted vaginoplasty coverage; an employee assigned the male sex at birth is denied coverage.  And, to the extent Defendants seek to argue that a Title VII sex claim is limited to treating women as a class differently from men as class, *Bostock* clearly forecloses that defense: because Title VII focuses on "individuals, not groups," "an employer cannot escape liability by demonstrating that it treats males and females comparably as groups."  *Id*. at 1740, 1744.  Defendants' argument that Sgt. Lange receives the same treatment as her similarly situated employees because both men and women are equally denied gender-affirming care therefore fails as a matter of law.

> 2.    *The Defendants' Purportedly Non-Discriminatory Business Reason for Maintaining the Exclusion—Cost—Is Demonstrably False.*

Under the *McDonnell Douglas* burden-shifting framework, once a plaintiff establishes a prima facie case, the burden shifts to the employer to proffer a legitimate nondiscriminatory reason for the challenged action.  *McDonnell Douglas Corp,* 411 U.S. at 802–03.  The plaintiff may then prove that the Defendants' stated reason (which, here is the cost to the Plan) is mere pretext.  *Id.* at 804–05.  This burden "merges with [the plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination."  *Burdine*, 450 U.S. at 256.  "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Hurlbert v. St. Mary's Health Care Sys., Inc*., 439 F.3d 1286, 1298 (11th Cir. 2006) (internal

citations omitted).  As shown next, Sgt. Lange can easily meet this burden.  Additionally, cost is not a legally recognized reason to violate Title VII.  For these reasons, Defendants' motion must be denied.

### a.   The Proffered Reason For The Exclusion Is Mere Pretext.

Defendants assert they have chosen to maintain the Exclusion because of concerns about the costs of the plan as a whole.  They argue that maintaining the Exclusion "limit[s] the overall growth of the cost of the plan and protect[s] against future cost increases."  County's Br. at 23. Defendants' reliance on cost fails on several grounds.  Most significantly, the evidence is undisputed that Defendants manufactured this rationale *after* the County adopted and renewed the Exclusion.

The Eleventh Circuit has "recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext."  *Hurlbert,* 439 F.3d at 1298.  *See also Donnellon v. Fruehauf Corp*., 794 F.2d 598, 601–02 (11th Cir.1986) (holding that evidence was sufficient to sustain a finding that an employer's stated reasons for discharge were pretextual where "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged").  Here, even Defendants admit that they have failed to articulate clearly and consistently their explanations for maintaining the Exclusion. SOF ¶¶  213–16.  When it rejected the Nondiscrimination Mandate, it did not consider cost at all (SOF ¶¶ 134–35); and it again did not consider any cost information when ignoring Sgt. Lange's request for relief from the Exclusion in January 2019 (SOF ¶ 141) or again when it summarily rejected her request in February 2019.  (SOF ¶ 174) The County has admitted also that its concern that removing the Exclusion would cause its expenses to "snowball" because other exclusions would also need to be removed was not a "basis of [its] decision not to remove the Exclusion;"

that cost concerns were not included in Mr. Carter's memo or presentation and were not reflected in the Commissioners' Nov. 19, 2019 meeting minutes; and its "snowball" defense arose "about three weeks" after commissioners voted to maintain the Exclusion.  SOF ¶¶ 213–16.  These are precisely the kinds of inconsistencies that the Eleventh Circuit has deemed to be evidence of pretext sufficient to defeat a defendant's motion for summary judgment.  *See, e.g.*, *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (holding that an employee presented evidence of pretext sufficient to preclude summary judgment on his retaliation claim where the employer offered different reasons for terminating the employee on his job separation notice and counseling statements than the employer offered in his testimony); *Keene v. Prine*, 477 F. App'x 575, 583 (11th Cir. 2012) (reversing summary judgment where, as evidence of pretext, "none of the five reasons proffered for [the plaintiff's] termination was ever provided to the Georgia Department of Labor, the POST organization, or the EEOC.").

### b.      Cost Is No Defense Under Title VII.

Even if Defendants had developed this cost rationale when adopting and retaining the Exclusion, it would fail because the law is well-settled that cost is no defense to a Title VII case. *See* Pl.'s Br. at 23–24.  And, even if cost were a permitted defense to this Title VII claim, it simply implausible here because the cost of removing the Exclusion would be miniscule, and the County can afford to grant exceptions, as it has done in the past with other express exclusions.  *See* SOF ¶¶ 222–31, 235–40.  Specifically, the estimated cost of the vaginoplasty surgery Sgt. Lange needs would amount to .25% of the Plan's annual expenditure, and the County in the past removed an exclusion for bariatric surgery after an employee who was denied coverage for a lap band adjustment requested an exception, without incurring undue costs.  *See* Pl.'s Br. at 25; SOF ¶¶ 216, 222–31, 235–42.

The Sheriff cites *Woolsey v. Town of Hillsboro Beach* for the proposition that a "subjective reason is a legally sufficient reason 'where the employer articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.'"  Sheriff's Br. at 23 (quoting *Woolsey v. Town of Hillsboro Beach*, 541 F. App'x 917, 919 (11th Cir. 2013)).  However, unlike in *Woolsey*, the Defendants' reasoning is objectively flawed and not credible.  Defendants' assertions that "the coverage works well for the great majority of employees" and that eliminating the Exclusion would raise the plan's costs or lead to the removal of other exclusions (Sheriff's Br. at 23) are not legally sufficient justifications for discriminating against transgender employees in violation of Title VII.  That the Plan is sufficient for the employees against whom Defendants do not discriminate is not an explanation for their actions against those against whom they do.

The County argues that Sgt. Lange has not shown pretext because she has not met its cost justification argument "head on," citing to *Hornsby-Culpepper v. Ware,* 906 F. 3d 1302 (11th Cir. 2018), for the proposition that a plaintiff cannot merely recast an employer's proffered non-discriminatory reasons or substitute her business judgment for that of the employer.  *See* County's Br. at 23.  But Sgt. Lange has not, as in *Hornsby,* simply second guessed her employer's wisdom for denying her a higher salary.  Rather, she has pointed to specific record evidence—including cost estimates from Anthem, changes in Defendants' testimony regarding their cost justification defense, an actuarial analysis that removing the Exclusion would be immaterial, and specific instances of past exemptions from another exclusion that did not "snowball" costs, to show that Defendants' contention that eliminating the Exclusion would increase Defendants' costs is contrary to all the evidence that was available to Defendants when the Exclusion was adopted and reaffirmed and that Defendants had not in fact developed the cost rationale until *after* the Exclusion was decided.  Pl.'s Br. at 23–25.

At a minimum, Sgt. Lange has presented enough record evidence to raise a genuine issue of fact as to whether Defendant's proffered nondiscriminatory explanations are indeed pretextual. This is all that is needed to defeat Defendant's summary judgment motion with respect to this issue. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1531 (11th Cir. 1987) (reversing a district court's grant of summary judgment for the employer because the plaintiff employee presented evidence that, if believed, created an issue of material fact regarding pretext); *Shedrick v. Dist. Bd. of Trs. of Miami-Dade Coll*., 941 F. Supp. 2d 1348, 1370 (S.D. Fla. 2013) (holding that summary judgment for the defendant was inappropriate because "[a] reasonable factfinder could infer that [the adverse employment action] was pretextual" where an employee who did not engage in protected activity was not punished for the same misconduct for which the plaintiff was punished). Therefore, Defendants' motion for summary judgment on Sgt. Lange's Title VII claim should be denied.

## V.     The Exclusion Violates Title I Of The ADA.

Title I of the ADA prohibits employers from discriminating "'against a qualified individual on the basis of a disability' in any of the 'terms, conditions, [or] privileges of employment.'" *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  To establish a prima facie case of employment discrimination under Title I, a plaintiff must show that she: (i) is disabled, (ii) is a qualified individual, and (iii) was unlawfully discriminated against because of her disability.  *Id.*  As shown in Sgt. Lange's summary judgment brief, the undisputed evidence shows that Sgt. Lange has satisfied this standard.  Pl.'s Br. 30–38. She has gender dysphoria, a disability as that term is defined under the ADA; is capable of performing her job as a law enforcement officer; and was subjected to unlawful discrimination because of her disability under theories of disparate treatment, disparate impact, and failure to accommodate.  For these reasons, Plaintiff's motion with respect to its claim under Title I of the

ADA should be granted and Defendant's motion for summary judgment with respect to this claim unquestionably should be denied.

### A.   The Uncontroverted Evidence Shows That Sgt. Lange Has A Disability.

Defendants assert that Sgt. Lange is not disabled as defined by the ADA, because (i) gender dysphoria is "explicitly excluded" from the ADA, *see* 42 U.S.C. § 12211(b)(1), and (ii) Sgt. Lange's gender dysphoria does not result from physical impairments.  These arguments miss the mark.

### 1.   *The ADA Does Not Exclude Gender Dysphoria.*

Defendants cannot escape the fact that the ADA makes no mention of gender dysphoria.  Rather, the statute excludes "***gender identity disorders*** not resulting from physical impairments" (the "GIDs Exclusion").  42 U.S.C. § 12211(b)(1).  Since Sgt. Lange has not been diagnosed with gender identity disorder and makes no claim with respect to this condition, the GIDs Exclusion does not apply to Sgt. Lange.  Seeking to escape this conclusion, Defendants assert that "gender dysphoria," as a matter of law (because they cite no record evidence) is merely a "replacement diagnosis" for "gender identity disorder."  Sheriff's Br. at 11, n. 5; County's Br. at 12, n. 6.  But Defendants' position is contradicted by case law and medical literature addressing this very question: gender dysphoria "is not merely another term for gender identity disorder"—it is a new and distinct diagnosis.  *Doe v. Mass. Dep't of Corr.*, No. CV 17-12255-RGS, 2018 WL 2994403, at *3 (D. Mass. June 14, 2018).  In fact, "in 2013, the diagnosis of 'gender identity disorders' was removed from the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), and 'gender dysphoria' was added."  *Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at *2 (S.D. Ill. Feb. 22, 2021) (citing Kevin M. Barry, Jennifer L. Levi, *The Future of Disability Rights Prots. for Transgender People*, 35 Touro L. Rev. 25, 44 (2019)).  That change was "more than

semantic"—it "reflect[ed] a substantive difference between the medical conditions themselves." 35 Touro L. Rev. at 44. Specifically, "unlike the outdated diagnosis of 'gender identity disorder,' the hallmark or presenting feature of gender dysphoria is not a person's gender identity per se, but rather the clinically diagnosable distress they experience as a consequence of the incongruence of their assigned and experienced genders." SOF ¶¶ 2-6. Other courts have correctly recognized this distinction.[5] *See Doe*, 2018 WL 2994403 at *3 ("A growing consensus in the medical and psychiatric community now regards Doe's condition, although diagnosed in her teenage years as GID, as more accurately classified as GD, a rare but serious medical condition."); *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017) (holding that gender dysphoria is not excluded from ADA coverage because it is "possible to interpret the term gender identity disorders narrowly to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have—such as Blatt's gender dysphoria, which substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning"); *Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at *3 (S.D. Ill. Feb. 22, 2021) (allowing plaintiff's claims to proceed because the court "cannot say for certain that gender dysphoria falls within the ADA's exclusionary language"); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 135 (E.D. Pa. 2020) (same); *Tay v. Dennison*, No. 19-cv-00501-NJR, 2020 WL

---

[5]      This has also been the consistent position of the United States. *See* Stat. of Int. of U.S. at 2–3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017) ("In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, . . . the [GIDs exclusion] should be construed narrowly such that gender dysphoria falls outside its scope."), ECF No. 57; *accord* Stat. of Int. of U.S. at 2–3, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49; Stat. of Int. of U.S. at 5, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

2100761, at *3 (S.D. Ill. May 1, 2020) (same); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-cv-00151-BLW, 2018 WL 2745898, at *8 (D. Idaho June 7, 2018) (same).[6]

Further, the County's proposed construction of the GIDs Exclusion would give rise to "a serious doubt of constitutionality" under the Equal Protection Clause and must therefore be avoided. *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at *5–7 (D. Mass. June 14, 2018). *Accord Doe v. Pennsylvania Dept. of Corrections*, 120CV00023SPBRAL, 2021 WL 1583556, at *11 (W.D. Pa. Feb. 19, 2021); *Shorter v. Barr*, 4:19CV108-WS/CAS, 2020 WL 1942785, at *9–10 (N.D. Fla. Mar. 13, 2020), *report and recommendation adopted*, 4:19CV108-WS/CAS, 2020 WL 1942300 (N.D. Fla. Apr. 22, 2020). *See also United States v. Stone*, 139 F.3d 822, 834 (11th Cir. 1998) ("The court must examine . . . at least, whether a reading of the statute reasonably supports two interpretations, one of which is a construction avoiding the likelihood of constitutional infirmity."). Specifically, by excluding a medical condition that is closely associated with transgender people and with gender nonconformity, the GIDs Exclusion invokes heightened scrutiny, which it fails, for the same reasons discussed above that the Plan's Exclusion fails heightened scrutiny.

To be sure, the GIDs Exclusion, construed to apply to gender dysphoria, would fail even the most minimal level of scrutiny because it would be rooted in animus against transgender people,[7] and such "a bare [congressional] desire to harm a politically unpopular group cannot

---

[6]     Defendants cite *John Doe v. Northrop Grumman Sys. Corp.*, No. 5:19-CV-00991, 2019 WL 5390953, at *7 (N.D. Ala. Oct. 22, 2019), and *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754-55 (S.D. Ohio 2018), in support of their argument that "gender dysphoria" and "gender identity disorder" are synonymous. However, those cases are distinguishable. Both cases are (i) against the weight of authority holding that gender dysphoria is not excluded from the ADA, and (ii) both cases are factually distinguishable because, unlike here, neither party alleged that gender dysphoria "results from a physical impairment" or raised the constitutional avoidance argument discussed.

[7]     The ADA's legislative history is consistent with a view that the ADA's exclusion of "gender identity disorders" was based on the moral opprobrium of three senior senators who were seeking to exclude "sexual behavior disorders" they thought undeserving of legal protection. *See, e.g.*, 135 Cong. Rec. S10753, *available at* 1989 WL 183115 (daily ed. Sept. 7, 1989) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content.") (statement

constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). As the District of Massachusetts has concluded, an ADA exclusion of gender dysphoria would be "constitutionally suspect," particularly given "the pairing of gender identity disorders with conduct that is criminal or viewed by society as immoral or lewd," which would raise "a serious question as to the light in which the drafters of this exclusion viewed transgender persons." *See Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at \*7 (D. Mass. June 14, 2018).   For this reason, Defendants' proposed construction cannot survive review.

### 2. *Sgt. Lange's Gender Dysphoria Is Not Excluded Under The ADA Because It Results From Physical Impairments.*

Even if the Court treats "gender dysphoria" and "gender identity disorder" as synonymous, the GIDs Exclusion would still not apply to Sgt. Lange because the uncontroverted evidence shows that her gender dysphoria results from physical impairments.  This Court has held that "if Lange is alleging (i) that gender dysphoria results from a physical impairment and (ii) that she has gender dysphoria, then it follows that (iii) her dysphoria results from a physical impairment."  ECF No. 89 at 14.  *See also Doe v. Pa. Dep't of Corr.*, No. 1:20-cv-00023-SPB-RAL, 2021 WL 1583556, at \*9 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted*, No. 20-23, 2021 WL

---

of Sen. Armstrong); *Id.* at S10768, *available at* 1989 WL 183216 ("If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing.  But how in the world did you get to the place that you did not even [ex]clude transvestites?  What I get out of all of this is here comes the U.S. Government telling the employer that he cannot set up any moral standards for his business . . . . [H]e cannot say, look I feel very strongly about people who engage in sexually deviant behavior or unlawful sexual practices.") (statement of Sen. Helms); *id.* at S10796 ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in for their own volition, admittedly for reasons we do not fully understand.") (statement of Sen. Rudman). The Court can avoid the problem of whether such opprobrium is an unconstitutional basis for legislation by holding that the GIDs exclusion does not reach gender dysphoria.

1115373 (W.D. Pa. Mar. 24, 2021) (agreeing with the view that "court should rarely hold as a matter of law, . . . that a plaintiff's gender dysphoria is or is not the result of a physical impairment" because this approach "remains faithful to the plain meaning of the statute, which expressly contemplates that only gender disorders that result from physical impairments are considered a disability under the ADA"). *See also Iglesias v. True*, 403 F. Supp. 3d 680, 687-88 (S.D. Ill. Jul. 25, 2019) (allowing plaintiff's Rehabilitation Act claim to proceed because the court "cannot categorically say that gender dysphoria falls within the RA's exclusionary language"); *Shorter v. Barr*, No. 4:19cv108-WS/CAS, 2020 WL 1942785, at *10 (N.D. Fla. Mar. 13, 2020), *report and recommendation adopted*, No. 4:19cv108-WS/CAS, 2020 WL 1942300 (N.D. Fla. Apr. 22, 2020) (same).

As set forth in her summary judgment motion, Sgt. Lange's allegation that her gender dysphoria results from physical impairments is now supported by undisputed record evidence that gender dysphoria has "a physical and biological etiology." SOF ¶ 5; *see also* 29 C.F.R. § 1630.2(h)(1) (defining "physical impairment" to include "[a]ny physiological . . . condition, . . . affecting one or more body systems"). Specifically, it is a medical condition directly caused by "an atypical influence of sex hormones—notably, the presence or absence of elevated testosterone levels during pregnancy—on the developing fetal brain, which takes place at a later period in pregnancy than the sexual differentiation of the genitalia." Decl. of Declaration of Rachel Bluebond-Langner, M.D in Support of Plaintiff's Mot. for Summ. J., ECF No. 144-1 at Ex. 1, ¶ 18. *See also Mass. Dep't of Corr.*, 2018 WL 2994403, at *6 (noting "recent studies demonstrating that GD diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria" and concluding that gender dysphoria is not excluded under

the ADA).  Defendants have not pointed and cannot point to any evidence in the record to the contrary.

Sgt. Lange's allegation that she has gender dysphoria likewise is supported by undisputed evidence.  The record shows that Sgt. Lange has been diagnosed with gender dysphoria, and it causes her significant distress, anxiety, sleeplessness, feelings of depression, and other symptoms that limit her ability to function socially and professionally.  SOF ¶¶ 31, 268.  Defendants do not dispute this either.  Having established both that she has gender dysphoria and that gender dysphoria results from physical impairments, consistent with this Court's reasoning, the undisputed evidence is that Sgt. Lange's *own* gender dysphoria results from physical impairments. MTD Order at 14; *accord Doe v. Hosp. of Univ. of Pa.*, No. 19-2881-KSM, 2021 WL 2661501, at *10–12 (E.D. Pa. June 29, 2021) (applying "the *Lange* court's logic").[8]  Accordingly the GIDs Exclusion has no application to Sgt. Lange.[9]

### 3.      Sgt. Lange Meets the ADA's Definition of "Disability."

Under the ADA, an individual meets the definition of "disability" if she can show *at least* one of the following three things: (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(1).[10]  Defendants seek summary judgment with respect to Sgt. Lange's ADA claim because they urge she cannot meet the first of these prongs due to the GIDs Exclusion, and ignore the second and third prongs, both of which also apply to Sgt. Lange.

---

[8]      In light of this, Defendants' argument that Sgt. Lange's medical records lack an affirmative statement that her gender dysphoria results from physical impairments is unpersuasive.

[9]      If the Court were to adopt the Defendants' argument that "gender identity disorder" and "gender dysphoria" are synonymous, and that Sgt. Lange's gender dysphoria does not result from a physical impairment and is therefore excluded from the ADA, this interpretation would give rise to a serious doubt of constitutionality and therefore must be avoided for the reasons discussed above.

[10]      This definition is to be broadly construed.  *See* 42 U.S.C. § 12102(4)(A).

*First*, the record establishes that Sgt. Lange has "a record of" a disability because she has a "history of . . . a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). As well-documented in Sgt. Lange's medical records and expert reports, Sgt. Lange's health care provider diagnosed her with gender dysphoria in 2017, following which she began sustained treatment for the condition, including social transition, hormone replacement therapy, and feminizing chest surgery. SOF ¶¶ 31–35. *See also Mileski v. Gulf Health Hosps., Inc.*, No. 14-0514-C, 2016 WL 1295026, No. CA 14-0514-C, at *15 (S.D. Ala. Mar. 31, 2016) (finding that plaintiff had an actual disability and/or a record of a disability based on plaintiff's bouts of depression, which she had experienced for many years, that limited her ability to interact and communicate with others, as well as care for herself).

*Second*, Sgt. Lange is "regarded as having a" disability because it is undisputed that both the County and the Sheriff's Office are on notice that Sgt. Lange has gender dysphoria and, because of that disability (and her employer's knowledge of it), she has been denied healthcare coverage under the Health Plan for medical services that are not excluded for Health Plan members who do not have the same condition. SOF ¶¶ 77, 129; *see also* 42 U.S.C. § 12102(3)(A) (an individual meets the "regarded as" prong if "she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment"). Accordingly, Sgt. Lange meets the ADA's definition of "disability" for reasons not contested by Defendants.

## B.    Sgt. Lange Suffered An Adverse Employment Action.

Defendants argue that because Sgt. Lange has access to the same healthcare coverage as her colleagues without gender dysphoria, she has not suffered an "adverse action." This argument ignores the law and the facts.

Defendants rely on *Ford v. Schering-Plough Corp.* for the proposition that the ADA does not require equal coverage for every type of disability. 145 F.3d 601, 608 (3d Cir. 1998). But

*Ford* is inapposite.  *Ford* held that "so long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities."  *Id.*  However, that statement was made in the context of a health plan that differentiated in coverage between two broad *types* of disabilities (i.e., physical versus mental).[11]  In fact, *Ford* observed, "this is a far cry from a specific disabled employee facing differential treatment due to her disability," *id.*, which is exactly the case here.

Unlike in *Ford,* the Exclusion specifically singles out individuals with a particular disability—gender dysphoria—for different and lesser benefits.  Put differently, Sgt. Lange is denied coverage she would otherwise have, solely because of her disability.  As a result, Sgt. Lange (and others suffering from gender dysphoria) are prevented from receiving even the *same* treatments available to cisgender plan members.  For example, Sgt. Lange has been denied coverage for surgery, a routine blood test, and an annual endocrinologist visit—all of which would have been covered had it not been sought in connection with her treatment for gender dysphoria.  This is fundamentally different from the decision determined to be outside of the scope of the ADA in *Ford.*

Indeed, courts have held that the exclusion of benefits under a health plan may constitute discrimination under the ADA where "the plan provides the treatment for other conditions directly comparable to the one at issue."  *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 960–61 (8th Cir. 1995) (granting preliminary injunction to provide coverage for a certain treatment that was

---

[11]     Other cases that are in accord with *Ford* similarly involve plans that differentiated between mental and physical disabilities as opposed to singling out a particular disability for lesser benefits.  *See, e.g., E.E.O.C. v. Staten Island Savs. Bank*, 207 F.3d 144, 151–53 (2d Cir. 2000); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1116–18 (9th Cir. 2000); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1101–02 (10th Cir. 1999); *Lewis v. Kmart Corp.*, 180 F.3d 166, 170 (4th Cir. 1999); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1018 (6th Cir. 1997) (en banc); *EEOC v. CNA Ins. Cos.*, 96 F.3d 1039, 1043–45 (7th Cir. 1996).

being denied for breast cancer but allowed for other cancers). *See also Fletcher v. Tufts Univ.*, 367 F. Supp. 2d 99, 104, , 111, 114 (D. Mass. 2005) (holding that plaintiff stated claim that employer violated Title I of the ADA by adopting and maintaining a health plan that provided inferior benefits to people with mental health conditions); *de Louis v. Metro. Atlanta Rapid Transit Auth.*, No. 1:04-CV-2816-CC, 2005 WL 8154830, at *10 (N.D. Ga. Aug. 4, 2005) (holding that a public employee stated a claim under Title II for "alleged[] discriminati[on] against him in the provision of disability benefits" on the basis of his mental health condition); *Boots v. Nw. Mut. Life Ins. Co.*, 77 F. Supp. 2d 211, 219 (D.N.H. 1999) ("[T]he ADA is violated by a policy that disadvantages schizophrenics based on their disability.").

### C. Defendants Denied Sgt. Lange's Request For A Reasonable Accommodation.

Defendants argue that Sgt. Lange did not request an accommodation and, even if she had done so, it would be unreasonable to change the Health Plan for all employees. *See* Sheriff's Br. at 12–14. Both arguments are controverted by the record. The undisputed evidence shows that Sgt. Lange requested an accommodation and that the requested accommodation did not, as Defendants argue, seek to "change the health plan for 350 employees and their dependents to accommodate her." *Id.* at 14. Rather, Sgt. Lange requested either removal of the Exclusion *or* an exception to the Exclusion so that she could obtain the procedure that she needed. Sheriff's SOF ¶ 38; *see also* SOF ¶ 169. The County has granted such exceptions in the past. SOF ¶¶ 235–40. Further, the record is clear that the County understood that to be the request. SOF ¶ 169.

Defendants further argue that granting Sgt. Lange's request for an accommodation would create an undue hardship on the Sheriff's Office. Sheriff's Br. at 13. The evidence contradicts this argument. Anthem estimated the cost of a vaginoplasty, the only procedure that Sgt. Lange was seeking, at $26,500. SOF ¶ 189. This is not even a high-cost claim under the Health Plan,

which categorizes such costs as those over $50,000.  SOF ¶ 192.  Granting an exception to the

Exclusion that would allow Sgt. Lange to have this procedure would have a minimal impact on

the Health Plan, which has an annual budget of around $10 million.  Defendants have already

granted a cisgender employee an exception to an exclusion, permitting that employee to have

*multiple* excluded lap-band adjustment procedures following their initial bariatric surgery.  SOF ¶

216.  Yet none of the parade of horribles cited by Defendants occurred: there was no change in

network, no change in scope of coverage, and most importantly, no change in scope of cost.  *See*

Sheriff's Br. at 14.

Even if Sgt. Lange had pressed for removing the Exclusion entirely as her accommodation,

the record establishes that it would have caused no undue hardship.  While Defendants have not

conducted an analysis of the cost of removing the Exclusion, the evidence shows that the cost

impact on the plan would be minimal.  SOF ¶¶ 222–27.  Indeed, the undisputed record shows that

Defendants have removed exclusions in the past without causing a financial crisis.  SOF ¶ 220.

The same would happen here.  If anything, there would be even less impact here, given how

uncommon gender dysphoria is.

Defendants' reliance on *Winnie v. Infectious Disease Assocs., P.A.*, 750 F. App'x 954, 961-

962 (11th Cir. 2018) is unavailing.  In that case, the court held that the plaintiff's request for a

four-month leave was unreasonable, but this was because the employer was severely understaffed

during an extremely busy time, and the proposed accommodation would be an undue hardship on

the employees who would have to do the plaintiff's work.  *Id.* at 962.  Sgt. Lange's requested

accommodations impose no such hardship, on either her employer or fellow employees.  The cost

of the care she seeks is not significant (compared to other routinely-covered care or the County's

annual cost of self-insurance), and Defendants adduced no evidence that they could not budget for

the cost of the procedure that Sgt. Lange needs, just as it budgets for other care.  SOF ¶¶ 70, 244–45.  Indeed, Defendants failed entirely to put forth evidence showing that covering a single procedure, or even removal of the Exclusion entirely, would have any material financial impact, let alone the sweeping consequences that they claim.  In fact, the record established that the likely cost increase (as a percentage of total annual Health Plan costs) would be under .1%.  SOF ¶¶ 222–24.

### D.    Sheriff Talton Received Notice Of Sgt. Lange's Request For Reasonable Accommodation.

Sheriff Talton also argues that Sgt. Lange never requested an accommodation from him.  *See* Sheriff's Br. at 13.  However, he concedes that Sgt. Lange told him about her intent to have gender-confirming surgery, that she had traveled to New York to meet with a surgeon, that coverage of the surgery had been denied, the estimated cost of the surgery, and that she planned to speak to the Commission to request coverage for her surgery.  *Id*. at 13-14; SOF ¶ 165.  This is sufficient to constitute a request for a reasonable accommodation under the ADA.  *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1226 (11th Cir. 2016) (relying on ADA Title I cases to find that "a plaintiff can be said to have made a request for accommodation when the defendant has 'enough information to know of both the disability and desire for an accommodation.'" (citation omitted)); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.").  *See also* Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA, EEOC (Oct. 17, 2002) (making clear that an individual has made a request for an accommodation when they "let the employer know that s/he needs an adjustment or

change at work for a reason related to a medical condition").  After this meeting, Sheriff Talton

had a duty to engage with her about reasonable accommodations.  *See Williamson v. Clarke Cnty.*

*Dep't of Hum. Res.,* 834 F. Supp. 2d 1310, 1320 (S.D. Ala. 2011) (stating that an employer's duty

to address an employee's request for an accommodation is triggered when an employee "make[s]

an adequate request, thereby putting the employer on notice.").  Sheriff Talton did not do so.  SOF

¶ 166.

### VI.    The Sheriff's Office Is Not Entitled To Sovereign Immunity.

The Sheriff's Office has not carried its burden to demonstrate it is an arm of the State

because the State of Georgia would neither be responsible for a monetary judgment against the

Sheriff nor does the State exercise control over the provision of healthcare benefits to Sheriff's

Office employees.  The Eleventh Circuit employs a four-factor test to determine whether an entity

is an "arm of the state" entitled to sovereign immunity: "(1) how state law defines the entity; (2)

what degree of control the State maintains over the entity; (3) where the entity derives its funds;

and (4) who is responsible for judgments against the entity."  *Manders v. Lee*, 338 F.3d 1304 (11th

Cir. 2003).  "Whether a defendant is an 'arm of the State' must be assessed in light of the particular

function in which the defendant was engaged when taking the actions out of which liability is

asserted to arise."  *Manders,* 338 F.3d at 1308.  The entity invoking Eleventh Amendment

immunity "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to

share in its immunity."  *Haven v. Bd. of Trs. of Three Rivers Reg'l Libr. Sys*., 625 F. App'x 929,

933 (11th Cir. 2015).  The evidence is undisputed that the Sheriff's Office was not acting as an

"arm of the state" when providing healthcare benefits to its employees.  Since Sgt. Lange's claims

arise out of the provision of healthcare, the Sheriff is not entitled to sovereign immunity from these

claims.

40

A.     **The Most Significant Factor—That Neither The State of Georgia Nor Houston County Is Responsible For A Monetary Judgment Against The Sheriff's Office—Weighs Strongly Against a Finding of Sovereign Immunity.**

The fourth factor—whether the state is responsible for judgments against the entity—is the "most important of the *Manders* calculus," *Freyre v. Chronister*, 910 F.3d 1371, 1380 (11th Cir. 2018), and here it weighs strongly against sovereign immunity.  As the Supreme Court has emphasized, this factor implicates the Eleventh Amendment's "core concern" that "the State [will be] in fact obligated to bear and pay" adverse judgments.  *See Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 48 (1994) (observing that "Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations" and collecting cases).  The undisputed evidence shows that "in the event of an adverse outcome against the Sheriff's Office in this case, the Sheriff's Office would be responsible for any remedy" and "the State would not be directly impacted." SO Brief at 10.  The undisputed fact that neither the State of Georgia nor Houston County would be responsible for funding any judgment "carries great weight" in the *Manders* analysis.  *Keene v. Prine*, 477 F. App'x 575, 576 (11th Cir. 2012).

B.     **The Other Factors Weigh Against Sovereign Immunity.**

The remaining factors also weigh against sovereign immunity.  The Sheriff's Office cannot meet its burden to show that factors two (degree of control) and three (where the entity derives its funds) militate in favor of sovereign immunity.

As to control, the Sheriff's Office again fails to show that the State of Georgia exercises any control over the provision of healthcare benefits.  Instead, the Sheriff's Office renews its previously rejected argument that because the State exercises control over Sheriff certification and peace officer training, the State somehow exercises control over provision of healthcare benefits. *See Lange*, 499 F. Supp. 3d at 1269.  ("Though it is true that the State's authority to train and

discipline supports a finding that the Sheriff's Office is an arm of the state *for purposes of hiring and firing deputies*, provision of healthcare benefits to employees is a different function.").  The Sheriff's Office cites *Halliburton v. Peach Cnty. Sheriff's Dept.*, 2012 WL 4468764, No. 5:11-CV-109(MTT) (M.D. Ga. Sep. 26, 2012), for the proposition that in the context of employment decisions, Sheriffs and their employees are state officers.  (Doc. 136-9 at 9.)  However, *Halliburton* involved a Sheriff's decision to hire, where the Sheriff's office does act as an arm of the state and not, as here, a decision to provide healthcare.  In fact, Defendants have admitted that the State of Georgia has no control over the terms and conditions of the Health Plan.  SOF ¶ 65.  Thus, as this Court has previously found, this factor weighs against sovereign immunity.

The third factor considers the source of funding.  The Sheriff's Office fails to offer new support that would tip this factor in favor of sovereign immunity.  This Court has already found that this factor "does not weigh for or against immunity" because while state law requires counties to fund sheriff's offices, the county cannot dictate how the Sheriff spends its funds.  *See Lange*, 499 F. Supp. 3d at 1269.  Because the entity invoking Eleventh Amendment immunity "bears the burden of demonstrating that it qualifie[s] as an arm of the state entitled to share in its immunity" *Haven v. Bd. of Trs. of Three Rivers Reg'l Libr. Sys.*, 625 F. App'x 929, 933 (11th Cir. 2015) and because the Sheriff's Office has not affirmatively shown that the factor weighs in favor of immunity, it has not carried its burden on this issue.

Taken together, the *Manders* factors weigh against immunity.  It is undisputed that the most salient factor (monetary liability) weighs strongly against immunity.  In addition, the second factor (control) weighs strongly against immunity.  While factor one (how state law defines the entity) weighs in favor of immunity and factor three (source of funding) is neutral, those factors

42

are not enough to overcome the strength of factors four and two under the Sheriff's Office's burden. Accordingly, the Sheriff's Office cannot show there is no issue for trial.

### C. Sovereign Immunity Does Not Bar Claims For Prospective Relief.

Moreover, even if the Court were to find that the Sheriff is entitled to sovereign immunity, Sgt. Lange may still seek prospective relief under *Ex Parte Young*, 209 U.S. 123 (1908). Immunity does not apply to claims against state officers in their official or individual capacities for injunctive and declaratory relief from the enforcement of laws alleged to be unconstitutional when the relief is prospective in nature. *See Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1334 n.27 (N.D. Ga. 2019).

### CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment should be denied and summary judgment instead awarded to Sgt. Lange.

Respectfully submitted this 22 day of December, 2021.


Kenneth E. Barton III
Ga. State Bar No. 301171
M. Devlin Cooper
Ga. State Bar No. 142447
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com

David Brown*
Gabriel Arkles*
TRANSGENDER LEGAL DEFENSE EDUCATION
FUND, INC.
520 8th Ave. Ste. 2204
New York, NY 10018
(646) 862-9396 tel.
(646) 993-1686 fax
dbrown@transgenderlegal.org
acaraballo@transgenderlegal.org
nlewis@transgenderlegal.org


Wesley Powell*
Jill K. Grant*
Catherine E. Fata*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000 tel.
(212) 728-8111 fax
wpowell@willkie.com
jgrant@willkie.com

cfata@willkie.com

Kevin M. Barry*
QUINNIPIAC UNIVERSITY SCHOOL OF LAW
LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, CT 06518
(203) 582-3238 tel.
(203) 582-3237 fax
legalclinic@quinnipiac.edu

*Attorneys for Plaintiff*


* Admitted pro hac vice.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing **Omnibus Memorandum of Law in Oppositions to Defendants' Motions for Summary Judgment** to the Clerk of Court using the CM/ECF system, which will automatically send electronic mail notification of such filing to the following counsel of record, who are CM/ECF participants:

Sharon P. Morgan, Esq.
Patrick L. Lail
Elarbee, Thompson, Sapp & Wilson, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
morgan@elarbeethompson.com
lail@elarbeethompson.com
*Attorneys for Defendants*

This 22 day of December, 2021.

Kenneth E. Barton III
Ga. State Bar No. 301171
M. Devlin Cooper
Ga. State Bar No. 142447
COOPER, BARTON & COOPER
170 College Street
Macon, GA 31201
(478) 841-9007 tel.
(478) 841-9002 fax
keb@cooperbarton.com
mdc@cooperbarton.com