**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| ANNA LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:19-CV-00392-MTT |
| HOUSTON COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' RESPONSE IN OPPOSITON TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Houston County, Georgia (hereinafter, "County") and Houston County Sheriff Cullen Talton in his official capacity (hereinafter, "Sheriff's Office," "Sheriff Talton," or the "Sheriff," and collectively with the County, "Defendants") file this response in opposition to Plaintiff Anna Lange's Motion for Summary Judgment.

Plaintiff's Motion rests on faulty footing.  First, in an effort to shoehorn her case into a mold of other transgender benefits cases, she falsely presents the County's Health Plan as having a "blanket" exclusion of any treatment for transition issues.  This wholly ignores Plaintiff's own extensive testimony that her non-surgical endocrinologist visits, psychological counseling, and hormones and other drugs have been reimbursed by the plan. This one correction of the facts sidelines much of Plaintiff's arguments, which depend upon a complete exclusion of all forms of care for a gender transition.

Second, Plaintiff offers an incorrect, non-binding, and extremely broad definition of direct evidence and claims that any number of actions fall within it.  However, Eleventh

Circuit law is clear that direct evidence of discrimination is only established with a truly *direct* statement of discrimination that requires no inference or presumption. Plaintiff offers no such evidence, and she fails to proceed under any alternate methodology of proof.

Third, Plaintiff seeks to redefine the County's cost defense as being based on the cost of removing the gender reassignment surgery exclusion alone. The County's focus has always been on keeping down the cost of the plan as a whole. An additional element to that focus which became more evident after Plaintiff filed her lawsuit and generated publicity about it is the prospect that other plan participants would seek legal relief regarding the exclusions affecting them. This only deepens the County's concern to ward off any steps that increase the already-growing cost trends of the plan.

Plaintiff bears the burden of proof on each of her claims, and, as the movant here, must demonstrate *affirmatively* the absence of a genuine issue of material fact and her entitlement to judgment as matter of law. As shown below, Plaintiff has failed to carry her burden and her Motion is due to be denied.

## I. <u>BACKGROUND FACTS</u>

The County's Health Plan does not constitute a "blanket exclusion" for gender transition treatment. Plaintiff's assertion to the contrary (Doc. 140-1 at 8)[1] ignores not only record evidence in general but Plaintiff's own testimony. Plaintiff testified her endocrinologist visits, the hormones and other drugs, and her psychologist visits have been

---

[1] Defendants cite to page numbers of Plaintiff's brief using the court ECF legend at the top of the page.

covered by insurance.  (Doc. 150-8 at 48:19-49:15; Doc. 150-18 at 120:14-123:24.)[2]  As with other conditions under the Health Plan, non-surgical transition treatments are covered, but the most expensive treatment (gender confirmation surgery) is not.  (Doc. 155-1 at 72.) The same applies as to hearing issues, so that relatively inexpensive hearing tests and diagnosis are covered, but more expensive hearing aids are not.  (Doc. 155-1 at 70.)  Since Plaintiff acknowledges that not all transgender individuals want or have medical necessity for surgery (Doc. 140-1 at 10), the Plan's coverage addresses *all* needs for some transgender individuals.

Plaintiff makes much about communications from Anthem regarding a "Nondiscrimination Mandate" imposed by Section 1557 of the Affordable Care Act, asserting that the County failed to follow Anthem's recommendation on this matter.  (Doc. 140-1 at 9, 13, 29.)  However, Carter testified uniformly (three times) that he reviewed the Section 1557 guidance available on the website of the Secretary of Health and Human Services, saw that Section 1557 only applies to three categories of plans, and the County's self-funded plan did not fall in any of those categories.  (Doc. 150-1 at 59:25-60:21; Doc. 150-14 at 35:2-12; Doc. 150-19 at 180:17-181:11.)  Having heard that repeated explanation

---

[2] Plaintiff cites testimony from the County's insurance broker Donna Clark and County Personnel Director Ken Carter when they share their respective interpretation of the Plan.  (Doc. 140-1 at 11.)  However, it is Anthem's interpretation as claims administrator that matters.  (Doc. 137-4, ¶ 3.)  Therefore, when Carter said he was "good with nothing being covered" as to Clark's assessment of Plaintiff's psychological treatments for transgender coverage, he was conveying that he understood Clark's message, not that he was glad for the lack of coverage.  (Exhibit A, Declaration of Kenneth Carter (hereinafter, "Carter Dec. II"), ¶ 4.)

over months of discovery, Plaintiff has not challenged Carter's conclusion or asserted an ACA Section 1557 claim against Defendants.

Plaintiff appears to criticize Carter for inserting himself into Plaintiff's first meeting with the Sheriff. (Doc. 140-1 at 11.) However, Carter accompanied Plaintiff to the Sheriff meeting *at Plaintiff's request,* (Doc. 137-3 at 56:6-8; Doc 150-1 at 111:12-21) and provided the Sheriff with a helpful explanation of Plaintiff's situation, which smoothed over a delicate matter[3] (Doc. 150-2 at 114:12-21).

The exclusion for gender reassignment surgery has consistently been in the Health Plan since at least the 1990s. (Doc. 159 at 28:25-29:11.) Plaintiff refers to confusion over whether the County "opted out" of the Nondiscrimination Mandate in late 2016 or whether it did so in 2018. (Doc. 140-1 at 13, n. 4.) The confusion was all on Anthem's part. The insurance broker, Clark, testified that she made notes on an open enrollment highlights sheet of her meeting with the County in late 2016 for the 2017 plan year. (Doc. 163 at 111:13-113:10; Ex. 20A (p. 32 of scan).) Clark noted, "Remove. Not taking," next to the Nondiscrimination provisions and explained that meant the County wanted to retain the Exclusion. (Doc. 163 at 114:19-115:6; Ex. 20A (p. 32 of scan).) Clark communicated that decision to Anthem. (Doc. 163 at 48:14-23.) The plan document continued to say gender reassignment surgery was *not* covered, even if Anthem's system mistakenly said it was. (Doc. 163 at 116:2-9.)

---

[3] Although the Sheriff has a strong personal opinion about not believing in sex changes, (Doc. 157 at 15-25) – an opinion Plaintiff recognizes he is entitled to have, (Doc. 137-3 at 70:19-24) – the Sheriff attended the meeting with CID the next day and offered comments of support for Plaintiff, (Doc. 165-1 at 8:6-17).

Nevertheless, on November 29, 2018, Anthem contacted Clark about the Mandate and first informed her that Anthem's records indicated the Mandate had been accepted. (Doc. 163 at 276-277; 52:1-57:16.)  Clark promptly responded, "Not sure I agree with that." (Doc. 163 at 277.)  Anthem then began efforts to correct its record—and contrary to Plaintiff's presentation of this information that *the County* was making a retroactive change—Clark testified: "We [she and the County] were trying to correct the record, not make a different plan change." (Doc. 163 at 59:16-20.)  To correct its record, Anthem sent Clark a form for the County to check its election regarding various plan features, including the Mandate. (Doc. 163 at 281.)  Clark or someone else filled in "No" for the Mandate and Carter signed the form. (Doc. 150-1, Ex. A at 62:4-21.)

Throughout this time, Carter understood this was sent as a standard piece of documentation because the County's plan is self-insured. (Carter Dec. II at ¶ 3.)  Plaintiff now suggests the timing of her appeal of the denial of her surgery as the impetus for Anthem's request for the form. (Doc. 140-1 at 14.)  To the extent that may have influenced *Anthem*, Carter was unaware of Plaintiff's appeal, or that Plaintiff had even met with a surgeon, at the time he signed and returned the form. (Carter Dec. II, ¶ 3.)

Plaintiff also points out she received misinformation from Anthem about whether her surgery was covered under the Plan. (Doc. 140-1 at 13, n. 4.)  This misinformation was surprising, as Plaintiff admitted to having looked at the Plan herself and contacted Clark to confirm her understanding the surgery was not covered before making her first

call to Anthem.[4]  (Doc. 137-3 at 45:5-19.)  For that matter, she testified that, at her initial meeting with him to express her desire to transition, Carter told her the Plan did not cover surgery and she said she would work at Starbuck's part time if she had to in order to qualify for health insurance there.  (Doc. 137-3 at 56:22-25.)  Plaintiff acknowledged she does not believe the County had any role in her having received misinformation from Anthem. (Doc. 137-3 at 45:5-8.)

Plaintiff faults the County for not engaging with her in February 2019 to address her request that the Plan be changed at that time.  (Doc. 140-1 at 15.)  While the Commission has the *authority* to change the plan at any time, its practice is to consider plan changes only at the time of plan renewal.  (Doc. 150-2 at 149:8-13.)  Clark testified she could not recall a time when the County made a mid-year change.  (Doc. 163 at 24:10-12.)  This is consistent with what was said at the February 2019 Commission meeting by both County Attorney Tom Hall (there would be no change "at this time") and by Chairman Tommy Stalnaker to a speaker who appeared two people before Plaintiff spoke (at the 0:30-0:50 mark of the recording available at https://www.facebook.com/HHJOnline/videos/558703247982131/).

Plaintiff repeatedly criticizes the County for not having developed a cost assessment *for the Exclusion on its own*.[5]  (Doc. 140-1 at 16.)  That is not what the County has claimed

---

[4] It was not Anthem's only error in handling her claim.  One denial letter dealt with a supposed bariatric surgery, which Plaintiff confirmed she did not request.  (Doc. 137-2 at 45:23-46:10.)

[5] Moreover, as shown in Defendants' Motion to Exclude Expert Testimony of Joan Barrett and in their own expert report by Thomas Galasso, Plaintiff's actuarial assessment

to be its cost concern.  Rather, the County has focused on trying to keep down the *overall* costs of the Plan as a whole, including the cost trends of claims paid.  (Doc. 159 at 42:11-45:6.)

> Q      The cost data you're referencing is the actual claims cost that
>        the county ends up paying?
>
> A      That's correct.

(Doc. 159 at 45:3-6.)  Carter, as Personnel Director, stated he speaks with the County's decisionmakers about the Health Plan frequently because they are "concerned with the cost."  (Doc. 150-14 at 44:7.)

In fact, the cost trends are concerning.  The Health Plan's costs have increased steadily since at least 1994.  (Doc. 150-19 at 37:9-14, 87.)  The County tracks its annual spending on the Health Plan and produced a summary chart showing the Annual Cost Per Employee rose from $2,057 in 1994 to $15,881 in 2018.  (Doc. 150-9 at 113:8-19, 87.)  Annual plan costs rose by over 17% from $10.6 Million in 2018 to $12.5 Million in 2019 and by 2.3% in 2020 to $12.8 Million.  (Doc. 137-5 at ¶ 9.)   Health Plan spending is

---

of the cost to remove the exclusion is not reliable.  Reducing the increased cost of a claim for transgender surgery to a per member per month (PMPM) basis is not actuarially sound in this situation.  (Doc. 150-17 at 61:4-20.)  Rather, a PMPM analysis would be appropriate in the case of vision or dental coverage when the cost of treatments and the utilization of treatments is well known from years of study of such patterns.  (Doc. 167 at 65:18-68:5.)  Here, Galasso noted that Barrett's report relies on studies with wide variation in the cost of transition surgery, from $21,302 to $52,344, and utilization was unpredictable.  (Doc. 167 at 300.)  Although Plaintiff is the only known plan member who desires surgery, the County does not know whether any dependent may want such surgery if it became covered.  (Doc. 150-19, Ex. M at 27:16-28:4.)  Accordingly, Galasso concluded the greater risk to the Plan was a spike of an unpredictable amount in an unpredictable year that could throw off the budget of the plan.  (Doc. 167 at 116:9-119:9.)  Plaintiff has not moved to strike Galasso's testimony.

commanding an ever-increasing percentage of the County's overall budget. (Carter Dec. II, ¶ 5.)

Moreover, in addition to the cost trends of the plan, the County knew that Plan members had asked about exclusions other than the sex change surgery exclusion and there was concern that eliminating one exclusion would lead to requests (or even lawsuits) to remove other exclusions. (County 30(b)(6) Dep. II Carter, pp. 84:7-14, 129:24-130:15, Ex. 31.) Since Plaintiff's lawsuit, some members have even stated that, if Plaintiff gets the relief she is seeking, those members will take action (legal or otherwise) to have the exclusion that affects them removed from the plan. (County 30(b)(6) Dep. II Carter, p. 161:15-25, Ex. 31.)

## II. ARGUMENT AND CITATION OF AUTHORITY

### A.    Legal Standard Applicable to Plaintiff's Motion.

On summary judgment, "[t]he moving party bears 'the initial responsibility of informing the … court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in Ala., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) ("Four Parcels") (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where, as here, "the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial." Id. at 1438 (internal quotation marks and citation

omitted) (emphasis in original).  Therefore, Plaintiff "must show that, on all the essential elements of [her] case on which [she] bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." Id.

"[A]ll reasonable doubts" are to be resolved and "all justifiable inferences" are to be drawn in favor of the County and the Sheriff's Office.  Id. at 1437 (internal quotation marks and citation omitted).  "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, summary judgment is not justified." Id. (internal quotation marks and citation omitted). Applying the applicable standards here, Plaintiff has not affirmatively demonstrated her entitlement to judgment as a matter of law in her favor on any of her claims of discrimination.  Therefore, as discussed further below, Plaintiff's Motion for Summary Judgment should be denied.

## B.   **Plaintiff Is Not Entitled to Summary Judgment on Her Title VII Claim.**

Plaintiff asserts a claim of sex discrimination under Title VII.  She contends (1) that the Exclusion is expressly discriminatory, (2) that Defendants' actions in adopting the Exclusion demonstrate discriminatory intent, (3) that Defendants' cost justification fails as a matter of law, and (4) that the County is liable as an agent of the Sheriff's Office. However, at least for purposes of *Plaintiff's* Motion for Summary Judgment, she has not shown the absence of genuine issues of material fact as to Defendants' alleged liability, much less her affirmative entitlement to judgment as a matter of law.  Accordingly, her Motion for Summary Judgment should be denied.

1.      **Plaintiff Has Not Presented Direct Evidence of Discrimination in Support of Her Title VII Claim of Discrimination.**

As an initial matter, in support of her Title VII and other claims, Plaintiff relies heavily on the contention that she has presented direct evidence of unlawful discrimination but cites the Court to the wrong legal standard.  Plaintiff contends that direct evidence is "'evidence from which a trier of fact could reasonably find that the defendant more probably than not discriminated against the plaintiff on the basis of a protected personal characteristic.'"  (Doc. 140-1 at 21 (quoting EEOC v. Dolgencorp, LLC, No. CV 617-100, 2018 WL 6251379, at *6 (S.D. Ga. Nov. 29, 2018).)  And although her Memorandum retains the internal quotation marks, it omits the citation to the case from which the district judge in Dolgencorp quoted: Wright v. Southland Corp., 187 F.3d 1287, 1300 (11th Cir. 1999).  "[T]he Wright definition" of direct evidence, however, "is not precedential" because "[t]he two other judges on the panel concurred in judgment only."  Robertson v. Riverstone Comms., LLC, 849 F. App'x 795, 801 n.4 (11th Cir. 2021) (per curiam) (citing Wright, 187 F.3d at 1306).[6]

The binding standard for direct evidence in this Circuit is as follows: evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  See, e.g., Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v.

---

[6] See also Thomas v. Aventis Pharm., Inc., 177 F. App'x 54, 55 n.2 (11th Cir. 2006) (per curiam) ("We are unpersuaded by [the plaintiff's] reliance on [Wright]—an opinion to which two judges filed special concurring opinions, concurring in the judgment only—for his argument to apply a lower, preponderance standard to such evidence.").

White, 548 U.S. 53 (2006). Having failed to acknowledge this standard, Plaintiff fails to meet it.[7] Thus, Plaintiff's Motion fails to demonstrate affirmatively her entitlement to judgment as a matter of law by direct evidence. Four Parcels, 941 F.2d at 1437.[8]

### 2. The Exclusion is Not Expressly Discriminatory.

#### a. The Plan Does Not Expressly Withhold Benefits Based on "Sex."

Plaintiff contends that the Exclusion is "expressly discriminatory," effectively reprising the argument made in her "Omnibus Memorandum" filed in opposition to Defendants' Motion to Dismiss that the Exclusion is "facially discriminatory." (Compare Doc. 140-1 at 15-19 with Doc. 74 at 14, 22.) In denying that Motion on Plaintiff's Equal Protection claim—where Defendants bore the burden of proof—the Court nevertheless found her argument "suspect," correctly observing that, like the plaintiff attacking the pregnancy classification at issue in Geduldig v. Aiello, 417 U.S. 484 (1974), Plaintiff "has the same health coverage as other employees" under the County's Plan (Doc. 89 at 23-24.)

---

[7] Plaintiff's reliance on the pre-Bostock decision in Glenn v. Brumby, 663 F.3d 1312 (11th Cir. 2011), is therefore misplaced. In Glenn, the panel, having previously held as a matter of law that "fir[ing] a transgender … employee because of his or her gender non-conformity" "violated the Equal Protection Clause's prohibition of sex-based discrimination," id. at 1320, found the decisionmaker's admission that "his decision to fire Glenn was based on 'the sheer fact of the transition'" was direct evidence of sex discrimination, id. at 1320-21. Plaintiff, however, has produced no such evidence here.

[8] Plaintiff's Motion does not attempt to show her entitlement to judgment as a matter of law under the burden-shifting circumstantial-evidence framework recognized by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 802-804 (1973), or by presenting a "convincing mosaic" as recognized by this Circuit in Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). (See Doc. 140-1 at 15 n.7.) Accordingly, the Court need not address either of those theories of liability.

Plaintiff acknowledges the previous rejection of her facially-discriminatory argument but contends that "neither the reasoning nor the holding of <u>Geduldig</u> applies to Title VII as amended by the Pregnancy Discrimination Act," Pub. L. 95-555, 92 Stat. 2076, 42 U.S.C. § 2000e(k) ("PDA"). (Doc. 140-1 at 19 n. 13.) However, there is no reason why this Court's earlier analysis of Plaintiff's Equal Protection claim—which alleges both sex *and* transgender discrimination— should apply with any less force to its analysis of her Title VII claim—which alleges sex discrimination only.[9]

---

[9] In ruling on the Motion to Dismiss, this Court remarked that the analysis in <u>Geduldig</u> "suggest[ing] the Exclusion, which does not facially classify among groups at all, is facially neutral" "may seem a bit strained today, but it nonetheless remains intact." (Doc. 89 at 25.) Subsequent legal developments do not suggest any need for this Court to reconsider that observation. In its previous Order, the Court observed that the majority in <u>Adams by & through Kasper v. School Board of St. Johns County</u>, 968 F.3d 1286, 1296 (11th Cir. 2020), had found a school policy requiring transgender students to use the bathroom corresponding to their gender assigned at birth to be "facially discriminatory because it singled out transgender students as a group for different treatment." (<u>See</u> Doc. 89 at 25 n.14 (citing <u>Adams</u>, 968 F.3d at 1296).) That opinion was subsequently vacated, although the majority's superseding opinion again held the policy to be violative of the Equal Protection Clause. <u>See</u> 3 F.4th 1299, 1310-11 (11th Cir. 2021). Chief Judge Pryor dissented from both opinions, writing in each that <u>Geduldig</u> was "instructive" in addressing the question of whether the alleged transgender bathroom policy at issue there created a "sex-based classification." <u>See</u> 3 F.4th at 1331; <u>see also</u> 968 F.3d at 1315-16. Shortly thereafter, the majority's superseding opinion was vacated, and the case is now pending on rehearing <u>en banc</u>. <u>See</u> 9 F.4th 1369, 1372 (11th Cir. 2021).

Plaintiff here cites to a Seventh Circuit opinion for the proposition that "[a] 'policy [that] cannot be stated without referencing sex' is 'inherently based upon a sex-classification.'" (<u>See</u> Doc. 140-1 at 22, citing <u>Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.</u>, 858 F.3d 1034, 1051 (7th Cir. 2017).) <u>Whitaker</u>, which would not be binding on this Court in any case, also concerned a transgender bathroom policy. <u>See</u> <u>id.</u> at 1038-39. But as <u>Adams</u> indicates, at this time, the question of whether such a policy constitutes a "sex-based classification" is an open one in this Circuit.

Plaintiff further contends that "'an employer who discriminates against a transgender employee necessarily and intentionally applies sex-based rules.'" (Doc. 140-1 at 22 (quoting Bostock v. Clayton Cty., __ U.S. __, 140 S. Ct. 1731, 1748 (2020)).) Bostock, however, held only that "[w]hen an employer *fires an employee for being … transgender*, it necessarily and intentionally discriminates against that individual in part because of sex." See 140 S. Ct. at 1744 (emphasis added). Nowhere in Bostock did the Court suggest a Health Plan violates Title VII merely by containing a limitation on coverage for certain procedures or treatment affecting a transgender participant, noting expressly that its decision did not address employment actions other than discharge based on homosexuality or transgender status.[10] Bostock, 140 S. Ct. at 1753-54.

Plaintiff also misrepresents various material facts that are—for purposes of *her* Motion at least—in genuine dispute and, thus, preclude summary judgment in her favor. Most notably, at various points in her supporting Memorandum, Plaintiff mischaracterizes the Exclusion as a "blanket Exclusion for gender-confirming care." (See Doc. 140-1 at 21; see also id. at 8, 18, 25.) But the record evidence shows (or at least presents a genuine issue of material fact as to whether) the Health Plan has, in fact, covered Plaintiff's *non*-surgical gender-transition medical treatment; i.e., medically necessary hormone

---

[10] Corbitt v. Taylor, 513 F. Supp. 3d 1309 (M.D. Ala. 2021), also cited by Plaintiff, is entirely unhelpful to her argument. In Corbitt, the district court held that an Alabama law *requiring* transgender residents to undergo "gender-reassignment surgery" before they could be issued a driver's license reflecting a sex different from their natal sex violated the Equal Protection Clause. Id. at 1312, 1323-24. Such a law is a far cry from the Health Plan here, which covers some though not all forms of treatment that may be appropriate for transgender participants.

medication, endocrinologist visits, and psychological monitoring.[11] (Doc. 150-8 at 48:19-49:15; Doc. 150-18 at 120:14-123:24; Ex. 36.)

> **b.    The Plan Does Not Discriminate on the Basis of Transgender Status.**

The Health Plan at issue here does not offend the cases upon which Plaintiff relies in her Memorandum. In City of Los Angeles Department of Water and Power v. Manhart, 435 U.S. 702, 704 (1978), the city "required its female employees to make larger contributions to its pension fund than its male employees" because, "[as] a class, women live longer than men." As the Court observed there, "each of the two groups of employees involved in [Manhart] [were] composed entirely and exclusively of members of the same sex" – one group of only men; one group of only women – and the employment practice at issue discriminated against women "on its face" in violation of Title VII. Id. at 715-16. But Plaintiff acknowledges she can avail herself of the same health insurance options as any other Plan participant, is not aware of anyone whose coverage is subject to different terms than hers, and is not aware of any other participant who has any health insurance

---

[11] Plaintiff contends she was denied coverage for a "routine blood test" in June 2019, as well as for a regular annual endocrinologist visit in October 2021. (See Doc. 140-1 at 20; see also id. at p. 8.) But it is undisputed that it is Anthem, the Plan's TPA, that processes claims made under the Plan. (Doc. 150-4 at 109.) Plaintiff has not provided any documentary evidence (e.g., an Explanation of Benefits form) or otherwise testified as to the reasons given her for any denial of coverage on those two occasions. Moreover, to the extent Plaintiff was, in fact, denied reimbursement, in whole or in part, on those discrete occasions, she has presented no evidence that it was done at the County's direction, or that the denial was based on anything other than Anthem's application of the Plan's terms, erroneous or not. Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("An employer may fire an employee for … a reason based on erroneous facts … as long as its action is not for a discriminatory reason." (internal quotation marks and citation omitted)).

other than what is available to her under the Health Plan. (Doc. 137-3 at 40:3-9, 17-25.) Again, Plaintiff "has the same health coverage as other employees" under the County's Plan. (Doc. 89 at 23-24.)

In a subsequent case, Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669 (1983), the Court held that the employer violated the PDA by providing less extensive pregnancy-related hospital coverage to the dependent-spouses of male employees than it did to its married female employees. Id. at 672. The Court held that, "since the sex of the spouse is always the opposite of the sex of the employee, it follows inexorably that discrimination against female spouses in the provision of fringe benefits is also discrimination against male employees" in violation of Title VII. Id. at 684.

Plaintiff, of course, is not proceeding under the PDA. And, in asserting her sex discrimination claim under Title VII, Plaintiff does not seek to compare herself with transgender *male* participants, for it cannot be disputed that the Plan covers non-surgical treatments for gender dysphoria equally for participants of both sexes (regardless of gender), and that sex-reassignment surgery—as well as the reversal of the same—and related services and supplies are likewise excluded from coverage for participants of both sexes (regardless of gender).

Instead, Plaintiff, a transgender female, proffers as her comparator *cisgender* females generally. However, to the extent Plaintiff seeks to shoehorn her claim into the kind of unique comparison reserved for pregnant employees (or spouses of pregnant

employees) under the second clause of the PDA, that argument is not effective in the context of this case.[12]

The Supreme Court has observed that "the meaning of the second clause [of the PDA] is less clear" than the first clause. Young v. United Parcel Svc., 575 U.S. 206, 135 S. Ct. 1338, 1348 (2015). In Young, the plaintiff, a pregnant woman with a history of miscarriages who was advised by her doctor not to lift more than 20 pounds, was told by her employer that she could not continue performing any of her job duties even though, she contended, several persons whose disabilities created work restrictions similar to hers had been accommodated. See id. at 1344, 1347. Similar to Plaintiff here, the plaintiff in Young argued "because the record [] contains 'evidence that pregnant and nonpregnant workers were not treated the same,' that is the end of the matter, she must win." Id. at 1349.

But the "problem with [the plaintiff's] approach" in Young, the Court found, was that "[i]t seem[ed] to say that the [PDA] grants pregnant workers a 'most-favored-nation' status." Id. Putting it another way, the Court found that plaintiff's argument was that "[a]s long as an employer provides one or two workers with an accommodation … then it must provide similar accommodations to *all* pregnant workers (with comparable physical limitations), irrespective of the nature of their jobs, the employer's need to keep them working[,] their ages, *or any other criteria*." Id. at 1349-50 (emphasis added to "or any

---

[12]   See 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; *and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work*.") (emphasis added).

other criteria"). The Court observed that "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has a legitimate, nondiscriminatory, nonpretextual reason for doing so." Id. at 1350 (emphasis added). Accordingly, the plaintiff in Young was required to prove her employer's reasons to be a mere pretext for unlawful sex discrimination under the McDonnell Douglas circumstantial evidence test. Id. at 1356.

As noted above, Plaintiff has deemed it "unnecessary" to proceed under the McDonnell Douglas test on her Title VII claim. (See Doc. 140-1 at 22, n.7.) But, given the absence of direct evidence, and properly viewing the circumstantial evidence and drawing all inferences therefrom in a light most favorable to the County and the Sheriff's Office, Plaintiff cannot be said to have proved *affirmatively* that the reasons for the Exclusion here are a mere pretext for sex discrimination. Accordingly, her Motion for Summary Judgment should be denied.[13]

---

[13] More akin to the first clause of the PDA than the second, Bostock's judicial pronouncement merely held that, contrary to the findings of the courts below, discrimination on the basis of sexual orientation or transgender status is discrimination on the basis of sex. Bostock, 140 S. Ct. at 1754. Plaintiff's citation to the nonbinding opinion in Schroer v. Billington, 577 F. Supp. 2d 293 (D.D.C. 2008), is distinguishable on similar and other grounds. As an initial matter, the district court's findings of fact and conclusions of law in that opinion were made following a bench trial, id. at 295, and thereby fails to support Plaintiff's motion for *summary judgment*. Furthermore, the court in that case did not indicate what legal standard it applied in finding direct evidence of discrimination (much less, of course, whether it comports with the binding standard in the Eleventh Circuit). Compare id. at 305 ("Schroer's case indeed rests on direct evidence, and compelling evidence that the Library's hiring was infected by sex stereotypes.") with Standard, 161 F.3d at 1330 (direct evidence "establishes the existence of discriminatory

Almost every employee, regardless of sex and gender, who is covered by his or her employer's insurance plan, knows the irritation of discovering a form of treatment is not covered, either in whole or in part.  Here, the Health Plan included 68 medical exclusions and 29 pharmacy exclusions in 2019. (Doc. 137-5 at ¶ 13.)  The mere fact that the Health Plan places some limitations on coverage for gender-confirming treatment that is otherwise made available to participants regardless of their sex (or gender) is not proof of discrimination based on sex or otherwise, much less direct evidence of such discrimination.

Nevertheless, Plaintiff contends that this is a "'straightforward case' of discrimination based on transgender status" because a "'natal female born without a vagina qualifies for coverage of a vaginoplasty, but not [Plaintiff] because [her] natal sex is male.'" (Doc. 140-1 at 17 (quoting Boyden v. Conlin, 341 F. Supp. 3d 979, 995 (W.D. Wis. 2018)); see also Doc. 140-1 at 17 n.9 (citing cases holding similarly).)  The nonbinding caselaw cited by Plaintiff notwithstanding, this reductive form of reasoning is incorrect: a natal female does not qualify for coverage of a vaginoplasty under the Plan because she is female but, rather, *because she suffers from some variation of MRKH Syndrome*.[14]  On the other hand, the only evidence Plaintiff offers as to the procedure she (Plaintiff) seeks is as follows: "convert[ing] [his] penis into a neovagina" by removing his testicles, shortening

---

intent behind the employment decision without any inference or presumption").  As discussed above, Plaintiff has produced no such evidence here.

      [14]    See Te Linde's Operative Gynecology, 12th ed., Sect. VII, Management of Selected Gynecologic Conditions, Ch. 40, Surgical Management of Reproductive Tract Anomalies (July 2019), Surgical Management of Reproductive Overflow Tract Anomalies, Class I Anomalies, Uterovaginal Atresia, available in Westlaw at LWWOPGYN12TH CH40.

the urethra, and using the penile and scrotal skin "to line the neovagina, the space between the rectum and the prostrate and the bladder." (See Doc. 144-1 at 8, ¶ 23.) That procedure is more than sufficiently different to negate a finding of "discriminatory intent behind the [coverage of a cisgender female's vaginoplasty] without any inference or presumption," the standard in this Circuit for direct evidence. Standard, 161 F.3d at 1330. For purposes of Plaintiff's Motion at least, that difference presents a genuine issue of material fact precluding the entry of summary judgment in her favor on her Title VII claim.[15]

Plaintiff also asserts that the policy is sexually discriminatory because her doctors have determined that it is "medically necessary" to treat her gender dysphoria. (Doc. 140-1 at 13.) However, with regard to gender dysphoria, Dr. Schechter states that "[n]ot every transgender person wants, requires, or qualifies for every available surgical procedure," and "'[t]he number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs.'" (Doc. 148-2 at 9-10 ¶ 23 (brackets in original).) And, as Dr. Schechter further explains, "[t]he medical community and insurance providers recognize a distinction between surgery that is medically necessary and cosmetic surgery,

---

[15]     Plaintiff also relies upon Dr. Schechter's report for the proposition that "[g]ender-confirming surgeries do not involve uniquely expensive or novel procedures; rather, they involve the same procedures (as indicated by use of the same CPT code [footnote omitted]) that are used to treat non-transgender individuals." (See Doc. 140-1, at 3; see also Doc. 140-2 at ¶ 17.) The omitted footnote reads as follows: "Current Procedural Terminology ('CPT') codes are numerical codes used primarily to identify medical services and procedures." (See Doc. 140-1 at 3; see also Doc. 140-2 at ¶ 17.) Dr. Schechter's report, however, states only that "[t]he same code or codes *may* apply …" and does not provide any information permitting the Court to conclude, at least for purposes of Plaintiff's Motion, that a vaginoplasty should be viewed as the same procedure as the gender-confirming surgery Plaintiff seeks. (Emphasis added.)

which generally is not," but "*[n]o particular procedure is inherently cosmetic or inherently medically necessary*."  (Id. at 10, ¶ 26 (emphasis added).)

Moreover, the Health Plan limits reimbursement for certain procedures or treatments for *other medically necessary treatments unrelated to transgender status*, as well. For example, the Plan covers various medically necessary treatments for participants suffering from obesity but excludes lap-band surgery. (Doc. 150-4 at 49-51, 60; Doc. 150-5 at 67.)  Accordingly, when "all reasonable doubts" are resolved and "all justifiable inferences" are drawn in favor of the non-movants here, the Health Plan's coverage of non-surgical treatment for gender dysphoria—but exclusion of sex-reassignment surgery (or reversal of the same) and related services and supplies—for participants of both sexes (regardless of gender) raises a genuine issue of material fact as to the requisite discriminatory intent.  Four Parcels, 941 F.2d at 1437.  Because Plaintiff has failed to show her entitlement to judgment as a matter of law, her Motion should be denied.[16]

---

[16] Plaintiff argues that "[t]o satisfy Title VII's intent requirement," a plaintiff is not required to show the employer was "'motivated by invidious hostility or animus,'" but only that the decision was 'premised on' the protected characteristic. (Doc. 140-1, p. 25; see also id. at 25-26.)  Each of the cases upon which Plaintiff relies, however, addressed a facially-discriminatory policy or other direct evidence of discrimination. (See Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999) ("direct evidence of disparate treatment"); Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991) ("a facially discriminatory policy"); Rodriguez v. Procter & Gamble Co., 465 F. Supp. 3d 1301, 1321-22 (S.D. Fla. 2020) ("facially discriminatory"); Newport News, 462 U.S. at 684 (1983) ("on its face").  The Health Plan here is not such a policy and is not direct evidence of discrimination.

c.     **Plaintiff Has Failed to Establish the Absence of Genuine Issues of Material Fact as to Defendants' Alleged Discriminatory Intent.**

Plaintiff also contends that Defendants' alleged actions in adopting the Exclusion demonstrate discriminatory intent, but again fails to show affirmatively her entitlement to judgment as a matter of law in her favor.  (Doc. 140-1 at 26-30.)   As an initial matter, although Plaintiff refers to Defendants in the plural through her Motion, she has produced no evidence that the Sheriff was involved in the initial adoption of the Exclusion or in any subsequent decision regarding the Exclusion or any other aspect of the Plan—which he was not.  Neither the Sheriff nor the Sheriff's Office has any control over the Plan or the authority to amend its terms; only the County, as the Plan Sponsor, can amend the Plan. (Doc. 150-5 at 52; Doc. 150-11 at 49:2-18; Doc. 137-10 at ¶ 6.)

Moreover, because Plaintiff is the movant here, whatever facts she offers must be both material *and undisputed*—and, even if undisputed, "all reasonable doubts'" are to be resolved and "all justifiable inferences" as to the evidence must be drawn in favor of the County and the Sheriff's Office.  Four Parcels, 941 F.2d at 1437.  Finally, those facts, properly considered under that standard, must affirmatively "show that, on all the essential elements of [Plaintiff's] case on which [she] bears the burden of proof at trial, no reasonable jury could find for the nonmoving part[ies]" here.  Id. at 1438.[17]

---

[17]  Again, what Plaintiff contends to be direct evidence is not under binding Circuit precedent.   See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) ("[e]vidence that only suggests discrimination, … or that is subject to more than one interpretation, … does not constitute direct evidence" (internal quotation marks and citations omitted)).  In contrast with the case before this Court now, in Merritt, the Eleventh Circuit addressed an employer's motion for summary judgment.  See 120 F.3d at 1182

Plaintiff contends that the Exclusion has an alleged disproportionate impact on transgender employees that shows discriminatory intent, citing to the Supreme Court's decision in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977), for the proposition that "where 'a clear pattern, unexplainable on grounds other than [a protected characteristic], emerges from the effect of the state action … [t]he evidentiary inquiry is then relatively easy.'" (Doc. 140-1 at 27.)  The plaintiff in Arlington Heights, a real estate developer who had contracted to purchase a tract of land on which to build low and moderate income housing, challenged the local authorities' refusal to change the tract from single-family to a multi-family classification as racially discriminatory.  Id. at 254.  Although the Court found that "[t]he impact of the [defendant] Village's decision [did] arguably bear more heavily on racial minorities," see 429 U.S. at 269, it held that the plaintiff had nonetheless failed to carry its burden of showing the requisite discriminatory purpose in consideration of the evidence "[i]n sum," id. at 270.[18]

Like the local authorities' decision at issue in that case, the County here adopted the Health Plan containing the Exclusion "long before [Plaintiff] entered the picture," see id., and as this Court previously observed, Plaintiff "has the same health coverage as other employees" under the Plan (see Doc. 89 at 23-24).  Therefore, for purposes of Plaintiff's

---

("[a]t least as we are required to view them at this stage, the facts ….").  Similarly, in addressing – and denying in part – Defendants' motion to dismiss earlier in this action, the Court properly construed the "reasonable inferences" from the well-pleaded facts of the Amended Complaint "in the light most favorable to the plaintiff."  Lange, 499 F. Supp. 3d at 1266 (emphasis added).

[18] The Court also found that the appellate court's "finding that the Village's decision carried a discriminatory 'ultimate effect' [was] without independent constitutional significance."  Id. at 271.

Motion for Summary Judgment at least, there exist genuine issues of material fact as to whether a vaginoplasty for a cisgender female is so similar to the gender-confirming surgery Plaintiff seeks to undergo that no reasonable jury could find in Defendants' favor on her claim of sex discrimination.

Plaintiff also relies upon allegedly disparaging statements from alleged decisionmakers and Defendants' alleged departure from "normal procedures." (Doc. 140-1 at 28.) Again, contrary to Plaintiff's contentions, these so-called disparaging statements are not direct evidence. And as circumstantial evidence at best, each of those statements, even where Plaintiff's recitation is undisputed, must be read in the light most favorable to Defendants as the non-moving parties and all reasonable inferences must be drawn in Defendants' favor.

Chief among those, perhaps, is Plaintiff's misleading characterization of the 88-year-old Sheriff's testimony that he does not believe in "sex change, whether it's surgery or not surgery." (Doc. 157 at 104:5-105:18.) That line of questioning followed up on Sheriff Talton's earlier testimony regarding the meeting at which Plaintiff first told him she wanted to present as female, and during which the Sheriff told her, "Well, I don't believe in this," but "told [Plaintiff] it wouldn't affect [Plaintiff's] job as long as [Plaintiff] did [Plaintiff's] job and didn't cause any problems with the other people or him."[19]  (Doc. 157 at 18:15-25; see also Doc. 157 at 17:13-19:22.)

---

[19] Sheriff Talton, of course, is no more required by Title VII to agree with Plaintiff's plans to undergo gender-confirming surgery than he would be required to agree with the contrary religious beliefs of one of his other reports.  Plaintiff testified that she received all

Likewise, Plaintiff disagrees with the focus and calculations undertaken by the County regarding the potential cost impact on the Plan.  (Doc. 140-1 at 29.)  As a matter of law, Plaintiff cannot survive a motion for summary judgment—much less prevail on her own—by "simply quarreling with the wisdom of [the employer's] reason."  Chapman v. AI Transp., 229 F.3d at 1030; cf. Short v. Mando Am. Corp., 805 F. Supp. 2d 1246, 1274 (M.D. Ala. 2011) ("That [the plaintiff] disagrees with [the defendant's] assessment of the economic situation with respect to his job … is irrelevant.").  Moreover, Defendants have offered expert testimony supporting the County's cost concerns for the Plan as a whole and the actions taken in response (Doc. 167) and Plaintiff has not challenged the admissibility of that testimony.  See n.5 supra.

As shown here, many of Plaintiff's statements of fact misstate the record (see Defendants' Responses to Plaintiff's SOF ¶¶ 14-16, 110, 234, 253, 255, 262), or are "subject to more than one interpretation," Merritt, 120 F.3d at 1189.  Therefore, that evidence must be viewed in a light most favorable to Defendants with the record evidence in sum.  As such, at least as to Plaintiff's contentions in her Motion for Summary Judgment, there exist genuine issues of material fact to be tried.

Plaintiff also mischaracterizes the record—and certainly fails to show an absence of genuine issues of material fact—in contending that the County departed from its normal

---

pay increases that other Sheriff's Office employees received and that when it was her turn to get a new Sheriff's Office vehicle, she got to pick the type and color of the vehicle—just like other employees at her rank in CID. (Doc. 137-3 at 36:19-23, 37:15-23.)  There is no allegation that the Sheriff, who could not exercise any control over the Plan, treated her differently because of her plans to undergo surgery.

procedures in addressing Anthem's January 2019 letter and the conduct of the February 2019 Commission meeting at which she appeared with her counsel.  (Doc. 140-1 at. 29.) As an initial matter, although Plaintiff contends that the federal Affordable Care Act ("ACA") prohibits discrimination on the basis of sex, see 42 U.S.C § 18116(a), and despite claiming that the letter constituted a "warn[ing]" that the County was in violation of the ACA, she does not claim Defendants' actions violated any rights *she* might have thereunder that statute.[20]  As reflected on the face of its letter, Anthem acknowledged Section 1557 of the ACA was subject to varying interpretations and did not make any recommendation to the County regarding the Plan's Exclusion.  (Doc. 150-30 at 2.)  Plaintiff does not introduce any testimony from Anthem to the contrary.  Thus, at least with regard to Plaintiff's Motion, and properly viewing the letter and the actions taken by Carter in response in the light most favorable to *Defendants*, there exist genuine issues of material facts precluding summary judgment in her favor.

Finally, Plaintiff contends that sexually discriminatory intent is evidenced by the alleged granting of a single exception for a follow-up bariatric surgery.  (Doc. 140-1 at 30.) Once again, Plaintiff misrepresents the record evidence.  Before 2010, when the Health Plan did *not* exclude lap band surgery, a participant underwent that surgery with the understanding that the treatment protocol called for lap band adjustments every year for a few years following the surgery.  (Doc. 150-19 at 184:6-185:2.)  Effective January 1, 2010,

---

[20] Compare Flack v. Wis. Dep't of Health Servs., 328 F. Supp. 3d 931, 946-51 (W.D. Wis. 2018) (plaintiff asserted ACA claim); Boyden, 341 F. Supp. 3d at 994 (same); Kadel v. Folwell, 446 F. Supp. 3d 1, 14-17 (M.D.N.C. 2020) (same), aff'd, 12 F.4th 422 (4th Cir. 2021).

however, the County agreed to Anthem's recommendation to add a bariatric surgery exclusion to the plan. (Doc. 150-19 at 186:4-10.) When the participant was denied coverage for a subsequent lap band adjustment pursuant to that exclusion, she complained that the adjustments were contemplated as part of the treatment protocol when she had the surgery and the County agreed to cover the adjustments. (Doc. 150-19 at 184:3-186:10.) In this case, however, the Exclusion has been part of the Health Plan since before Plaintiff came out as transgender, let alone sought gender-affirming surgery. (Doc. 137-3 at 48:5-18.) Furthermore, Defendants expressly deny Plaintiff's gender, transgender status, or her intent to undergo sex reassignment surgery, were factors on the Commission's decision to retain all Plan exclusions for 2020 or Plan renewals in other years. (Doc. 137-7 at ¶ 4; Doc. 137-8 at ¶ 4; Doc. 137-9 at ¶ 4.) So, at least with regard to Plaintiff's Motion, there exist genuine issues of material facts precluding summary judgment in her favor.

### d.    The Cost Justification Does Not Fail as a Matter of Law.

The County has explained it considered the cost of the plan as a whole—which has risen dramatically since 1994 and continues to do so—in assessing her request to remove an exclusion that would necessarily increase plan costs. (Doc. 150-19, Ex. M at 37:9-14, 87; 113:8-19, 87; Doc. 137-5 at ¶ 9; Doc. 159 at 101:22-102:7; Doc. 150-19, Ex. M at 23:20-31:7.) Relying upon the Supreme Court's decisions in Manhart and Newport News, Plaintiff contends that what she characterizes as a cost savings defense must fail as a matter of law. (Doc. 140-1 at 30-31.) But, as discussed above, Manhart addressed a pension plan that discriminated against women "on its face" in violation of Title VII. See 435 U.S. at 715-16. Newport News similarly addressed a facially discriminatory policy and held that

"no such justification is recognized under Title VII *once discrimination has been shown*" under the PDA.  See 462 U.S. at 684 & n.26 (emphasis added).  But, unlike the plans in Manhart and Newport News, the Plan here is neither facially nor expressly discriminatory.

As this Court observed in ruling on Defendants' Motion to Dismiss, the Exclusion "does not facially classify among groups at all, [and] is facially neutral."  (Doc. 89 at 25.) Plaintiff herself acknowledges she can avail herself of the same health insurance options as any other Plan participant, is not aware of anyone whose coverage is subject to different terms than hers, and is not aware of any Sheriff's Office employee who has any health insurance other than what is available to her under the Plan. (Doc. 137-3 at 40:3-9, 17-25.) In sum, "[Plaintiff] has the same health coverage as other employees" under the County's Plan.  (Doc. 89 at 23-24.)

Plaintiff attacks the County's cost analysis—the Sheriff was not required to conduct such an analysis and did not do so—but did not move to exclude the testimony of its expert witness, James P. Galasso.  Galasso testified that "substantial year-to-year fluctuations in both total health care costs and transgender health care costs is the norm" and "projecting the cost of transgender health care costs is highly uncertain, especially for a group with only about 1,500 members."  (Doc. 137-12 at 288.)  Thus, Galasso testified that contrary to the opinion of Plaintiff's expert witness, the County "must not rely on the expectation that the financial impact of such a loss will smooth out over time." (Id. at 289.)

Galasso also testified that it was "reasonable for an employer to be concerned that removing one benefit from the benefit exclusion list may result in requests or demands to remove other related and unrelated benefit exclusions."  (Id. at 310.)  And, as to stop-loss

protections, he testified that "[b]ecause the cost to maintain the stop-loss coverages would increase if the threshold were reached, the existence of these stop-loss policies is not, in [his] opinion, a justification for the potential removal of any benefit exclusion." (Id. at 316.) In short, at least with regard to Plaintiff's Motion for Summary Judgment, there exists a genuine issue of material fact as to whether the County's cost concerns indicate discrimination instead. Accordingly, Plaintiff's Motion should be denied.

e. **Plaintiff has not shown affirmatively that the County is an agent of the Sheriff's Office.**

As part of her Motion for Summary Judgment, Plaintiff also contends that "[t]he County cannot escape liability under Title VII (or under the ADA) because [she] works for the Sheriff's Office." (Doc. 140-1 at 32.) But as the movant, Plaintiff "must show that, on all the essential elements of [her] case on which [she] bears the burden of proof at trial, no reasonable jury could find for the nonmoving part[ies]"—including whether the County is her employer under Title VII (as well as the ADA). Four Parcels, 941 F.2d at 1438.

Plaintiff contends the record evidence now shows that the Sheriff's Office has chosen to delegate the provisions of healthcare benefits to the County and that the County has provided those benefits to be undisputed. (See Doc. 140-1 at 25-26.) However, even assuming, *arguendo*, that those two simple facts are undisputed, they are not sufficient for Plaintiff to carry her burden of proving affirmatively the County's status as a matter of law. Clark v. St. Joseph's/Candler Health Sys., Inc., No. 4:05-CV-119, 2006 WL 2228929, at *7 (S.D. Ga. Aug. 3, 2006), aff'd, 225 F. App'x 799 (11th Cir. 2007) (per curiam).

Plaintiff seeks to hold the County liable for the Sheriff's Office's employment of her under an "agency" theory. This theory applies where an employer delegates control of some of its traditional rights over its employees to another entity. See Williams v. City of Montgomery, 742 F.2d 586, 589 (11th Cir. 1984) (per curiam); see also Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc). In Williams, a city employee asserted discrimination claims under Title VII against the city and the Montgomery City-County Personnel Board, among others. See 742 F.2d at 587. On appeal, the Eleventh Circuit affirmed the district court's conclusion that the personnel board was the agent of the city for Title VII purposes. See id. at 588-89. In so doing, the court observed that, while the city was the plaintiff's employer, *Alabama law* "grants the [personnel] board rights traditionally reserved to the employer." Id. at 589. The rights granted included the right to establish a pay plan, a position classification plan, and minimum standards and qualifications, to evaluate the performance of employees during their probationary periods, to transfer, promote, demote, and reinstate employees. Id. Therefore, the court held that the delegation of such traditional employment authority to the personnel board made the board an agent of the city for purposes of Title VII. Id.[21]

---

[21] Such delegation of employment authority between independent governmental agencies is unusual, underscoring the en banc Eleventh Circuit's acknowledgment that the agency theory may be "a poor fit where public entities are concerned." Lyes, 166 F.3d at 1341. n.4. The Williams court's finding of an agency relationship based on the employer's "delegation" of the employment-related power or authority at issue to another entity is consistent with a line of cases of which Spirt v. Teachers Ins. & Ann. Assn., 475 F. Supp. 1298, 1308 (S.D.N.Y. 1979), reversed on other grounds, 463 U.S. 1223 (1983), is representative. In Spirt, the plaintiff's employer, as a condition of employment, *compelled* her participation in a pension plan administered by another entity which, by design, paid

In the present case, however, while it is true that the County—through its Board—controls the terms and conditions of the Plan, including its exclusions, it is the Sheriff who controls both *whether* to provide health insurance benefits to his employees and *how* to provide such benefits to his employees.  Indeed, by law, the County cannot exercise such control. See Brown v. Dorsey, 625 S.E.2d 16, 21 (Ga. App. 2006) ("[T]he [c]ounty has no control over the sheriff's department personnel, including its deputies and jailors."); see also Ga. Const. art. IX, §2, ¶1(c)(1) (counties' home rule authority does not include any "[a]ction affecting any elective county office … or the personnel thereof …."). The Sheriff's power and authority in this regard were *not* delegated to the County.  To the contrary, the Sheriff alone exercised that power and authority by choosing to provide health insurance benefits to his employees in the first instance, and then by choosing to do so by taking advantage of the opportunity to join the County's Plan.  The manner in which the Sheriff, as the employer of Plaintiff and her fellow deputies, chose to exercise his exclusive control over this aspect of their employment simply cannot be likened to the compulsory

---

female participants lower pension benefits than male participants making the same contributions.  See Spirt, 475 F. Supp. at 1307-08.  On this basis, the court concluded that "[h]olding responsible those who control the aspects of employment accorded protection under Title VII is consistent with the congressional intent … that the Act's effectiveness not be frustrated by an employer's delegating authority for its employees' compensation, terms, conditions, or privileges of employment to third parties, …." Id. at 1308 (emphasis added; citations and footnote omitted); see also id. ("[T]he term 'employer' under Title VII has been construed … to encompass persons who are not employers in conventional terms, but who nevertheless *control* some aspect of [the plaintiff's] compensation, terms, conditions, or privileges of employment." (Emphasis added; citations omitted).).

delegation of such control which supported findings of agency in <u>Williams</u> and the <u>Spirt</u> line of cases.[22]

Therefore, at least with regard to Plaintiff's Motion for Summary Judgment, there exist genuine issues of material fact with regard to the Sheriff's delegation of control to the County over whether and how to provide health insurance benefits to his employees, and Plaintiff is not entitled to summary judgment on Plaintiff's Title VII and ADA claim on the issue of whether the County is her employer within the meaning of either statute.

**C.** **Plaintiff is not entitled to summary judgment on her Equal Protection claim.**

Plaintiff also moves for summary judgment on her Equal Protection claim based on her sex and transgender status.  (Doc. 140-1 at 33-37.)  The Fourteenth Amendment states that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  But "[t]he Equal Protection Clause does not forbid classifications."  <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992).  "The equal protection question is whether the distinction is lawful."  <u>Nguyen v. Immigration Naturalization Serv.</u>, 533 U.S. 53, 64 (2001).

This Circuit recognizes three categories of Equal Protection claims: (1) "that a statute discriminates on its face"; (2) that the "neutral application of a facially neutral statute has a disparate impact"; and (3) that the "defendants are unequally administering a facially neutral statute."  <u>E & T Realty v. Strickland</u>, 830 F.2d 1107, 1112 n.5 (11th Cir.

---

[22] Notably, the County adds newly-hired Sheriff's Office employees into applicable benefit plans *when directed to do so by a letter from the Sheriff's Office*.  (Doc. 150-11 at 45:20-46:3; Doc. 150-14 at 18:4-19:2.)

1987) (citations omitted). "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." <u>Bucklew v. Precythe</u>, 139 S. Ct. 1112, 1127 (2019) (analyzing Eighth Amendment claim). "So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." <u>Id.</u> (internal quotation marks omitted).

Plaintiff asserts a facial challenge only. As discussed above, however, this Court correctly observed in ruling on Defendants' Rule 12(b)(6) Motion that the Exclusion is not discriminatory on its face. (<u>See</u> Doc. 89 at 23-25.) Furthermore, although the Court found in that same Order that Plaintiff's Amended Complaint had pled facts sufficient to plausibly contend that "the Exclusion is a facially neutral classification that has a disproportionate impact on transgender persons and is motivated by discriminatory purpose" (<u>see</u> Doc. 89 at 23), she has *not* moved for summary judgment under either of those categories. <u>See Four Parcels</u>, 941 F.2d at 1437 (noting that "[t]he moving party bears the initial responsibility of informing the … court of the basis for its motion" (internal quotation marks omitted)).[23] Accordingly, Plaintiff has not demonstrated affirmatively an absence of genuine issues of material fact or her entitlement to summary judgment on her Equal Protection claim, and her Motion should therefore be denied.

---

[23] Should the Court find that those other categories of Equal Protection claims are before it, summary judgment should be denied on those categories, as well, based on the discussion of Plaintiff's Title VII claim at Section B of this memo, and the Memorandum in Support of Defendants' Motion for Summary Judgment. (Doc. 137-2 at 28-30.)

Although Plaintiff previously contended that the Exclusion "is facially discriminatory," this Court correctly recognized that extant Supreme Court precedent counsels otherwise.  (Doc. 89 at 23-25.)  In <u>Geduldig</u>, the Court held that a coverage exclusion for pregnancy under California's disability insurance system was not a sex-based classification, but one based on a medical condition instead.  417 U.S. at 495-97.  The Court found that classification resulted in two groups: "pregnant and nonpregnant people." <u>Id.</u> at 496 n.20.  The Court then explained that while "the first group is exclusively female," "the second includes members of both sexes," and, thus, there was a "lack of identity" between pregnancy and sex.  <u>Id.</u>  Accordingly, the Court reversed the judgment of the three-judge district court's finding in favor of the plaintiff on her Equal Protection claim.  <u>Id.</u> at 497.

As this Court correctly found, the Plan provides Lange with "the same health coverage as other employees," regardless of sex or gender.  (Doc. 89 at 24.)[24]  However, even assuming, *arguendo*, that the Exclusion is sexually discriminatory on its face, it would survive the intermediate scrutiny constitutional standard applied to classifications based on sex.  <u>Miss. Univ. for Women v. Hogan</u>, 458 U.S. 718, 724 (1982); <u>accord</u> <u>Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cty.</u>, 122 F.3d 895, 908 (11th Cir. 1997).[25]

---

[24] <u>Compare</u> <u>U.S. v. Virginia</u>, 518 U.S. 515, 519 (1996) (limiting admission to state-maintained military college to men denied equal protection to women); <u>Miss. Univ. for Women v. Hogan</u>, 458 U.S. 718, 724 (1982) (limiting admission to state-supported university to women denied equal protection to men).

[25] Neither <u>Bostock</u>, *supra*, nor the Eleventh Circuit's earlier holding in <u>Glenn</u>, <u>supra</u>, requires this Court to reconsider that analysis.  See footnote 7, *supra*.

1.      **The Exclusion serves important governmental objectives.**

Even general economic concerns constitute an important governmental objective. See Book v. Daytona Beach, Fla., Case No. 6:08-cv-1180-Orl-28DAB, 2009 WL 10706063, at *3 (M.D. Fla. July 14, 2009) (holding that the city's Public Nudity Ordinance served important governmental objectives in light of the city's "'economic problems due to [a] decline in year-round family tourism in recent decades and costs associated with special event tourism" and desire to "improve its economic situation and that of its citizens and businesses by returning to an emphasis on family-oriented tourism'" (quoting public nudity ordinance)).  But it is especially so here as the Plan is self-funded, and, thus, the County must "pay out any claims from its own funds" and bear the "financial risk" associated with doing so.  America's Health Ins. Plans v. Hudgens, 742 F.3d 1319, 1324 (11th Cir. 2014) (contrasting self-funded plans with "insured" health benefit plans, under which an "insurance company—not [the employer]—will assume the entire risk in paying out health care claims").[26]

The County is subject to a statutory cap on how much it can raise its millage rate for property taxes, and, thus, it cannot simply pass on an increase in spending to the taxpayers.  (Doc. 137-6 at ¶ 6.)  Furthermore, it is undisputed that the Plan's costs have risen steadily since at least 1994, the earliest year for which records are still available.  The

---

[26] To guard against the risk under its self-funded plan, the County has two kinds of "stop-loss" insurance in place—one for individual claims exceeding $175,000 and another for aggregate loss if actual claims exceed expected claims by 25%.  For example, if expected claims were $10 million dollars, the aggregate stop-loss would be triggered if actual claims exceed $12.5 million dollars.  (Doc. 167 at 314.)

County tracks its annual spending on the Health Plan and a summary chart shows the Annual Cost Per Employee rose from $2,057 in 1994 to $15,881 in 2018. (Doc. 150-19 at 87.) Annual plan costs rose by over 17% from $10.6 Million in 2018 to $12.5 Million in 2019 and by 2.3% in 2020 to $12.8 Million. (Doc. 137-5 at ¶ 9.)

**2.      The Exclusion is substantially related to the achievement of lower costs.**

Moreover, the Exclusion is "substantially related to the achievement" of lower costs. Nothing in the record shows that the Exclusion—*one of 68 under the Plan*—is inconsistent with the important governmental objective of managing the self-funded Health Plan's costs. Plan participants with other medical conditions are treated similarly to Plaintiff under the Plan and its exclusions. With respect to coverage related to obesity, the plan covers various other medically necessary treatments for obesity such as medications and preventive care but excludes medically necessary lap-band surgery. (Doc. 155-1 at 72.) With respect to hearing issues, the Plan covers medically necessary audiology testing and office visits to assess an individual's hearing but excludes medically necessary hearing aids. (Doc. 155-1 at 40, 49, 70.)

Similarly, the Plan covers medically necessary hormone medication, endocrinologist visits, and psychological monitoring for participants suffering from gender dysphoria, but excludes sex change surgery and related drugs. (Doc. 155-1 at 27, 49, 58, 72, 74.) The case authority upon which Plaintiff's Motion relies is inapposite. To the extent Plaintiff cites Justice Brennan's *plurality* opinion in <u>Frontiero v. Richardson</u>, 411 U.S. 677 (1973), for the proposition that sex-based classifications are subject to strict scrutiny, that decision is contrary to the standard of review established in *binding* Supreme

Court authority.[27]   The Supreme Court's decision in Memorial Hospital v. Maricopa County, 415 U.S. 250, 260 n.21 (1974), is likewise inapplicable because the challenged classification in that case impinged upon a fundamental right (i.e., the "right of interstate travel"), to which strict scrutiny does apply, but which is not the constitutional right at issue here.[28]

Plaintiff also cites the nonbinding Ninth Circuit's decision in Diaz v. Brewer, 656 F.3d 1008, 1013 (9th Cir. 2011), for the contention that, "'[W]hen a state chooses to provide [employee health] benefits, it may not do so in an arbitrary or discriminatory manner that adversely affects particular groups that may be unpopular.'"  (Doc. 140-1 at p. 29.)  That opinion relied upon the Supreme Court's decision in U.S. Department of Agriculture v. Moreno, 413 U.S. 528 (1973), which addressed a claim pursuant to the "Due Process Clause of the Fifth Amendment."   Id. at 529 (emphasis added).  Plaintiff's Amended Complaint does not plead such a claim here (see Doc. 56 at ¶¶ 11, 133-135), and the Court should not consider such unpled claims, see Coon v. Ga. Pacific Corp., 829 F.2d 1563, 1571 (11th Cir. 1987) ("Whatever the reason for her failure to amend, we find no error in the district court's taking the complaint at face value, and holding that the unpleaded claims

---

[27]   See Hogan, 458 U.S. at 724; Virginia, 518 U.S. at 519; cf. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 469 (1985) (Marshall, J., concurring in part) ("Heightened but not strict scrutiny is considered appropriate in areas such as gender, illegitimacy, or alienage because the Court views the trait as relevant under some circumstances but not others." (emphasis added)).

[28]   And the nonbinding opinion in Bonidy v. U.S. Postal Service, 790 F.3d 1121, 1122-23 (10th Cir. 2015), did not address an Equal Protection challenge at all but, rather, whether the Second Amendment right to carry firearms applied to the storage and carriage of firearms in federal buildings, including the defendant post office.

were not before it.").  This is especially so, Defendants submit, when such a claim is presented for the first time in Plaintiff's Motion for Summary Judgment.

Furthermore, Moreno applies to a review of policies under "rational basis scrutiny." See Trump v Hawaii, 138 S. Ct. 2392, 2421 (2018).  And even in the nonbinding opinion in Brewer, the Ninth Circuit did *not* hold that "cost savings" could not justify the difference in treatment, but simply that the defendant state had "not provided any evidence of the actual amounts of benefits the state paid for same-sex partners."  See 656 F.3d at 1013. Therefore, none of the case authority upon which Plaintiff relies supports her Equal Protection claim, much less her Motion for Summary Judgment on that claim.

As noted above, the Exclusion at issue here is *one of 68* (not including 29 additional pharmacy exclusions) under the Plan.  Plaintiff contends that "[r]emoving the Exclusion would cost a small fraction of one percent of the Health Plan's expenditure" and Defendants' 'snowball' cost defense belies common sense and is wholly unsupported by the evidence.'"  (Doc. 140-1 at 37.)[29]

Finally, Plaintiff has not shown that Defendants' cost concerns were "'invented post hoc in response to litigation.'"  (See Doc. 140-1 quoting Virginia, 518 U.S. at 533.) Plaintiff contends that "it did not consider any cost information *about the Exclusion* until after it was sued, and did not settle on its current, 'snowball' defense until … after they [*sic*] had readopted the Exclusion yet one more time in November 2019."  (Doc. 140-1 at

---

[29] To the extent Plaintiff relies upon Anthem, Anthem used the same PMPM methodology Barrett used, which was found inappropriate and unreliable for this situation by Galasso.  (Doc. 167, Ex. 2.)

37 (emphasis added).)  Plaintiff misapprehends the County's cost defense.  It has tracked annual spending on the Plan and its costs have steadily increased since at least 1994.  (Doc. 150-19 at 37:9-14, 87.)  A majority of the then-Commissioners were aware of the escalating costs of the plan.  (Doc. 137-7 at ¶ 4; Doc. 137-8 at ¶ 4; Doc. 137-9 at ¶ 4.)

Of course, it is entirely irrelevant whether the Sheriff's Office considered costs of the Exclusion as neither the Sheriff nor the Sheriff's Office has any control over the Plan or the authority to amend its terms; only the County, as the Plan Sponsor, can amend the Plan.  (Doc. 155-1 at 118; Doc. 150-11 at 49:2-18; Doc. 137-10 at ¶ 6.)  Therefore, for purposes of Plaintiff's Motion for Summary Judgment at least, there exist genuine issues of material fact and she has not shown affirmatively her entitlement to judgment as a matter of law.

**D.** **Plaintiff is Not Entitled to Summary Judgment on Her ADA Claim.**

**1.** **A Health Plan exclusion does not violate the ADA.**

Plaintiff cannot meet her burden of demonstrating discrimination on the basis of disability.  The sole basis for her claim is the existence of the Exclusion.  However, having an exclusion in a Health Plan does not violate the ADA.

In an early decision interpreting the ADA, the Third Circuit Court of Appeals concluded:

> So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities. The ADA does not require equal coverage for every type of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA.

Ford v. Schering-Plough Corp., 145 F.3d 601, 608 (3d Cir. 1998).  In reaching that

decision, the court analyzed Supreme Court and Court of Appeals precedent under the

Rehabilitation Act and the ADA, as well as the ADA's legislative history.  Id. at 608-610.

The Rehabilitation Act cases approved a Health Plan reduction in the number of inpatient

days deemed to fall more heavily on disabled participants, see Alexander v. Choate, 469

U.S. 287, 302 (1985); a Veterans' Administration limitation on benefits for "self-inflicted"

conditions, specifically alcoholism, see Traynor v. Turnage, 485 U.S. 535, 549 (1988); and

lower levels of benefits for mental health conditions compared to physical conditions, see

Modderno v. King, 82 F.3d 1059, 1064-65 (D.C. Cir. 1996); Doe v. Colautti, 592 F.2d 704,

708 (3d Cir. 1979).

     The ADA cases follow suit.[30]  Addressing a two-year maximum on disability

benefits for mental health conditions (in the face of benefits until age 65 for physical

conditions), the Seventh Circuit found no remedy under the ADA:

> Without far stronger language in the ADA supporting this result [that mental
> health conditions must be covered equally], we are loath to read into it a rule
> that has been the subject of vigorous, sometimes contentious, national debate
> for the last several years.  Few, if any, mental health advocates have thought
> that the result they would like to see has been there all along in the ADA.

EEOC v. CNA Ins. Cos., 96 F.3d 1039, 1044 (7th Cir. 1996); see also Krauel v. Iowa

Methodist Med. Ctr., 95 F.3d 674, 680-81 (8th Cir. 1996) (finding no violation of ADA

Title I based on excluding coverage for infertility), abrogated on other grounds, Bragdon

---

[30] Defendants note that the ADA cases regarding coverage for mental health matters
pre-date the Mental Health Parity Act.  While disparities in mental health coverage today
would not be analyzed under the ADA, those cases demonstrate the thorough approach of
the Ford analysis and that the ADA has consistently permitted insurance plan distinctions.

v. Abbott, 524 U.S. 624 (1998); cf. Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1015-19 (6th Cir. 1997) (en banc) (ADA Title III did not prohibit employer from providing long-term disability plan providing for longer benefits for employees disabled due to physical illness than those disabled due to mental illness).

Finally, the court in Ford concluded that the ADA's legislative history did not prohibit insurance plan distinctions in procedures and treatments, specifically quoting from a report of the Senate Labor and Human Resources Committee:

> In addition, employers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example, while it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, e.g., only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition. A limitation may be placed on reimbursements for a procedure or the types of drugs or procedures covered[,] e.g., a limit on the number of x-rays or non-coverage of experimental drugs or procedures; but, that limitation must apply to persons with or without disabilities. All people with disabilities must have equal access to the health insurance coverage that is provided by the employer to all employees.

Ford, 145 F.3d at 610 (quoting S. Rep. No. 101-116, at 29 (1989)). Thus, pre-ADA case law, ADA decisions, and the Act's legislative history all point to the same conclusion—that having disability-based, treatment-based, or procedure-based limitations in a health insurance plan does not violate the ADA.[31]

---

[31]   Moreover, Court of Appeals decisions since Ford have followed its lead. See Doe v. CVS Pharm., Inc., 982 F.3d 1204, 1212 (9th Cir. 2020); McKnight v. GMC, 550 F.3d 519, 529 (6th Cir. 2008); EEOC v. Staten Is. Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000); Rogers v. Dep't of Health & Envtl. Ctrl., 174 F.3d 431, 433 (4th Cir. 1999). See also Collins v. Hartford Fire Ins. Co., Civil Action File No. 1:04-CV-3219-WBH, 2006

Against the weight of this overwhelming authority, Plaintiff cites one non-binding district court opinion based on very different facts and containing little legal analysis; and, indeed, what little analysis was employed is different from the one urged by Plaintiff here. In Whitley v. Dr. Pepper Snapple Group, Inc., 4:16-CV-00362, 2017 WL 1739917, at *3-4 (W.D. Tex. May 4, 2017), the court found that a plaintiff had established an adverse action under a McDonnell-Douglas framework by offering evidence that a plan *added* an exclusion for Applied Behavioral Analysis in response to the plaintiff's efforts to clarify whether it was covered. This case is distinguishable for two reasons. First, the sex reassignment surgery exclusion has been in the County's plan since the 1990s (see Doc. 150-15 at 28:25-29:11; Doc. 150-13 at 40:11-22), and Plaintiff admitted it was in the 2011 plan years before she publicly transitioned (see Doc. 150-8 at 48:5-18). Thus, it was not added because of her situation like the exclusion in Whitley. Second, the court in Whitley found (albeit with little analysis) an adverse action under the traditional McDonnell Douglas paradigm.[32] Here, Plaintiff has eschewed the McDonnell Douglas framework and instead asserts the Exclusion amounts to direct evidence (see Doc. 140-1 at 40), a standard of proof not addressed at all in Whitley. The Exclusion no more amounts to direct evidence under a disability discrimination analysis than it does under a sex discrimination analysis

---

WL 8431856, at *2 (N.D. Ga. Aug. 3, 2006) (listing Ford among seven courts of appeals to find distinctions in coverage between mental health conditions and physical conditions in disability plans *not* to violate ADA).

[32] Even under a McDonnell Douglas standard, Plaintiff cannot demonstrate that she has experienced an adverse action, as the Exclusion has been part of the Health Plan prior to her joining the Sheriff's Office, and she has testified that she is aware that it was in place *before* she sought gender-affirming surgery. (Doc. 150-8 at 48:5-18.)

under Title VII addressed above, and a single case finding adverse action (a lower threshold) fails to support Plaintiff's chosen standard of proof.

In summary, Whitley must be considered an outlier case in comparison with Ford and the other appellate decisions following it, it was decided under a different legal standard than Plaintiff seeks to travel under, and it is based on very different facts. Other than cases for general ADA standards, Whitley is the only substantive case relied on by Plaintiff in support of her specific ADA arguments. Accordingly, she has not established an entitlement to judgment as a matter of law and her Motion is due to be denied as to the ADA. In fact, since Ford and its progeny establish that Health Plan coverage distinctions do not violate the ADA, *all* of Plaintiff's arguments (regarding disparate treatment, disparate impact, and reasonable accommodation) are due to be dismissed. However, even if the Court were inclined to consider these arguments, they are not persuasive.

### 2.    Plaintiff Does Not Have a Disability Protected by the ADA.

As an initial matter, Plaintiff's alleged disability (gender dysphoria) is explicitly excluded from the Act's coverage unless it results from a physical impairment. See 42 U.S.C. § 12211(b)(1) (explicitly referring to "gender identity disorders"). Because the diagnosis of "gender dysphoria" is a *replacement* diagnosis for "gender identity disorder" (as opposed to an independent diagnosis), courts have considered the two diagnoses to be legally synonymous, at least in terms of determining eligibility for ADA coverage. See John Doe v. Northrop Grumman Sys. Corp., Civil Action No. 5:19-CV-00991-CLS, 2019 WL 5390953, at *7 (N.D. Ala. Oct. 22, 2019); see also Parker v. Strawser Constr., Inc., 307 F. Supp. 3d 744, 754-55 (S.D. Ohio 2018) (dismissing ADA claim of gender dysphoria

-42-

as excluded from ADA coverage). Plaintiff has produced no medical records affirmatively stating that her gender dysphoria is based on a physical impairment. Rather she submits an expert report *suggesting* that gender dysphoria in general has a physical origin.[33]

Even absent the ADA's express exclusion of gender dysphoria from its coverage, Plaintiff cannot meet her burden to show she has a disability.

Plaintiff claims that she is substantially limited in the major life activities of "thinking, concentrating, and interacting with other people."[34]   (Doc. 140-1 at 39.) However, Plaintiff has not provided evidence showing her experience of these symptoms is substantially limiting as compared to the average person in the general population.  29

---

[33] Dr. Bluebond-Langner's report quotes from an Endocrine Society paper stating: "Although the *specific* mechanisms guiding the biological underpinnings of gender identity are not entirely understood, there is *evolving consensus* that being transgender is not a mental health disorder. Such evidence stems from scientific studies *suggesting* …" (ECF 144-1, ¶ 19 (emphasis added).)  Even Plaintiff's expert acknowledges the physical etiology of gender dysphoria is hard to pin down.  A report published on the National Institutes of Health website, last updated July 20, 2021, agrees that "the etiology of gender dysphoria (GD) remains unclear." GARIMA GARG, GHADA ELSHIMY, RAMAN MARWAHA, GENDER DYSPHORIA, July 20, 2021.  https://www.ncbi.nlm.nih.gov/books/NBK532313/.  Even cases cited by Plaintiff finding gender dysphoria to be a disability have noted there is "no clear scientific consensus" on its origins. Blatt v. Cabela's Retail, Inc., No. 5:14-cv-4822-JFL, 2015 WL 9872493 (E.D. Pa. Nov. 16, 2015).

[34] As Judge Royal observed in Grizzle v. Macon County, Ga., Civil Action No. 5:08-CV-164 (CAR), 2009 WL 2611319, at *7 (M.D. Ga. Aug. 20, 2009), the Eleventh Circuit has not yet recognized "interacting with others" as a major life activity and those circuits that have recognized it seem to limit it to the "most severe cases."    Plaintiff's testimony that she gets along with her colleagues, has worked as a soccer referee, has participated in several tennis tournaments (with *three* tennis teams) even to the state championship level, and has spoken on panels, hardly indicates difficulty interacting with others. (Doc. 150-8 at 13:21-23, 14:8-10, 16:5-7, 17:18-20, 30:16-18, 38:16-18, 39:9-11, 32:12-15.) See Grizzle, 2009 WL 2611319, at *8. Plaintiff claims that she has difficulty interacting with her former spouse and son, but "a dispute with [family], however, certainly does not render one 'substantially limited' in the life activity of 'interacting with others.'" Id. at *8.

C.F.R. § 1630.2(j)(4)(i).  In fact, directly contrary to the assertions in the Memorandum, Plaintiff and her providers have indicated she is functioning well:

- First and foremost, Plaintiff declares that her "transition has positively impacted [her] job performance and experience"; that "living and working as a female" allows her to "interact with [her] colleagues and the public more openly"; and that she has "continued to do [her] job successfully." (Doc. 140-4 at ¶ 13.)

- Plaintiff's endocrinologist's annual notes indicate that █████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ (Pl. Dep. II, Def. Ex. 33 (Lange 2499), Def. Ex. 32 (Lange 2503), Def. Ex. 31 (Lange 2507), Def. Ex. 30 (Lange 2511), Def. Ex. 29 (Lange 2519).)

- While Plaintiff's therapist recorded that Plaintiff █████████████████ █████████ there is no indication that Plaintiff's experience with these emotions is greater than that of the general population such that it substantially limits Plaintiff in her major life activities. (Pl. Dep. II, Def. Ex. 39 (Lange 2443).)

- Furthermore, the therapist's report states that Plaintiff denied █████████████ █████████ (id.) which is contrary to Plaintiff's assertion that she suffers from "anxiety, feelings of depression, and sleeplessness," (Doc. 140-1 at 32).

- In fact, based on Plaintiff's therapist's treatment summary dated July 27, 2021, ████████████████████████████████████████████████████████████ ██████████████████████████ (Pl. Dep. II, Def. Ex. 38 (Lange 2446).)

A reasonable inference can be drawn from the points above that, while Plaintiff may have *experienced* anxiety and depression, it does not *substantially limit* her ability to function. Accordingly, she has not carried her burden as the movant of affirmatively demonstrating a covered disability under the ADA. Enwonwu v. Fulton-Dekalb Hosp. Auth., 286 F. App'x 586, 603 (11th Cir. 2008) (per curiam).

Plaintiff also states that her gender dysphoria includes "difficulties with . . . major bodily functions such as neurological and brain functions." (Doc. 140-1 at 39.) But she provided no evidence as to how her gender dysphoria impairs *her* neurological or endocrine systems.

Finally, Plaintiff contends she is "regarded as" disabled because the sex reassignment surgery exclusion affects her. As shown above, the mere existence of the exclusion does not violate the ADA. See Ford, *supra*. Moreover, the County testified it considered Plaintiff "a capable investigator who 'has performed her duties as an investigator very well before, during, and after this process." (Doc. 174 at ¶ 28.) Construing all reasonable doubts in favor of the non-moving parties, the Court must find that, at least for purposes of Plaintiff's motion for summary judgment, a genuine issue of material fact exists regarding her alleged disability.

### 3.    Plaintiff's proposed accommodation is not reasonable.

Plaintiff's proposed accommodation is not reasonable and would create an undue hardship.  Plaintiff proposes that the exclusion affecting *her* be removed or that she be granted an exception to it.   (Doc. 150-18 at 144:23-145:1.) However, a proposed accommodation that negatively impacts other employees is not reasonable and imposes an

undue hardship.  See, e.g., Winnie v. Infectious Disease Assocs., P.A., 750 F. App'x. 954, 961-62 (11th Cir. 2018) (per curiam) (finding a four-month leave for a specialized IV nurse would impose an undue hardship because of the impact on other staff).  "[A]n employer is not required to accommodate an employee in any manner in which the employee desires." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997) (internal quotation marks omitted).  "[A] demand for an effective accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees …" US Airways, Inc. v. Barnett, 535 U.S. 391, 400-01 (2002).

Here, changing the exclusion affecting Plaintiff—whether by removal of it or exception to it—would open the door to countless other employees who would want the exclusions affecting *them* to be removed or have exceptions granted.  (Doc.150-19 at 83:15-85:8, 129:24-130:15, 161:15-25; County 30(b)(6) Carter 2021.09.16 Ex. 31.)  Carter testified that if several exclusions were affected in this way, the County may have to implement further cost-shifting measure that would make the plan more akin to a high-deductible plan common in the private sector.  (Doc. 150-19 at 31:13-32:23, 33:15-21.).

Plaintiff's contention that the County "has granted a similar [accommodation] request on at least one occasion" mischaracterizes the facts.  (Doc. 140-1 at 40.)  In 2009, when the Plan did *not* exclude lap band surgery, a participant underwent that surgery understanding that the surgical protocol called for lap band adjustments every year for a few years after the initial procedure.  In 2010, however, a bariatric surgery exclusion was added to the plan.  When she had a subsequent lap band adjustment and was denied coverage under the Exclusion, she complained to the County that the adjustments were

contemplated when she had the initial surgery, and the County agreed to cover the adjustments.  (Doc. 150-19 at 185:14-186:10.) In this case, however, the Exclusion has been part of the Health Plan since before Plaintiff came out as transgender, let alone sought gender-affirming surgery. (Doc. 150-8 at 48:5-18; Doc. 150-15 at 28:25-29:11; Doc. 150-13 at 40:11-22.)

In light of all these issues, Plaintiff's Motion for Summary Judgment should be denied on her ADA claims.

**E.**     **Plaintiff is not due Summary Judgment on the Sheriff's Office's entitlement to Eleventh Amendment Immunity.**[35]

The Eleventh Amendment bars a private citizen from suing a state, including state officials in their official capacity.  Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc); U.S. Const. Amend. XI.  Whether an entity is an arm of the state entitled to immunity is determined using the following factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  Manders, 338 F.3d at 1309.  "Whether a defendant was acting as an 'arm of the State' must be 'assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise."  Pellitteri v. Prine, 776 F.3d 777, 779 (11th Cir.

---

[35] As the Court recognized in its Order ruling on the Sheriff's Motion to Dismiss, a defendant can make a facial or factual attack regarding the Court's subject matter jurisdiction. (Doc. 89 at 5, citing Stalley v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008).)   At that time, however, the Court looked at only the sufficiency of the Complaint under a facial attack via the Sheriff's Rule 12(b)(1) motion (Doc. 89 at 6), but the Sheriff's Office now provides extrinsic record evidence supporting a factual attack.

2015) (internal quotation marks omitted).

On summary judgment, "[t]he moving party bears 'the initial responsibility of informing the … court of the basis for its motion." Four Parcels, 941 F.2d at 1437 (quoting Celotex Corp., 477 U.S. at 323).  In support of her Motion for Summary Judgment, Plaintiff asserts that the Sheriff's Office admits that the state of Georgia "does not exercise control over the terms or conditions of the Health Plan" and "does not fund the Plan."  (Doc. 140-1 at 46.)  But even though the Sheriff's Office bears the burden of proof on this affirmative defense, those two simple assertions do not satisfy Plaintiff's initial responsibility under Rule 56 and certainly do not demonstrate the absence of genuine issues of material fact exist entitling her to summary judgment on the defense.[36]

Plaintiff appears to concede that the Sheriff's Office was acting as an arm of the State based on how state law defines the entity.  (Doc. 140-1 at 46.)  But contrary to Plaintiff's two statements, it is the Sheriff's role as *employer* that is the focus here, not merely the more limited issue of providing benefits.  See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 374 (2001) (applying Eleventh Amendment immunity regarding an ADA Title I claim); Pellitteri, 776 F.3d at 782 (same with respect to a sheriff).  As this Court has recognized, "it is clear that in the context of employment decisions Sheriffs and their employees are state officers."  Halliburton v. Peach Cty. Sheriff's Dep't, No. 5:11-

---

[36] Plaintiff appears to rely upon the Court's Order ruling on Defendants' Motion to Dismiss.  (See Doc. 140-1 at 46.)  At that stage, however, the Court "look[ed] only to the complaint to determine whether there [was] jurisdiction."  (See Doc. 89 at 6.)  The Sheriff's Office has moved for summary judgment in its favor under the Eleventh Amendment on Plaintiff's ADA and Equal Protection claims.  (See Doc. 136-9 at 5-11.)

CV-109 (MTT), 2012 WL 4468764, at \*14 (M.D. Ga. Sept. 26, 2012) (emphasis in original).  Choosing to provide a benefit as part of deputies' compensation package is such an "employment decision," and, therefore, the second factor also weighs heavily in favor of immunity.

Furthermore, although a county appropriates funds for the sheriff in that county, the county does so because the State mandates it.  Manders, 338 F.3d at 1323.  The Manders court further noted that, while counties must provide "reasonably sufficient funds to allow the sheriff to discharge his legal duties," the county may not dictate how that budget will be spent by the sheriff.  Manders, 338 F.3d at 1323 (internal quotation marks omitted); Pellitteri, 776 F.3d at 782 (same).

This "hands off" approach of being obligated to fund the sheriff's activities, but having no control over them, speaks to a sheriff's independence from the county and dependence on State oversight.  In fact, if the Sheriff's Office's budget is not approved, the Sheriff's Office can pursue a remedy against the County in court.  (Doc. 150-11 at 34:9-35:3.)  This adversarial procedure is derived from the State's oversight.  This third factor also weighs in favor of immunity for the Sheriff's Office.

Courts balance the four Manders factors in determining the application of Eleventh Amendment immunity.  See Manders, 328 F.3d at 1328.  Unanimity of factors is not required.  See Pellitteri, 776 F.3d at 783 (applying immunity where "the first three factors weigh in favor of immunity, while the fourth factor weighs against immunity").  Here, the first and second factors weigh heavily in favor of immunity, as state law and the facts show the Sheriff acts for the State as an employer, and the third factor also weighs in favor of

immunity, since the obligation to fund the Sheriff's Office comes from state law and state law provides a forum to contest insufficient funding.  Even if the fourth factor does not weigh in favor of immunity, the overall balancing of these factors demonstrates the existence of genuine issues of material fact precluding any grant of summary judgment in Plaintiff's favor as to whether the Sheriff's Office is entitled to immunity on her ADA and Equal Protection claims.[37]

Respectfully submitted this 22nd day of December 2021.

*s/ Patrick L. Lail*
R. Read Gignilliat
Georgia Bar No. 293390
Sharon P. Morgan
Georgia Bar No. 522955
Patrick L. Lail
Georgia Bar No. 431101

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 659-6700
(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com
morgan@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants*

---

[37] Having shown Plaintiff is not entitled to summary judgment on any claim, her request for injunctive relief (see Doc. 140-1 at pp. 38-39) is due to be denied, as well. Brown v. Sec'y, United States HHS, 4 F.4th 1220, 1225-26 (11th Cir. 2021) (holding irreparable injury is necessary element to injunctive relief).

**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| ANNA LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 5:19-CV-00392-MTT |
| v. | ) | |
| | ) | |
| HOUSTON COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on December 22, 2021, I served a true and correct copy of

**DEFENDANTS' RESPONSE IN OPPOSITON TO PLAINTIFF'S MOTION FOR**

**SUMMARY JUDGMENT** via this Court's ECF filing system which will automatically

send electronic notification of filing to the following attorneys of record:

| | |
|---|---|
| Kenneth E. Barton, III | Wesley Powell |
| M. Devlin Cooper | Jill K. Grant |
| | |
| David Brown | Kevin M. Barry |

*s/ Patrick L. Lail*
Patrick L. Lail
Georgia Bar No. 431101