## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| ANNA LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:19-CV-00392-MTT |
| HOUSTON COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Houston County, Georgia, and Defendant Houston County Sheriff Cullen Talton, in his official capacity ("Defendants") respond to Plaintiff Anna Lange's Local Rule 56 Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment (ECF No. 174)[1] as follows:

## I.     Transgender People, Gender Dysphoria, and Gender Transition[2]

1.

Transgender is a term used to describe a person whose gender identity—*i.e.*, an internal sense of who they know themselves to be—differs from the sex they were assigned at birth. Decl. of Loren S. Schechter M.D. in Support of Plaintiff's Mot. for Summ. J. ("Schechter Decl.") at Ex. 1, ¶ 18. *See also* Decl. of Jill K. Grant in Support of Plaintiff's

---

[1] Plaintiff's Statement of Undisputed Material Facts was originally filed as ECF No. 140-2.  It was re-filed to correct paragraph numbering issues as ECF No. 174.

[2] Defendants include the headings from Plaintiff's Statement only as a marker for the Court's assessment of the Response; not as an endorsement of the headings themselves.

Motion for Summary Judgment ("Grant Decl."), Ex. A Carter Dep., Feb. 23, 2021 ("Carter Dep.") at 31:8-13.

**RESPONSE:**

Undisputed.

2.

This dissonance between one's gender identity and sex assigned at birth can cause intent [*sic*] and persistent discomfort, including "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Schechter Decl. at Ex. 1, ¶¶ 19–20.

**RESPONSE:**

Undisputed.

3.

The medical diagnosis for this incongruence and associated distress is gender dysphoria. *Id.*; Decl. of Declaration of Rachel Bluebond-Langner, M.D in Support of Plaintiff's Mot. for Summ. J. ("Bluebond-Langner Decl.") at Ex. 1, ¶ 17. Gender dysphoria is defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5) as "a difference between one's experienced/expressed gender and assigned gender, and significant distress or problems functioning." Schechter Decl. at Ex. 1, ¶19.

**RESPONSE:**

Defendants object to SUMF No. 3 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

4.

Many transgender people experience gender dysphoria at some point in their lives. Schechter Decl. at Ex. 1, ¶ 21.

**RESPONSE**:

Undisputed.

5.

Gender dysphoria has a physiological and biological etiology; the condition derives from an atypical interaction of the endocrine and neurological systems, which results in a person being born with external sex characteristics and hormones that are inconsistent with the person's gender perception. Bluebond-Langner Decl. at Ex. 1, ¶ 18.

**RESPONSE**:

Disputed.  Dr. Bluebond-Langner's Declaration contradicts itself.  On the one hand, quoting from an article summarizing the Endocrine Society's view, Paragraph 19 of her Declaration states on the one hand "Considerable scientific evidence has emerged *demonstrating a durable biological element underlying gender identity*. Individuals may make choices due to other factors in their lives, but there do not seem to be external forces that genuinely cause individuals to change gender identity."  On the other hand, however, that same Paragraph admits: "Although the *specific* mechanisms guiding the biological underpinnings of gender identity are not entirely understood, there is *evolving consensus* that being transgender is not a mental health disorder. Such evidence stems from scientific studies *suggesting* …"  (ECF 144-1, ¶ 19 (emphasis added).)  These findings indicate that the definitive statement in Paragraph 5 above is not entitled to credence.

6.

Left untreated, gender dysphoria can lead to clinically significant personal suffering and comorbidities, including anxiety, depression, self-harm, and suicidality. Schechter Decl. at Ex. 1, ¶ 19. These effects can intensify over time. Schechter Decl. at Ex. 1, ¶ 20.

**RESPONSE**:

Defendants object to Paragraph 6 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

7.

Gender dysphoria is treatable. *See* Schechter Decl. at Ex. 1, at ¶21.

**RESPONSE:**

Undisputed.

8.

Since 1979, the World Professional Association for Transgender Health ("WPATH"), a non-profit professional and educational organization devoted to transgender health, has promulgated Standards of Care ("SOC")—guidelines for the clinical management of gender dysphoria that reflect the best available scientific evidence and expert professional consensus. Schechter Decl. at Ex. 1, at ¶ 23.

**RESPONSE:**

Disputed.  Plaintiff's citation to the record evidence does not support the fact. Defendants also object to SUMF No. 8 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert.  United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).

9.

The major health professional associations—including the American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American College of Physicians, the American Osteopathic Association, and the American College of Obstetrics and Gynecology—endorse protocols in line with the SOC and/or call for insurance coverage of these treatments. See Schechter Decl. at Ex. 1, at ¶¶ 24, 24, 33; Bluebond-Langner Decl. at Ex. 1, ¶ 21.

**RESPONSE:**

Disputed.  Plaintiff's citation to Exhibit 1 to Dr. Schechter's Declaration does not support the fact.  Defendants also object to SUMF No. 9 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert. United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).

10.

Effective treatment options for gender dysphoria, as outlined in the SOC, include mental health care, hormone therapy, and surgical procedures. See Schechter Decl. at Ex. 1, at ¶ 25.

**RESPONSE:**

Undisputed.

11.

Social transition involves bringing a person's gender expression and social sex role into alignment with their affirmed sex, such as by wearing clothes, using a new name and pronouns, and interacting with one's peers and social environment in a manner that matches the person's affirmed sex. Schechter Decl. at Ex. 1, at ¶ 25.

**RESPONSE:**

Undisputed.

12.

Pharmacological transition (or hormone replacement therapy) is the prescription of drugs, generally by an endocrinologist, to change the hormone balance in a person's body to be consistent with their affirmed sex. Schechter Decl. at Ex. 1, at ¶ 26.

**RESPONSE**:

Undisputed.

13.

Surgical transition entails surgical modification of secondary sex characteristics to align a person's primary and/or secondary sex characteristics with the person's gender identity. Schechter Decl. at Ex. 1, at ¶ 27.

**RESPONSE**:

Undisputed.

14.

Gender-confirming surgeries are "medically necessary" for many people with gender dysphoria. Schechter Decl. at Ex. 1, at ¶¶27-28; Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 3 (admitting that "gender transition, or 'sex change' as that term is used in the Health Plan [as defined in the RFA and in paragraph 44 herein], can be medically necessary treatment for gender dysphoria for some people").

**RESPONSE**:

Undisputed, but Dr. Schechter's report states that "[n]o particular procedure is inherently cosmetic or inherently medically necessary; rather, the underlying diagnosis

determines whether procedure is considered cosmetic or medically necessary.  (Doc. 148-2, ¶ 26.)

<p style="text-align: center">15.</p>

Accordingly, third-party administrator for the Defendants' health plan, the health insurance company Anthem Blue Cross Blue Shield ("Anthem") maintains a "Clinical U[tilization] M[anagement] Guideline" ("Guideline") of criteria for when it deems gender-confirming surgery to be "medically necessary." *See* Grant Decl., Ex. A Carter Dep. at Ex. 2.

**RESPONSE**:

Undisputed.

<p style="text-align: center">16.</p>

Under the Guideline, surgery is medically necessary if there is "significant functional impairment AND the procedure can be reasonably expected to improve the functional impairment." Grant Decl., Ex. S at p.1 (BCBS 000224).

**RESPONSE**:

Undisputed.

<p style="text-align: center">17.</p>

Treatments that underlie gender-confirming care involve the same procedures (as indicated by use of the same CPT codes) that are used to treat non-transgender individuals. *See* Schechter Decl., at Ex. 2 at ¶¶ 37–40. For example, surgeons perform procedures to reconstruct genitalia—including phalloplasties and vaginoplasties—following oncologic resection, traumatic injury, infection, or to address congenital conditions. *Id.* at ¶ 39.

**RESPONSE**:

Disputed.   Defendants object to SUMF No. 17 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately. Defendants also object to SUMF No. 17 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert, and Dr. Schechter is not qualified to testify as an expert on CPT codes.  United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).  To the extent Dr. Schechter contends that a billing insurer uses the same CPT code to bill for a vaginoplasty performed on cisgender female as gender-norming surgery performed on a transgender female, his Report does not provide any basis for supporting that fact.

18.

"These medical procedures do not become more expensive simply because they are being performed for the purpose of treating gender dysphoria." *Id.* at ¶ 36.

**RESPONSE**:

Defendants object to SUMF No. 18 as immaterial.  Defendants also object to SUMF No. 18 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert, and Dr. Schechter is not qualified to testify as an expert on CPT codes.  United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).

Undisputed only with regard to that a procedure in a hospital billed based on a CPT code will generally not be more expensive than the same procedure with the same CPT code in the same hospital.

19.

Research indicates that "the one-time costs of gender-confirmation surgeries coupled with standard post-operative, primary and maintenance care, were overall less

expensive at 5 and 10-year marks, as compared to the long-term treatment of the negative health outcomes associated with lack of insurance and resulting healthcare access." *Id.* at ¶ 41.

**RESPONSE**:

Defendants object to SUMF No. 19 as immaterial. Defendants also object to SUMF No. 19 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert. United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).

Disputed. Defendants' expert explained that, given the uncertainty of both pricing and utilization of transgender surgery, a single year could see a material spike in costs. Doc. 167 at 116:9-119:9.

20.

Transgender people constitute approximately 0.58% of the adult population. *See* Decl. of Paisley Currah in Support of Plaintiff's Mot. for Summ. J. ("Currah Decl.") at Ex. 1, ¶ 65.

**RESPONSE**:

Undisputed, but Defendants object to SUMF No. 20 as immaterial.

21.

Transgender people are perceived as a discrete social group due to their defining characteristic of living in a gender other than that assigned at birth. Currah Decl. at Ex. 1, ¶ 46. They have been targeted for discrimination on that basis. Currah Decl. at Ex. 1, ¶¶ 3, 12, 17–45, 51.

**RESPONSE**:

Defendants object to SUMF No. 21 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately. Defendants also object to SUMF No. 21 as immaterial.

Disputed.   Plaintiff's citation to the record evidence does not support the fact: Currah did not state that transgender people are perceived as a discrete social group.  (Doc. 145-1, Ex. 1, ¶ 46.)

22.

Transgender people have historically been subjected to discrimination in all facets of life. Currah Decl. at Ex. 1, ¶¶ 11–13. That discrimination remains pervasive today. *Id*.

**RESPONSE**:

Defendants object to SUMF No. 22 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately. Defendants also object to SUMF No. 22 as immaterial.

Undisputed.

23.

Transgender people routinely encounter discrimination in employment, housing, education, and in government services. Currah Decl. at Ex. 1, ¶¶ 22–44; Decl. of Chanel Haley in Support of Plaintiff's Mot. for Summ. J. ("Haley Decl.") at Ex. 1, ¶¶ 14–18. Rates are even higher among transgender women and transgender people of color. Haley Decl. at Ex. 1, ¶ 18.

**RESPONSE**:

Defendants object to SUMF No. 23 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately. Defendant objects to SUMF No. 23 as immaterial.

Disputed.  These conclusions appear to be based on allegations of individuals other than the declarants.  Doc. 130-3 at 10, ¶ 23, p. 13, ¶ 27.

24.

Transgender people are significantly underrepresented politically. Currah Decl. at Ex. 1, ¶ 58. The first openly transgender member of a state legislature was elected in 2017, and transgender people remain underrepresented in state legislatures in proportion to their share of the population by a factor of four. *Id*. No person known to be transgender has ever been elected to federal office. *Id*. There has never been a cabinet secretary known to be transgender. *Id*. at ¶ 59. It was not until this year that the U.S. Senate confirmed an openly transgender person in any executive role. *Id*.

**RESPONSE**:

Defendants object to SUMF No. 24 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed, but Defendants also object to SUMF No. 24 as immaterial.

25.

Due to their lack of political influence, transgender people have had only limited success in combatting a wave of discriminatory laws and policies enacted at the state and federal levels in recent years. *Id*. at ¶¶ 60–69. *See also* Haley Decl. at Ex. 1, ¶¶ 30–35 (transgender people have had only limited success in in obtaining protection against discrimination under state and local law in Georgia).

**RESPONSE**:

Defendants object to SUMF No. 25 as immaterial.

Disputed.   Defendants also object to SUMF No. 25 as setting forth a legal conclusion.   Defendants also object to SUMF No. 25 on the grounds that the admissibility cannot be established merely by the ipse dixit of even a qualified expert.   United States v. Frazier, 387 F.3d 1244, 1261 (11th Cir. 2004).

26.

Neither transgender status nor gender dysphoria have a bearing on a person's ability to work, to care for others, or to participate in civic life. *See* Currah Decl. at Ex. 1, ¶ 51.

**RESPONSE**:

Undisputed, but immaterial to this case.

27.

Despite a history of social animus against them, transgender people have excelled as creators, performers, teachers, attorneys, physicians, and elected officials, among many other professions. *Id*. ¶ 54.

**RESPONSE**:

Undisputed, but immaterial to this case.

II.   **The Parties**

*Plaintiff Sergeant Anna Lange*

28.

Sgt. Lange has worked in law enforcement for twenty-five years and has served as a deputy in the Sheriff's office of Houston County, Georgia (the "County") since 2006. *See* Decl. of Sgt. Anna Lange in Support of Plaintiff's Mot. for Summ. J. ("Lange Decl.") at ¶

4. Sgt. Lange is a capable investigator who "has performed her duties as an investigator very well, before, during and after this process." Grant Decl., Ex. H HC Dep. (B. Holland) at 78:11-79:6.

**RESPONSE**:

    Undisputed.

<div align="center">29.</div>

    Sgt. Lange is also a transgender woman, meaning that although she was assigned a male sex at birth, her internal knowledge of herself has always been that she is female. *See* Lange Decl. at ¶ 6.

**RESPONSE**:

    Undisputed.

<div align="center">30.</div>

    Sgt. Lange is the only openly transgender employee in the Sheriff's Office and the County and the only transgender member of the Defendants' health plan. *See* Grant Decl., Ex. A Carter Dep. at 93:4–12; Grant Decl., Ex. H Houston County 30(b)(6) Dep. (B. Holland), Apr. 15, 2021 ("HC Dep. (B. Holland)") at 51:14-20; Grant Decl., Ex. E SO Dep. (Rape) at 75:2–8; Def. Sheriff Talton's (in His Official Capacity) Answer and Affirmative Defenses to Plaintiff's Am. Compl. (ECF No. 96) ("Def. Sheriff Talton's Answer") at ¶ 41.

**RESPONSE**:

    Undisputed.

31.

Sgt. Lange began her gender transition in 2017, after being diagnosed with gender dysphoria by her health care provider. *See* Lange Decl. at ¶ 9.

**<u>RESPONSE</u>**:

Undisputed.

32.

After her diagnosis, Sgt. Lange began sustained treatment—namely, a gender transition. *Id*.

**<u>RESPONSE</u>**:

Undisputed.

33.

In consultation with her health professionals, Sgt. Lange has transitioned socially. *See id*. She lives fully and consistently with her female identity: she told her family, friends, and employers; she exclusively uses her female name, Anna, and female pronouns; and she wears typical women's clothing. *See id*.

**<u>RESPONSE</u>**:

Undisputed.

34.

Sgt. Lange also takes a regimen of hormone replacement therapy prescribed by her endocrinologist, which is comprised of estradiol, a form of estrogen, and spironolactone, a testosterone blocker. *See id*. This is necessary to avoid masculinization of Sgt. Lange's body, which would exacerbate her gender dysphoria and negatively affect her day-to-day functioning. *See* Bluebond-Langner Decl. at Ex. 1, ¶ 26.

**RESPONSE**:

Undisputed.

35.

Sgt. Lange also obtained top surgery to feminize her chest. *See* Grant Decl., Ex. R

Zhao Evaluation at p.1 (Lange_00002422); Lange Decl. at ¶¶ 9, 14.

**RESPONSE**:

Undisputed.  Plaintiff acknowledged she paid for this surgery.  (Doc. 150-18, Pl.

Dep. II, p. 155:1-11.)

36.

Nevertheless, Sgt. Lange still feels significant distress and anxiety due to the

incongruence between her female gender identity and her remaining male physical

characteristics, including her genitalia. *See* Lange Decl. at ¶¶ 15, 22; Bluebond-Langner

Decl. at Ex. 1, ¶¶ 31, 33–34.

**RESPONSE**:

Disputed.  Plaintiff is not so distressed that she cannot perform a law enforcement

job as a criminal investigator, work side jobs, and engage in hobbies like beekeeping,

refereeing soccer, and playing in a competitive tennis league all the way to the state

championships for her division.  (Doc. 137-3 at 12:12-22, 38:2-39:18.)

37.

Accordingly, upon the recommendation of her endocrinologist, two psychologists, and

a surgeon, Sgt. Lange has determined that vaginoplasty, also known as "bottom surgery," is

the next step in her treatment. *See* Bluebond-Langner Decl. at Ex. 1, ¶ 24; Lange Decl. at ¶

21; Grant Decl., Ex. L Lange Dep., Sept. 14, 2021 ("Lange II Dep.") at Ex. 42, p. 3 (Lange_00002425).

**RESPONSE**:

Undisputed.

38.

Sgt. Lange has fully complied with and met the medical necessity criteria for a vaginoplasty under Anthem's Guidelines. *See* Bluebond-Langner Decl. at Ex. 1, ¶¶27, 33–34.

**RESPONSE**:

Undisputed.

### *Defendant Sheriff Cullen Talton*

39.

Cullen Talton is the Sheriff of Houston County, Georgia and he has served in this position since 1973. See Grant Decl., Ex. B Sheriff Talton Dep., Mar. 25, 2021 ("Sheriff Talton Dep.") at 10:12-14.

**RESPONSE**:

Undisputed.

40.

Sheriff Talton is a constitutional officer, a separate entity from the County under the Georgia Constitution. Grant Decl., Ex. E Sheriff's Office 30(b)(6) Dep. (Rape), Apr. 13, 2021 ("SO (Rape) Dep.") at 32:4–13.

**RESPONSE**:

Undisputed.

41.

The Sheriff has had at least 15 employees each year since 2017 and is engaged in the business of government, which affects interstate commerce. Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 9.

**RESPONSE**:

Undisputed.

42.

The Sheriff has not placed his employees in the County's civil service system. See Grant Decl., Ex. P Def. Sheriff Talton's Resp. to Second Set of RFAs at No. 5.

**RESPONSE**:

Undisputed.

*Defendant Houston County, Georgia*

43.

The Houston County Board of Commissioners (the "Commissioners") is the governing authority for Houston County, which is comprised of 5 commissioners (the "County").         See         Houston         County,         Georgia, https://www.houstoncountyga.org/commissioner/contact-information.cms   (last   visited Nov. 3, 2021); Grant Decl., Ex. A Carter Dep. at 53:20–22.

**RESPONSE**:

Undisputed.

44.

The Commissioners sponsor a healthcare plan (the "Health Plan") for all full-time employees of the County, the Sheriff's Office, the Houston County Tax Commissioners,

the Houston County Clerk of the Superior Court, the Houston County Probate Court, and the Houston County District Attorney. *See* Grant Decl., Ex. A Carter Dep. at Ex. 1; Grant Decl., Ex. A Carter Dep. at 22:19-23:7; 26:3-5; Grant Decl., Ex. G Houston County 30(b)(6) Dep. (K. Carter), Apr. 15, 2021 ("HC Dep. (Carter I)") at 14:7-15:12, 16:17-25.

**RESPONSE**:

Undisputed.

45.

The County has had at least 15 employees each year since 2017 and is engaged **in** the business of government, which affects interstate commerce. *See* Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 9.

**RESPONSE**:

Undisputed.

## III. The Intergovernmental Relationship

46.

The Sheriff's Office has delegated certain employment functions to the County, pursuant to an unwritten agreement. *See* Grant Decl., Ex. E SO Dep. (Rape) at 35:4-39:11.

**RESPONSE**:

Disputed.  Rape described the intergovernmental relationship and did not use the term "delegate."  (Doc. 165 at 35:4-39:11.)  Moreover, the Sheriff's Office acknowledged it has the option to obtain other insurance; thus, it retains authority over the provision of health insurance and has not delegated it to the County.  (Doc. 157 at 81:4-10)

47.

Kenneth Carter is the Director of Personnel for Houston County and is responsible for the administration of benefits, including the Health Plan. *See* Grant Decl., Ex. A Carter Dep. at 11:11–13, 15:12–16, 16:11–17:3.

**RESPONSE**:

Undisputed that Carter is the Director of Personnel and *internally* administers benefits.  However, the claims administrator is Anthem, which adjudicates claims and determines whether a claim is covered under the plan.  (Doc. 150-4 at 109; Doc. 137-4 at ¶ 3.)

48.

In this role, Mr. Carter reports to the Director of the Administration, Barry Holland, as well as to the Commissioners. *See* Grant Decl., Ex. A Carter Dep. at 15:17-23.

**RESPONSE**:

Undisputed.

49.

Mr. Carter's responsibilities for the Health Plan include, among other things, obtaining the Commissioners' approval for changes to the Health Plan. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 21:24–22:19.

**RESPONSE**:

Undisputed.

50.

Although the Commissioners are responsible for deciding what changes, if any, will be made, their decision is guided by recommendations from Mr. Carter and his superior,

Mr. Holland. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 22:20-25; 23:2; Grant Decl., Ex. A Carter Dep. at 49:3-5.

**RESPONSE**:

Undisputed.  It is standard that elected officials receive staff recommendations on various matters.  (Doc. 150-15 at 90:2-91:7).

51.

Not all changes relating to the Health Plan requires approval by the entire Board of Commissioners. *See* Grant Decl., Ex. A Carter Dep. at 46:24-48:4; 49:6-8.

**RESPONSE**:

Undisputed.

52.

The Sheriff's Office uses the County Personnel Policy Manual, which contains policies that apply to all Sheriff's Office employees. *See generally* Grant Decl., Ex. E SO Dep. (Rape) at Ex. 12. *See also* Grant Decl., Ex. E SO Dep. (Rape) at 116:19–118:11.

**RESPONSE**:

Disputed.  The cited testimony establishes that the Sheriff's Office has its own policies, it follows certain County policies like EEO, and Sheriff's Office employees *used to* receive a copy of the County policies, but that process was stopped because employees were confused who they work for.  Doc. 165 at 116:19-118:11.

53.

As a part of this onboarding process, the County handles the new hire's paperwork and holds an orientation for them. See Grant Decl., Ex. G HC Dep. (Carter I) at 18:3-18.

**RESPONSE**:

Disputed.  The County's role is only to provide a benefits orientation.  (Doc. 150-11 at 123:2-18).

<div align="center">54.</div>

When the Sheriff's Office terminates an employee or an employee otherwise leaves, the County also handles the employees off boarding with respect to payroll and benefits. See Grant Decl., Ex. G HC Dep. (Carter I) at 19:3-13.

**RESPONSE**:

Undisputed.  After the Sheriff's Office makes the termination decision, the County removes the person from benefits.  (Doc. 150-11 at 46:4-14; Doc. 150-14 at 19:3-13).

<div align="center">55.</div>

The County also provides consultation to Sheriff's Office regarding individual human resources issues; for example, Mr. Carter has had two meetings with the Sheriff about Sgt. Lange regarding issues other than the Health Plan—the first on Sgt. Lange's transitioning and work and the second when the Sheriff "ask[ed him] on an HR sort of advice" around a disciplinary issue. See Grant Decl., Ex. C, Lange Dep., Apr. 2, 2021 ("Lange I Dep.") at 55:3-58:7; Grant Decl., Ex. A Carter Dep. at 111:8-112:19, 188:10–189:2-20.

**RESPONSE**:

Disputed.  The Sheriff's Office makes its own employment decisions.  (Doc. 150-11 at 33:20-34:4; Doc. 150-14 at 19:3-13).  Carter met with the Sheriff at the time of her transition at *Plaintiff's* request.  (Doc. 137-3 at 56:6-8; Doc 150-1 at 111:12-21.)  Carter's meeting with the Sheriff's Office about a disciplinary issue involving Plaintiff was a rare

occurrence, and Carter merely provided input for the Sheriff's Office's consideration. (Doc. 150-1 at 188:18-25.)

<center>56.</center>

The County also administers employee payroll for the Sheriff's Office. See Grant Decl., Ex. G HC Dep. (Carter I) at 35:19-21.

**RESPONSE**:

Undisputed.

<center>57.</center>

Accordingly, "Houston County Commissioners" is listed as Sgt. Lange's employer on both her IRS Form W-2 and IRS Form 1095-C. See Def. Sheriff Talton's Answer at ¶ 20.

**RESPONSE**:

Undisputed.

<center>58.</center>

As part of administering the Sheriff's Office onboarding for new employees, the County will add them to the Health Plan, if they choose to participate in it. See Grant Decl., Ex. G HC Dep. (Carter I) at 17:13-15; 18:2-25.

**RESPONSE**:

Undisputed.  The County adds those employees to the Health Plan at the Sheriff's Office's and the employee's direction.  (Doc. 150-14 at 18:4-19:2.)

## IV.    The Health Plan

<center>59.</center>

The Sheriff's Office provides health insurance benefits to its employees as a

<center>-22-</center>

component of their compensation package. See Def. Sheriff Talton's Answer at ¶ 42; Grant Decl., Ex. V (letter from Houston County to Sgt. Lange showing her "personalized total compensation" and including her health insurance benefits in the total amount).

**RESPONSE**:

Undisputed.

60.

The Sheriff's Office has chosen to have its employees participate in the County's Health Plan, pursuant to its informal intergovernmental agreement with the County, since at least 1973. See Grant Decl., Ex. Q Def. Sheriff Talton's Resp. to First Set of Interrogatories at No. 1; Grant Decl., Ex. E SO Dep. (Rape) at 38:8–39:10; Grant Decl., Ex. B Sheriff Talton Dep. at 80:12–1 8.

**RESPONSE**:

Undisputed.

61.

This agreement is voluntary on the part of both parties. Def. Sheriff Talton's Answer at ¶ 72; Def. Houston County's Answer and Affirmative Defenses to Plaintiff's Am. Compl. (ECF No. 95) ("Def. Houston County's Answer") ¶ 72. The Sheriff's Office, if it so chose, could obtain a separate health plan. See Grant Decl., Ex. A Carter Dep. at 124:10-18 ("Q. Does the sheriff have the authority to amend the health plan for his employees? A. I mean, in the grand scheme of things, yes; . . . he can pull out of our health plan and get his own."); Grant Decl., Ex. B Sheriff Talton Dep. at 81:4-13; Grant Decl., Ex. E SO Dep. (Rape) at 44:3-20.

**RESPONSE**:

Defendants object to SUMF No. 61 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

62.

Under their agreement, the County sets the Health Plan's benefit terms. See Def. Sheriff Talton's Answer at ¶ 77; Def. Houston County's Answer at ¶ 77; Grant Decl., Ex. A Carter Dep. at 26:3-10, 49:3-5); determines the members' deductibles and premiums (Grant Decl., Ex. A Carter Dep. at 49:3-14; Grant Decl., Ex. M HC Dep. (Carter II) at 106:3-10); and provides for Sheriffs' Office employees to enroll, disenroll, and have their questions answered, among other things. Grant Decl., Ex. E SO Dep. (Rape) at 45:11–46:14, 48:8-20.

**RESPONSE**:

Undisputed.

63.

For example, if a plan member has an issue, they may text or call Mr. Carter, Houston County's Director of Personnel, to discuss. See Grant Decl., Ex. A Carter Dep. at 18:18– 19:5 (Q: Do you know if you ever texted a co-worker about the health plan? A: I've had co-workers text me that they have a health plan issue. Generally I like to do that over the phone because it's very hard to explain things by text, so they may call and say I'm at the doctor having this issue or I'm in the hospital[.]").

**RESPONSE**:

Undisputed.

64.

The County also advises the Sheriff regarding the costs of the Health Plan (Grant Decl., Ex. G HC Dep. (Carter I) at 26:20-27:9); discusses issues with the Sheriff arising out of his employees' participation (for example, Sheriff Talton discussed Sgt. Lange's case with the Commission's Chair, Tommy Stalnaker (Grant Decl., Ex. B Sheriff Talton Dep. at 51:25–52:9)); and speaks with its insurance broker about issues related to Sheriff's Office employees. *See, e.g.*, Grant Decl., Ex. A Carter Dep. at 98:12-104:19; Grant Decl. Ex. A Carter Dep. at Ex. 6.

**RESPONSE**:

Disputed.  Plaintiff suggests a pattern of collaboration, which presents a false picture. The County informs the Sheriff's Office what the costs of the Health Plan are and charges it a per capita fee for its employee-participants.  (Doc. 137-5 at ¶ 11; Doc. 150-14 at 19:15-20:18.)  Far from a pattern, Sheriff Talton testified he had *one* meeting with Stalnaker shortly after Plaintiff spoke at a Commission meeting.  (Doc. 157 at 52:5-53:13.)

65.

The State of Georgia has no control over the terms or conditions of the Health Plan. *See* Grant Decl., Ex. P Def. Sheriff Talton's Resp. to Second Set of RFAs at No. 2.

**RESPONSE:**

Undisputed.

66.

The State of Georgia does not fund the Health Plan. *See* Grant Decl., Ex. P Def. Sheriff Talton's Resp. to Second Set of RFAs at No 4.

**RESPONSE**:

Undisputed.  However, the State provides a mechanism for the Sheriff to challenge any underfunding of its benefits.  The Sheriff's Office submits an annual budget to the County to support its activities and, generally, the requested budget is approved.  (S.O. 30(b)(6) Dep. Rape, p. 34:9-35:3.)  If it were not approved, the Sheriff's Office could pursue a remedy against the County in court.  Id.

67.

The plan has, in total, about 1,500 members. *See* Grant Decl., Ex. T at p.8 (Lange – HC000425) ("Membership" shows 1444 members in 2016-2017 and a total spend of $9,476,062 for the same time period); Grant Decl., Ex. M Houston County 30(b)(6) Dep. (K. Carter), Sept. 16, 2021 ("HC Dep. (Carter II)") at Ex. 32 (showing 1,498 "Avg Total Lives" in the Health Plan in 2019); Grant Decl., Ex. M HC Dep. (Carter II) at 43:24-44:2 (explaining "Average Total Lives" means "everybody that's on the plan, including employee and dependent").

**RESPONSE**:

Undisputed.

68.

About 350 employees of the Sheriff's Office participate in the Health Plan, whereas about 320 County employees participate in the Health Plan. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 17:10-12 ("Q So the sheriff's office employees are the largest percentage of eligible members? A Yes."). *See also id.* at 16:12-17:9 (estimating that there are between about 660 and 701 plan members who are current employees; about 350 work for the

Sheriff's Office; about 320 work for the County; and about 15 and 18, respectively, work for two other agencies).

**RESPONSE**:

    Undisputed.

<div align="center">69.</div>

The Health Plan is a self-funded or Administrative Services Only ("ASO") plan, which means that Anthem, the County's third-party administrator, administers claims using funds provided by the County and employee contributions. *See* Grant Decl., Ex. A Carter Dep. at 25:2426:2, 54:23-55:3. *See also* Grant Decl., Ex. F Clark Dep., Apr. 13, 2021 ("Clark Dep.") at 62:1014.

**RESPONSE**:

    Undisputed.

<div align="center">70.</div>

Annual expenditures for the Health Plan are around $10 million dollars. *See* Grant Decl., Ex. T at p. 8 (Lange – HC000425).

**RESPONSE**:

    Undisputed.  However, Health Plan expenditures vary from year to year.  In 2019, plan expenditures were $12.5 million dollars.  (Doc. 137-1 at ¶ 37.)

<div align="center">71.</div>

Sgt. Lange participates in and contributes monthly premiums to the Health Plan. *See* Lange Decl. at ¶ 14.

**RESPONSE**:

    Undisputed.

72.

The Health Plan covers medically necessary services including "office visits and doctor services," "diagnostic laboratory" services, "prescription drugs," "surgical supplies," "inpatient hospital care," and "inpatient professional services" including "surgery" and "general anesthesia," subject to certain exclusions. *See* Grant Decl. Ex. A Carter Dep. at Ex. 1; Def. Sheriff Talton's Answer at ¶ 79; Def. Houston County's Answer at ¶ 79. *See also* Grant Decl., Ex. A Carter Dep. at 41:3-8 (agreeing that the Health Plan only covers services when Anthem deems them medically necessary).

**RESPONSE**:

Undisputed.

73.

The County believes that the Health Plan is more generous than health plans typically offered by the private sector employees. *See* Grant Decl., Ex. M HC Dep. (Carter II) at 33:15-21, 52:8-53:12.

**RESPONSE**:

Undisputed.

**V.**   **The Exclusion**

74.

Like all insurance plans, the Health Plan contains a number of exclusions, *i.e.*, certain types of medical care that are not covered. *See* Grant Decl. Ex. A Carter Dep. at Ex. 1 at p. 66 (Lange – HC001827).

**RESPONSE**:

Undisputed.

75.

Since at least 1998, the Health Plan has excluded coverage for the treatment of gender dysphoria. *See id*. at p. 71 (Lange – HC001832), p. 73 (Lange – HC001834); Grant Decl., Ex. A Carter Dep. at 67:18–21 (acknowledging that the Health Plan does not cover treatment for gender dysphoria); Ex. W Def. Houston County's Resp. to First Set of Interrogatories at No. 1 ("After a careful search of records available to the County, the Exclusion was found in a County health plan as early as 1998."). *See also* Grant Decl., Ex. F Clark Dep. at Ex. 26 (County's insurance broker referring to it as "the exclusion for Gender Dysphoria").

**RESPONSE**:

Disputed.   Since at least 1998, an exclusion for sex change surgery (or similar language) – not an exclusion for "the treatment of gender dysphoria" – has been in the Health Plan.  (Doc. 150-14 at 10:25-11:3; Doc. 137-3, Ex. 9, 10; Doc. 150-15 at 45:9-23.)  Further, Plaintiff testified that her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan.  (Doc. 137-3 at 48:19-49:15.)

76.

Specifically, there are two exclusions—Exclusion 57 and Exclusion 26 (together, the "Exclusion")—that preclude treatment for transition-related care. *See* Grant Decl. Ex. A Carter Dep. at Ex. 1 at p. 71 (Lange – HC001832), p. 73 (Lange – HC001834). Exclusion 57 excludes coverage for "[s]ervices and supplies for a sex change and/or the reversal of a sex change." Grant Decl. Ex. A Carter Dep. at Ex. 1 at p. 71 (Lange – HC001832). Exclusion 26 excludes coverage for "[d]rugs for sex change surgery." Grant Decl. Ex. A Carter Dep. at Ex. 1 at p. 73 (Lange – HC001834).

**RESPONSE**:

Disputed.  As stated in response to SUMF 75, the Exclusion does not "preclude treatment for transition-related care," but only excludes sex change surgery.  Plaintiff's experience of having her own care covered demonstrates that the Exclusion is not total.

<div align="center">77.</div>

The Exclusion denies coverage for procedures and treatments that would otherwise be covered if provided in connection with a different diagnosis. *See* Grant Decl., Ex. A Carter Dep. at 6:7–13 (agreeing that "without an exclusion, gender confirmation surgery would be covered under a health plan administered by Anthem if it was medically necessary"); *id*. at 35:9– 15 (Q: "Would exclusion 57 exclude a mastectomy sought for cancer treatment?" A: "No." Q:  "But would exclusion 57 prevent coverage of a mastectomy if it was used to treat gender dysphoria?" A: "Yes."); 37:9–16 (Q: "Exclusion 26 would not exclude hormone replacement therapy to treat menopause?" A: "No, not as I understand it." Q: "But would exclusion 26 prevent hormone replacement therapy if used to treat gender dysphoria?" A: "As I understand it, yes."); 103:10-22 (Q: "Is mental healthcare generally covered under the plan?" A: "Yes." Q: "So it becomes not covered when it's related to transgender treatment?" A: "Well, yes . . . . When it is because of transgender surgery or whatever it may be, then it is not covered."); Grant Decl., Ex. F Clark Dep. at 100:6–10 (Q: "So were you saying that if [mental health] counseling were done for the purpose of treating gender dysphoria, then it would not be covered because of the exclusion?" A: "Yes."); Grant Decl., Ex. H HC Dep. (B. Holland) at 27:16–20 (Q: "Would any mental health counseling around transitioning be excluded under this exclusion?" A: "I believe it would, if it was specific to transitioning, yes."); Grant Decl., Ex. B Sheriff Talton Dep. at 55: 6–12 (Q: "Do

you know if . . . mastectomies, you know, breast surgery . . . in the context of breast cancer, whether that's covered by the policy?" A: "I understand [if] it is about breast cancer, things like that, yes.").

**RESPONSE**:

Disputed to the extent Plaintiff suggests that *all* treatment for gender dysphoria is excluded.  Plaintiff testified that her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan.  (Doc. 137-3 at 48:19-49:15.)

Defendants object to SUMF No. 77 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

78.

Defendants admits "that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.'" Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 5.

**RESPONSE**:

Undisputed.

79.

The County could remove the Exclusion at any time. See Grant Decl., Ex. A Carter Dep. at 149:8–13 (Q: "The Board of Commissioners is permitted to change the plan during the plan year if they are so inclined, correct?: A: "I would think they had the authority, it's our plan.").

**RESPONSE**:

Undisputed that the Commission has the *authority* to change the plan during the plan year.  However, the Commission's *practice* is only to make changes at the time of annual renewal.  (Doc. 150-15 at 68:2-6.)

80.

The County has chosen to retain the Exclusion because they are concerned about potentially having to offer different or lesser benefits to other plan members. See Grant Decl., Ex. M HC Dep. (Carter II) at 32:24-33:21 (Q: "Does the County believe that removing the exclusion would cause the health plan to become insolvent?" A: "You know, can I get a definition of 'insolvent?' I'm just an HR person so...." Q: "[T]hat the County wouldn't be able to cover the cost of the health plan." A: "I believe that we would have to make changes. I don't think it's going to do away with the health plan, no, but I think we would have to make some drastic changes if the cost does increase." Q: "What kind of drastic changes?" A: "We potentially may have to go to more of a high deductible plan, we may have to actually look at actually really cutting out a lot of the plan we have, I mean, we have really good health insurance, and we may have to go back to some of what the private sector actually has.").

**RESPONSE**:

Disputed.  The County looked at the cost of the plan as a whole, including the cost trends of claims paid.  (County 30(b)(6) Dep. I Holland, pp. 42:11-45:6.).  However, any change that impacts cost will have some effect on other plan participants.

## VI. Anthem's 2017 Nondiscrimination Mandate

81.

The McNeal Insurance Agency ("McNeal") is the County's insurance broker and acts as a liaison between the County and Anthem. See Grant Decl., Ex. A Carter Dep. at 48:5–10; 75:24–77:7; Grant Decl., Ex. F Clark Dep. at 12:15–22.

**RESPONSE**:

Undisputed.

82.

Donna Clark is a group account manager at McNeal and serves as the County's agent and primary contact. See Grant Decl., Ex. F Clark Dep. at 12:5–7; 15:24–16:7; Grant Decl., Ex. A Carter Dep. at 76:2–77:7.

**RESPONSE**:

Undisputed.

83.

On September 27, 2016, Anthem sent Ms. Clark an email attaching information related to the County's plan renewal for 2017. See Grant Decl., Ex. F Clark Dep. at Ex. 5, p. 3 (Anthem_0000006).

**RESPONSE**:

Undisputed.

84.

Attached to that September 26, 2017 email from Anthem of renewal information was a document titled "2017 Medical Plan Changes for Large Group (100+ Enrolled Employees)" which included certain "2017 Mandates." Grant Decl., Ex. F Clark Dep. at Ex. 5 at pgs. 5-6 (Anthem_0000008–09).

**RESPONSE**:

Undisputed.

85.

One of the "Mandates" is titled, "Nondiscrimination in Health Programs and Activities Rule," and states that "[i]n recognition of regulations issued under PPACA section 1557, the exclusion for Gender Identity Disorders and Sex Change Surgery will be removed from our plans (both Fully Insured and ASO)" (the "Nondiscrimination Mandate"). *See id*.

**RESPONSE**:

Undisputed.

86.

During their annual renewal process in late 2016, Ms. Clark informed the County of these mandates. *See* Grant Decl., Ex. F Clark Dep. at 45:18–22; Grant Decl., Ex. G HC Dep. (Carter I) at 180:25–181:11 (stating that "back in '16 when this e-mail came out and Donna came and talked to me, I probably was under the understanding that was probably something they asked us to do").

**RESPONSE**:

Undisputed.

87.

"[T]he County generally follows the recommendation of its third-party administrator as to exclusions for the plan." *See* Ex. O Def. Houston County's Resp. to Third Set of Interrogatories at No.3.

**RESPONSE**:

Undisputed.

<div align="center">88.</div>

For example, the County has removed exclusions recommended by Anthem in connection with the Mental Health Parity Act. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 29:11– 24 ("[W]e removed some mental health stuff [*i.e.*, exclusions], I think back in 2012 or 2013, but that was because of the Mental Health Parity Act and we were required to do that.").

**RESPONSE**:

Undisputed.

<div align="center">89.</div>

The County has relied on Anthem's recommendations with respect to exclusions in the Health Plan, including those recommended based on "Anthem's experience" rather than dictated by law. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 32:8–33:25.

**RESPONSE:**

Undisputed.

<div align="center">90.</div>

In fact, since 2017, the County has followed Anthem's recommendations with respect to approximately 10 different exclusions (without conducting any independent analysis with respect to those exclusions). *See* Grant Decl., Ex. G HC Dep. (Carter I) at 35:13–16.

**RESPONSE**:

Undisputed, but these were *added* exclusions, not *removed* exclusions.  County 30(b)(6) I (Carter), p. 35:13-16.

<div align="center">-35-</div>

91.

Despite its general practice of following Anthem's recommendations, the County chose to not accept the Non-Discrimination Mandate. See Grant Decl., Ex. M HC Dep. (Carter II) at 180:4–7; Grant Decl., Ex. F Clark Dep. at Ex. 26, p. 32 (Ms. Clark's handwritten note next to the Nondiscrimination Mandate stating "remove not taking"); Grant Decl., Ex. F Clark Dep. at 114:19–115:10.

**RESPONSE**:

Undisputed.  Carter testified he researched the non-discrimination mandate, which is based on Section 1557 of the Affordable Care Act and determined the County's self-funded Health Plan was not covered by Section 1557.  (Doc. 150-1 at 89:2-18.)

92.

Despite the County's decision to reject the Nondiscrimination Mandate, Anthem reported that it had no record of the opt-out at the time. See Anthem_00000012 ("Everything we have shows that the county accepted the mandates.").

**RESPONSE**:

Undisputed.  However, this reflects only a misunderstanding on *Anthem's* part. Clark made notes of the County's position on her renewal document for the 2017 plan year and informed Anthem of the County's position.  (Clark Dep., p. 48:14-23, Ex. 20A)

VII.   **Sgt. Lange Informed the County and Sheriff's Office That She Is Transgender**

93.

On April 18, 2018, Sgt. Anna Lange sought out Mr. Carter in his office and informed

him that she was transgender and intended to live openly as a woman. See Grant Decl.,

Ex. A Carter Dep. at 92:10-95:18; Lange Decl. at ¶ 10.

**RESPONSE**:

      Undisputed.

<div align="center">94.</div>

      During this conversation, Sgt. Lange informed Mr. Carter that she would be seeking

gender reassignment surgery and Mr. Carter confirmed that it was not covered by the

Health Plan, because of the Exclusion. See Grant Decl., Ex. A Carter Dep. at 95:19–20

("We discussed about the insurance not paying it").

**RESPONSE**:

      Undisputed.

<div align="center">95.</div>

      Following this meeting, Mr. Carter sent an email to Ms. Clark stating: "I know that

the insurance does not pay for gender reassignment surgery or any medication that comes

with it. But what about the mental health side. I am thinking more for someone who needs

counseling to help them get through, decide, or just confirm their thoughts about being

transgender. It seems to me that is as much of a mental health need as most anything. Just

curious before I tell someone to file it with insurance." See Grant Decl. Ex. A Carter Dep.

at Ex. 7, p. 3 (Lange-HC000897).

**RESPONSE**:

      Defendants object to SUMF No. 95 on the grounds that it does not comply with the

requirements of Local Rule 56 because the proposed facts are not numbered separately.

      Undisputed.

96.

Ms. Clark responded: "I am not sure if you were made aware that I spoke at length to someone about this last week. We discussed the issues with counseling, one being no one around here apparently is familiar with that type of counseling and two if they are and they use the codes necessary it will not be covered since the 'overall diagnosis' is not covered." Grant Decl., Ex. F Clark Dep. at Ex. 17.

**<u>RESPONSE</u>**:

Defendants object to SUMF No. 96 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

97.

Mr. Carter replied: "Yes I was told you were spoken to and told him. So he was aware not covered. I told him that don't seem right but Donna would know." Grant Decl. Ex. A Carter Dep. at Ex. 7, p. 2 (Lange-HC000896).

**<u>RESPONSE</u>**:

Undisputed.

98.

Later that same day, Sgt. Lange met with Sheriff Talton and informed him that she is transgender; Mr. Carter accompanied her. See Grant Decl., Ex. A Carter Dep. at 112:7–23; Grant Decl., Ex. B Sheriff Talton Dep. at 17:10–18:18; 23:15–20; Grant Decl., Ex. E SO Dep. (Rape) at 61:24–62:21; Grant Decl., Ex. C Lange I Dep. at 57:23–58:7.

**<u>RESPONSE</u>**:

Undisputed.

<div align="center">99.</div>

During the meeting with Sheriff Talton, Sgt. Lange requested permission to wear a female uniform at work and present herself as a female in the office. See Grant Decl., Ex. A Carter Dep. at 115:11–20; Lange Decl. at ¶ 10; Grant Decl., Ex. C Lange I Dep. at 57:23–58:7.

**RESPONSE**:

Undisputed.

<div align="center">100.</div>

In response, Sheriff Talton looked at Mr. Carter and said, "What the hell is he talking about?" Grant Decl., Ex. A Carter Dep. at 114:3-11.

**RESPONSE**:

Undisputed.

<div align="center">101.</div>

Mr. Carter then explained to Sheriff Talton that "what Sergeant Lange is trying to tell you is that she would like to start presenting herself as a woman and she wants you to understand that." Grant Decl., Ex. A Carter Dep. at 114:12–18.

**RESPONSE**:

Undisputed.

<div align="center">102.</div>

Sheriff Talton was shocked and, at first, "thought it was a joke." See Grant Decl., Ex. B Sheriff Talton Dep. at 37:7–15.

**RESPONSE**:

Undisputed.

103.

Sheriff Talton then told Sgt. Lange that he doesn't " believe in sex changes." Grant Decl., Ex. B Sheriff Talton Dep. at 104:8–105:3; Grant Decl., Ex. C Lange I Dep. at 58:17–25; Grant Decl., Ex. E SO Dep. (Rape) at 66:17–22.

**RESPONSE**:

Undisputed.

104.

Sheriff Talton then asked Sgt. Lange to step outside and asked his secretary to find Chief Deputy Billy Rape and Captain John Holland, Sgt. Lange's direct supervisor. See Grant Decl., Ex. A Carter Dep. at 113:2–7, 115:21-25, 116:2-6; Sheriff Tr. 26:24–27:22; 28:21–23.

**RESPONSE**:

Undisputed.

105.

Once Chief Rape and Captain Holland arrived, Sheriff Talton, and Mr. Carter informed them of Sgt. Lange's news and the group, excluding Sgt. Lange, discussed whether it would be an issue for Sgt. Lange to wear female attire. See Grant Decl., Ex. A Carter Dep. at 116:7–118:3; Grant Decl., Ex. B Sheriff Talton Dep. at 26:24–28:5.

**RESPONSE**:

Undisputed.

106.

Sgt. Lange was then brought back into the room and given permission to dress as a

female at the office. See Grant Decl., Ex. A Carter Dep. at 118:15-24; Grant Decl., Ex. B Sheriff Talton Dep. at 28:24–29:9.

**RESPONSE**:

Undisputed.

107.

Chief Rape also informed Sgt. Lange that she would need to "have tough skin." Grant Decl., Ex. A Carter Dep. at 118:15–119:7; Grant Decl., Ex. B Sheriff Talton Dep. at 24:22– 25:15; Grant Decl., Ex. C Lange I Dep. at 59:22–60:3.

**RESPONSE**:

Undisputed.

108.

Sheriff Talton understood Chief Rape's comment to mean that Sgt. Lange "was going to take a lot of riding from some of his cohorts back in the back." Grant Decl., Ex. B Sheriff Talton Dep. at 25:16–23.

**RESPONSE**:

Undisputed.  In full, Sheriff Talton answered: "personally I think he meant that he was going to take a lot of riding about this from some of his cohorts back in the back, but we let him know right quick that we weren't going to put with that."  (Doc. 57 at 25:16-23.)

109.

Sgt. Lange understood Chief Rape's comment to mean that she should not report inappropriate comments and teasing from his colleagues until "it's out of hand." See Grant Decl., Ex. C Lange I Dep. at 60:4–10.

**RESPONSE**:

Undisputed that that is Plaintiff's interpretation. Plaintiff also acknowledged the CID team engages in teasing on various subjects and she participates in such teasing. (Doc. 137-3 at 60:11-24.)

110.

After the meeting, Mr. Carter again emailed Ms. Clark: "We just had the meeting with the sheriff and it went well. I am good with nothing being covered and I think he is also. I do think that some of the mental health part should be covered in the beginning (not later) but do not want to get into creating loop holes and things like that." Grant Decl. Ex. A Carter Dep. at Ex. 7, p. 1 (Lange-HC000895).

**RESPONSE**:

Defendants object to SUMF No. 110 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

111.

The following day, April 19, 2017, Sgt. Lange came out to her coworkers in the Criminal Investigation Division ("CID"). Grant Decl., Ex. B Sheriff Talton Dep. 60:5–61:10; Grant Decl., Ex. C Lange I Dep. at 61:5-17 ("[T]hey said it couldn't be kept a secret, that you need to tell them."); Lange Decl. at ¶ 10.

**RESPONSE**:

Undisputed.

112.

During the meeting, Sheriff Talton repeated that he "didn't believe in all this." Grant

Decl., Ex. C Lange I Dep. at 62:13-24; Grant Decl., Ex. D Sheriff's Office 30(b)(6) Dep. (J. Holland), Apr. 13, 2021 ("SO Dep. (J. Holland)") at 8:18-25; 9:2-11 ("I recall him making a statement about he doesn't believe in this, referring to the transgender issue necessarily.").

**RESPONSE:**

Undisputed.  Holland also testified that Sheriff Talton opened the meeting by saying "we were going to be talking about a sensitive and a serious subject that date and he wanted everyone's attention."  (Doc. 165-1 at 7:16-25.)

113.

Sheriff Talton also told the group that what Sgt. Lange did "takes big balls." Grant Decl., Ex. C Lange I Dep. at 62:13-24; *accord* Grant Decl., Ex. D SO Dep. (J. Holland) at 8:6-17 ("I forget the exact verbiage, it took a lot of nerve or something to that effect. . .").

**RESPONSE**:

Undisputed.

**VIII.  Sgt. Lange is Denied Coverage for Medically Necessary Bottom Surgery.**

114.

On September 12, 2018, Sgt. Lange contacted Anthem, inquiring about pre-authorization for gender confirmation surgery. *See* Lange Decl. at ¶ 26.

**RESPONSE**:

Undisputed.  However, Defendants note that, before calling, Plaintiff understood that gender confirmation surgery was not covered as stated in the Health Plan and she confirmed that understanding with broker Donna Clark before calling Anthem.  (Doc. 137-3 at 44:22-45:19.)

<div align="center">115.</div>

During this call, Anthem informed Sgt. Lange that the surgery would be covered provided that it was "medically necessary" under Anthem's Guideline. Lange Decl. at ¶ 25; Grant Decl., Ex. U at p. 18 (Anthem000049).

**RESPONSE**:

Undisputed that is what Anthem told Plaintiff.

<div align="center">116.</div>

Sgt. Lange then contacted the office of Dr. Rachel Bluebond-Langner at NYU Langone Health, who had been performing gender confirming surgeries for transgender individuals for over seven years. Lange Decl. at ¶ 24; Bluebond-Langner Decl. at Ex. 1, ¶ 8.

**RESPONSE**:

Undisputed.

<div align="center">117.</div>

Sgt. Lange chose Dr. Rachel Bluebond-Langner as her surgeon because "she is in-network at Anthem" and because "there are no surgeons providing bottom surgery in [her] community." Lange Decl. at ¶ 24.

**RESPONSE**:

Undisputed.

<div align="center">118.</div>

On September 14, 2018, Cheryl Morris, an employee in Dr. Bluebond-Langner's office, also called Anthem on September 14, 2018 to confirm coverage for bottom surgery under the Health Plan. Bluebond-Langner Decl. at Ex. 1, ¶ 22.

**RESPONSE**:

     Undisputed.

<center>119.</center>

     Anthem representatives informed Dr. Bluebond-Langer's office "that Sgt. Lange had gender-affirming benefits and that preauthorization would be required." Bluebond-Langner Decl. at Ex. 1, ¶ 22. *See also* Grant Decl., Ex. F Clark Dep. at Ex. 14, p. 1 (summary of call stating that "associate confirmed that codes are covered under the patient's plan.").

**RESPONSE**:

     Undisputed.

<center>120.</center>

     On November 13, 2018, Sgt. Lange flew to New York for a consultation with Dr. Bluebond-Langner and her colleague, Dr. Lee Zhao. *See* Lange Decl. at ¶ 27; Bluebond-Langner Decl. at Ex. 1, ¶ 23.

**RESPONSE**:

     Undisputed.

<center>121.</center>

     Dr. Bluebond-Langner and Dr. Zhao both determined that sex reassignment surgery is medically necessary for the treatment of Sgt. Lange's gender dysphoria under Anthem's Guideline. Bluebond-Langner Decl. at Ex. 1, ¶¶ 24, 27-36; Grant Decl., Ex. A Carter Dep. at Ex. 2, pgs. 1-3 (Lange00001205-07).

**RESPONSE**:

     Undisputed.

122.

Following Sgt. Lange's consultation, on November 21, 2019, Dr. Bluebond-Langner's office called Anthem to check for precertification and coverage for gender confirming surgery under the Health Plan. *See* Grant Decl., Ex. F Clark Dep. at Ex. 14, p. 2.

**RESPONSE**:

Undisputed.

123.

Again, Anthem informed her office that "service will be covered at 80% of the allowed amount once the deductible is met." *Id*.

**RESPONSE**:

Undisputed.  This was based on the discrepancy between the plan document and what Anthem had in its system.  (Doc. 163 at 88:25-89:6.)

124.

Following her consultation with Sgt. Lange, Dr. Bluebond-Langner submitted a pre-authorization request to Anthem for Sgt. Lange's gender reassignment surgery, which was scheduled for January 31, 2019. *See* Bluebond-Langner Decl. at Ex. 1, ¶ 27; Lange Decl. at ¶ 27.

**RESPONSE**:

Undisputed.

125.

On November 29, 2018, Deborah Pope of Anthem informed Ms. Clark that,

according to Anthem's records, the County had not opted-out of the Nondiscrimination Mandate. Grant Decl., Ex. F Clark Dep. at Ex. 5, p. 9 (Anthem_00000012).

**RESPONSE**:

Disputed.  The cited e-mail was sent on September 27, 2016 and merely listed the ACA Section 1557 mandates at Anthem_0009.  (Doc. 163 at 270, 273.)  Clark and Pope had a separate e-mail exchange on November 29, 2018 regarding Anthem's confusion about the mandates.  (Doc. 163 at 276-277; 56:21-57:16.)

126.

In doing so, Ms. Pope included the language of the Non-Discrimination Mandate and explained that: "Everything we have shows that the county accepted the mandates. There have been other mandates for other years that they did not accept, but for 2017, they accepted them all." *Id*.

**RESPONSE**:

Undisputed, although this language is at Doc. 163 at 276.

127.

Ms. Clark immediately responded to Ms. Pope, stating, "[n]ot sure I agree with that." *Id*. at p. 10 (Anthem_00000013).

**RESPONSE**:

Undisputed, although this language is at Doc. 163 at 277.

128.

Ms. Clark, in consultation with Mr. Carter, then worked with Anthem to pursue a "retro change to 1/1/2017 on the antidiscrimination benefit," which required approval from

Anthem's legal team. *Id*. at pgs. 11-12 (Anthem_00000014-15); Grant Decl., Ex. F Clark Dep. at 59:4-60:21.

**RESPONSE**:

Disputed.  *Anthem* was making a "retro change" to address its error.  Clark testified: "We [she and the County] were trying to correct the record, not make a different plan change."  (Doc. 163 at 59:16-20.)

<div align="center">129.</div>

On November 30, 2018, Sgt. Lange received a letter, dated November 26, 2018, denying the pre-authorization request and explaining that the "service is excluded or not covered under your plan benefits." *See* Lange Decl. at ¶ 28; Grant Decl. Ex. A Carter Dep. at Ex. 9, p. 1114 (Lange - HC001951-54). She appealed this decision on December 11, 2018 and the appeal was denied on January 29, 2019, citing the Exclusion. Lange Decl. at ¶ 29.

**RESPONSE**:

Defendants object to SUMF No. 129 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

<div align="center">130.</div>

In response to Ms. Clark's request for a "retro change," Ms. Pope sent Ms. Clark a document, titled in relevant part "2017 Mandates—only ASO can opt out," and which states, "Nondiscrimination in Health Programs and Activities Rule (ACA Section 1557): "In recognition of regulations issued under PPACA section 1557, the exclusion for Gender Identity Disorders and Sex Change Surgery will be removed for our plans (both fully insured

<div align="center">-48-</div>

and ASO)." Beside that statement is a box marked "Yes" and a box marked "No." Grant Decl., Ex. F Clark Dep. at Ex. 5, pgs. 11-14 (Anthem_00000014-17); Grant Decl., Ex. F Clark Dep. at 62:2–23.

**RESPONSE**:

Disputed.   Clark did not ask for a "retro change," which is Anthem's language. Rather, Clark testified: "We [she and the County] were trying to correct the record, not make a different plan change."  (Doc. 163 at 59:16-20.)  Defendants do not dispute the language of the form, except there were only blanks on the referenced pages for "Yes" or "No," but neither was marked.  (Doc. 163 at 281.)

131.

In the body of her email, Ms. Pope told Ms. Clark that she could "add a signature line" to the sign off sheet, which Ms. Clark did. *See* Grant Decl., Ex. F Clark Dep. at Ex. 5, pgs. 11-14 (Anthem_00000014-17); Grant Decl., Ex. F Clark Dep. at 62:12–14.

**RESPONSE**:

Undisputed.

132.

Ms. Clark testified that she has never seen a process similar to this for plan changes before. *See* Grant Decl., Ex. F Clark Dep. at 62:2-23.

**RESPONSE**:

Undisputed.

133.

On December 19, 2018, Mr. Carter checked the "No" box next on the form in order to retroactively opt out of the Nondiscrimination Mandate (i.e., reject the removal of the

Exclusion from the Health Plan) and signed and dated the form. See Grant Decl., Ex. A

Carter Dep. at Ex. 4; Grant Decl. Ex. A Carter Dep. at Ex. 5, p. 1 (Lange - HC000442);

Grant Decl., Ex. A Carter Dep. at 62:11–12.

**RESPONSE**:

      Undisputed that Carter signed the form.

      Disputed that it was a retroactive opt out.  Clark testified: "We [she and the County]

were trying to correct the record, not make a different plan change."  (Doc. 163 at 59:16-

20.)  Clark further testified that "they [the County] did not accept the mandate, so the plan

document indicated that so this was to clear the record to make sure that the plan document

was the same as what was in the Anthem system."  (Doc. 163 at 59:25-60:5.)

<p align="center">134.</p>

      Prior to executing the retroactive opt-out, Mr. Carter did not consult with counsel,

discuss the matter with the Commissioners, or consider any information about the cost of

the Nondiscrimination Mandate (i.e. removing the Exclusion). Grant Decl., Ex. A Carter

Dep. at 64:924, 66:23-67:9, 69:7-10, 74:17-25; 75:2.

**RESPONSE**:

      Undisputed that Carter did not consult with counsel, discuss the matter with the

Commissioners, or consider any information about the cost of the Nondiscrimination

Mandate before signing the form.

      Disputed that this was a retroactive opt-out.  Clark testified: "We [she and the

County] were trying to correct the record, not make a different plan change."  (Doc. 163 at

59:16-20.)  Clark further testified that "they [the County] did not accept the mandate, so

the plan document indicated that so this was to clear the record to make sure that the plan document was the same as what was in the Anthem system."  (Doc. 163 at 59:25-60:5.)

135.

Cost was not a factor in the County's decision to opt out of the Nondiscrimination Mandate. Grant Decl., Ex. A Carter Dep. at 74:17-20.

**RESPONSE**:

Undisputed.

136.

The decision to opt out of the Nondiscrimination Mandate was not presented to the Commissioners and was not the subject of a vote. See Grant Decl. Ex. A Carter Dep. at Ex. 4; Grant Decl., Ex. A Carter Dep. at 66:23–67:5; Grant Decl., Ex. G HC Dep. (Carter I) at 40:7-10.

**RESPONSE**:

Undisputed.

137.

The County admits that, by checking the box, it knew the Health Plan would not cover treatment for gender dysphoria. Grant Decl., Ex. A Carter Dep. at 67:18-21.

**RESPONSE**:

Undisputed, but Carter did not know Plaintiff had sought surgery at the time he completed the form.  (Doc. 150-1 at 67:10-17.)

## IX.   Sgt. Lange Requests Rescission of the Exclusion And Coverage Of Medically Necessary Care

138.

On January 6, 2019, at 10:43 a.m., Sgt. Lange, through her counsel, Noah Lewis, sent a letter, via email, to County Attorney Tom Hall informing the County that Sgt. Lange had been denied coverage under the Health Plan for medically necessary health care and requesting that, "in lieu of a lawsuit," the County engage in a "Structured Negotiation" regarding removal of the Exclusion. Grant Decl. Ex. A Carter Dep. at Ex. 9, pgs. 1-5 (Lange - HC001941-45); Grant Decl., Ex. A Carter Dep. at 130:10–16; Grant Decl. Ex. A Carter Dep. at Ex. 8.

**RESPONSE**:

Undisputed.

139.

At 10:48 a.m., five minutes after receiving the email, Mr. Hall forwarded it to Mr. Carter at 10:48 a.m., stating "I just received this. I have not read it completely. Looks like someone is trying to raise an issue." Grant Decl. Ex. A Carter Dep. at Ex. 8; Grant Decl., Ex. A Carter Dep. at 132:5-17.

**RESPONSE**:

Undisputed.

140.

Forty-eight minutes after that, at 11:36 a.m., Mr. Carter forwarded the letter to Robert Kissell, the supervisor of the County's liability insurance at the Association of County Commissioners, informing him of the letter received from Sgt. Lange's counsel and stating, "We have not received any lawsuit yet, but I do believe that we will not move forward with

negotiations as indicated in the letter." Grant Decl. Ex. A Carter Dep. at Ex. 11; Grant Decl., Ex. H HC Dep. (B. Holland) at 61:1-15 ("Q: What information did Houston County consider before deciding not to move forward with negotiations? A: No information other that we weren't in a position, at that time of year, to make any changes to the plan.").

**RESPONSE**:

Undisputed.

141.

Mr. Carter did not consider the cost of removing the exclusion, or even read the email "in detail" before forwarding it to Mr. Kissel. Grant Decl., Ex. A Carter Dep. at 138:19–20 (Q: Did you read this correspondence and the attachments before you sent it to Mr. Kissel? A: I'm sure I did, I'm sure I went through, probably not in detail, but I probably scanned it.").

**RESPONSE**:

Undisputed.

142.

On January 16, 2019, Mr. Carter sent the January 6, 2019, letter and attachments to Ms. Clark, informing her that Sgt. Lange has "hired an attorney to challenge our decision to not cover her surgery." *See* Grant Decl., Ex. F Clark Dep. at Ex. 19A.

**RESPONSE**:

Undisputed.  (Doc. 150-1 at 142:11-24.)

143.

That same day, Ms. Clark forwarded Mr. Carter's email to Ms. Pope. *See* McNeal_00000121.

**RESPONSE**:

Disputed.  The referenced document is not part of the summary judgment record.

144.

And the next day, on January 17, 2019, Ms. Pope requested that Anthem "please add back the exclusion for Transgender surgery on both medical plans." Grant Decl., Ex. AA at pgs. 1-2.

**RESPONSE**:

Undisputed this is what the e-mail says.

Disputed that it is related to the notice purportedly sent on January 16, 2019.

145.

On January 23, 2019, Anthem notified Sgt. Lange that it was denying her appeal of the denial of her claim for gender reassignment surgery. Grant Decl., Ex. C Lange I Dep. at 45:23– 46:1; Grant Decl., Ex. C Lange I Dep. at Ex. 22.

**RESPONSE**:

Undisputed.

146.

On February 4, 2019, Mr. Lewis again emailed Mr. Hall asking for a meeting to discuss Sgt. Lange's Request. Grant Decl., Ex. Y.

**RESPONSE**:

Undisputed.

147.

Mr. Hall responded that his schedule was full that week and that they would have to try for another time. *Id.*

**RESPONSE**:

Undisputed.

148.

On February 7, 2019, Mr. Lewis again emailed Mr. Hall asking to have "a conversation next week about the transgender health exclusion." Grant Decl., Ex. Z.

**RESPONSE**:

Undisputed.

149.

Mr. Lewis stated: "[w]e would really like to have a private dialogue with you, but if that is not going to happen imminently, we will plan to deliver public comments at the Feb. 19 Commissioners meeting." *Id.*

**RESPONSE**:

Undisputed.

150.

Mr. Hall never responded to the letter nor to Mr. Lewis's meeting request. *See* Grant Decl., Ex. H HC Dep. (B. Holland) at 58:16-20.

**RESPONSE**:

Undisputed.

**X.** **The County Confirms Its Decision To Opt Out of the Mandate for 2019.**

151.

On February 7, 2019, Anthem emailed Ms. Clark attaching a letter and stating that Anthem is "requesting this going forward with 2019. I would guess that it is more CYA than anything else." *See* Grant Decl., Ex. X at pgs. 1-2 (McNeal_00000115-16). The letter

was addressed to Mr. Carter and requested confirmation that the County had discussed its decision to reject the Nondiscrimination Mandate with counsel and agreed "to be responsible for any penalties if the plan is determined to be noncompliant." *Id*. The County had never before seen an indemnity demand in any other correspondence with Anthem. *See* Grant Decl., Ex. G HC Dep. (Carter I) at 42:17-19.

**RESPONSE**:

Defendants object to SUMF No. 151 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.  In addition, the letter stated: "We're writing because Houston Co BOC has elected to decline the 2017 Mandate for Nondiscrimination in Health Programs and Activities Rule ACA Section 1557 for the plan year beginning 01/01/2017. While your chosen plan design differs from our interpretation of the Affordable Care Act (ACA or health care reform law) and related regulations, we understand that many aspects of the law are unclear and may be subject to varying interpretations. Therefore, Anthem is offering some flexibility to self-funded customers who may have a different interpretation of the law."  (Doc. 150-30, p. 2.)

152.

On February 13, 2019, Ms. Clark forwarded Mr. Carter the email from Ms. Pope attaching the confirmation letter and explaining that he would need to respond to it on Houston County letterhead. Grant Decl. Ex. A Carter Dep. at Ex. 5, pgs. 1-6 (Lange - HC000442-47).

**RESPONSE**:

Undisputed.

153.

The letter states that it is being sent because the County "elected to decline the 2017 mandate for Nondiscrimination in Health Programs and Activities Rule ACA Section 1557 for the plan year beginning 1/1/2017." *Id*. at p. 6 (Lange - HC000447).

**RESPONSE**:

Undisputed.  In addition, the letter stated: "We're writing because Houston Co BOC has elected to decline the 2017 Mandate for Nondiscrimination in Health Programs and Activities Rule ACA Section 1557 for the plan year beginning 01/01/2017. While your chosen plan design differs from our interpretation of the Affordable Care Act (ACA or health care reform law) and related regulations, we understand that many aspects of the law are unclear and may be subject to varying interpretations. Therefore, Anthem is offering some flexibility to self-funded customers who may have a different interpretation of the law."  (Doc. 150-30, p. 2.)

154.

The confirmation letter further informs the County that their "chosen plan design differs from [Anthem's] interpretation of the Affordable Care Act and related regulations." *Id*.

**RESPONSE**:

Undisputed.  The above phrase appears in this paragraph of the letter: "We're writing because Houston Co BOC has elected to decline the 2017 Mandate for Nondiscrimination in Health Programs and Activities Rule ACA Section 1557 for the plan year beginning 01/01/2017. While your chosen plan design differs from our interpretation of the Affordable Care Act (ACA or health care reform law) and related regulations, we

understand that many aspects of the law are unclear and may be subject to varying interpretations. Therefore, Anthem is offering some flexibility to self-funded customers who may have a different interpretation of the law." (Doc. 150-30, p. 2.)

155.

The confirmation letter seeks confirmation that the County (1) has chosen to decline the 2017 Nondiscrimination Mandate and believes that doing so is in compliance with the ACA and related regulations; (2) will be responsible for any penalties that result if the plan is determined to be noncompliant; and (3) has consulted legal counsel with respect to the plan design. Id.

**RESPONSE**:

Undisputed.

156.

The confirmation letter asks for a response within 30 days, otherwise Anthem would "consider the benefit plan document as the source of group intent regarding benefits." Id.

**RESPONSE**:

Undisputed.

157.

After receiving the confirmation letter from Anthem, Mr. Carter discussed the decision to opt out of the Nondiscrimination Mandate with Barry Holland and Tom Hall for "30 seconds, a minute" and, separately, Tommy Stalnaker for "probably less than a minute." Grant Decl., Ex. A Carter Dep. at 84:23–88:25; Grant Decl., Ex. G HC Dep. (Carter I) at 39:3-19. The substance of the conversation with Mr. Stalnaker was Mr. Carter informing him that "Anthem [was] asking [the County] do we still want to have this

[E]xclusion and I just want to confirm that's what we want to have," and Mr. Stalnaker's response was "yes." Grant Decl., Ex. A Carter Dep. at 85:25–86:18.

**RESPONSE**:

Defendants object to SUMF No. 157 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

158.

At Mr. Stalnaker's instruction, Mr. Carter also spoke with some of the other Commissioners, but no discussion, meeting, or vote was held. See Grant Decl., Ex. G HC Dep. (Carter I) at 38:12-23, 39:3-19, 40:7-10.

**RESPONSE**:

Undisputed.

159.

On February 13, 2019, the same day that he received the confirmation letter, Mr. Carter drafted a response, stating "We have elected to decline the 2017 mandate for Nondiscrimination in Health Programs and Activities Rule ACA Section 1557 for the plan year beginning 01/01/2017." Grant Decl. Ex. A Carter Dep. at Ex. 5, pgs. 1-3 (Lange - HC000442-44).

**RESPONSE**:

Undisputed.

160.

The letter provides that "Houston County will be responsible for any penalties that result if the plan is determined to be noncompliant." Id. at p. 3 (Lange - HC000442)

**RESPONSE**:

Undisputed.

161.

The letter also provides that Houston County consulted its own legal counsel with respect to the plan design. *Id.*

**RESPONSE**:

Undisputed.

162.

On February 14, 2019, Mr. Carter sent the letter to Ms. Clark. *Id. See also* Grant Decl., Ex. A Carter Dep. at 84:7-10.

**RESPONSE**:

Undisputed.

163.

On February 15, 2019, Ms. Clark forwarded the confirmation letter to Anthem. Grant Decl., Ex. BB at p. 1 (McNeal_00000109).

**RESPONSE**:

Undisputed.

164.

On February 21, 2019, Ms. Pope sent Ms. Clark the "corrected" Health Plan, which Ms. Clark then forwarded to Mr. Carter. Grant Decl., Ex. CC.

**RESPONSE**:

Undisputed.

**XI.**   **The Commissioners Refuse to Consider Sgt. Lange's Request For Accommodation.**

165.

In mid-February 2019, Sgt. Lange met with Sheriff Talton and informed him that she planned to speak to the Commission about his request to modify the Health Plan; they also discussed her trip to New York and that she had appealed the denial of her claim for gender reassignment surgery). Grant Decl., Ex. C Lange I Dep. at 72:6–73:20; Grant Decl., Ex. B Sheriff Talton Dep. at 70:8–71:3; 75:4–24.

**RESPONSE**:

Undisputed that Plaintiff informed Sheriff Talton she intended to speak to the Commission and that she had travelled to New York.  However, Sheriff Talton recalled she met with lawyers in New York, but not a doctor.  (Doc. 157 at 91:19-92:9.)

Disputed that Sheriff Talton testified there was any discussion of Plaintiff's appeal.

166.

Sheriff Talton took no action in response. Grant Decl., Ex. C Lange I Dep. 72:16–73:20; Grant Decl., Ex. B Sheriff Talton Dep. at 81:14–21. *See also* Grant Decl., Ex. B Sheriff Talton Dep. at 77:19-78:3, 78:25-79:22 (after meeting with Sgt. Lange, the Sheriff discussed the Exclusion with Mr. Stalnaker, but they did not discuss removing it).

**RESPONSE**:

Undisputed.

167.

On February 19, 2019, Sgt. Lange and Mr. Lewis attended a regular public meeting of the Board of Commissioners. Grant Decl., Ex. A Carter Dep. at 147:5–18.

**RESPONSE**:

Undisputed.

168.

Prior to the meeting, the County was aware that Sgt. Lange's intention at this meeting was "[t]o ask for an exclusion or some kind of an accommodation removing that exclusion specifically for her so that she could proceed with her surgeries, under our plan." Grant Decl., Ex. H HC Dep. (B. Holland) at 66:4-10.

**RESPONSE**:

Undisputed.

169.

Specifically, the County understood that she was seeking either "a rescission of the [E]xclusion entirely or an exception [to the Exclusion] for her individually." Grant Decl., Ex. H HC Dep. (B. Holland) at 66:20-25.

**RESPONSE**:

Undisputed.

170.

Mr. Lewis and Sgt. Lange then each made a presentation. *See* Meeting Mins. at PDF p. 5.

**RESPONSE**:

Undisputed.

171.

When Sgt. Lange spoke, she explained that "she was originally told by Blue Cross and Blue Shield that the surgery would be covered but was later denied even though the gender transition was medically necessary" and that she "feels discriminated against because the County refuses to make the necessary changes to the County's insurance plan

and asked the Board to vote to remove the exclusions." Grant Decl. Ex. A Carter Dep. at Ex. 13, p. 5.

**RESPONSE**:

    Undisputed.

<div align="center">172.</div>

When Mr. Lewis spoke, he explained that "correspondence to the County asking for mediation concerning this matter elicited no response from County Attorney Tom Hall" and that, "[a]lthough they would like to avoid legal action, if the Board does not remove the exclusion by the next Commissioner's meeting on March 5th a complaint with the Equal Employment Opportunity Commission will be filed." *Id*.

**RESPONSE**:

    Undisputed.

<div align="center">173.</div>

A transcription of the Commissioners' entire response to these presentations, made in 2019 by Sgt. Lange's counsel based on the County's videorecording of the meeting, which the County had posted to its website but subsequently took down, is as follows. A recording obtained by the Houston Home Journal remains available at https://www.facebook.com/HHJOnline/videos/558703247982131/.

> Chair Stalnaker: "Let's make one statement. To you and Anna. I'm gonna call on County Attorney Tom Hall to tell the County's position on this particular issue. Mr. Hall."
> Mr. Hall: "Thank you Mr. Chairman. The information that you sent on the 19th of January, we did receive, and had an answer to that prepared, and then your client asked for an audience here at the meeting. So, we determined that we weren't going to send you an answer—that we would, at this meeting, as you present yours, we would also tell you our answer. What you requested, as you know, is not covered by the County health insurance. The Commissioners is not considering any changes to the plan at this time. I'll let everyone know that I have advised the Commission and the staff not to discuss this matter due to the potential for litigation. So, if you do ask

<div align="center">-63-</div>

them about it, they're not going to answer you about it. So, that is, in a nutshell, that's
our answer. And we appreciate your time."

Mr. Lewis: "Can you offer a reason for the..."

Chair Stalnaker: "No, thanks. Your time's up. Thank you very much."

**RESPONSE**:

Undisputed.

174.

The County did not consider any cost information prior to deciding not to consider
Sgt. Lange's request to remove the Exclusion. Grant Decl., Ex. A Carter Dep. at 151:4-13;
Grant Decl., Ex. H HC Dep. (B. Holland) at 61:10-62:13.

**RESPONSE**:

Undisputed.  In fact, both Chairman Stalnaker (at 0:30-0:50) and County Attorney
Hall (at the end of the recording) stated at the meeting (as can be heard in the linked
recording) that no change would be considered since the terms of the then-plan year had
already been set.

175.

At deposition, the County testified that the Commissioners told Sgt. Lange the
County wasn't "in a position, at that time of year, to make any changes to the plan." Grant
Decl., Ex. H HC Dep. (B. Holland) at 61:10-15. This testimony is contradicted by the
recording of the meeting, which does not contain any explanation regarding the time of
year. In any event, "[t]he Board of Commissioners is permitted to change the plan during
the plan year if they are so inclined." Grant Decl., Ex. A Carter Dep. at 149:8-13.

**RESPONSE**:

Defendants object to SUMF No. 175 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately. Undisputed that Barry Holland testified as stated.

Disputed.  Both Chairman Stalnaker and County Attorney Hall stated at the meeting (as can be heard in the linked recording) that no change would be considered since the terms of the then-plan year had already been set.

176.

The only explanation it provided was that the County wasn't "in a position, at that time of year, to make any changes to the plan." See Grant Decl., Ex. H HC Dep. (B. Holland) at 61:10-15, 62:7-63:6; Grant Decl., Ex. A Carter Dep. at 150:24-151:13.

**RESPONSE**:

Undisputed.

XII.   **September 20, 2019 Request for Accommodation**

177.

Sgt. Lange researched whether she could afford to pay for the surgery out-of-pocket, and called multiple additional surgeons around the country seeking cost quotes. Grant Decl., Ex. C Lange I Dep. at 136:14-137:2; Lange Decl. at ¶ 23.

**RESPONSE**:

Undisputed.

178.

Only one provided an estimate, of $40,000 to $50,000, which Sgt. Lange could not

afford on her law enforcement salary. Grant Decl., Ex. C Lange I Dep. at 137:7:10; 24-25; 138:14.

**RESPONSE**:

    Undisputed.

<div align="center">179.</div>

    Sgt. Lange investigated surgery abroad, but determined this was not a safe course of action. Grant Decl., Ex. C Lange I Dep. at 52:13-17; 138:7-14. She also felt that being forced to have surgery outside of the United States for medically necessary care when her colleagues were not forced to was "not equal and it's not fair." Grant Decl., Ex. C Lange I Dep. at 172:10–173:1.

**RESPONSE**:

    Defendants object to SUMF No. 179 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

    Undisputed that these are Plaintiff's opinions.

<div align="center">180.</div>

    Sgt. Lange then filed EEOC charges against the County and on July 8, 2019, was issued a right-to-sue letter. Grant Decl., Ex. EE at p. 16 (Lange-HC005532).

**RESPONSE**:

    Undisputed.

<div align="center">181.</div>

    On September 20, 2019, Willkie Farr & Gallagher, LLP, counsel for Sgt. Lange, sent a letter to Mr. Hall, again requesting a reasonable accommodation. Grant Decl., Ex. A Carter Dep. at Ex. 14.

<div align="center"></div>

**RESPONSE**:

Undisputed that her attorneys sent a letter that date.

182.

The letter stated that Sgt. Lange seeks a "modification or adjustment of the Plan or on-going exemptions to the Exclusions for 'Drugs for sex change surgery' and 'services and supplies for a sex change' that would allow her access to coverage for medically necessary treatments for gender dysphoria." Id. at p. 3 (Lange_00002359).

**RESPONSE**:

Undisputed.

183.

The letter further stated that Sgt. Lange would prefer to resolve the dispute without litigation, although she would need to file suit by early October under the EEOC's deadline. Id. at p. 1 (Lange_00002357).

**RESPONSE:**

Undisputed.

184.

On September 26, 2019, Mr. Hall replied, stating that he would need to wait until after the next Commissioners' meeting to respond. Grant Decl., Ex. A Carter Dep. at Ex. 15.

**RESPONSE**:

Undisputed.

185.

The County never engaged in any discussions with Sgt. Lange as to her requested accommodation. Lange Decl. at ¶ 32.

**RESPONSE**:

Undisputed, except that it heard from Plaintiff and her attorney at a February 2019 meeting and considered her request at a November 2019 meeting.  (Doc. 150-15 at 65:15-66:10, 103:10-104:14.)

## XIII. The County Sought Information about the Cost of Removing the Exclusion Only After Sgt. Lange Threatened Litigation.

186.

On September 30, 2019, Mr. Carter emailed Ms. Clark, writing the following: "Do you think that Anthem BC/BS could give us an estimated cost of the gender reassignment. I know that there are before and after surgery cost including maintenance and that is fine if those are included also. Additionally, I know it can depend on the facility and provider but was wondering if they have something that says this surgery will cost _____ and the additional cost are. We are working with he [stet.] attorney and this question has come up. I thought I would ask before I let google tell me because BCBS numbers may be closer to fact." Grant Decl., Ex. A Carter Dep. at Ex. 16, p. 2 (Lange - HC003299); Grant Decl., Ex. A Carter Dep. at 157:21-158:2; Grant Decl., Ex. H HC Dep. (B. Holland) at 41:23-25.

**RESPONSE**:

187.         Undisputed.  Defendants object to SUMF No. 186 on the grounds that it does not comply with the requirements of Local Rule

56 because the proposed facts are not numbered separately.    This was the first time that the County had sought any information about the cost of removing the Exclusion or providing coverage for gender-confirming care. Grant Decl., Ex. F Clark Dep. at 79:16-80:5; Grant Decl., Ex. H HC Dep. (B. Holland) at 94:22-95:2.

**RESPONSE**:

Undisputed.

<div align="center">188.</div>

The reason the County sought out the cost information was because of the threatened litigation. See Grant Decl., Ex. M HC Dep. (Carter II) at 25:4-19; Grant Decl., Ex. H HC Dep. (B. Holland) at 115:15-16 (Q: "Why was [cost information] obtained here then?" A: "Frankly, because we were sued here."); 41:16-22 ("In this particular year, I believe Sergeant Lange had filed -- had filed her lawsuit in October of 2019 and in light of those claims, we decided to gather information and we asked our third-party administrator Anthem to provide us some cost data on what might be the typical cost for those procedures."); ECF No. 68-1 at ¶¶ 2-4 (explaining that when the Commissioners renew the plan, Carter makes "recommendations" regarding "terms and rates," but in November 2019, "[i]n addition" [and only] "in light of this lawsuit" and Sgt. Lange's "request that the Board of Commissioners look at the exclusions in the plan affecting sex reassignment surgery, I provided [exclusion-related] information to the Board.").

**RESPONSE**:

Undisputed, and as referenced in this paragraph, this was the time of plan renewal.

<div align="center">189.</div>

Later that same day, Ms. Clark sent Mr. Carter a photograph of a portion of a

computer screen with text on it, purportedly generated by Anthem, showing various estimated costs for male to female gender reassignment surgery, with estimated costs totaling $186,100, including $25,600 for a genital vaginoplasty—the only surgery that Sgt. Lange was seeking. Grant Decl., Ex. A Carter Dep. at Ex. 16, p. 1, 4 (Lange - HC003298, 3301); Lange Decl. at ¶ 15.

**RESPONSE**:

Undisputed.

<div align="center">190.</div>

A number of the procedures listed in the photograph were not considered not medically necessary under Anthem's Guideline, and so would not have been covered if the Exclusion were removed. Grant Decl., Ex. A Carter Dep. at 177:22-178:20; Grant Decl. Ex. A Carter Dep. at Ex. 2, p. 4 (Lange_00001208).

**RESPONSE**:

To the extent this paragraph asserts that some procedures on the screen image were not medically necessary, it is undisputed.

<div align="center">191.</div>

The photograph also states, "This is a much more difficult question than it might seem on the surface; the price is dependent on what the individual has done surgically to achieve gender reassignment." Grant Decl., Ex. A Carter Dep. at Ex. 16, p. 4 (Lange - HC003301)

**RESPONSE**:

Undisputed.

192.

The $25,600 cost estimate of a vaginoplasty provided by Anthem to the County in the photograph would not be a "high-cost" claim under the Health Plan which categorizes such costs as those over $50,000. Grant Decl. Ex. A Carter Dep. at Ex. 17, p. 7 (Lange - HC001912).

**RESPONSE**:

Undisputed.

193.

The County admits the data provided in the photograph was not "an in-depth cost analysis of the cost of removing the . . . [E]xclusion," and that the County, in fact, never conducted such an analysis. Grant Decl., Ex. M HC Dep. (Carter II) at 24:4–19. *See also* Grant Decl., Ex. K James Galasso Dep., Sept. 9, 2021 ("Galasso Dep.") at 14:3-8 (testifying that Galasso's scope of retention does not include calculating the cost of removing the Exclusion).

**RESPONSE**:

Undisputed.

194.

No other cost information relating to the Exclusion (or any other exclusion) was obtained from Anthem or provided to the Commissioners. *See* Grant Decl., Ex. H HC Dep. (B. Holland) at 102:8–11; 105:21–24.

**RESPONSE**:

Undisputed.

**XIV.** **The County Prepares A *Pro Forma* Cost Analysis Before the Next Board Meeting**

195.

On November 4, 2019, Mr. Carter sent the Commissioners a memorandum recommending the Health Plan be renewed for the 2020 plan year without changes to the scope of benefits but with certain changes to cost sharing and premiums, including to "[i]mplement Prior Authorization for Prescription Drug Plan; [i]ncrease Retiree Rates by 4%; [and] [i]ncrease deductible, copay, and out of pocket maximum for both plans." Grant Decl. Ex. A Carter Dep. at Ex. 17, p. 1 (Lange - HC001906); Grant Decl., Ex. A Carter Dep. at 160:15-20.

**RESPONSE**:

Undisputed.

196.

Despite having received the cost information from Anthem related to gender-confirming care, that information was not included in the November 4 memorandum. Grant Decl. Ex. A Carter Dep. at Ex. 17.

**RESPONSE**:

Undisputed.

197.

On November 16, 2019, two weeks after sending the Commissioners his recommended plan changes, and only three days prior to the Commissioners' meeting, Mr. Carter sent another memorandum to the Commissioners, this time providing the cost information that he received from Ms. Clark on September 30, 2019. Grant Decl. Ex. A Carter Dep. at Ex. 18.

**RESPONSE**:

Undisputed.

198.

Mr. Carter testified that he provided this information separately because the November 4, 2019, memorandum was the "actual changes" that County was going to make to the Health Plan. Grant Decl., Ex. A Carter Dep. at 169:7-20.

**RESPONSE**:

Undisputed.

199.

The November 16, 2019, memorandum did not provide a recommendation as to the Exclusion, because Mr. Carter anticipated that it would not be removed. Grant Decl., Ex. M HC Dep. (Carter II) at 77:15 ("I think you could say that we were not going to remove the [E]xclusion, but that had not been decided on yet and had not been voted on."). Its stated intent was to provide information to "assist in evaluating any changes to plan design." Grant Decl. Ex. A Carter Dep. at Ex. 18, p.1 (Lange – HC001904).

**RESPONSE**:

Disputed.   Carter testified: "I think it would be accurate to say that the recommendations from staff was not going to be able to remove the exclusion, but the commissioners who actually can do that had not made that decision." (Doc. 150-19 at 77:25-78:10.)

200.

Nowhere in the November 16, 2019, memorandum did Mr. Carter mention the County's concern that removing one exclusion would cause all other exclusions to be

removed. Grant Decl. Ex. A Carter Dep. at Ex. 18; Grant Decl., Ex. M HC Dep. (Carter II) at 79:21-25.

**RESPONSE**:

    Undisputed.

<div align="center">201.</div>

Mr. Carter also did not explain that a number of the listed procedures would not have been covered under Anthem's Guideline even if the Exclusion were removed. Grant Decl., Ex. A Carter Dep. at 179:3-10.

**RESPONSE**:

    Undisputed.

<div align="center">202.</div>

On November 19, 2019, the Commissioners held a public meeting. Grant Decl., Ex. DD.

**RESPONSE**:

    Undisputed.

<div align="center">203.</div>

During this meeting, Mr. Carter briefed the Commissioners on the 2020 health insurance renewal and recommended changes. *Id*. at p. 2 (Lange - HC000434).

**RESPONSE**:

    Undisputed.

<div align="center">204.</div>

Mr. Carter noted that "the County has been challenged over an exclusion in the plan," and explained that "cost data was obtained from Anthem on the exclusion and its

<div align="center">-74-</div>

removal would impact the cost to the County plan" though he did not explain what that impact would be. *Id.*

**RESPONSE**:

Undisputed.

205.

Mr. Carter recommended not removing "any of the 68 medical and 29 pharmacy exclusions." *Id.*

**RESPONSE**:

Undisputed.

206.

Neither Mr. Carter's notes from the meeting nor the official minutes mention a concern that the removal of the Exclusion would result in the removal of all exclusions. Grant Decl., Ex. M HC Dep. (Carter II) at Ex. 41; Grant Decl., Ex. M HC Dep. (Carter II) at 81:21-8214, 83:7-14.

**RESPONSE**:

Undisputed.

207.

Mr. Carter had not prepared or provided any cost information regarding removing all of the exclusions in connection with the 2020 health insurance renewal decision. Grant Decl., Ex. H HC Dep. (B. Holland) at 105:21-24.

**RESPONSE**:

Undisputed.

208.

The Commissioners did not discuss any cost information regarding the Exclusion. Grant Decl., Ex. DD. *See also* Houston County, *Commissioner's Meeting*, VIMEO (Nov. 5, 2019), https://vimeo.com/366622943 (*also available at* Houston County, *Commissioners Meeting Minutes*, https://www.houstoncountyga.org/commissioner/meeting-minutes.cms (last visited Nov. 3, 2021). Nor did they remark on the fact that the scope of Mr. Carter's recommendation— regarding all the Health Plan's exclusions—did not match the content of the cost information he presented—regarding just the one Exclusion. *Id*.

**RESPONSE**:

Defendants object to SUMF No. 208 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.  However, a majority of Commissioners were aware of the rising costs of the plan as a whole.  (Doc. 150-15 at 101:8-12, 104:10-14; Doc. 137-7 at ¶ 4; Doc. 137-9 at ¶ 4; Doc. 137-8 at ¶ 4.)

## XV.   **The Commissioners Meet On November 19, 2019 and Conduct an Unprecedented  Vote On Exclusions**

209.

On November 19, 2019, the Commissioners passed a motion "unanimously by all to approve the recommended cost-sharing to plan participants and the premium increases to retirees as presented and that the 68 plan exclusions and 29 pharmacy benefits exclusions remain in place." Grant Decl., Ex. DD at p. 3 (Lange - HC000435). In other words, the Commissioners voted to *not* make any changes to the Health Plan for regarding exclusions for 2020.

**RESPONSE**:

Defendants object to SUMF No. 209 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

<div align="center">210.</div>

The Commissioners typically only vote on "major changes to the [Health Plan]." Grant Decl., Ex. A Carter Dep. at 49:6-14 (Q: Do [the Commissioners] have to vote on every change to the health plan? A: No. Q: What types of changes would they have to vote on? A: Major changes that involve [sic] whether it's deductibles, whether its adding things, major changes to the plan, yes they would have to vote on.").

**RESPONSE**:

Undisputed.

<div align="center">211.</div>

The Commissioners do not vote on adding exclusions to or removing exclusions from the Health Plan; Mr. Carter testified that he and Ms. Clark "discuss it and then me and Donna sometimes will go meet with Barry [Holland] before we go meet with Chairman Stalnaker and we will updated Chairman Stalnaker," and he or Mr. Holland "may go around to some of the other commissioners and talk to them." Grant Decl., Ex. A Carter Dep. at 24:24–27:19.

**RESPONSE:**

Undisputed.

<div align="center">212.</div>

When deciding in 2019 to maintain the Health Plan with no changes for the 2020 plan year, the Commissioners did not vote at an open meeting. Grant Decl., Ex. A Carter Dep. at

23:3-14 ("Q And are all of those decisions [about the Health Plan] made during open meetings? A Not all of them. The past probably four years, yes, because there have been some major changes. **Last year we didn't do any changes, so, you know, didn't go before them because we didn't change anything.** But there's been years when it's very small changes that we've done and I just updated each commissioner and then the chairman said this is – I'm good with it if the other commissioners are good and we just went with it from that point.").

**RESPONSE**:

Undisputed.

## XVI.   The County Develops Its "Snowball" Defense After The Commissioners Vote.

213.

Subsequently, the County settled on an explanation for its removing the Exclusion: if it removed one exclusion, it would have to remove all of them, thus quintupling the Health Plan's expenses. Grant Decl., Ex. A Carter Dep. at 163:5-6. The County calls this its "snowball" defense. Grant Decl., Ex. M HC Dep. (Carter II) at 34:4.

**RESPONSE**:

Defendants object to SUMF No. 213 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Disputed.   The County declined to remove the Exclusion, or any of the many exclusions in the Health Plan, to keep down the overall costs of the plan.  (Doc. 150-15 at 101:8-12, 104:10-14; Doc. 137-7 at ¶ 4; Doc. 137-9 at ¶ 4; Doc. 137-8 at ¶ 4.)  After publicity about Plaintiff's lawsuit, several employees said, if she were successful, those employees

would take action to change the exclusions that affected them.  (Doc. 150-19 at 166:10-168:22.)

<div align="center">214.</div>

The County admits that its snowball defense was not a "basis of [its] decision not to remove the Exclusion." Grant Decl., Ex. M HC Dep. (Carter II) at 83:15-84:24. *See also id*. at 79:21-83:14 (admitting that this concern was not included in Mr. Carter's memo or presentation and is not reflected in the Commissioners' Nov. 19, 2019, meeting minutes).

**<u>RESPONSE</u>**:

Undisputed; however, in addition to the cost trends of the plan, the County knew that plan members had asked about exclusions other than the sex change surgery exclusion and there was concern that eliminating one exclusion would lead to requests (or even lawsuits) to remove other exclusions. (County 30(b)(6) Dep. II Carter, pp. 84:7-14, 129:24-130:15, Ex. 31.) Since Plaintiff's lawsuit, some members have even stated that, if Plaintiff gets the relief she is seeking, those members would take action (legal or otherwise) to have the exclusion that affects them removed from the plan. (County 30(b)(6) Dep. II Carter, p. 161:15-25, Ex. 31.)

<div align="center">215.</div>

Rather, the County admits this concern arose "about three weeks" after the Commissioners voted to maintain the Exclusion. *Id*. at 84:25-85:18.

**<u>RESPONSE</u>**:

Undisputed; however, in addition to the cost trends of the plan, the County knew that plan members had asked about exclusions other than the sex change surgery exclusion and there was concern that eliminating one exclusion would lead to requests (or even lawsuits)

<div align="center"></div>

to remove other exclusions. (County 30(b)(6) Dep. II Carter, pp. 84:7-14, 129:24-130:15, Ex. 31.) Since Plaintiff's lawsuit, some members have even stated (starting three weeks after the November 2019 meeting) that, if Plaintiff gets the relief she is seeking, those members would take action (legal or otherwise) to have the exclusion that affects them removed from the plan. (County 30(b)(6) Dep. II Carter, p. 161:15-25, Ex. 31.)

216.

But the County admits that the exclusions would not automatically be removed as a result of the removal of the Exclusion. *See* Grant Decl., Ex. M HC Dep. (Carter II) at 189:20-190:7. Rather, "it's going to put the exclusion in challenge from other employees." *Id.*; Grant Decl., Ex. H HC Dep. (B. Holland) at 86:10-88:10 (admitting that after granting an exemption to an employee regarding bariatric surgery, the County did not have to remove any exclusions).

**RESPONSE**:

Defendants object to SUMF No. 216 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

217.

The County also admits that other exclusions would not automatically be removed as a result of the removal of the Exclusion. *See* Grant Decl., Ex. M HC Dep. (Carter II) at 189:2025; 190:2-7. Rather, "it's going to put the exclusion in challenge from other employees." *Id.*

**RESPONSE**:

Defendants object to SUMF No. 217 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

218.

The County's own actuarial expert, James Galasso, testified that he "would be hard pressed to say it's [his] opinion as an actuary" that removal of one exclusion would result in removing additional exclusions. Grant Decl., Ex. K Galasso Dep. at 92:4-20; 95:4-96:6; 97:2-9 ("Q: Is it your opinion that it's reasonable to assume that removing one exclusion would result in removing all exclusions? A: That would sound like a stretch me, that they would all be removed.").

**RESPONSE**:

Undisputed as to removing one exclusion leading to the removal of *all* exclusions. Disputed in that Galasso testified the County's concern about having other exclusions challenged was reasonable because it is rare to remove an exclusion not required by regulatory mandate, the Plan's history over the past three years has only see the addition of exclusions and not any removals, and the County provided a list of employees who had questioned various exclusions over the past few years.  (Doc. 167 at 91:1-13.)

219.

Likewise, according to Sgt. Lange's actuarial and insurance expert, Joan Barrett, "it is standard practice to maintain certain non-standard exclusions and remove others." Decl. of Joan Barrett in Support of Plaintiff's Mot. for Summ. J. ("Barret Decl.") at Ex. 1, ¶¶

5(b). *See also* Grant Decl., Ex. J Joan Barrett Dep., Aug. 24, 2021 ("Barrett Dep.") at 68:6-15.

**RESPONSE**:

Undisputed that is Barrett's testimony.

220.

The County has previously removed other exclusions from the Health Plan without causing a financial crisis. Grant Decl., Ex. A Carter Dep. at 174:7-21; Grant Decl., Ex. M HC Dep. (Carter II) at 176:22-25.

**RESPONSE**:

Undisputed; however, those exclusions were mandated by regulation.  (Doc. 150-19 at 174:24-175:17.)

221.

Ms. Clark testified that in her experience as an insurance agent, removing one exclusion does not require removal or other or all exclusions, and "every plan has exclusions." Grant Decl., Ex. F Clark Dep. at 78:15-18 (Q: [J]ust because one exclusion is removed, it doesn't mean that another exclusion will necessarily be removed, right? A: That's correct.") *Id.* at 78:10– 14 ("Q: So for those other plans where the exclusion did end up getting removed, do you know if those plans continue to have other types of exclusions? A: Every plan has exclusions.")

**RESPONSE**:

Undisputed.


 **XVII. The Estimated Cost of Removing the Exclusion is Minimal.**

222.

Sgt. Lange's actuarial expert, Joan Barrett, estimated that the budgetary impact of removing the exclusion of transition-related surgery would be, on average, less than 0.1% of total annual medical and pharmacy claims. *See* Barrett Decl. at Ex. 1, ¶¶ 5(a), 47-50, 53; Grant Decl., Ex. J Barrett Dep. at 40:9-14; 41:18-25; 42:1-2; Grant Decl., Ex. K Galasso Dep. at 60:2-6; 13-16.

**RESPONSE**:

Undisputed, but immaterial to this case.  In their Motion to Exclude Expert Testimony of Barrett, Defendants showed this opinion was unreliable.  (Doc. 133.)

223.

The impact would be considered immaterial from an actuarial perspective. *See* Barrett Decl. at Ex. 1, ¶¶ 5(a), 53; Grant Decl., Ex. J Barrett Dep. at 49:7-25; 50:19; Grant Decl., Ex. K Galasso Dep. at 97:15-23; 101: 13-16. (Q. Have you, in your experience, ever concluded that a .1 percent cost increase was material? A. Not that I can recall, no.").

**RESPONSE**:

Disputed.  Galasso disputes that spreading the cost of transgender surgery over time via a per member per month calculation (leading to the assessment of a 0.1% cost increase) is a valid or reliable actuarial approach and compared it to the possible impact in the year the cost occurs.  "If the number is a PMPM spread over a hundred years, it's not terribly relevant. If the number is, in my experience, next year, likely or unlikely, I think it is relevant."  (Doc. 167 at 97:24-100:6.)

224.

Anthem's own analysis, as provided to the County, is consistent with Ms. Barrett's

estimates. Anthem purportedly estimated the cost for a genital vaginoplasty is $25,600, which would be less than .1% of the Health Plan's total claims over the three-year period of 2017 to 2019. *See* Grant Decl., Ex. FF at p. 2 (McNeal_00000066); Barrett Decl. at Ex. 1, ¶ 53.

**RESPONSE**:

Undisputed.  However, Galasso noted that Barrett's report relies on studies with wide variation in the cost of transition surgery, including from $21,302 to $52,344, all of which indicates unpredictability in cost for the procedure.  (Doc. 167 at 300.)

225.

Anthem produced an "estimation" prepared for its internal use during the 2017 plan year, based on data from state plans without blanket exclusions. Grant Decl., Ex. GG. Anthem calculated that, for a transgender woman seeking both top and bottom surgeries, the average cost paid was [Redacted]. *Id.*

**RESPONSE**:

Undisputed.

226.

Anthem also concluded that that utilization of gender-confirming care was low, [Redacted] utilizing surgical services for gender dysphoria annually, and [Redacted] of health plan members using any covered services. *Id.* Based on these estimations, Anthem concluded that the average cost to plans of covering gender-confirming care was about [Redacted] *Id.*

**RESPONSE**:

Defendants object to SUMF No. 226 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed that this is Anthem's conclusions, which differ from Barrett's conclusions.  (Doc. 167 at 162, ¶ 44.)

227.

The County did not provide any analysis to show that the cost of removing the Exclusion would be greater than .1%. Grant Decl., Ex. K Galasso Dep. at 14:3-8 (testifying that Galasso's scope of retention does not include calculating the cost of removing the Exclusion).

**RESPONSE**:

Undisputed, but not reliable as stated in Doc. 133.

228.

Other than obtaining estimated costs for various gender reassignment procedures, the County has never analyzed the cost of removing the Exclusion. Grant Decl., Ex. M HC Dep. (Carter II) at 24:14-25:9; Grant Decl., Ex. H HC Dep. (B. Holland) at 106:5-25. The same is true with respect to Sheriff Talton. Grant Decl., Ex. B Sheriff Talton Dep. at 75:4-76:14

**RESPONSE**:

Defendants object to SUMF No. 228 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.

229.

The County admits that the removal of the Exclusion in and of itself would not cause the County "to make [any] drastic changes" to the Health Plan or "do away with the plan". *See* Grant Decl., Ex. M HC Dep. (Carter II) at 33:2-12; 34:2-10.

**RESPONSE**:

Undisputed.

230.

The County has stated that, if it were to remove the Exclusion, it might need to offer a plan that is more like plans offered in by private sector employers, such as a plan with higher deductibles. Grant Decl., Ex. M HC Dep. (Carter II) at 33:13-21.

**RESPONSE**:

Undisputed.

231.

Houston County also maintains a stop-loss policy that allows it to manage risk and protect the Health Plan from unusually large claims expenditure in a given year. Grant Decl., Ex. A Carter Dep. at 55:23-57:13; Barrett Decl. at Ex. 1, ¶ 52; Grant Decl., Ex. J Barrett Dep. at 21:2522:3; 55:24-56:9; Grant Decl., Ex. K Galasso Dep. at 110:14-23.

**RESPONSE**:

Undisputed that the plan has stop-loss insurance.  Disputed that such insurance would keep the Plan from unusually large expenditure during a year.  Individual claim stop loss triggers at $175,000 and aggregate stop loss (for a plan year's spend) does not trigger until actual plan expenditures exceed anticipated claims by 25% (thus, if anticipated claims are $10M, the County would spend $2.5M *over budget* before the stop loss would help). (Doc. 167 at 313-314.)

**XVIII. Despite Invitation to Settle, Defendants Insisted on Continuing Litigation and Incurred Disproportionately High Legal Expenses**

232.

On February 12, 2020, before filing an Amended Complaint naming the Sheriff's Office as an additional defendant, counsel for Sgt. Lange sent the Sheriff's Office an *ante litem* notice, whose purpose whose purpose under Georgia practice is to "provide adequate notice of the claim to facilitate settlement before the filing of a lawsuit." *Board of Regents v. Myers*, 764 S.E.2d 543, 546 (Ga. 2014) (emphasis added). The Sheriff's Office received the notice, but did not respond. Grant Decl., Ex. E SO Dep. (Rape) at 82:13-15; Def. Sheriff Talton's Answer at ¶ 105.

**RESPONSE**:

Defendants object to SUMF No. 232 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately and supported by specific citation to particular parts of materials in the record.

Undisputed, but immaterial to this case.

233.

Defendants had, as of September 17, 2021, spent over $541,000 on attorney's fees defending this matter. Grant Decl., Ex. HH. This is over twenty-one times their estimate for the cost of Sgt. Lange's surgery.

**RESPONSE**:

Defendants object to Paragraph 233 on the ground that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately and supported by specific citation to particular parts of materials in the record.

Undisputed, but immaterial to this case

## XIX. **The County Has Granted An Exception to an Exclusion in the Past.**

234.

According to the County, granting an exception to the Exclusion, would "would only open up Pandora's Box for every other participant to ask for removal or exceptions to any of the other listed exclusions in the plan, which we maintained in -- maintain the affordability of the plan for all of our employees." Grant Decl., Ex. H HC Dep. (B. Holland) at 79:18-80:2. The County has explained "if you make one exception or remove one," then "why would you not do [it] for others when they come asking for a tummy tuck or a nose job or infertility treatments or so on." Grant Decl., Ex. H HC Dep. (B. Holland) at 80:3-11; 85:18-86:9.

**RESPONSE**:

Defendants object to Paragraph 234 on the ground that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed.  The County further explained that Plaintiff "is one of hundreds of participants] on that plan" (Doc. 159 at 79:17-18.) and "we have 68, I believe, stated exclusions in our plan, just under medical."  (Doc. 159 at 80;6-8.)

235.

Nevertheless, the County has made an exception to the Health Plan in the past. Grant Decl., Ex. O Def. Houston County's Resp. to Third Set of Interrogatories at No. 4. Grant Decl., Ex. H HC Dep. (B. Holland) at 80:16-25; 81:2-12; 81:18-25; 82:2-25; 83:2-6.

**RESPONSE**:

Disputed on the grounds that the cited evidence does not support Plaintiff's proposed fact.  The County testified that the Plan had previously covered lap band surgery

which contemplated annual adjustments for several years after the initial procedure. (Doc. 150-19 at 184:6-13). A Plan participant had the surgery and one adjustment before an exclusion for lap band surgery was added to the Plan effective January 1, 2010.  (Id. p. 184:14-25; Ex. 40.)  When the Plan participant was subsequently denied coverage for a lap band adjustment, she asked the County to pay for the adjustment since it was contemplated when she had the surgery.  Id. p. 184:20-185:2.  The County agreed to cover the remaining lap band adjustment procedure because it was contemplated when the initial surgery occurred and was covered.  Id. p. 184:6-25; 185:14-186:3.

236.

In that case, a plan member received lap band surgery that was covered under the Health Plan at the time of the procedure. Grant Decl., Ex. M HC Dep. (Carter II) at 184:2-13.

**RESPONSE**:

Undisputed.

237.

The following year, the County added an exclusion for bariatric surgery. Grant Decl., Ex. O Def. Houston County's Resp. to Third Set of Interrogatories at No. 4; Grant Decl., Ex. M HC Dep. (Carter II) at 186:7-10.

**RESPONSE**:

Undisputed that the County accepted Anthem's recommendation to add an exclusion for bariatric surgery to the Health Plan.

Disputed that the cited evidence supports Plaintiff's statement that the exclusion for bariatric surgery was added the year following the surgery referenced in SUMF 236.

238.

The plan member was subsequently denied coverage for lap band adjustment surgeries as a result of the bariatric surgery exclusion. Grant Decl., Ex. M HC Dep. (Carter II) at 184:14-20.

**RESPONSE**:

Undisputed.

239.

That individual requested an exception to the exclusion. Grant Decl., Ex. M HC Dep. (Carter II) at 184:14-25; 185:2.

**RESPONSE**:

Undisputed.

240.

After the individual discussed her request with Chairman Stalnaker on January 1, 2011, the County granted an exception to the exclusion not only to her, but all plan members in the same circumstance. Grant Decl., Ex. M HC Dep. (Carter II) at 186:4-10.

**RESPONSE**:

Undisputed.   The County issued a letter to Anthem to clarify its intention to cover the "lap band adjustments" for lap band procedures which were covered by the Plan prior to the decision to add an exclusion for lap band surgery effective January 1, 2021.   (Doc. 150-19 186:4-10, Ex. 40)

241.

The County was not concerned that granting this exception would lead to the removal of other exclusions. Grant Decl., Ex. M HC Dep. (Carter II) at 189:9-14.

**RESPONSE**:

Disputed as the cited evidence does not support that the County removed an exclusion.  As explained by the County, however, the decision to pay for the adjustments was viewed as a clarification because the surgery and required adjustments were covered at the time of the participant's surgery.  (Doc. 150-19 at 188:20-24.)  The County was not worried that its decision to approve payment for the second and third adjustments would lead to the removal of other exclusions because it didn't remove any exclusions but rather kept the exclusion in place. (Id. 189:9-14.)


242.

The County did not have to remove any exclusions as a result of making this exemption. Grant Decl., Ex. H HC Dep. (B. Holland) at 86:10-88:10.

**RESPONSE**:

Disputed as to the term "exemption."   As explained by the County, the decision to pay for the adjustments was viewed as a clarification because the surgery and required adjustments were covered at the time of the participant's surgery.  (Doc. 150-19 at 188:20-24.)

243.

In granting this exception, the County did not consider whether the requested

surgeries were necessary for the Health Plan member to do their job. See Grant Decl., Ex. H HC Dep. (B. Holland) at 87:3-12.

**RESPONSE**:

Undisputed.  As explained by the County, the decision to pay for the remaining adjustments was viewed as a clarification because the surgery and required adjustments were covered at the time of the participant's surgery.  (Doc. 150-19 at 188:20-189:8.)

## XX.  **The County Routinely Handles High-Cost Claims**

244.

The County routinely covers numerous high-cost claimants each year, Lange – HC000425 (listing 107 of 1444 members during the years 2017-2019), including one whose costs reached $1.1 million. Grant Decl., Ex. M HC Dep. (Carter II) at 92:7-11

**RESPONSE**:

Undisputed.  Because the County already has these high-cost claims, it does not want to make plan changes that will add more costs.  (Doc. 159 at 101:22-102:7; Doc. 150-19, Ex. M at 23:20-31:7.)

245.

There are numerous high-cost procedures or conditions the Health Plan does not exclude—for example, in 2018, it covered: spinal stenosis with spinal fusion ($235,709 expended with additional $95,000 expected), colon cancer ($186,047 expended with an additional $250,000 expected) and endometriosis with hysterectomy ($171,979 expended with an additional $180,000 expected). Lange – HC000427.

**RESPONSE**:

Undisputed.  Because the County already has these high-cost claims, it does not want to make plan changes that will add more costs. (Doc. 159 at 101:22-102:7; Doc. 150-19, Ex. M at 23:20-31:7.)

246.

Likewise, most of the Health Plan's expenditure covers care that is subject to much higher rates of utilization and expenditure than those that would be expected regarding gender-confirming care. Grant Decl., Ex. O Def. Houston County's Resp. to Third Set of Interrogatories at No. 1; Grant Decl., Ex. M HC Dep. (Carter II) at Ex. 35; Grant Decl., Exhs. JJ, KK. For example, in 2019, the Health Plan spent $1.58 million on 538 members with disorders of the musculoskeletal system, comprising over a fifth of its total spending; and over $700,000 each on the claims of several hundred members with disorders of the circulatory system and "Injury & Poisoning," comprising nearly another tenth each. Grant Decl., Ex. KK. Despite these diagnoses being vastly more costly to the Health Plan than the predicted cost of covering gender dysphoria, they are not subject to a blanket exclusion.

**RESPONSE**:

Defendants object to SUMF No. 246 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed in that, because the County already has these high-cost claims, it does not want to make plan changes that will add more costs.  (Doc. 159 at 101:22-102:7; Doc. 150-19, Ex. M at 23:20-31:7.)

Disputed as to the suggestion transition treatments are subject to a "blanket exclusion."  Plaintiff testified that her endocrinologist visits, psychological visits, and

hormones and other medications have been covered by the Health Plan.  (Doc. 137-3 at 48:19-49:15.)

## XXI. **Defendants have made discriminatory statements regarding transgender people.**

247.

[*Intentionally left blank.*]

**RESPONSE**:


248.

Defendants have made numerous discriminatory statements regarding transgender people. For example, in the fall of 2017, Sgt. Lange requested to go by the name Anna before she had legally changed it. Grant Decl., Ex. II.

**RESPONSE**:

Defendants object to Paragraph 248 on the ground that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately and supported by specific citation to particular parts of materials in the record.

Disputed as to the first proposed fact.  Plaintiff asserts a general conclusory statement without any citation to the record.

Undisputed as to the second proposed fact.

249.

In response, Sheriff Talton indicated that he would not require anyone to call Sgt. Lange Anna until it was legally changed although others in the office use names of choice.

*See* Grant Decl., Ex. B Sheriff Talton Dep. at 97:6-98:14; 98:21-99:6. *See also* Grant Decl., Ex. E SO Dep. (Rape) at 107:22-108:3. Grant Decl., Ex. A Carter Dep. at 187:5-9.

**RESPONSE**:

Disputed as the cited evidence does not support Plaintiff's proposed fact that "others in the office use names of choice."

<div align="center">250.</div>

Even after she legally changed her name, Sheriff did not require his deputies to call her Anna. Grant Decl., Ex. B Sheriff Talton Dep. at 101:15-20; Grant Decl., Ex. E SO Dep. (Rape) at Ex. 6; Grant Decl., Ex. LL; Grant Decl., Ex. E SO Dep. (Rape) at 106:9 – 23. To this day, the Sheriff has still given no instructions or request to his deputies to call Sgt. Lange by her legal name. Grant Decl., Ex. B Sheriff Talton Dep. at 101:24-102:6. Both her state-issued identification and County personnel records list her as female. Grant Decl., Ex. L Lange Dep. at 124:15-125-7.

**RESPONSE**:

Defendants object to SUMF No. 250 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed, but not material as Plaintiff has not alleged that since she legally changed her name to Anna Lange that any Sheriff's Office employee has refused to call her by her legal name.

<div align="center">251.</div>

Sheriff Talton still refers to Sgt. Lange with male pronouns, even though Sgt. Lange has requested to be called "she," has presented as female for years and legally changed her name to Anna. *See e.g.,* Grant Decl., Ex. B Sheriff Talton Dep. at 14:2-9; 15:17-24; 17:3

**RESPONSE**:

Disputed to the extent Plaintiff's proposed fact suggests that Sheriff Talton does not refer to Plaintiff with female pronouns. (Doc. 157 at 22:23-23:4; 29:3-13; 63:16-64:9; 93:5-12; 97:6-23; 98:9-14; 104: 8-14.).

252.

In August 2018, Sgt. Lange was reprimanded for posting "improper" photographs of herself in female court clothes on social media. Grant Decl., Ex. E SO Dep. (Rape) at Ex. 6, p. 11 (Lange – SO000088); Grant Decl., Ex. C Lange I Dep. at 18:14-17; 20:7-13. Sgt. Lange was told by her immediate supervise that he "didn't feel comfortable when [Sgt. Lange] wore female attire at work." Grant Decl., Ex. C Lange I Dep. at 26:11-12; 23-25.

**RESPONSE**:

Defendants object to SUMF No. 252 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Disputed as Plaintiff was not reprimanded for posting a photograph of herself in female court clothes on social media but was reprimanded for posting a nude photo of herself on her public Facebook page (Doc. 137-3 at 18:10-25, 110.)

253.

Sheriff Talton has stated that he does not believe in sex changes—"whether it is surgery or not." Grant Decl., Ex. B Sheriff Talton Dep. at 105:16–18.

**RESPONSE**:

Undisputed, but Defendants contend that Sheriff Talton's personal belief about gender transition – which he is entitled to have – is not material where, as here, it has no

impact on his treatment of Plaintiff as an employee of the Sheriff's Office (Doc. 157 at 18:15-25, 104:5-105:18; Doc. 137-3 at 36:19-23; 37:15-23.)

254.

Sheriff Talton has stated that he does not think that gender dysphoria is "a type of thing . . . that's going to affect [Sgt. Lange's] health or anything like that." Grant Decl., Ex. B Sheriff Talton Dep. at 86:11–16; 87:15–18.

**RESPONSE**:

Disputed on the ground that Plaintiff's cited evidence does not support the proposed fact.  Moreover, Plaintiff's proposed fact is immaterial because Sheriff Talton does not exercise any authority or control over the County's Health Plan (Doc. 150-11 at 49:2-18.)

255.

Sheriff Talton has stated that he does not believe that there is any form of care for a transgender person that should be covered under the Health Plan to treat gender dysphoria. See Grant Decl., Ex. B Sheriff Talton Dep. at 87:19–88:3. Mr. Carter likewise stated he was "good with nothing being covered." Grant Decl., Ex. A Carter Dep. at Ex. 7, p. 1 (Lange-HC000895).

**RESPONSE**:

Defendants object to SUMF No. 255 on the grounds that it does not comply with the requirements of Local Rule 56 because the proposed facts are not numbered separately.

Undisputed as to the first proposed fact, but immaterial to this case as it is a statement of Sheriff Talton's personal opinion and the record is unrefuted that Sheriff Talton does not exercise any authority or control over the County's Health Plan (Doc. 137-10 at ¶ 6; Doc. 150-11 at 49:2-18.)

Disputed as to the second proposed fact as the cited evidence does not support it. (Carter Dec. II, ¶ 4). Moreover, Plaintiff's use of the term "likewise" improperly suggests that Carter does not believe that the Plan should cover care for a transgender person which is unsupported by the record.  (Id.)

256.

Sheriff Talton has stated that he believes that no treatment for a transgender individual can be medically necessary. Grant Decl., Ex. B Sheriff Talton Dep. at 55:18–25.

**RESPONSE**:

Disputed on the ground that Plaintiff's cited evidence does not support the proposed fact.  Sheriff Talton stated that, in his opinion, he does not believe that surgery is medically necessary as a form of treatment for someone who is transgender.  He did not state that "no treatment for a transgender individual can be medically necessary."  Defendants further object to the proposed fact as immaterial to this case as it is a statement of Sheriff Talton's personal opinion and the record is unrefuted that Sheriff Talton does not exercise any authority or control over the County's Health Plan (Doc. 137-10 at ¶ 6; Doc. 150-11 at 49:2-18.)

257.

Sheriff Talton has stated that he believes that sex change surgery is not medically necessary for a transgender individual the way that surgery may be medically necessary for someone with breast cancer. Grant Decl., Ex. B Sheriff Talton Dep. at 57:8–17.

**RESPONSE**:

Undisputed but the proposed fact is not immaterial to this case as it is a statement of Sheriff Talton's personal opinion and the record is unrefuted that Sheriff Talton does not exercise any authority or control over the County's Health Plan (Doc. 137-10 at ¶ 6; Doc. 150-11 at 49:2-18.)

<div align="center">258.</div>

Sheriff Talton has stated that he is concerned about what the public and other members of the Sheriff's Office would think about there being a transgender deputy. Grant Decl., Ex. B Sheriff Talton Dep. at 38:15-25; 39:2-22.

**RESPONSE**:

Disputed. Plaintiff's cited evidence is incomplete and does not support the proposed fact.  Sheriff Talton testified that while he was concerned about what the public would think, that "didn't change his mind about keeping Sergeant Lange in [her] position" and that as long as Plaintiff continued to do her job he planned on keeping her, and her transition "didn't affect my feelings at all." (Doc. 157 at 38:15-39:8.)

<div align="center">259.</div>

Mr. Carter understands the term "transgender" to mean "a person who wants to be or believes or however, it's a person that identifies as the opposite sex of what they assign for at birth." Grant Decl., Ex. A Carter Dep. at 31:8-13.

**RESPONSE**:

Undisputed.

260.

Mr. Carter views the terms "transgender" and "gender dysphoria" to mean the same thing. Grant Decl., Ex. A Carter Dep. at 31:14-24.

**RESPONSE**:

Undisputed.

261.

Sheriff Talton also understands "transgender" and "sex change" to mean the same thing. Grant Decl., Ex. B Sheriff Talton Dep. at 15:14-20.

**RESPONSE**:

Disputed, as Plaintiff's cited evidence does not support the proposed fact.

262.

Both the County and the Sheriff likened gender-affirming healthcare to cosmetic surgery, like a "tummy tuck," a "nose job," or an aesthetic breast enhancement. Grant Decl., Ex. H HC Dep. (B. Holland) at 80:3-11; Grant Decl., Ex. B Sheriff Talton Dep. at 54:24-55:5.

**RESPONSE**:

Disputed. Plaintiff's cited evidence does not support the proposed fact. When asked why he did not believe Plaintiff's surgery should be covered, Sheriff Talton referred to his need for hearing aids and that they are not covered under the policy. (Doc. 157 at 54:21-24.)  The County's referenced testimony refers to its concern that other current medical exclusions may be challenged if the County removes the Exclusion for Plaintiff.

## XXII. **Sgt. Lange Continues to Need Healthcare**

263.

Sgt. Lange has continued to have routine healthcare coverage denied. Lange Decl. at ¶ 37.

**RESPONSE**:

Disputed as Plaintiff's cited evidence does not support the proposed fact.  Even if Plaintiff's statement as to the two claims referenced in Paragraph 36 of her Declaration are undisputed, it is also undisputed that the Plan covered (and continues to cover) Plaintiff's transition-related hormone medication, endocrinologist visits and psychological monitoring, (Doc. 137-3 48:19-49:15; Doc. 150-18 at 120:14-123, Ex. 36).

264.

Sgt. Lange requires annual endocrinologist visits and blood work to monitor her hormone levels and renew her hormone replacement therapy prescriptions. Lange Decl. at ¶ 16.

**RESPONSE**:

Disputed as Plaintiff's cited evidence does not support the proposed fact.

265.

On June 12, 2019, she was denied coverage for a routine blood test for monitoring her hormone and medication levels, citing the Exclusion. Grant Decl., Ex. A Carter Dep. at Ex. 1, p. 72-73 (Lange – HC001833-34); Lange Decl. at ¶ 37.

**RESPONSE**:

Disputed, as the cited evidence does not support that Plaintiff was told she was denied coverage for this blood test due to the Exclusion.

266.

And as recently as October 18, 2021, she was denied coverage for her regular annual visit to the endocrinologist. Lange Decl. at ¶ 37.

**RESPONSE**:

Undisputed, but Plaintiff testified that her previous endocrinologist visits have been covered under the Plan.  (Doc. 150-18 at 120:14 – 124:7, Ex. 36)

267.

Sgt. Lange remains unable to afford surgery, and so her gender dysphoria remains only partially treated. Lange Decl. at ¶ 24.

**RESPONSE**:

Undisputed.

268.

This continues to cause her distress, anxiety, sleeplessness, feelings of depression, and other symptoms, which continue to limit her ability to function socially and professionally, including difficulties thinking, concentrating, and interacting with other people like her spouse, child, and coworkers—this last interfering with her career goals and relationships with colleagues—as well as major bodily functions, such as neurological and brain functions. Lange Decl. at ¶¶ 15, 22, 27.

**RESPONSE**:

Undisputed, but Plaintiff has been successful in her job duties and interactions with colleagues, and she has participated in a number of hobbies, including working as a soccer referee, participating in several tennis tournaments and as a speaker on panels addressing

transgender issues. (Doc. 137-3 at 13:21-23, 14:8-10, 16:5-7, 17:18-20, 30:16-18, 38:16-18, 39:9-11, 32:12-15.)

Respectfully submitted this 22nd day of December 2021.

s/ Patrick L. Lail
R. Read Gignilliat
Georgia Bar No. 293390
Sharon P. Morgan
Georgia Bar No. 522955
Patrick L. Lail
Georgia Bar No. 431101

ELARBEE, THOMPSON, SAPP & WILSON, LLP
800 International Tower
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 659-6700
(404) 222-9718 (Facsimile)
gignilliat@elarbeethompson.com
morgan@elarbeethompson.com
lail@elarbeethompson.com

*Attorneys for Defendants*

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| ANNA LANGE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 5:19-CV-00392-MTT |
| v. | ) | |
| | ) | |
| HOUSTON COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 22, 2021, I served a true and correct copy of

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED**

**MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY**

**JUDGMENT** via this Court's ECF filing system which will automatically send electronic

notification of filing to the following attorneys of record:

| | |
|---|---|
| Kenneth E. Barton, III | Jill K. Grant |
| M. Devlin Cooper | |
| | |
| David Brown | Kevin M. Barry |

*s/ Patrick L. Lail*
Patrick L. Lail
Georgia Bar No. 431101