**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **ANNA LANGE,** )<br><br>)<br><br>)<br>**Plaintiff,** )<br><br>)<br>**v.** )<br><br>)<br>**HOUSTON COUNTY, GEORGIA, *et al.*,** )<br><br>)<br><br>)<br>**Defendants.** )<br>———————————————————— ) | **CIVIL ACTION NO. 5:19-cv-392 (MTT)** |

## <u>ORDER</u>

Plaintiff Anna Lange—a transgender woman and sworn deputy with the Houston County Sheriff's Office—brings this action against her employer Defendant Sheriff Cullen Talton in his official capacity and Defendant Houston County, Georgia. Doc. 56. The County's health insurance plan, which Sheriff Talton elected to provide to his employees, excludes coverage for "sex change" surgery, which Lange contends violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; the Equal Protection Clause of the United States Constitution; and Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq. Id.* Sheriff Talton, the County, and Lange have moved for summary judgment on all claims. Docs. 136; 137; 140. For the following reasons, the parties' motions are **GRANTED in part** and **DENIED in part**. Lange is entitled to partial summary judgment on her Title VII claim against both Sheriff Talton and the County. Lange's equal protection claim shall proceed against the County, and to the extent that Lange seeks prospective relief against Sheriff Talton under the Equal Protection Clause, that claim too shall proceed. Lange's ADA claim

fails on the merits because she has not come forward with sufficient admissible evidence that her gender dysphoria is the result of a physical impairment.

## I. BACKGROUND

### A. Lange's Employment with the Houston County Sheriff's Office

Unless noted, the parties agree the following facts are undisputed.

*1. Lange's Gender Dysphoria and Gender Transition*

Lange is a twenty-five-year law enforcement veteran, the past fifteen of which have been with the Houston County Sheriff's Office.  Docs. 179-3 ¶ 28; 195 ¶ 28.  By all accounts, Lange is an exceptional employee who "has performed her duties as an investigator very well" throughout her tenure as a sheriff's deputy.  *Id.*  Lange is also a transgender woman, meaning that although she was assigned a male sex at birth, her internal knowledge of herself has always been that she is female.  Docs. 179-3 ¶ 29; 195 ¶ 29.  In medical parlance, this condition is called gender dysphoria.  Docs. 179-3 ¶ 3; 195 ¶ 3.  Left untreated, gender dysphoria can lead to clinically significant personal suffering and comorbidities, including anxiety, depression, self-harm, and suicidality.  Docs. 179-3 ¶ 6; 195 ¶ 6.

Lange began her gender transition in 2017 after she was diagnosed with gender dysphoria.  Docs. 179-3 ¶ 31; 195 ¶ 31.  Lange now lives fully and consistently as a woman.  Docs. 179-3 ¶ 33; 195 ¶ 33.  To facilitate her transition, Lange receives hormone replacement therapy and has had "top surgery" to feminize her chest.  Docs. 179-3 ¶¶ 34-35; 195 ¶¶ 34-35.  Notwithstanding that treatment, Lange alleges she continues to suffer significant distress and anxiety due to the incongruence between her female gender identity and her remaining male physical characteristics, including her

genitalia.  Docs. 179-3 ¶ 36; 195 ¶ 36 (the defendants dispute that Lange is so distressed that she cannot work or engage in recreational activities).  When such symptoms persist, gender-confirming surgery is considered "medically necessary."  Docs. 179-3 ¶ 14; 195 ¶ 14.  Following the recommendations of her endocrinologist, two psychologists, and a surgeon, Lange determined that a vaginoplasty, also known as "bottom surgery," was the next step in the treatment of her gender dysphoria.  Docs. 179-3 ¶ 37; 195 ¶ 37.

*2. The County's Health Insurance Plan and the Exclusion*

Pursuant to an informal intergovernmental agreement between the Sheriff and the County, the Sheriff's Office has participated in the County's health insurance plan since 1973.  Docs. 179-3 ¶ 60; 195 ¶ 60.  As a Sheriff's deputy, Lange participates in the County's plan—which has about 1500 members in total—and contributes monthly premiums for the coverage.  Docs. 179-3 ¶¶ 67, 70, 71; 195 ¶¶ 67, 70, 71.  The health insurance plan is a self-funded or Administrative Services Only ("ASO") plan, which means that Anthem Blue Cross Blue Shield, the County's third-party administrator, administers claims using funds provided by the County and employee contributions.  Docs. 179-3 ¶ 69; 195 ¶ 69.

The County's health insurance plan has 68 medical exclusions and 29 pharmacy benefit exclusions.  Docs. 179-3 ¶¶  74, 209; 195 ¶¶  74, 209.  Two of those exclusions, which have been in place since 1998, preclude coverage for "sex change" surgery.  Docs. 179-3 ¶¶  75, 76; 195 ¶¶ 75, 76.  Specifically, exclusions 26 and 57 ("the Exclusion") exclude coverage for "[d]rugs for sex change surgery" and "[s]ervices and

supplies for a sex change and/or the reversal of a sex change."  Docs. 179-3 ¶ 76; 195 ¶ 76.

Kenneth Carter is the Director of Personnel for Houston County and responsible for the administration of the County's health insurance plan.  Docs. 179-3 ¶ 47; 195 ¶ 47.  During the renewal process in late 2016, the County's insurance broker, who acts as a liaison between the County and Anthem, informed Carter of Anthem's "Nondiscrimination in Health Programs and Activities Rule" which stated that "[i]n recognition of regulations issued under PPACA section 1557, the exclusion for Gender Identity Disorders and Sex Change Surgery will be removed from our plans (both Fully Insured and ASO)."  Docs. 179-3 ¶¶ 81, 85, 86; 195 ¶¶ 81, 85, 86.  Despite Anthem's recommendation to do so, the County chose not to accept the nondiscrimination mandate.  Docs. 179-3 ¶ 91; 195 ¶ 91.  Accordingly, the Exclusion remained in place.

For health insurance plans that accepted the nondiscrimination mandate and thus removed the exclusion for "sex change surgery," Anthem has a Guideline for when such surgery is "medically necessary" and covered by the plan.  Docs. 179-3 ¶ 15; 195 ¶ 15.  Under the Guideline, surgery is medically necessary if there is "significant functional impairment AND the procedure can be reasonably expected to improve the functional impairment."  Docs. 179-3 ¶ 16; 195 ¶ 16.  It is undisputed that Lange's prescribed vaginoplasty is medically necessary under Anthem's Guideline.  Docs. 179-3 ¶ 38; 195 ¶ 38.  No evidence disputes Lange's evidence that the prescribed vaginoplasty is medically necessary.

*3. Lange Informs the County and the Sheriff's Office of her Transgender Status*

Lange told Carter that she was transgender and intended to live openly as a woman on April 18, 2018.  Docs. 179-3 ¶ 93; 195 ¶ 93.  The purpose of this conversation was to determine whether Lange's medically necessary gender reassignment surgery would be covered by the County's health insurance plan.  Docs. 179-3 ¶ 94; 195 ¶ 94.  Citing the Exclusion, Carter told Lange that her surgery would not be covered.  *Id.*

Later that day, Lange and Carter met with Sheriff Talton and told him Lange was transgender.  Docs. 179-3 ¶ 98; 195 ¶ 98.  During that meeting, Lange requested permission from Sheriff Talton to wear a female uniform at work and present herself as a female in the office.  Docs. 179-3 ¶ 99; 195 ¶ 99.  In response, Sheriff Talton looked at Carter and said, "[w]hat the hell is he talking about?"  Docs. 179-3 ¶ 100; 195 ¶ 100. Carter then explained to Sheriff Talton that "what Sergeant Lange is trying to tell you is that she would like to start presenting herself as a woman and she wants you to understand that."  Docs. 179-3 ¶ 101; 195 ¶ 101.  Sheriff Talton initially thought Lange's revelation was a joke.  Docs. 179-3 ¶ 102; 195 ¶ 102.  Sheriff Talton then told Lange that he doesn't "believe in sex changes."  Docs. 179-3 ¶ 103; 195 ¶ 103.  Nonetheless, the Sheriff ultimately granted Lange permission to dress as a female but also warned her she would need "tough skin" to deal with her coworkers.  Docs. 179-3 ¶¶ 106-107; 195 ¶¶ 106-107.

The following day, Lange came out to her coworkers in the Criminal Investigation Division ("CID") during a meeting chaired by Sheriff Talton.  Docs. 179-3 ¶¶ 111, 112; 195 ¶¶ 111, 112.  Despite acknowledging that Lange's transition was "sensitive and a

serious subject," Sheriff Talton repeated his sentiment that he "didn't believe in all this" during the meeting.  Docs. 179-3 ¶ 112; 195 ¶ 112.  And perhaps in tacit acknowledgement of the CID's boisterous atmosphere, Sheriff Talton told the group that what Lange did "takes big balls."  Docs. 179-3 ¶ 113; 195 ¶ 113.

**B. Lange's "Sex Change" Surgery is Denied Pursuant to the County's Exclusion**

*1. Lange's Gender Confirmation Surgery is Denied*

Anthem initially told Lange that her gender confirmation surgery would be covered if it was "medically necessary" under Anthem's Guideline.  Docs. 179-3 ¶ 115; 195 ¶ 115.  This, the County contends, was a misunderstanding, due to Anthem's failure to note the County's position on the 2017 plan year renewal document.  Docs. 179-3 ¶ 92; 195 ¶ 92.  According to Anthem's records, the County had not opted-out of the nondiscrimination mandate.  Docs. 179-3 ¶ 126; 195 ¶ 126.  In consultation with the County's insurance broker, Carter worked with Anthem to ensure the Exclusion remained intact.[1]  Docs. 179-3 ¶ 128; 195 ¶ 128.  The parties dispute whether this was a retroactive "opt-out" or whether the County was merely attempting to "correct the record."  Docs. 179-3 ¶ 133; 195 ¶ 133.  In any event, it is undisputed that cost was not a factor in the County's decision to opt out of the nondiscrimination mandate.  Docs. 179-3 ¶ 135; 195 ¶ 135.

On November 30, 2018, Lange was denied pre-authorization for gender confirmation surgery in accordance with the Exclusion.  Docs. 179-3 ¶ 129; 195 ¶ 129. Lange appealed, and that appeal was denied on January 23, 2019.  Docs. 179-3 ¶ 145; 195 ¶ 145.  In a final attempt to have the Exclusion removed and her surgery covered,

---

[1] Anthem reinstated the Exclusion but required the County to agree that the County "will be responsible for any penalties that result if the plan is determined to be noncompliant."  Docs. 179-3 ¶ 160; 195 ¶ 160.

Lange presented her case to the County Commissioners during a public meeting on February 19, 2019.  Docs. 179-3 ¶¶ 167-170; 195 ¶¶ 167-170.  The County Attorney, speaking for the County, informed Lange the Commissioners are "not considering any changes to the plan at this time" and that he further advised the Commission "not to discuss this matter due to the potential for litigation."  Docs. 179-3 ¶ 173; 195 ¶ 173. The County did not consider any cost information prior to deciding not to consider Lange's request to remove the Exclusion.  Docs. 179-3 ¶ 174; 195 ¶ 174.

   *2. The County Decides to Keep the Exclusion*

   Lange filed EEOC charges against the County and was issued a right-to-sue letter on July 8, 2019.  Docs. 179-3 ¶ 180; 195 ¶ 180.  With potential litigation on the table, the County sought information from Anthem about the cost of gender reassignment surgery on September 30, 2019.  Docs. 179-3 ¶¶ 186, 188; 195 ¶¶ 186, 188.  Anthem responded that such costs could total $186,100, but that the specific procedure Lange sought—a genital vaginoplasty—was estimated only to cost $25,600. Docs. 179-3 ¶ 189; 195 ¶ 189.  Anthem also concluded that that utilization of gender-confirming care was low.  Docs. 179-3 ¶ 226; 195 ¶ 226.

   On November 19, 2019, the County Commissioners voted "unanimously by all to approve the recommended cost-sharing to plan participants and the premium increases to retirees as presented and that the 68 plan exclusions and 29 pharmacy benefits exclusions remain in place."  Docs. 179-3 ¶ 209; 195 ¶ 209.  The County contends this was done to keep down the overall costs of the plan.  Doc. 179-3 ¶ 213.  Specifically, the County was concerned that eliminating one exclusion would lead to requests or legal action to remove other exclusions.  Doc. 179-3 ¶ 214.

**C. Procedural Summary**

Lange's operative complaint alleges the adoption and maintenance of the Exclusion violates the Equal Protection Clause of the U.S. Constitution, the Equal Protection guarantee of the Georgia Constitution, Title VII, Title I and Title II of the ADA, and the Rehabilitation Act of 1973.  Doc. 56.  On the defendants' motions, the Court dismissed Lange's ADA Title II claim, Georgia equal protection claim, and individual capacity federal equal protection claim against numerous defendants, including Sheriff Talton.  Doc. 89 at 36.  Accordingly, the only claims that remain are Lange's federal equal protection claim against the County and the Sheriff in his official capacity, Lange's Title VII claim against the County and the Sheriff in his official capacity, and Lange's ADA Title I claim against the County and the Sheriff in his official capacity.  *Id.* at 37.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Id.*  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438). The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material

*negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (cleaned up).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted).  The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

### III. DISCUSSION

The Court first addresses issues concerning the reach and scope of Lange's claims.

## A. Sheriff Talton's Immunity and the County's Agency

*1. The County is an "Agent" for Purposes of Title VII and the ADA*

Liability under Title VII and the ADA is the employer's.  *Busby v. Cty. of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (Title VII); *Mason v. Stallings*, 82 F.3d 1007, 1009

(11th Cir. 1996) (ADA).  But Title VII and the ADA both define "employer" to include an employer's agents.  42 U.S.C. §§ 12111(5)(A); 2000e(b).  That definition must be construed liberally.  *Cty. of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 718 n.33 (1978); *Williams v. Cty. of Montgomery*, 742 F.2d 586, 588 (11th Cir. 1984), *cert. denied*, 470 U.S. 1053 (1985).  "Where the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship." *Williams*, 742 F.2d. at 589 (quoting Schlei & Grossman, *Employment Discrimination Law* at 1002 (2d ed. 1983)).[2]  Lange contends that the Sheriff delegated to the County the authority to provide healthcare benefits to the Sheriff's employees, and thus, the County is an "employer."

In *Williams*, the Eleventh Circuit held that the City of Montgomery and its agent, the Montgomery City-County Personnel Board, were both liable for racial discrimination under Title VII.  742 F.2d. at 589.  In that case, the Board exercised rights traditionally reserved to the employer.  *Id.*  Among other things, the Board established a pay plan, formulated minimum standards for jobs, evaluated employees, and reinstated employees in the competitive service.  *Id.*  Because these functions were traditionally exercised by an employer, the Eleventh Circuit held the Board was an agent of the City and Title VII liability applied to both entities.  *Id.*  Thus, when the Board allegedly

---

[2] *See also Tolar v. Bradley Arant Boult Cummings*, 2014 WL 12836011, at *7 (N.D. Ala. Nov. 18, 2014) (collecting cases in which agents' control of a specific employment practice, such as health care, determined employer status under Title VII); *Fike v. Gold Kist, Inc.,* 514 F. Supp. 722, 728 (N.D. Ala. 1981), *aff'd,* 664 F.2d 295 (11th Cir. 1981) ("an agency relationship which establishes an 'employment nexus'" wherein one corporation is the "agent of the other with respect to employment practices" is sufficient to establish employer status under Title VII); *Ingber v. Ramada Inns, Inc.*, 1979 WL 280, at *3 (N.D. Ga. Aug. 7, 1979) (finding that the "ultimate question" for determining an agent's employer status under Title VII was whether one company functioned as the other's agent with respect to employment practices).

violated Title VII by refusing to reinstate a black firefighter, it was liable as an agent of the City.

Here, Sheriff Talton delegated the authority to the County to provide and administer healthcare benefits to his employees.  Docs. 179-3 ¶ 60; 195 ¶ 60.  The County—on behalf of the Sheriff—provided the Sheriff's employees a health insurance plan containing the Exclusion and, in the administration of that plan, it denied Lange's claim for medically necessary treatment.  Docs. 179-3 ¶¶  60, 75, 129; 195 ¶¶ 60, 75, 129.  In short, the County acted as an agent of the Sheriff because the County provided a health insurance plan to the Sheriff's deputies—a function traditionally exercised by an employer.  *Williams*, 742 F.2d at 589.

The County admits all of this.  Docs. 137-2 at 8-11; 180 at 30.  But it argues that Georgia law provides that sheriffs alone have the authority to decide whether and how to provide healthcare benefits to their employees.  *Id*.  True, but the County cites no law prohibiting what happened here—the Sheriff's delegation to the County the authority to provide and administer, on behalf of the Sheriff, healthcare benefits for his employees. The well-established law that a sheriff's employees are not county employees does not preclude a sheriff from outsourcing employer functions.  In other words, just because Sheriff Talton alone chooses how a health insurance plan is provided to his employees does not mean the County does not act as an agent when it provides health coverage at the express delegation of the Sheriff.  *See Williams*, 742 F.2d at 589.

In sum, it is undisputed that the County acted as the Sheriff's agent.  If the County violated Title VII and the ADA, the County, as an agent, is liable.

*2. Sheriff Talton Functions as an "Arm of the State" When Providing Healthcare Benefits to His Employees*

Sheriff Talton argues he is entitled to Eleventh Amendment immunity from Lange's equal protection and ADA claims because a sheriff acts as an "arm of the state" when he pays "wages" to his employees, and healthcare benefits are wages as part of his "deputies' compensation package."  Doc. 136-9 at 5-11.  The Sheriff is correct—healthcare benefits are a form of compensation—and that much Lange does not dispute.  Rather, Lange contends immunity is inappropriate because the State of Georgia would neither be responsible for a monetary judgment against the Sheriff nor does the State exercise control over the County's health insurance plan.  Doc. 178 at 49-52.

First, it is not just the Eleventh Amendment that bars § 1983 claims for damages against sheriffs in their official capacities.[3]  States—and, by extension, arms of the state—are not "persons" within the meaning of § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  And § 1983 subjects only "persons" to monetary liability for violations of constitutional rights.  But the questions of whether Sheriff Talton is a "person" subject to § 1983 liability and whether Sheriff Talton is entitled to Eleventh Amendment immunity from the ADA both turn on whether the Sheriff functioned as an arm of the state when he provided healthcare benefits to his employees.  In other words, the "personhood" analysis is the same as the Eleventh Amendment analysis.

---

[3] For the most part, it may only be of academic interest that courts repeatedly dismiss § 1983 claims against states and state agents, in their official capacities, on Eleventh Amendment grounds rather than because they are not "persons" subject to § 1983 liability for damages.  *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1301-02 (11th Cir. 2007); *Pellitteri v. Prine*, 776 F.3d 777, 779-80 (11th Cir. 2015).  That is because the result is the same either way— the claims fail.  But in some cases, this distinction can be significant, such as when a state removes an action to federal court.  *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002).

*United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 606 n.9 (11th Cir. 2014).[4]

      "Under the traditional Eleventh Amendment paradigm, states are extended immunity, counties and similar municipal corporations are not, and entities that share characteristics of both require a case-by-case analysis."  *Lesinski*, 739 F.3d at 601 (citing *Mt. Healthy Cty. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)).  In the Eleventh Circuit, this case-by-case analysis is conducted by applying the factors set forth in *Manders v. Lee*. 338 F.3d 1304, 1308-09 (11th Cir. 2003).[5]  When a county or municipality is acting in concert with an agent or instrumentally of the state, a *Manders* analysis is appropriate to determine the agency's status as either a state or local government actor when performing the specific function at issue.  *Monroe v. Fort Valley State Univ.*, ___F. Supp. 3d___, 2021 WL 5451145, at *6 (M.D. Ga. Nov. 22, 2021) (citations omitted).  But "when a state-created entity only serves the state, a *Manders* analysis is a pointless exercise."  *Id.*

      Both parties agree the function at issue is Sheriff Talton's provision of healthcare benefits to his employees.  Docs. 136-9 at 5-11; 178 at 49-52.  But with the benefit of discovery, Lange does not suggest that function was performed for or on behalf of the County.  *See* Doc. 178 at 49-52.  And during oral argument, Lange conceded Sheriff

---

[4] *Lesinski*, which addressed whether a *qui tam* action could be brought against a state created agency, was not an Eleventh Amendment case.  739 F.3d at 602.  Rather, it borrowed "Eleventh Amendment arm of the state analysis to determine whether a state entity is a 'person' subject to FCA liability."  *Id.*  Still, *Lesinski* is instructive because the Eleventh Circuit noted "that the analysis for the two questions is identical."  *Id.* at 606 n.9.

[5] *Manders* also notes that if a Sheriff is acting as an arm of the state when exercising certain functions, then the issue arises of whether any § 1983 suit is also "subject to dismissal on the independent ground that sheriffs are not 'persons' for purposes of § 1983."  338 F.3d at 1328 n.53 (citing *Will*, 491 U.S. at 71).  But because this statutory question was not briefed on appeal, *Manders* did not address it.  *Id.*

Talton was acting on his own behalf and not on behalf of the County.  Doc. 197 at

16:24-17:8.  Instead, Lange reasons that because Sheriff Talton was acting on his own

behalf when he adopted the County's health insurance plan, he could not be acting as

an arm of the state.  *See id*.  That is not how it works.

While a *Manders* analysis is frequently necessary when sheriffs are sued, it is

only necessary when there is a colorable question of whether the sheriff acted in his

capacity as a state officer or on behalf of some non-state governmental entity such as

the county he serves.  *See, e.g.*, *Manders*, 338 F.3d at 1305-06 (whether the sheriff

acts as an arm of the state when he establishes use-of-force policies at the county jail);

*Abusaid v. Hillsborough Cnty. Bd. of Cnty. Com'rs*, 405 F.3d 1298, 1309 (11th Cir.

2005) (whether the sheriff acts as an arm of the state when he enforces county

ordinances).  In this case, a *Manders* analysis is not required because Lange concedes

the Sheriff was not providing a health insurance plan to his employees on behalf of the

County.  *Monroe*, 2021 WL 5451145, at *6.  In other words, Sheriff Talton never

stepped outside his arm of the state position.

Accordingly, Lange's Equal Protection claim for damages pursuant to § 1983 fails

because Sheriff Talton is an arm of the state and, thus, not a "person" for the purposes

of that statute.[6]  Similarly, as an arm of the state, Sheriff Talton is entitled to Eleventh

---

[6] Even if a *Manders* analysis were appropriate, it is well settled that a sheriff acts as an arm of the state when carrying out employment decisions.  *See Pellitteri*, 776 F.3d at 779.  Employment decisions include compensation.  *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 757 (11th Cir. 2014); *see also Kicklighter v. Goodrich*, 162 F. Supp. 3d 1363, 1376 (S.D. Ga. 2016) ("Despite being distinguishable, [functions of hiring, firing, and compensation of employees] have been treated as one for purposes of the *Manders* inquiry.").  And while it has not been explicitly discussed in the *Manders* context, group health insurance plans are a form of compensation.  *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983).  Again, the parties do not dispute that.

Amendment immunity from Lange's ADA claim for monetary damages.[7]  *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001).

**B. Fact Issues Preclude Summary Judgment on Lange's Equal Protection Claim**

Section 1983 allows a plaintiff to seek relief when "deprived of a right 'secured by the Constitution and laws'" of the United States.  *Baker v. McCollan*, 443 U.S. 137, 140 (1979) (quoting 42 U.S.C. § 1983).  "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker*, 443 U.S. at 144 n.3).  Lange seeks relief under the Equal Protection Clause of the Fourteenth Amendment which guarantees "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.

*1. The Exclusion Is Not Facially Discriminatory Under the Equal Protection Clause*

There are three categories of equal protection claims.  *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987) (citations omitted).  First, a classification may violate the Equation Protection Clause if it discriminates "on its face."  *Id.*  "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications*."  Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).  Second, a facially

---

[7] Lange may seek injunctive and declaratory relief against Sheriff Talton under § 1983 and the ADA.  *Ex Parte Young*, 209 U.S. 123, 159-160 (1908).  When a state official in his official capacity is sued for such relief, that official "would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."  *Will*, 491 U.S. at 71 n.10 (quotation omitted).  Similarly, the Eleventh Amendment does not bar prospective relief.  *Garrett*, 531 U.S. at 374 n.9.  Sheriff Talton's Eleventh Amendment immunity does not, however, extend to the County as an agent of Sheriff Talton for the purposes of Lange's ADA claim.  *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1334 (11th Cir. 2007) (finding that derivative sovereign immunity was not available to a government contractor because "status as a common law agent is not a sufficient condition for derivative sovereign immunity."); *see also Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 125 (2d Cir. 2021) (declining to extend the Federal Tort Claims Act combatant activities defense to government contractors).

neutral classification may discriminate in its purpose or effect by having a "disparate impact" on a particular class. *E & T Realty,* 830 F.2d at 1112 n.5. Third, a facially neutral policy may be unequally administered as applied to the plaintiff. *Id.* Facially neutral classifications are unconstitutional when they are intended to affect a protected class and fail the applicable level of scrutiny.[8] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-73 (1979).

Lange does not argue the Exclusion facially discriminates on the basis of sex. Doc. 187 at 20. Understandably so, the Supreme Court has foreclosed that argument. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974). In *Geduldig*, the Supreme Court held a state insurance policy that excluded coverage for a medical procedure that only one sex can undergo did not classify on the basis of sex. *Id.* at 495-97. Rather, the classification was based on a medical condition. *Id.* at 496-97. The classification created two groups—pregnant and nonpregnant people. *Id.* at 496 n.20. Although "the first group is exclusively female," the Court reasoned "the second includes members of both sexes," which revealed a "lack of identity" between pregnancy and sex. *Id.* The Court noted that there was "no risk from which men are protected and women are not. Likewise, there is no risk from which women are protected and men are not." *Id.* at 496.

According to the logic of *Geduldig*, Lange has the same coverage as other employees because the Exclusion applies equally to a male seeking to become a woman or a woman seeking to become a man. And even if transgender individuals are

---

[8] Lange contends heightened scrutiny is appropriate because the Exclusion discriminates on the basis of sex, or in the alternative, that transgender status is a quasi-suspect class requiring heightened scrutiny. Doc. 140-1 at 34-35. In the Eleventh Circuit, controlling precedent holds "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011).

entitled to protection under the Equal Protection Clause as a separate and distinct class from that of males and females, the same logic would apply.  In other words, the Exclusion creates two groups—those that want a "sex change" and those that do not.  Both groups contain transgender members and non-transgender members, so a "lack of identity" exists between the policy and transgender status.  Thus, in the context of the Equal Protection Clause, the Exclusion does not facially discriminate on the basis of sex.[9]

### *2. Whether Lange Can Establish Invidious Discrimination is a Disputed Fact*

Lange argues the Exclusion, although facially neutral pursuant to *Geduldig,* nonetheless violates the Equal Protection Clause because it has "a disproportionate impact on transgender individuals and [was] motivated by discriminatory intent."  Doc. 187 at 20.  Determining discriminatory intent is guided by an eight-factor test: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; … (5) the contemporary statements and actions of key legislators; … (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives."  *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (cleaned up) (quoting *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021)).

---

[9] *Glenn* observed that the analysis to determine whether an employer's actions were sex discrimination is the same under the Equal Protection Clause and Title VII.  663 F.3d at 1321 ("If this were a Title VII case, the analysis would end here") (citing *Lewis v. Smith*, 731 F.2d 1535, 1537-38 (11th Cir.1984)).  Certainly, there are cases where this may hold true.  But *Glenn* has no bearing on the issue of whether an insurance exclusion based on a medical procedure that only one sex can undergo is facially discriminatory under the Equal Protection Clause because *Geduldig* already provides the answer.  417 U.S. at 496 n.20.

The parties do not address all eight factors.  But after a careful review of the record, it is clear material disputes of fact preclude summary judgment for any of the parties.

**The Impact of the Challenged Law**.  The impact of the Exclusion is no secret—the defendants admit "that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.'"  Docs. 179-3 ¶ 78; 195 ¶ 78.  And Lange is the only openly transgender member of the defendants' health insurance plan.  Docs. 179-3 ¶ 30; 195 ¶ 30.  But while "impact provides an important starting point, purposeful discrimination is the condition that offends the Constitution."  *Feeney*, 442 U.S. at 274 (cleaned up).

**The Historical Background and the Specific Sequence of Events Leading Up to the Exclusion**.  There is no direct evidence shedding light on why the Exclusion was adopted in 1998.[10]  One reason could have been cost control.  Certainly, the County *now* professes concern about costs, but that argument is undercut by the undisputed fact that the County built its cost defense after the fact.  *See* Docs. 179-3 ¶ 135; 195 ¶ 135.  And the Exclusion impacts only transgender individuals—that provides some circumstantial evidence of intentional discrimination.

**Procedural and Substantive Departures**.  The County chose not to accept the non-discrimination mandate and instead maintained the Exclusion notwithstanding Anthem's recommendation that it be removed.  Docs. 179-3 ¶ 91; 195 ¶ 91.  Of course,

---

[10] The Court refers here to direct and circumstantial evidence in the general sense, not in the *McDonnell Douglas* sense.  *See, e,g.*, *Eleventh Circuit Pattern Jury Instructions (Civil Cases)* 3.3 (2022) ("There's no legal difference in the weight you may give to either direct or circumstantial evidence."); *see also United States v. Barnette*, 800 F.2d 1558, 1566 (11th Cir. 1986), *reh'g denied*, 807 F.2d 999 (11th Cir. 1986), *cert. denied*, 480 U.S. 935 (1987) (noting that the "test for evaluating circumstantial evidence is the same as in evaluating direct evidence") (citing *United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982)).

the mandate arose from § 1557 of the Affordable Care Act, and the County concluded

that its self-funded plan did not fall within the mandate's scope.  Doc. 180 at 3.  Still,

Lange contends the mandate, even if technically not applicable, substantively gave

notice to the County that the Exclusion was discriminatory, yet the County maintained—

or reinstated—the Exclusion nonetheless.  Doc. 140-1 at 29.  Similarly, Lange argues

the County's refusal to consider an exception for Lange's "sex change" surgery

demonstrates discriminatory intent.  *Id.* at 30.

**The Contemporary Statements and Actions of Key Legislators**.  Sheriff

Talton didn't "believe in sex changes," and the County didn't consider the cost of

removing the Exclusion before it declined to do so.  Docs. 179-3 ¶¶ 103, 174; 195 ¶¶

103, 174.  On the other hand, because annual plan costs rose by over 17% in 2018–

2019 it could be that the County wasn't interested in taking any action that would cause

it to pay any more than it was already obligated to pay under the existing terms of the

health insurance plan.  *See* Docs. 137-1 ¶ 37; 178-1 ¶ 37.

**The Foreseeability of the Impact and Knowledge of the Impact**.  These

factors tend to favor Lange.  It is undisputed the Exclusion affected only transgender

members, Lange is the only openly transgender member, and the County, based on the

Exclusion, has refused to authorize medically necessary treatment.

**The Availability of Less Discriminatory Alternatives**.  There is no evidence

the County considered less discriminatory alternatives.

In sum, the facts are hotly disputed.  The Court cannot say as a matter of law

whether, under the Equal Protection Clause, the adoption and maintenance of the

Exclusion was motivated by discriminatory intent.  The parties' motions for summary judgment (Docs. 136; 137; 140) on equal protection grounds are **DENIED**.[11]

**C. Lange is Entitled to Partial Summary Judgment on Her Title VII Claim**

At first look, it may seem odd that the question of whether the Exclusion violates the Equal Protection Clause is one of fact while the question of whether the Exclusion violates Title VII can be decided as a matter of law.  Whether odd or not, the reason is clear— *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731 (2020).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Sex discrimination under Title VII includes discrimination based on sexual orientation and discrimination based on gender stereotyping because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  *Bostock*, 140 S. Ct. at 1741.  And as *Bostock* makes clear, "because of" sex means that "a particular outcome would not have happened 'but for' the purported cause."  *Id.* at 1739.  Denying healthcare coverage "because of" sex unquestionably violates Title VII because those benefits are "compensation, terms, conditions, or privileges of employment" under the Act.  *Newport News*, 462 U.S. at 682 (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also Manhart*, 435 U.S. at 710 ("[T]here is no reason to believe that Congress intended a

---

[11] Because there is a genuine dispute of material fact as to whether the adoption and maintenance of the Exclusion was done with discriminatory intent, the Court does not reach the question of whether the Exclusion would subsequently survive intermediate scrutiny.

special definition of discrimination in the context of employee group insurance

coverage.").

A facially discriminatory employer action against a member of a protected class

violates Title VII.[12]  *Johnson Controls, Inc.*, 499 U.S. at 206.  And if an adverse

employment action is facially discriminatory, the employer's intent is immaterial—"the

absence of a malevolent motive does not convert a facially discriminatory policy into a

neutral policy with a discriminatory effect."  *Id.* at 199.  Here, it is undisputed that the

Exclusion is facially discriminatory.

The relevant facts are neatly summarized in Lange's Statements of Material Fact

77 and 78.

> **77. The Exclusion denies coverage for procedures and treatments that
> would otherwise be covered if provided in connection with a different
> diagnosis.**  *See* Grant Decl., Ex. A Carter Dep. at 6:7-13 (agreeing that "without
> an exclusion, gender confirmation surgery would be covered under a health plan
> administered by Anthem if it was medically necessary"); *id.* at 35:9-15 (Q: "Would
> exclusion 57 exclude a mastectomy sought for cancer treatment?" A: "No." Q:
> "But would exclusion 57 prevent coverage of a mastectomy if it was used to treat
> gender dysphoria?" A: "Yes."); 37:9-16 (Q: "Exclusion 26 would not exclude
> hormone replacement therapy to treat menopause?" A: "No, not as I understand
> it." Q: "But would exclusion 26 prevent hormone replacement therapy if used to
> treat gender dysphoria?" A: "As I understand it, yes."); 103:10-22 (Q: "Is mental
> healthcare generally covered under the plan?" A: "Yes." Q: "So it becomes not
> covered when it's related to transgender treatment?" A: "Well, yes [.] When it is
> because of transgender surgery or whatever it may be, then it is not covered.");
> Grant Decl., Ex. F Clark Dep. at 100:6-10 (Q: "So were you saying that if [mental
> health] counseling were done for the purpose of treating gender dysphoria, then
> it would not be covered because of the exclusion?" A: "Yes."); Grant Decl., Ex. H
> HC Dep. (B. Holland) at 27:16–20 (Q: "Would any mental health counseling
> around transitioning be excluded under this exclusion?" A: "I believe it would, if it
> was specific to transitioning, yes."); Grant Decl., Ex. B Sheriff Talton Dep. at 55:

---

[12] The only exception is if the employer can establish a bona fide occupational qualification ("BFOQ")
justifying the action.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991).  "To prove a BFOQ, the employer must show that [the
protected characteristic] is a qualification 'reasonably necessary to the normal operation of that particular
business or enterprise.'"  *Garrett v. Okaloosa Cnty.*, 734 F.2d 621, 624 (11th Cir. 1984) (citation omitted).
Neither Sheriff Talton nor the County argue that a BFOQ justifies the Exclusion.

6–12 (Q: "Do you know if . . . mastectomies, you know, breast surgery . . . in the context of breast cancer, whether that's covered by the policy?" A: "I understand [if] it is about breast cancer, things like that, yes.").

RESPONSE: Disputed to the extent Plaintiff suggests that all treatment for gender dysphoria is excluded.  Plaintiff testified that her endocrinologist visits, psychological visits, and hormones and other medications have been covered by the Health Plan. (Doc. 137-3 at 48:19-49:15.)

Docs. 179-3 ¶ 77; 195 ¶ 77.

**78. Defendants admits "that the only Health Plan participants impacted by the Exclusion are transgender people seeking a 'sex change.'"** Grant Decl., Ex. N Defs.' Resp. to First Set of RFAs at No. 5.

RESPONSE: Undisputed.

Docs. 179-3 ¶ 78; 195 ¶ 78.

The defendants' qualification of their admission of Statement of Fact 77 is well taken.  Notwithstanding the County's apparent belief that the Exclusion bars all treatment for gender dysphoria (a belief providing some evidence of discriminatory intent), that plainly is not what the Exclusion says: it excludes coverage for sex change surgery and drugs related to sex change surgery.  That qualification, however, is immaterial to the question of whether the Exclusion is facially discriminatory.  The fact of the matter is, for example, that the plan pays for mastectomies when medically necessary for cancer treatment but not when mastectomies are medically necessary for sex change surgery.  And the plan pays for hormone replacement therapy medically necessary for the treatment of menopause, but not hormone replacement therapy medically necessary for "sex change."  The undisputed, ultimate point is that the Exclusion applies only to transgender members, and it applies to Lange because she is transgender.

The defendants' effort to mitigate the necessary implication of these admissions is damning.

> Since the plan covers some treatments related to her transgender status, it can only be said that the County's health plan differentiates on the basis of transgender individuals *who want transition surgery.*

Doc. 201 at 3.

Precisely.  Transgender employees cannot get medically necessary treatment for "sex change" medical care because they are transgender.  On these undisputed facts, the implication of *Bostock* is clear.

In *Bostock*, the Supreme Court recognized that Title VII delivers a message "equally simple and momentous: [a]n individual's … transgender status is not relevant to employment decisions."  140 S. Ct. at 1741.  Since the Supreme Court's decision, the defendants have struggled to marshal responses to this clear message.  For example, *Bostock* had not been decided when the defendants moved to dismiss Lange's complaint, but it had when the Court heard oral argument on the motions.  At that hearing, the following exchange took place:

> THE COURT: So let me be sure.  I think in your initial brief you raised the argument that this particular exclusion is not a Title VII violation because it impacts both male and female transgender people.  You don't make that argument anymore?

> COUNSEL: Your Honor, I think *Bostock* changes the landscape in that regard.  I think that was a viable argument when we made it back in April or May, whenever that brief was filed initially, before *Bostock* was decided in June.

Doc. 88 at 10:16-24.

But the defendants attempt to resurrect that argument to support their motions for summary judgment.  Specifically, they argue, without even a nod this time to *Bostock*, that the Exclusion cannot be discriminatory because it applies to "participants of both

sexes (regardless of gender)."  Docs. 136-9 at 16, 137-2 at 15.  But, as defendants

properly conceded initially, *Bostock* precludes that argument:

> Nor is it a defense for an employer to say it discriminates against both men and women because of sex.  This statute works to protect individuals of both sexes from discrimination, and does so equally.  So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.

140 S. Ct. at 1741.

Ignoring *Bostock* doesn't make it go away.  Yet the defendants' main briefs

relegate *Bostock* to a footnote in which they argue that the Supreme Court did not

create a new suspect class, but rather:

> the Supreme Court broadened the understanding of what amounts to "sex" discrimination.  Thus, for purposes of her Title VII claim, the issue is not whether the sex reassignment surgery exclusion discriminates on the basis of transgender status; Plaintiff must show it discriminates on the basis of sex.

Docs. 136-9 at 16 n.10; 137-2 at 14-15 n.11.

The defendants' point is not clear, but *Bostock* covers any possible intended

point—discrimination on the basis of transgender status is discrimination on the basis of

sex and is a violation of Title VII.

Given the import of the undisputed facts and the defendants' failure to address

*Bostock* in any meaningful way, the Court requested supplemental briefing on the

following question:

> Whether an exclusion in an employee healthcare benefit plan that excludes medically necessary coverage because of transgender status necessarily is a violation of Title VII.

Doc. 200.

The defendants' supplemental brief is telling.  They begin by acknowledging that sex "is deemed to include transgender status, and, therefore, an employer who takes an adverse employment action against 'an individual *merely for being* … transgender defies [Title VII].'"  Doc. 201 at 1.  The defendants do not explain why they emphasize "merely," but the Court notes that *Bostock* confirms that Title VII requires only "but for" causation.[13]  As framed, the issue for supplemental briefing clearly encompasses but-for causation.

The defendants then argue that there are only two "sets of circumstances in which a health plan could discriminate on the basis of … transgender status in violation of Title VII, neither of which is present in this case."  Doc. 201 at 1-2.  First, the defendants argue a plan violates Title VII if it "offer[s] a *different* coverage package to participants based on their sex or transgender status."  *Id.* at 2.  Second, "a plan violates Title VII if it *completely* excludes coverage for transgender care."  *Id.*  Because Lange has been offered the same coverage as other participants and the plan covers some treatment relating to Lange's transgender status, the defendants conclude the Exclusion is not facially discriminatory.  *Id.*  Under *Bostock*, neither argument has merit.

The defendants' first argument fails on its face.  The suggestion that an employer with a single health insurance plan could fill the plan with discriminatory exclusions and avoid Title VII liability because the employer offered that one "coverage package" to all employees lacks any merit.  The two cases defendants cite to support their argument make that clear.  In *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, the Supreme

---

[13] "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision."  *Bostock*, 140 S. Ct. at 1739.  Indeed, if "the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law."  *Id.*

Court held that a health insurance plan that provided different pregnancy benefits to female employees than to spouses of male employees violated Title VII.  462 U.S. at 685.  And in *City of Los Angeles v. Manhart*, the Supreme Court held that a pension plan requiring higher contributions from females because females live longer, violated Title VII notwithstanding the actuarial soundness of the scheme—charging women higher premiums because they are women violated Title VII.[14]  435 U.S. at 709.  Neither case remotely supports the proposition that health insurance plans run afoul of Title VII only if an employer provides "different coverage packages."  As the Supreme Court said in *Manhart*, there is no "special definition of discrimination" for employee benefits plans.[15]  435 U.S. at 710.

The defendants' second argument—the Exclusion is lawful because it excludes only some treatment because of transgender status—has, if possible, even less merit. For authority, the defendants cite recent district court cases finding unlawful insurance

---

[14] The defendants' first argument actually appears to be a strained reading of *General Electric Company v. Gilbert*, 429 U.S. 125 (1976).  It is instructive to examine *Gilbert*.  There, the Court upheld an exclusion in a disability plan for women unable to work because of pregnancy or childbirth.  The Court reasoned the plan did not classify by "gender as such," because one of the two groups comprised "non-pregnant persons" and thus "included members of both sexes."  *Id.* at 134-35.  The Court concluded the exclusion alone was not proof of discrimination against women.  That reasoning, of course, is taken directly from *Geduldig's* equal protection analysis.  The dissent in *Gilbert* took issue with the majority's assumption "that the Fourteenth Amendment standard of discrimination is coterminous with that applicable to Title VII," in part because the "word 'discriminate' does not appear in the Equal Protection Clause."  *Id.* at 154 n.6 (Brennan, J., dissenting); *id.* at 160-61 (Stevens, J., dissenting).  In other words, the *Gilbert* dissenters argued the majority improperly imported *Geduldig* into Title VII.  Congress legislatively overruled *Gilbert,* and the Supreme Court in *Newport News* made clear the extent of *Gilbert's* abrogation.  Congress, the Supreme Court concluded, not only overturned *Gilbert*, but it also made clear that its *Geduldig*-based reasoning had no place in Title VII analysis.  Thus, a benefit plan that provides less coverage because of sex violates Title VII.  That is precisely what the County's health insurance plan does.

[15] To state the obvious, cost savings cannot justify a facially discriminatory policy.  "[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII."  *Manhart*, 435 U.S.at 717; *see also Newport News*, 462 U.S. at 685 n.26 ("[No cost justification] is recognized under Title VII once discrimination has been shown.").  Although the parties debate whether the County's professed desire to save money is relevant to disprove discriminatory intent or to provide a legitimate nondiscriminatory reason appropriate in a *McDonnell Douglas* analysis, that debate has no place here.

plan exclusions for transgender healthcare but argue these cases turn on the blanket exclusion of benefits for transgender-related medical care. *See* Doc. 201 at 2-3. As Lange points out, they do no such thing.[16] Also, this argument is simply a rearranged version of the first argument—an employer, the defendants maintain, can lawfully refuse to pay benefits because of transgender status for some conditions as long as it pays benefits to transgenders for other services. Title VII does not exempt "partial" violations. *See* 42 U.S.C. § 2000e-2(a)(1).

In short, the defendants can't find a *Bostock* workaround. That is understandable. The Exclusion plainly discriminates because of transgender status. Accordingly, Lange's motion for summary judgment (Doc. 140) on Title VII grounds as to Sheriff Talton and the County is **GRANTED in part**. Lange does not address appropriate relief. That issue remains.

## D. Lange's ADA Claim Fails

Finally, Lange alleges the Exclusion discriminates on the basis of her gender dysphoria and thus violates Title I of the ADA. Doc. 140-1 at 21, 37-45. Congress enacted the ADA in 1990 to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I of the ADA prohibits certain discrimination because of disability in employment settings. *Id.* §§ 12111-12117. But the ADA does not cover all disabilities. Specifically, the ADA excludes from the definition of disability "gender identity disorders

---

[16] For example, in *Fletcher v. Alaska*—a case decided three months before *Bostock*—the district court held a state health insurance policy that excluded coverage for sex reassignment surgery was facially discriminatory under Title VII. 443 F. Supp. 3d 1024, 1030 (D. Alaska 2020). *Fletcher* did not turn on a partial versus a blanket exclusion, but rather on the simple principle that because the plaintiff "was treated differently because of her natal sex," that is "discrimination because of sex and makes defendant's formal policy … facially discriminatory." *Id.*

not resulting from physical impairments." *Id.* § 12211(b)(1).  Lange contends that because the text of 42 U.S.C. § 12211(b) makes no express mention of gender dysphoria, that condition is not excluded.  Doc. 178 at 38.  And even if the ADA's gender identity disorders exclusion did apply to gender dysphoria, Lange argues she has sufficient evidence to demonstrate her condition resulted from a physical impairment.  Both arguments are without merit.

*1. Gender Dysphoria is Subject to the ADA's Gender Identity Disorders Exclusion*

The exclusionary language of the ADA at issue has not been amended since it was enacted in 1990.  42 U.S.C. § 12211(b).  While not explicitly mentioned by Lange, her argument that gender dysphoria is not subject to the exclusion appears to rest on the "interpretive canon, *expressio unius est exclusio alterius*, 'expressing one item of [an] associated group or series excludes another left unmentioned.'"  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002)).  In other words, because the ADA's exclusionary language makes no mention of gender dysphoria, gender dysphoria is not subject to the exclusion.

"The force of any negative implication, however, depends on context."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013).  Indeed, "the *expressio unius* canon does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'"  *Id.* (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)).  That didn't happen here because gender dysphoria first appeared as a diagnosis in 2013 when the American Psychiatric Association published the Fifth Edition of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V").  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental*

*Disorders – Fifth Edition*, at 451 (2013).  So regardless of whether gender dysphoria is a "replacement diagnosis," as the defendants argue, or a "new and distinct" diagnosis, as Lange contends, the fact that it was not mentioned in the exclusionary language of the ADA is not determinative because the diagnosis did not exist at the time the Act was written.  *See Marx*, 568 U.S. at 381.

More fundamentally, Lange's statutory construct builds on a false premise.  She argues the diagnosis of gender dysphoria is not the same as the diagnosis of gender identity disorder.  But Congress did not limit the exclusion to a single diagnosis or a single condition.  Rather, Congress excluded from the coverage of the ADA "gender identity disorders."  42 U.S.C. § 12211(b)(1).  There is no reason to think Congress's use of the descriptive term "gender identity disorders" was an accident.  The Third Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-III")—the operative version at the time the ADA was drafted—used the same term.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Third Edition*, at 261 (1980).  The DSM-III defined "gender identity disorders" as one of four groups of "psychosexual disorders."  *Id*.  Under the DSM-III, the "gender identity disorders" subclass of psychosexual disorders was "characterized by the individual's feelings of discomfort and inappropriateness about his or her anatomic sex and by persistent behaviors generally associated with the other sex."  *Id*.  The DSM-III further defined the "essential feature" of the gender identity disorders subclass as "an incongruence between anatomic sex and gender identity."  *Id*.  The descriptive term

used in the DSM-III clearly includes the subsequently refined specific diagnosis of

gender dysphoria.[17]

The DSM-V confirms this:

> *Gender dysphoria* refers to the distress that may accompany the incongruence
> between one's experienced or expressed gender and one's assigned gender.
> Although not all individuals will experience distress as a result of such
> incongruence, many are distressed if the desired physical interventions by
> means of hormones and / or surgery are not available.  The current term is more
> descriptive than the previous DSM-IV term gender identity disorder and focuses
> on dysphoria as the clinical problem, not identity per se.

*Id.* at 451.

Thus, the "more descriptive" gender dysphoria emphasizes the "clinical problem"

rather than on the "identity per se."  But the focus of the new term didn't change—"the

incongruence between one's experienced or expressed gender and one's assigned

gender."  Clearly "gender identity disorders," as used in the ADA, and for that matter in

the DSM-III, includes within its scope the condition the DSM-V calls "gender dysphoria."

Lange argues this conclusion must be avoided because doing so would raise "a

serious doubt of constitutionality" under the Equal Protection Clause.  Doc. 178 at 40

(citing *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403, at *5-7 (D. Mass. June 14,

2018)).  Not true.  Aside from citing some legislative history in a footnote, Lange makes

no real effort to show that the ADA's gender identity disorder exclusion violates the

Equal Protection Clause and thus has not carried her burden necessary for the Court to

make such a finding.  Doc. 178 at 40 n.7; *see Panama City Med. Diagnostic Ltd. v.*

---

[17] The specific term "gender identity disorder" first appeared as an independent condition in the DSM-IV which was not published until 1994, four years after the ADA was enacted.  *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition*, at 532-38 (1994).

*Williams*, 13 F.3d 1541, 1547 (11th Cir. 1994).  Accordingly, Lange's ADA claim only survives if her gender dysphoria is the result of a physical impairment.

### 2. Lange Cannot Establish that her Gender Dysphoria Results from a Physical Impairment

The DSM-V makes clear that gender dysphoria is a mental impairment, which Lange acknowledges.  Doc. 140-1 at 38-39.  But she argues gender dysphoria is also a "physical impairment."  *Id.* at 38.  "Specifically, the condition is the result of an atypical interaction of the endocrine system and the neurological system."  *Id.*  However, the "evidence" offered to support this conclusion is nothing more than an expert's recitation of literature suggesting a *possible* influence of sex hormones on the developing fetal brain as a factor in gender dysphoria.  *See* Doc. 144-1 ¶¶ 18, 19.  The expert's report acknowledges that "the specific mechanisms guiding the biological underpinnings of gender identity are not entirely understood."  *Id.* ¶ 19.  But based on that not entirely understood mechanism(s), the expert's report cites an "evolving consensus that being transgender is not a mental health disorder."  *Id.*  This is not even an *ipse dixit,* it is an evolving possible *ipse dixit.*

Even if the Court were to accept Lange's expert report at face value, there is nothing in that report or anywhere else in the record suggesting *Lange's* gender dysphoria results from a "physical impairment."  *See* Doc. 144-1.  Nor does Lange address the kind of "physical impairments" required by the ADA.[18]

---

[18] At least one commentator has suggested that "physical condition" means just that—a manifest physical condition that causes one's gender identity disorder.  Thus, "the presence of a physical condition related to gender identity disorder, such as having undescended testicles, missing ovaries, hermaphroditic conditions, genetic anomalies, or an androgen receptor disorder" would qualify as a disability under the Act.  Jones, "Section 504 of the Rehabilitation Act of 1973: A Double-Edged Sword for the Protection of Students with Gender Identity Disorder," 25 Wis. J.L. Gender & Soc'y 353 (2010).

In short, Lange has submitted no evidence that her gender dysphoria results from a physical impairment, and her ADA claim fails. Accordingly, the defendants' motions for summary judgment (Docs. 136; 137) as to Lange's ADA claim are **GRANTED**.

## IV. CONCLUSION

Based on the foregoing, Lange's motion for summary judgment (Doc. 140) is **GRANTED in part.** She has established as a matter of law that the Exclusion is facially discriminatory and thus violates Title VII, leaving only the issue of appropriate relief. The defendants' motions for summary judgment (Docs. 136; 137) are **GRANTED** as to Lange's ADA claim because she has not established her gender dysphoria is the result of a physical impairment. Lange's equal protection claim will proceed to trial because there are numerous disputes of fact as to whether the Exclusion was adopted and maintained with a discriminatory intent. Thus, the parties' cross motions for summary judgment on that claim (Docs. 136; 137; 140) are **DENIED**.[19]

**SO ORDERED**, this 2nd day of June, 2022.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[19] Because this Order moots some, if not all, of the defendants' *Daubert* motions, those motions (Docs. 129; 130; 132; 133; 142) are **DENIED without prejudice**. The parties shall confer regarding what issues remain.